Tony West
Assistant Attorney General
Dennis K. Burke
United States Attorney
Arthur R. Goldberg
Assistant Director, Federal Programs Branch
Varu Chilakamarri (NY Bar #4324299)
Joshua Wilkenfeld (NY Bar #4440681)
U.S. Department of Justice, Civil Division
20 Massachusetts Avenue, N.W.
Washington, DC 20530
Tel. (202) 616-8489/Fax (202) 616-8470
varudhini.chilakamarri@usdoj.gov
*Attorneys for the United States*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| The United States of America, | No. _____ |
| Plaintiff, | |
| v. | **COMPLAINT** |
| The State of Arizona; and Janice K. Brewer, Governor of the State of Arizona, in her Official Capacity, | |
| Defendants. | |

Plaintiff, the United States of America, by its undersigned attorneys, brings this civil action for declaratory and injunctive relief, and alleges as follows:

**INTRODUCTION**

1. In this action, the United States seeks to declare invalid and preliminarily and permanently enjoin the enforcement of S.B. 1070, as amended and enacted by the State of Arizona, because S.B. 1070 is preempted by federal law and therefore violates the Supremacy Clause of the United States Constitution.

2. In our constitutional system, the federal government has preeminent authority to regulate immigration matters. This authority derives from the United States Constitution and numerous acts of Congress. The nation's immigration laws reflect a careful and considered

balance of national law enforcement, foreign relations, and humanitarian interests. Congress has assigned to the United States Department of Homeland Security, Department of Justice, and Department of State, along with other federal agencies, the task of enforcing and administering these immigration-related laws. In administering these laws, the federal agencies balance the complex – and often competing – objectives that animate federal immigration law and policy. Although states may exercise their police power in a manner that has an incidental or indirect effect on aliens, a state may *not* establish its own immigration policy or enforce state laws in a manner that interferes with the federal immigration laws. The Constitution and the federal immigration laws do not permit the development of a patchwork of state and local immigration policies throughout the country.

3. Despite the preeminent federal authority and responsibility over immigration, the State of Arizona recently enacted S.B. 1070, a sweeping set of provisions that are designed to "work together to discourage and deter the unlawful entry and presence of aliens" by making "attrition through enforcement the public policy of all state and local government agencies in Arizona." *See* S.B. 1070 (as amended by H.B. 2162). S.B. 1070's provisions, working in concert and separately, seek to deter and punish unlawful entry and presence by requiring, whenever practicable, the determination of immigration status during any lawful stop by the police where there is "reasonable suspicion" that an individual is unlawfully present, and by establishing new state criminal sanctions against unlawfully present aliens. The mandate to enforce S.B. 1070 to the fullest extent possible is reinforced by a provision allowing for any legal resident of Arizona to collect money damages by showing that "any official or agency . . . [has] adopt[ed] or implement[ed] a policy" that "limits or restricts the enforcement of federal immigration laws . . . to less than the full extent permitted by federal law."

4. S.B. 1070 pursues only one goal – "attrition" – and ignores the many other objectives that Congress has established for the federal immigration system. And even in pursuing attrition, S.B. 1070 disrupts federal enforcement priorities and resources that focus on aliens who pose a threat to national security or public safety. If allowed to go into effect,

S.B. 1070's mandatory enforcement scheme will conflict with and undermine the federal government's careful balance of immigration enforcement priorities and objectives. For example, it will impose significant and counterproductive burdens on the federal agencies charged with enforcing the national immigration scheme, diverting resources and attention from the dangerous aliens who the federal government targets as its top enforcement priority. It will cause the detention and harassment of authorized visitors, immigrants, and citizens who do not have or carry identification documents specified by the statute, or who otherwise will be swept into the ambit of S.B. 1070's "attrition through enforcement" approach. It will conflict with longstanding federal law governing the registration, smuggling, and employment of aliens. It will altogether ignore humanitarian concerns, such as the protections available under federal law for an alien who has a well-founded fear of persecution or who has been the victim of a natural disaster. And it will interfere with vital foreign policy and national security interests by disrupting the United States' relationship with Mexico and other countries.

5. The United States understands the State of Arizona's legitimate concerns about illegal immigration, and has undertaken significant efforts to secure our nation's borders. The federal government, moreover, welcomes cooperative efforts by states and localities to aid in the enforcement of the nation's immigration laws. But the United States Constitution forbids Arizona from supplanting the federal government's immigration regime with its own state-specific immigration policy – a policy that, in purpose and effect, interferes with the numerous interests the federal government must balance when enforcing and administering the immigration laws and disrupts the balance actually established by the federal government. Accordingly, S.B. 1070 is invalid under the Supremacy Clause of the United States Constitution and must be struck down.

## JURISDICTION AND VENUE

6. This action arises under the Constitution of the United States, Article VI, Clause 2 and Article I, Section 8, and the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101, *et seq.* This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331

1   and 1345, and the United States seeks remedies under 28 U.S.C. §§ 1651, 2201, and 2202.

2       7.  Venue lies in the District of Arizona pursuant to 28 U.S.C. § 1391(b).  Defendants

3   are the Governor of Arizona, who resides in Arizona, and the State of Arizona.  A substantial

4   part of the events or omissions giving rise to this claim occurred in Arizona.

5                                          **PARTIES**

6       8.  The United States of America is the plaintiff in this action, suing on its own behalf,

7   as well as on behalf of the United States Department of Homeland Security ("DHS"), the

8   Department of Justice ("DOJ"), and the Department of State.

9       9.  DHS is an executive department of the United States.  *See* Homeland Security Act,

10  Pub. L. No. 107-296, 116 Stat. 2135 (2002).  DHS is responsible for the administration and

11  enforcement of laws relating to immigration, as well as the investigation of immigration

12  crimes and protection of the United States border against the illegal entry of aliens.  *See* 8

13  U.S.C. § 1103.  DHS is also responsible for providing citizenship and immigration services

14  through U.S. Citizenship and Immigration Services.

15      10.  DOJ is an executive department of the United States.  *See* Act to Establish the

16  Department of Justice, ch. 150, 16 Stat. 162 (1870).  The Attorney General, as the head of

17  DOJ, shares certain immigration-related responsibilities with the Secretary of Homeland

18  Security, and he may, among his various immigration functions, order aliens removed from

19  the United States and order the cancellation of removal.  *See, e.g.*, 8 U.S.C. §§ 1103, 1158,

20  1182, 1227, 1229a, 1229b.

21      11.  The Department of State is an executive department of the United States.  *See*

22  State Department Basic Authorities Act of 1956, Pub. L. No. 84-885, as amended; 22 U.S.C.

23  § 2651 *et seq*.  The Department of State is partially responsible for administering aspects of

24  the federal immigration laws, including but not limited to the administration of visas.

25      12.  Defendant, the State of Arizona, is a state of the United States that entered the

26  Union as the 48th State in 1912.

27      13.  Defendant, Janice K. Brewer, is the Governor of Arizona, and is being sued in her

28  official capacity.

## STATEMENT OF THE CLAIM

### Federal Authority and Law Governing Immigration and Status of Aliens

14.  The Supremacy Clause of the Constitution mandates that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const., art. VI, cl. 2.

15.  The Constitution affords the federal government the power to "establish an uniform Rule of Naturalization," U.S. Const., art. I § 8, cl. 4, and to "regulate Commerce with foreign Nations," U.S. Const., art. I § 8, cl. 3.  Further, the federal government has broad authority to establish the terms and conditions for entry and continued presence in the United States, and to regulate the status of aliens within the boundaries of the United States.

16.  The Constitution affords the President of the United States the authority to "take Care that the Laws be faithfully executed."  U.S. Const., art. II § 3.  Further, the President has broad authority over foreign affairs.  Immigration law, policy, and enforcement priorities are affected by and have impacts on U.S. foreign policy, and are themselves the subject of diplomatic arrangements.

17.  Congress has exercised its authority to make laws governing immigration and the status of aliens within the United States by enacting the various provisions of the INA and other laws regulating immigration.  Through the INA, Congress set forth the framework by which the federal government determines which aliens may be eligible to enter and reside in the United States, which aliens may be removed from the United States, the consequences for unlawful presence, the penalties on persons who violate the procedures established for entry, conditions of residence, and employment of aliens, as well as the process by which certain aliens may ultimately become naturalized citizens of the United States.  *See* 8 U.S.C. § 1101, *et seq.*  The INA also vests the executive branch with considerable discretion in enforcing the provisions of the federal immigration laws, generally allowing federal agencies to ultimately decide whether particular immigration remedies are appropriate in individual

cases.

18.  In exercising its significant enforcement discretion, the federal government prioritizes for arrest, detention, prosecution, and removal those aliens who pose a danger to national security or a risk to public safety.  Consistent with these enforcement priorities, the federal government principally targets aliens engaged in or suspected of terrorism or espionage; aliens convicted of crimes, with a particular emphasis on violent criminals, felons, and repeat offenders; certain gang members; aliens subject to outstanding criminal warrants; and fugitive aliens, especially those with criminal records.

19.  In crafting federal immigration law and policy, Congress has necessarily taken into account multiple and often competing national interests.  Assuring effective enforcement of the provisions against illegal migration and unlawful presence is a highly important interest, but it is not the singular goal of the federal immigration laws.  The laws also take into account other uniquely national interests, including facilitating trade and commerce; welcoming those foreign nationals who visit or immigrate lawfully and ensuring their fair and equitable treatment wherever they may reside; responding to humanitarian concerns at the global and individual levels; and otherwise ensuring that the treatment of aliens present in our nation does not harm our foreign relations with the countries from which they come or jeopardize the treatment of U.S. citizens abroad.  Because immigration control and management is "a field where flexibility and the adaptation of the congressional policy to infinitely variable conditions constitute the essence of the program," *U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950) (internal citations omitted), Congress vested substantial discretion in the President and the administering federal agencies to adjust the balance of these multiple interests as appropriate – both globally and in individual cases.

20.  Congress has tasked DHS and DOJ with overseeing significant portions of the United States' immigration interests, and has provided each with specific powers to promote the various goals of the federal immigration scheme and to enforce the federal immigration authority under the INA.  *See* 8 U.S.C. § 1103.  The Department of State is also empowered

by the INA to administer aspects of the federal immigration laws, including visa programs. *See, e.g.*, 8 U.S.C. § 1104. DHS may generally order an alien immediately removed where the alien either fails to present the appropriate documentation or commits fraud at the time of the alien's inspection. DHS may also place an alien into removal proceedings, and may ultimately remove an alien who entered the United States unlawfully or violated the conditions of his admission. *See* 8 U.S.C. §§ 1182, 1225, 1227, 1228(b), 1229, 1229a, 1231. DOJ may order an alien removed for many reasons, including if the alien has stayed in the United States longer than permitted or has engaged in certain unlawful conduct. *See* 8 U.S.C. §§ 1227, 1229a. In addition to removal, the statute authorizes DHS and DOJ to employ civil and criminal sanctions against an alien for immigration violations, such as unlawful entry, failing to appropriately register with the federal government, and document fraud. *See, e.g.,* 8 U.S.C. §§ 1325, 1306, 1324c. However, in the exercise of discretion, the administering agencies may decide not to apply a specific sanction and may, among other steps, permit the alien to depart the country voluntarily at his or her own expense and may even decide not to pursue removal of the alien if deferred federal enforcement will help pursue some other goal of the immigration system. *See* 8 U.S.C. § 1229c.

21. Under federal law, both DHS and DOJ may, for humanitarian or other reasons, decline to exercise certain immigration sanctions or grant an otherwise unlawfully present or removable alien an immigration benefit – and potentially adjust that alien's immigration status – if the alien meets certain conditions. *See, e.g.*, 8 U.S.C. § 1158 (providing asylum eligibility for aliens who have a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion, if removed); 8 U.S.C. § 1254a (providing temporary protected status for otherwise eligible nationals of a foreign state that the Secretary of Homeland Security has specially designated as undergoing ongoing armed conflict, a natural disaster, or another extraordinary circumstance); 8 U.S.C. § 1227(a)(1)(E)(iii) (providing discretion to waive ground of deportability "for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest" for aliens who

are otherwise deportable for encouraging unlawful entry of an immediate family member); 8 U.S.C. § 1229b (granting the Attorney General discretion to cancel removal for certain aliens). DHS also has the authority to permit aliens, including those who would be inadmissible, to temporarily enter the United States for "urgent humanitarian reasons" or "significant public benefit." 8 U.S.C. § 1182(d)(5). DHS may also refrain from enforcement actions, in appropriate circumstances, against persons unlawfully present in the United States. *See* 8 C.F.R. § 274a.12(c)(14) (discussing deferred action).

22. In light of these statutory provisions, DHS and DOJ exercise discretion with respect to, among other things, whether to allow an unlawfully present alien to voluntarily depart, whether to place an alien into removal proceedings, whether to exact criminal sanctions on an alien who has committed an immigration violation, whether to allow an unlawfully present alien to remain in the country without physical detention, and whether to grant an alien humanitarian or some other form of relief. Decisions to forego removal or criminal penalties result not only from resource constraints, but also from affirmative policy considerations – including humanitarian and foreign policy interests – established by Congress and balanced by the executive branch.

23. Congress, which holds exclusive authority for establishing alien status categories and setting the conditions of aliens' entry and continued presence, has affirmatively decided that unlawful presence – standing alone – should not subject an alien to criminal penalties and incarceration although unlawful presence may subject the alien to the civil remedy of removal. *See* 8 U.S.C. §§ 1182(a)(6)(A)(i), 1227(a)(1)(B)&(C). However, unlawful presence becomes an element of a criminal offense when an alien is found in the United States after having been previously removed or after voluntarily departing from the United States while a removal order was pending. *See* 8 U.S.C. § 1326. Further, unlawful entry into the United States is a criminal offense, *see* 8 U.S.C. § 1325. Congress specifically authorized federal immigration officers to patrol the United States border, as well as search vehicles and lands near the border, to prevent aliens from unlawfully entering the United

States, and it empowered these officers to arrest an alien who is seen attempting unlawful entry at the border or who the officer has reason to believe has unlawfully entered the county and is likely to escape before a warrant can be obtained. *See* 8 U.S.C. § 1357.

24.    Congress has created a comprehensive alien registration system for monitoring the entry and movement of aliens within the United States. *See* 8 U.S.C. §§ 1201, 1301-1306; *see also* 8 C.F.R. Part 264 (regulations regarding "Registration and Fingerprinting of Aliens in the United States"). Under this federal alien registration system, aliens seeking to enter the United States, either permanently or temporarily (other than diplomatic and official visitors), must be registered by the Department of State at the time of visa application. *See* 8 U.S.C. §§ 1201(b), 1301, 1302. Any alien who is 14 or over, who has not otherwise been registered and fingerprinted under the INA, and who remains in the United States for 30 days or longer, must apply to be registered and fingerprinted by DHS. *See* 8 U.S.C. § 1302(a). The INA provides that any alien who is required to apply for registration and willfully fails to do so may be fined and imprisoned not more than six months. *See* 8 U.S.C. § 1306(a); 18 U.S.C. § 3571. Aliens are required to report their change of address to DHS within ten days of such change. *See* 8 U.S.C. § 1305.

25.    As part of this federal alien registration system, Congress further specified the content of the registration forms, *see* 8 U.S.C. § 1303, what special circumstances may require deviation, *id.*, and the confidential nature of registration information, *see* 8 U.S.C. § 1304. Aliens who are 18 years and older are required to carry in their possession their certificate of alien registration or alien registration receipt card. *See* 8 U.S.C. § 1304(e). The INA provides that any alien who fails to comply with this requirement may be fined and imprisoned not more than 30 days. *See id.*; 18 U.S.C. § 3571.

26.    However, there are several circumstances in which an alien would not be provided with evidence of registration notwithstanding the federal government's knowledge of the alien's presence. Federal law provides a variety of humanitarian options for aliens – including unlawfully present aliens – who have been victimized or fear persecution or

9

violence, including but not limited to asylum, special visas for victims of trafficking, and special visas for victims of violent crime. In order to qualify for such programs an alien needs to apply and satisfy the criteria that the program at issue requires. During the pendency of the application process, an alien may not have evidence of registration even though the federal government is aware of the alien's presence, has decided against removing the alien, and certainly has no interest in prosecuting the alien for a crime. These humanitarian programs demonstrate that one aspect of federal immigration policy is to assist and welcome such victims in the United States, notwithstanding possible temporary unlawful presence. It would therefore violate federal policy to prosecute or detain these types of aliens on the basis of their immigration status – which is often known to the federal government and, for affirmative policy reasons, not used as the basis for a removal proceeding or criminal prosecution.

27. Congress has further exercised its authority over the entry and movement of aliens by criminalizing the smuggling of unlawful aliens into the country, as well as the facilitation of unlawful immigration within the nation's borders. *See* 8 U.S.C. § 1324. Specifically, federal law prohibits the knowing attempt to bring an alien into the United States "at a place other than a designated port of entry or place other than as designated by the [Secretary of Homeland Security]," 8 U.S.C. § 1324(a)(1)(A)(i), and imposes criminal penalties on a person who, "knowing or in reckless disregard" of the fact that an alien has unlawfully entered or remained in the United States, attempts to "transport or move" the alien within the United States "in furtherance of such violation of law." 8 U.S.C. § 1324(a)(1)(A)(ii). These criminal sanctions are directed at the smuggler and are not meant to serve as a criminal sanction for the unlawfully present alien or for incidental transportation. Congress chose not to penalize an unlawfully present alien's mere movement within the country or across state lines unless other factors are present, nor do the federal immigration laws penalize the provision of transportation services in such situations.

28. Federal law also imposes criminal penalties on a person who, "conceals, harbors, or shields from detection," an alien in "knowing or in reckless disregard" of the fact that the alien has unlawfully entered or remained in the United States. 8 U.S.C. § 1324(a)(1)(A)(iii). Similarly, it is unlawful to "encourage[] or induce[] an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that" such entry or residence will be in violation of the law. 8 U.S.C. § 1324(a)(1)(A)(iv). Federal law does not, as a general matter, restrict the movement of aliens – whether lawfully or unlawfully present – between different states. Federal law additionally exempts from certain of these prohibitions religious organizations which "encourage, invite, call, allow, or enable" an alien to volunteer as a minister or missionary, and which provide the alien with basic living expenses. 8 U.S.C. § 1324(a)(1)(C).

29. Congress has further exercised its authority over immigration and the status of aliens by prohibiting the hiring of aliens not authorized to work in the United States. 8 U.S.C. § 1324a(a)(1). Specifically, federal law makes it unlawful "to hire, or to recruit or refer for a fee" an alien, knowing that the alien is not authorized to work in the United States. *Id.* Federal law also makes it "unlawful for a person or other entity, after hiring an alien for employment," to "continue to employ the alien in the United States knowing the alien is (or has become) an unauthorized alien with respect to such employment." 8 U.S.C. § 1324a(a)(2). In addition, Congress established civil penalties for immigration-related document fraud, such as the presentation of fraudulent documents to demonstrate work eligibility. 8 U.S.C. § 1324c. In enacting penalties on employers of unlawful aliens, as well as on unlawful aliens who engage in document fraud, Congress chose not to impose criminal penalties on aliens for solely seeking or obtaining employment in the United States without authorization and in fact decided that criminal sanctions for seeking or obtaining employment would run counter to the purposes of the immigration system. Although unlawfully present aliens may be subject to removal, no criminal penalty attaches simply because an alien has solicited or performed work without proper authorization.

30.   DHS is primarily charged with administering and enforcing the INA and other laws relating to immigration, which it accomplishes mainly through its components, U.S. Immigration and Customs Enforcement ("ICE"), U.S. Customs and Border Protection ("CBP"), and U.S. Citizenship and Immigration Services ("USCIS").  *See* 8 U.S.C. § 1103. DHS also receives state and local cooperation in its enforcement efforts.  *See* 8 U.S.C. § 1357(g).  In addition, Congress prescribed by statute a number of ways in which states may assist the federal government in its enforcement of the immigration laws.  *See, e.g.*, 8 U.S.C. § 1103(a)(10) (authorizing DHS to empower state or local law enforcement with immigration enforcement authority when an "actual or imminent mass influx of aliens . . . presents urgent circumstances requiring an immediate Federal response"); 8 U.S.C. § 1357(g)(1)–(9) (authorizing DHS to enter into agreements to provide appropriately trained and supervised state and local officers with the authority to perform functions related to the investigation, apprehension, and detention of aliens); 8 U.S.C. § 1373(a)-(b) (preempting state and local laws that prohibit information-sharing between local law enforcement and federal immigration authorities and proscribing such a prohibition); 8 U.S.C. § 1252c (authorizing state and local law enforcement to arrest aliens who are unlawfully present in the United States and were previously removed after being convicted of a felony in the United States).

31.   Through a variety of programs, DHS works cooperatively with states and localities to accomplish its mission to enforce the federal immigration laws.  Among these efforts is the Law Enforcement Agency Response program ("LEAR"), an Arizona-specific program that is operational 24 hours a day, 7 days a week, for responding to calls from state and local law enforcement officers seeking assistance from ICE regarding suspected unlawfully present aliens.  ICE also administers the Law Enforcement Support Center ("LESC"), also operational 24 hours a day, 7 days a week, which serves as a national enforcement operations center and – among other responsibilities – promptly provides immigration status and identity information to local, state, and federal law enforcement agencies regarding aliens suspected of, arrested for, or convicted of criminal activity.

Further, ICE and CBP officers respond to requests from state and local law enforcement officers on a variety of immigration matters, including assisting with translation, determining alienage, and evaluating immigration documentation.

32.  But the opportunity that federal law provides for participation by state and local officials does not mean that states can enact their own immigration policies to rival the national immigration policy; the formulation of immigration policy and balancing of immigration enforcement priorities is a matter reserved for the federal government.   Such regulations do not fall within the state's traditional police powers and remain the exclusive province of the federal government.

## Arizona's S.B. 1070

33.  On April 23, 2010, Governor Brewer signed into law S.B. 1070, which contains several provisions designed to "work together to discourage and deter the unlawful entry and presence of aliens" in Arizona by making "attrition through enforcement the public policy of all state and local government agencies in Arizona."  S.B. 1070 includes a provision that requires, in the context of a lawful stop, detention, or arrest, the verification of an individual's immigration status when practicable where there is "reasonable suspicion" that the individual is unlawfully present in the United States (Section 2).  This mandatory provision is reinforced through the creation of a private right of action, which allows any legal resident of Arizona to collect money damages if he can show that "any official or agency . . . [has] adopt[ed] or implent[ed] a policy" that "limits or restricts the enforcement of federal immigration laws . . . to less than the full extent permitted by federal law" (Section 2).  S.B. 1070 also creates or amends several state law criminal provisions, which impose criminal penalties for an alien's failure to federally register or carry his federal registration documents (Section 3), for the so-called smuggling, transporting, or harboring of an unlawfully present alien (Sections 4 and 5), for encouraging an unlawfully present alien to move to Arizona (Section 5), and for an unauthorized alien's attempt to seek work (Section 5). Further, S.B. 1070 provides law enforcement officers with authority to make warrantless

arrests of any person whom they have probable cause to believe has committed a public offense that would make the person "removable," regardless of where the offense was committed (Section 6).

34. On the same day that she signed S.B. 1070 into law, Governor Brewer issued an executive order requiring law enforcement training to "provide clear guidance to law enforcement officials regarding what constitutes reasonable suspicion," and to "make clear that an individual's race, color or national origin alone cannot be grounds for reasonable suspicion to believe any law has been violated." Arizona State Executive Order 2010-09 (Apr. 23, 2010).

35. One week after S.B. 1070 was signed into law, the Arizona Legislature passed, and Governor Brewer signed, H.B. 2162, which amended S.B. 1070.  H.B. 2162 made modifications to S.B. 1070 for the purpose of responding to those who "expressed fears that the original law would somehow allow or lead to racial profiling."  Statement by Governor Jan Brewer (Apr. 30, 2010), *available at* http://azgovernor.gov/dms/upload/PR_043010_StatementGovBrewer.pdf.

36. S.B. 1070 (as amended) attempts to second guess federal policies and re-order federal priorities in the area of immigration enforcement and to directly regulate immigration and the conditions of an alien's entry and presence in the United States despite the fact that those subjects are federal domains and do not involve any legitimate state interest.  Arizona's adoption of a maximal "attrition through enforcement" policy disrupts the national enforcement regime set forth in the INA and reflected in federal immigration enforcement policy and practice, including the federal government's prioritization of enforcement against dangerous aliens. S.B. 1070 also interferes with U.S. foreign affairs priorities and rejects any concern for humanitarian interests or broader security objectives, and will thus harm a range of U.S. interests.  Thus, because S.B. 1070 attempts to set state-specific immigration policy, it legislates in an area constitutionally reserved to the federal government, conflicts with the federal immigration laws and federal immigration policy, conflicts with foreign policy, and

impedes the accomplishment and execution of the full purposes and objectives of Congress, and is therefore preempted.

37.  S.B. 1070 implements Arizona's stated immigration policy through a novel and comprehensive immigration regime that, among other things, creates a series of state immigration crimes (Sections 3-5) relating to the presence, employment, and transportation of aliens, expands the opportunities for Arizona police to push aliens toward incarceration for those crimes by enforcing a mandatory immigration status verification system (Section 2), and allows for arrests based on crimes with no nexus to Arizona (Section 6).  By pursuing attrition and ignoring every other objective embodied in the federal immigration system (including the federal government's prioritization of the removal of dangerous aliens), S.B. 1070 conflicts with and otherwise stands as an obstacle to Congress's demand that federal immigration policy accommodate the competing interests of immigration control, national security and public safety, humanitarian concerns, and foreign relations – a balance implemented through the policies of the President and various executive officers with the discretion to enforce the federal immigration laws.  *See* 8 U.S.C. § 1101, *et seq.* Enforcement of S.B. 1070 would also effectively create state crimes and sanctions for unlawful presence despite Congress's considered judgment to not criminalize such status. S.B. 1070 would thus interfere with federal policy and prerogatives in the enforcement of the U.S. immigration laws.

38.  Because S.B. 1070, in both its singularly stated purpose and necessary operation, conflicts with the federal government's balance of competing objectives in the enforcement of the federal immigration laws, its passage already has had foreign policy implications for U.S. diplomatic relations with other countries, including Mexico and many others.  S.B. 1070 has also had foreign policy implications concerning specific national interests regarding national security, drug enforcement, tourism, trade, and a variety of other issues.  *See, e.g.*,Travel Alert, Secretaría de Relaciones Exteriores, Mexico, Apr. 27, 2010, *available at* http://www.sre.gob.mx/csocial/contenido/comunicados/2010/abr//cp_121eng.html; Mexican

1   President Calderon's Address to Joint Meeting of Congress, May 20, 2010, *available at*

2   http://www.c-spanvideo.org/program/293616-2.  S.B. 1070 has subjected the United States

3   to direct criticism by other countries and international organizations and has resulted in a

4   breakdown in certain planned bilateral and multilateral arrangements on issues such as border

5   security and disaster management.  S.B. 1070 has in these ways undermined several aspects

6   of U.S. foreign policy related to immigration issues and other national concerns that are

7   unrelated to immigration.

8       39.  Numerous other states are contemplating passing legislation similar to S.B. 1070.

9   The development of various conflicting state immigration enforcement policies would result

10  in further and significant damage to (1) U.S. foreign relations, (2) the United States' ability

11  to fairly and consistently enforce the federal immigration laws and provide immigration-

12  related humanitarian relief, and (3) the United States' ability to exercise the discretion vested

13  in the executive branch under the INA, and would result in the non-uniform treatment of

14  aliens across the United States.

15                          ***Section 2 of S.B. 1070***

16
17      40.  Section 2 of S.B. 1070 (adding Ariz. Rev. Stat. 11-1051) mandates that for any

18  lawful "stop, detention or arrest made by a law enforcement official" (or agency) in the

19  enforcement of any state or local law, including civil ordinances, where reasonable suspicion

20  exists that an individual is an alien and is "unlawfully present" in the United States, the

21  officer must make a reasonable attempt to determine the individual's immigration status

22  when practicable, and to verify it with the federal government pursuant to 8 U.S.C. § 1373(c)

23  or through a federally qualified law enforcement officer.  Section 2 also requires that "[a]ny

24  person who is arrested shall have the person's immigration status determined before the

25  person is released."

26      41.  Section 2 provides that any legal resident of Arizona may bring a civil action in

27  an Arizona court to challenge any official or agency that "adopts or implements a policy that

28  limits or restricts the enforcement of federal immigration laws . . . to less than the full extent

permitted by federal law."  Whereas Arizona police (like federal officers and police in other states) formerly had the discretion to decide whether to verify immigration status during the course of a lawful stop, the combination of the verification requirement and the threat of private lawsuits now removes such discretion and mandates verification.  This provision also mandates the enforcement of the remaining provisions of S.B. 1070.

42.  The mandatory nature of Section 2, in tandem with S.B. 1070's new or amended state immigration crimes, directs officers to seek maximum scrutiny of a person's immigration status, and mandates the imposition of state criminal penalties for what is effectively unlawful presence, even in circumstances where the federal government has decided not to impose such penalties because of federal enforcement priorities or humanitarian, foreign policy, or other federal interests.

43.  In addition, the mandatory nature of this alien inspection scheme will necessarily result in countless inspections and detentions of individuals who are lawfully present in the United States.  Verification is mandated for all cases where an Arizona police officer has a "reasonable suspicion" that a person in a lawful stop is unlawfully present and it is practicable to do so.  But a "reasonable suspicion" is not definitive proof, and will often result in the verification requirement being applied – wholly unnecessarily – to lawfully present aliens and United States citizens.  Further, because the federal authorities may not be able to immediately verify lawful presence – and may rarely have information related to stopped U.S. citizens – Section 2 will result in the prolonged detention of lawfully present aliens and United States citizens.  Section 2 of S.B. 1070 will therefore impose burdens on lawful immigrants and U.S. citizens alike who are stopped, questioned, or detained and cannot readily prove their immigration or citizenship status, including those individuals who may not have an accepted form of identification because, for example, they are legal minors without a driver's license.  Arizona's alien inspection scheme therefore will subject lawful aliens to the "possibility of inquisitorial practices and police surveillance," *Hines v.*

*Davidowitz*, 312 U.S. 52, 74 (1941) – a form of treatment which Congress has plainly guarded against in crafting a balanced, federally-directed immigration enforcement scheme.

44.   Mandatory state alien inspection schemes and attendant federal verification requirements will impermissibly impair and burden the federal resources and activities of DHS.  S.B. 1070's mandate for verification of alien status will necessarily result in a dramatic increase in the number of verification requests being issued to DHS, and will thereby place a tremendous burden on DHS resources, necessitating a reallocation of DHS resources away from its policy priorities.  As such, the federal government will be required to divert resources from its own, carefully considered enforcement priorities – dangerous aliens who pose a threat to national security and public safety – to address the work that Arizona will now create for it.  Such interference with federal priorities, driven by state-imposed burdens on federal resources, constitutes a violation of the Supremacy Clause.

45.   Section 2 conflicts with and otherwise stands as an obstacle to the full purposes and objectives of Congress, and its enforcement would further conflict with the enforcement prerogatives and priorities of the federal government.  Moreover, Section 2 does not promote any legitimate state interest.

### Section 3 of S.B. 1070

46.   Section 3 of S.B. 1070 (adding Ariz. Rev. Stat. 13-1509) makes it a new state criminal offense for an alien in Arizona to violate 8 U.S.C. § 1304(e), which requires every alien to "at all times carry with him and have in his personal possession any certificate of alien registration or alien registration receipt card issued to him," or 8 U.S.C. § 1306(a), which penalizes the willful failure to apply for registration when required.  Section 3 of S.B. 1070 provides a state penalty of up to $100 and up to twenty days imprisonment for a first offense and thirty days imprisonment for any subsequent violation.

47.   Section 3 of S.B. 1070 is preempted by the comprehensive federal alien registration scheme – including 8 U.S.C. §§ 1201, 1301-1306, and 8 C.F.R. Part 264 – which provides a "standard for alien registration in a single integrated and all-embracing system."

*Hines*, 312 U.S. at 73.  Section 3 of S.B. 1070 conflicts with and otherwise stands as an obstacle to the full purposes and objectives of Congress in creating a uniform and singular federal alien registration scheme.

48.  Section 3 – the enforcement of which S.B. 1070 effectively mandates through operation of Section 2's alien inspection and verification regime – demands the arrest and prosecution of all aliens who do not have certain enumerated registration documents.  But several classes of aliens who are eligible for humanitarian relief are simply not provided with registration documents while their status is being adjudicated by the federal government, notwithstanding the federal government's knowledge that these aliens are present in the United States.  S.B. 1070 thus seeks to criminalize aliens whose presence is known and accepted by the federal government (at least during the pendency of their status review) and thereby conflicts with and otherwise stands as an obstacle to the full purposes and objectives of Congress in providing certain forms of humanitarian relief.

49.  Additionally, Section 3 of S.B. 1070 is a key part of Arizona's new immigration policy as it is tantamount to a regulation of immigration, in that it seeks to control the conditions of an alien's entry and presence in the United States without serving any traditional state police interest.  Accordingly, Section 3 of S.B. 1070 is preempted by the federal government's recognized exclusive authority over the regulation of immigration.

### Section 4 of S.B. 1070/Ariz. Rev. Stat. 13-2319

50.  Section 4 of S.B. 1070 amended Ariz. Rev. Stat. 13-2319 (collectively, "Arizona's alien smuggling prohibition").  Arizona's alien smuggling prohibition makes it a felony for "a person to intentionally engage in the smuggling of human beings for profit or commercial purpose." Ariz. Rev. Stat. 13-2319. The statute defines "smuggling of human beings" as the "transportation, procurement of transportation or use of property . . . by a person or an entity that knows or has reason to know that the person or persons transported . . . are not United States citizens, permanent resident aliens or persons otherwise lawfully

in this state or have attempted to enter, entered or remained in the United States in violation of law." *Id.* § 13-2319(E).

51.  Arizona's alien smuggling prohibition is preempted by federal law, including 8 U.S.C. § 1324.  There are several key differences between the federal and Arizona alien smuggling provisions that demonstrate that Arizona's alien smuggling prohibition actually regulates conditions of unlawful presence and not smuggling at all.  First, Arizona's alien smuggling law, unlike the federal criminal provisions, is not limited to transportation that is provided "in furtherance" of unlawful immigration, but instead prohibits the knowing provision of any commercial transportation services to an alien unlawfully present in the United States.  Ariz. Rev. Stat. 13-2319(A).  Second, unlike federal law, Arizona's alien smuggling law not only criminalizes the conduct of the transportation provider but has been used, in conjunction with Arizona's conspiracy statute, to prosecute the unlawfully present alien.  Third, Arizona's smuggling provision is not targeted at smuggling across the United States' international borders.  As a result of these differences, taken both separately and in tandem, Arizona's smuggling prohibition regulates the conditions of an alien's entry and continued presence in the United States, by essentially banning an unlawfully present alien from using commercial transportation.  Although a state is free, in certain instances, to regulate conduct that is not regulated by the federal government, the differences between Section 4 and federal anti-smuggling law convert Arizona's alien smuggling prohibitions into a preempted regulation of immigration.  Additionally, Arizona's smuggling prohibition will result in special, impermissible burdens for lawfully present aliens, who will predictably be impeded from using commercial transportation services due to the strictures of Section 4.  Arizona's smuggling prohibition thus conflicts with and otherwise stands as an obstacle to the full purposes and objectives of Congress in creating a comprehensive system of penalties for aliens who are unlawfully present in the United States.

### *Section 5 of S.B. 1070*

52.  Section 5 of S.B. 1070 adds two new provisions to Arizona's revised code:

Ariz. Rev. Stat. 13-2928 and Ariz. Rev. Stat. 13-2929.

53.   Ariz. Rev. Stat. 13-2928 makes it a new state crime for any person who is "unauthorized" and "unlawfully present" in the United States to solicit, apply for, or perform work.  S.B. 1070, Section 5(C)-(E).

54.   Arizona's new prohibition on unauthorized aliens seeking or performing work is preempted by the comprehensive federal scheme of sanctions related to the employment of unauthorized aliens – including 8 U.S.C. §§ 1324a–1324c.  The text, structure, history, and purpose of this scheme reflect an affirmative decision by Congress to regulate the employment of unlawful aliens by imposing sanctions on the employer without imposing sanctions on the unlawful alien employee.  Arizona's criminal sanction on unauthorized aliens stands as an obstacle to the full purposes and objectives of Congress's considered approach to regulating employment practices concerning unauthorized aliens, and it conflicts with Congress's decision not to criminalize such conduct for humanitarian and other reasons. Enforcement of this new state crime additionally interferes with the comprehensive system of civil consequences for aliens unlawfully present in the United States by attaching criminal sanctions on the conditions of unlawful presence, despite an affirmative choice by Congress not to criminalize unlawful presence.

55.   Ariz. Rev. Stat. 13-2929 makes it a new state crime for a person committing any criminal offense to (1) "transport . . . an alien . . . , in furtherance of the illegal presence of the alien in the United States, . . . if the person knows or recklessly disregards" that the alien is here illegally; (2) "conceal, harbor or shield . . . an alien from detection . . . if the person knows or recklessly disregards the fact that the alien" is unlawfully present; or (3) "encourage or induce an alien to come to or reside in this state if the person knows or recklessly disregards the fact that such . . . entering or residing in this state is or will be in violation of law."  This provision exempts child protective service workers, first responders, and emergency medical technicians.  S.B. 1070 § 5.  This provision contains no further exceptions, including for organizations exempted by federal law from criminal liability, such

as religious organizations which "encourage, invite, call, allow, or enable" an alien to volunteer as a minister or missionary.  *See* 8 U.S.C. § 1324(a)(C).

56.  Arizona's new state law prohibition of certain transporting, concealing, and encouraging of unlawfully present aliens is preempted by federal law, including 8 U.S.C. § 1324(a)(1)(C).  This new provision is an attempt to regulate unlawful entry into the United States (through the Arizona border).  The regulation of unlawful entry is an area from which states are definitively barred by the U.S. Constitution.  Additionally, because the purpose of this law is to deter and prevent the movement of certain aliens into Arizona, the law restricts interstate commerce.  Enforcement and operation of this state law provision would therefore conflict and interfere with the federal government's management of interstate commerce, and would thereby violate Article I, Section 8 of the United States Constitution.

### Section 6 of S.B. 1070

57.  Section 6 of S.B. 1070 amends a preexisting Arizona criminal statute (Ariz. Rev. Stat. 13-3883) governing the circumstances under which law enforcement officers can make a warrantless arrest.  Section 6 allows the arrest of anyone whom the officer has probable cause to believe "has committed any public offense that makes the person removable from the United States," and does not require coordination with DHS to confirm removability.  The warrantless arrest authority provided by Section 6 applies to persons who have committed an offense in another state when an Arizona law enforcement official believes that offense makes the person removable.  *See* Ariz. Rev. Stat. 13-3883.

58.  Arizona law previously allowed for the warrantless arrest of anyone who was suspected of having committed a misdemeanor or felony in Arizona.  Although Section 6 authorizes warrantless arrests based on crimes committed out of state, it does so only if the officer believes the crime makes the individual removable.  Thus, Section 6 is not intended to serve any new law enforcement interest.  Rather, the purpose of Section 6, especially when read in light of S.B. 1070's overall purpose, is plain:  Section 6 provides additional means to arrest aliens in the state on the basis of immigration status.

59.  Section 6 makes no exception for aliens whose removability has already been resolved by federal authorities, despite the fact that only the federal government can actually issue removal decisions.  Section 6 will therefore necessarily result in the arrest of aliens based on out-of-state crimes, even if the criminal and immigration consequences of the out-of-state crime have already been definitively resolved.  For that reason, as with Section 2, Section 6 of S.B. 1070 interferes with the federal government's enforcement prerogatives and will necessarily impose burdens on lawful aliens in a manner that conflicts with the purposes and practices of the federal immigration laws.  Additionally, Section 6 will result in the arrest of aliens whose out-of-state crimes would not give rise to removal proceedings at all.

60.  By reason of the foregoing, defendants' actions have caused and will continue to cause substantial and irreparable harm to the United States for which plaintiff has no adequate remedy except by this action.

## FIRST CAUSE OF ACTION – VIOLATION OF THE SUPREMACY CLAUSE

61.  Plaintiff incorporates paragraphs 1 through 60 of the Complaint as if fully stated herein.

62.  Sections 1-6 of S.B. 1070, taken in whole and in part, represent an impermissible effort by Arizona to establish its own immigration policy and to directly regulate the immigration status of aliens.  In particular, Sections 1-6 conflict with federal law and foreign policy, disregard federal policies, interfere with federal enforcement priorities in areas committed to the discretion of plaintiff United States, and otherwise impede the accomplishment and execution of the full purposes and objectives of federal law and foreign policy.

63.  Sections 1-6 of S.B. 1070 violate the Supremacy Clause, and are invalid.

## SECOND CAUSE OF ACTION – PREEMPTION UNDER FEDERAL LAW

64.  Plaintiff incorporates paragraphs 1 through 63 of the Complaint as if fully stated herein.

23

65.  Sections 1-6 of S.B. 1070 are preempted by federal law, including 8 U.S.C. § 1101, *et seq.*, and by U.S. foreign policy.

### THIRD CAUSE OF ACTION – VIOLATION OF THE COMMERCE CLAUSE

66.  Plaintiff incorporates paragraphs 1 through 65 of the Complaint as if fully stated herein.

67.  Section 5 of S.B. 1070 (adding Ariz. Rev. Stat. 13-2929) restricts the interstate movement of aliens in a manner that is prohibited by Article One, Section Eight of the Constitution.

68.  Section 5 of S.B. 1070 (adding Ariz. Rev. Stat. 13-2929) violates the Commerce Clause, and is therefore invalid.

### PRAYER FOR RELIEF

WHEREFORE, the United States respectfully requests the following relief:

1.  A declaratory judgment stating that Sections 1-6 of S.B. 1070 are invalid, null, and void;

2.  A preliminary and a permanent injunction against the State of Arizona, and its officers, agents, and employees, prohibiting the enforcement of Sections 1-6 of S.B. 1070;

3.  That this Court award the United States its costs in this action; and

4.  That this Court award any other relief it deems just and proper.


DATED: July 6, 2010

Tony West
Assistant Attorney General

Dennis K. Burke
United States Attorney

Arthur R. Goldberg
Assistant Director, Federal Programs Branch

*/s/ Varu Chilakamarri*
Varu Chilakamarri (NY Bar #4324299)
Joshua Wilkenfeld (NY Bar #4440681)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

U.S. Department of Justice, Civil Division
20 Massachusetts Avenue, N.W.
Washington, DC  20530
Tel.  (202) 616-8489/Fax (202) 616-8470
varudhini.chilakamarri@usdoj.gov
Attorneys for the United States