# EXHIBIT  1

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

THE UNITED STATES OF AMERICA,

       Plaintiff,

    v.

THE STATE OF ARIZONA, et al.,

       Defendants.

Civil Action No.

### DECLARATION OF JAMES B. STEINBERG

Pursuant to 28 U.S.C. 1746, I, James B. Steinberg, declare and state as follows:

*1.* I am Deputy Secretary of State. I make this declaration based on my personal knowledge and on information I have received in my official capacity.

*2.* I have served as Deputy Secretary of State since January 28, 2009. Immediately prior to joining the Department of State, I served as Dean of the Lyndon B. Johnson School of Public Affairs at the University of Texas at Austin. From 1993 to 1994, I served as Deputy Assistant Secretary of State for analysis in the Bureau of Intelligence and Research, and from 1994 to 1996 as Director of the Department of State's Policy Planning Staff. From December 1996 to August 2000, I served as Deputy National Security Adviser on the staff of the National Security Council. From 2001-2005, I was the President and Director of Foreign Policy Studies at the Brookings Institution in Washington, D.C.

*3.* In my capacity as Deputy Secretary of State, I assist the Secretary of State in

1

the formulation and conduct of U.S. foreign policy and in giving general supervision and direction to all elements of the Department.  I have delegated authority to act on behalf of the Secretary of State, and assist the Secretary in representing the United States at international meetings and performing other representational assignments with senior foreign government officials.

4.  I have read and am familiar with Arizona law S.B. 1070.  I am also familiar with the reactions of foreign governments to the law.

5.  As I explain further below, U.S. federal immigration law incorporates foreign relations concerns by providing a comprehensive range of tools for regulating entry and enforcement.  These may be employed with sensitivity to the spectrum of foreign relations interests and priorities of the national government.  By contrast, Arizona law S.B. 1070 establishes a single, inflexible, state-specific immigration policy based narrowly on criminal sanctions that is not responsive to these concerns, and will unnecessarily antagonize foreign governments.  If allowed to enter into force, S.B. 1070 would result in significant and ongoing consequences for U.S. foreign relations.

6.  Through the Immigration and Nationality Act ("INA") and other federal laws, the national government has developed a comprehensive regime of immigration regulation, administration, and enforcement, in which the Department of State participates.  This regime is designed to accommodate complex and important U.S. foreign relations priorities that are implicated by immigration policy -- including humanitarian and refugee protection, access for diplomats and official foreign visitors, national security and counterterrorism, criminal law enforcement, and the promotion of

2

U.S. human rights policies abroad.  To allow the national government flexibility in addressing these concerns, the INA provides the Executive Branch with a range of regulatory options governing the entry, treatment and departure of aliens.  Moreover, foreign governments' reactions to immigration policies and the treatment of their nationals in the U.S. impacts not only immigration matters, but also any other issue in which we seek cooperation with foreign states, including international trade, tourism, and security cooperation.  These foreign relations priorities and policy impacts are ones to which the national government is sensitive in ways that individual states are not.

7.  By rigidly imposing a singular, mandatory form of criminal immigration enforcement through mandatory verification of immigration status and criminal enforcement of alien registration, S.B. 1070 deviates from the national government's policy of calibrated immigration enforcement.  The Arizona law also uniquely burdens foreign nationals by criminalizing work and travel beyond the restrictions imposed by U.S. law.  These multiple, interlinking procedural and criminal provisions, adopted in order to enforce an explicit state policy of "attrition through enforcement," all manifest Arizona's intention to globally influence immigration enforcement.  S.B. 1070 thereby undermines the diverse immigration administration and enforcement tools made available to federal authorities, and establishes a distinct state-specific immigration policy, driven by an individual state's own policy choices, which risks significant harassment of foreign nationals, is insensitive to U.S. foreign affairs priorities, and has the potential to harm a wide range of delicate U.S. foreign relations interests.

8.  Indeed, although it was only adopted in April 2010, is the law of only one

3

state, and has not yet gone into effect, Arizona law S.B. 1070 already has provoked

significant criticism in U.S. bilateral relationships with many countries, particularly in the

Western Hemisphere, as well as in a variety of regional and multilateral bodies. Foreign

governments and international bodies have expressed significant concerns regarding the

potential for discriminatory treatment of foreign nationals posed by S.B. 1070, among

other issues.

9.  By deviating from federal immigration enforcement policies as well as

federal rules governing work and travel by foreign nationals, S.B. 1070 threatens at least

three different serious harms to U.S. foreign relations. *First*, S.B. 1070 risks reciprocal

and retaliatory treatment of U.S. citizens abroad, whom foreign governments may subject

to equivalently rigid or otherwise hostile immigration regulations, with significant

potential harm to the ability of U.S. citizens to travel, conduct business, and live abroad.

Reciprocal treatment is a significant concern in immigration policy, and U.S. immigration

laws must always be adopted and administered with sensitivity to the potential for

reciprocal or retaliatory treatment of U.S. nationals by foreign governments.

10.  *Second*, S.B. 1070 necessarily antagonizes foreign governments and their

populations, both at home and in the U.S., likely making them less willing to negotiate,

cooperate with, or support the United States across a broad range of important foreign

policy issues.  U.S. immigration policy and treatment of foreign nationals can directly

affect the United States' ability to negotiate and implement favourable trade and

investment agreements, to coordinate disaster response arrangements, to secure

cooperation on counterterrorism or drug trafficking operations, and to obtain cooperation

4

in international bodies on priority U.S. goals such as nuclear non-proliferation, among other important U.S. interests. The law has already complicated our efforts to pursue broader U.S. priorities. S.B. 1070's impact is likely to be most acute, moreover, among our many important democratic allies, as those governments are most likely to be responsive to the concerns of their constituents and the treatment of their own nationals abroad.

*11. Third*, S.B. 1070 threatens to undermine our standing in regional and multilateral bodies that address migration and human rights matters and to hamper our ability to advocate effectively internationally for the advancement of human rights and other U.S. values. Multilateral, regional and bilateral engagement on human rights issues and the international promotion of the rule of law is a high priority for the United States, and for this Administration. Consistency in U.S. practices at home is critical for us to be able to argue for international law consistency abroad. By deviating from national policy in this area, S.B. 1070 may place the U.S. in tension with our international treaty obligations and commitments and compromise our position in bilateral, regional and multilateral conversations regarding human rights.

*12.* In all activities relating to U.S foreign relations, including immigration, the United States is constantly engaged in weighing multiple competing considerations and choosing among priorities in order to develop an overall foreign policy strategy that will most effectively advance U.S. interests. The United States likewise is constantly seeking the support of foreign governments through a delicately-navigated balance of interests across the entire range of U.S. national policy goals. Only the national government has

5

the information available to it to be able to appropriately evaluate these choices on a

continuing basis in response to fluctuating events on the international stage.  Because of

the broad-based and often unintended ways in which U.S. immigration policies can

adversely impact our foreign relations, it is critically important that national immigration

policy be governed by a uniform legal regime, and that decisions regarding the

development and enforcement of immigration policy be made by the national

government, so that the United States can speak to the international arena with one voice

in this area.

13.  While isolated state enactments that incidentally touch on immigration may

not implicate foreign policy concerns (or may implicate them only slightly), Arizona's

law more directly and severely impacts United States foreign policy interests by

establishing an alternative immigration policy of multiple, interlinking procedural and

criminal provisions, all of which manifest Arizona's intention to globally influence

immigration enforcement.  As I understand it, Arizona's effort to set its own immigration

policy is markedly different from instances in which states and localities assist and

cooperate with the federal government in the enforcement of federal immigration laws.

When states and localities work in concert with the federal government, the likelihood for

conflicts with U.S. foreign policy interests is greatly diminished.  When states and

localities assist the federal government, and take measures that are in line with federal

priorities, then the United States retains its ability to speak with one voice on matters of

immigration policy, which in turn enables it to keep control of the message it sends to

6

foreign states and to calibrate responses as it deems appropriate, given the ever-changing dynamics of foreign relations.

*14.* By contrast, by pursuing a singular policy of criminal enforcement-at-all-costs through, among other things, imposing an extraordinary mandatory verification regime coupled with what is effectively state criminalization of unlawful presence, S.B. 1070 is likely to provoke retaliatory treatment of U.S. nationals overseas, weaken public support among key domestic constituencies abroad for cooperating with the U.S, and endanger our ability to negotiate international arrangements and to seek bilateral, regional or multilateral support across a range of economic, human rights, security, and other non-immigration concerns, and be a source of ongoing criticism in international fora. Arizona's unprecedented effort to set its own, contrary immigration policy predictably conflicts with U.S. foreign policy interests and with the United States' ability to speak with one voice.

## I.    U.S. Immigration Law Incorporates Foreign Relations Concerns

*15.* The Secretary of State is charged with the day-to-day conduct of U.S. foreign affairs, as directed by the President, and exercises authority derived from the President's powers to represent the United States under Article II of the Constitution and from statute. As part of these responsibilities, the Department of State plays a substantial role in administering U.S. immigration law and policy, as well as in managing and negotiating its foreign relations aspects and impact. Within the Department of State, the Bureau of Consular Affairs has responsibility for the adjudication and issuance of passports, visas, and related services; protection and welfare of U.S. citizens and interests

7

abroad; third-country representation of interests of foreign governments; and the

determination of nationality of persons not in the United States.   See 1 Foreign Affairs

Manual 250.[1]   Several other bureaus within the Department of State, including the Bureau

of Population, Refugees and Migration; the Bureau of Human Rights, Democracy and

Labor; the Bureau of International Organization Affairs; and all regional bureaus are

routinely engaged in negotiations and multilateral diplomatic and policy work in global,

regional, and bilateral forums on migration issues.   Collectively, the Department of State

promotes U.S. policies internationally in this area and bears the burden of managing

foreign governments' objections to the treatment of their nationals in the United States.

  *16.*   U.S. law, and particularly Section 104 of the INA, as amended by the

Homeland Security Act, invests the Secretary of State with specific powers and duties

relating to immigration and nationality.   A 2003 Memorandum of Understanding Between

the Secretaries of State and Homeland Security Concerning Implementation of Section

428 of the Homeland Security Act of 2002, ¶ 1(b),  provided that the Secretary of

Homeland Security would establish visa policy, review implementation of that policy,

and provide additional direction as provided in the MOU, while respecting the

prerogatives of the Secretary of State to lead and manage the consular corps and its

functions, to manage the visa process, and to execute the foreign policy of the United

States.

---

[1]  The Secretary of State's authorities under the INA are found in various provisions,
including §§ 104, 105, 349(a)(5), 358, and 359 (8 U.S.C. §§ 1104, 1105, 1481(a)(5),
1501, and 1502) (visa and other immigration-related laws).  The Department also
exercises passport-related authorities, including those found at 22 U.S.C. §§ 211a, et seq.

8

17.  Our immigration laws, including those administered by the Department of State, are crafted to incorporate and accommodate a wide range of sensitive U.S. foreign relations concerns.  Our visa regime, for example, both embodies and permits consideration of U.S. diplomatic, human rights, and other foreign relations interests.  To give but a few examples, the INA authorizes the Secretary of State to help determine which diplomats are entitled to diplomatic visas to represent their countries in the United States.  INA § 101(a)(15)(A).  INA § 243(d) authorizes the Secretary of State to determine the scope of visa sanctions that will be imposed on countries, upon notification from DHS that such countries have denied or unreasonably delayed accepting their nationals back from the United States.  The INA also authorizes the Secretary of State to deny visas to aliens whose entry or proposed activity in the United States "would have potentially serious adverse foreign policy consequences."  *See* INA § 212(a)(3)(C).  During the Honduran constitutional crisis in 2009, the State Department imposed visa restrictions and revoked several visas under this authority to encourage the de facto government to enter into good faith negotiations with deposed President Zelaya.  Likewise, under the auspices of INA § 212(f) and Presidential Proclamation 7750, the State Department recently revoked several visas for officials who engaged in or benefited from corruption, in an effort to bring pressure to bear on other countries to investigate and eliminate corruption by their government officials.

18.  Further, our law provides for the denial of U.S. visas on security and related grounds to aliens who are anticipated to violate U.S. law following entry into the United States and those with a broad range of ties to terrorism, including those with

9

certain ties to groups that a consular officer or the Secretary of State reasonably believes

has engaged in terrorist activity, as defined in the INA, § 212(a)(3)(B).  Our visa laws

also deny admission and make subject to removal aliens who participated in human rights

violations such as genocide or torture.[2]  And even the general authority to issue visas

requires Department officials to monitor the political, legal, economic, and cultural

developments in foreign countries for matters directly relevant to the full range of visa

ineligibilities (e.g., economic, demographic, political, ethnicity, criminal, and security

issues).

   *19.*   Finally, under section 244 of the INA, 8 U.S.C. § 1254a, U.S. law also

provides for temporary protected status ("TPS"), a temporary immigration status which

permits eligible foreign nationals who are already present in the United States to remain

in the United States and obtain employment authorization.  TPS is available to eligible

foreign nationals who, due to armed conflict, an environmental disaster, or extraordinary

and temporary conditions in their states of nationality, may face risk to personal safety if

returned to that state while such conditions persist.  Recent examples include the

designation this year of Haiti for TPS following the devastating earthquake in that

country, and the extension of Sudan's designation as a result of ongoing armed conflict.

DHS administers the program and, pursuant to the statute, routinely consults with the

State Department for its views on issues relevant to determinations whether to designate

or continue to designate a foreign state or part thereof for TPS, including whether the

---

[2] 8 U.S.C. §§ 1182(a)(2)(G), 1182(a)(3)(E), and 1182(a)(3)(G) (inadmissible); 8 U.S.C.
§§ 1227(a)(4)(D)-(4)(F) (removable).

statutory criteria are satisfied in each case.  TPS furthers certain U.S. foreign policy

interests by facilitating provision of humanitarian protection to eligible persons who

might otherwise be subject to removal to their home countries in times of armed conflict,

environmental disasters, or other extenuating and temporary conditions.  The impact of

the program can be significant:  DHS estimated that 100,000 to 200,000 individuals were

eligible for TPS under the Haiti designation.

## II.    U.S. Immigration Practices Significantly Impact Our Foreign Relations

*20.*  In addition to incorporating foreign relations concerns, the United States'

choices with respect to immigration policies and practices also have a significant impact

on our foreign relations.  Again using State Department visa processes as an example, the

process for visa issuance and denial is of great interest to foreign governments, owing to

the direct impact the visa process has on the affairs of their own nationals.  Similarly,

domestic processes for arrest, detention, and removal of aliens and other aspects of their

treatment in the U.S. are of great interest to foreign governments because of the impact

these processes have on foreign nationals and their families.  Aspects of U.S. immigration

laws, such as the prohibitions on removal of an individual to a country where it is more

likely than not that he would be tortured, and on removal of a refugee to a country where

his life or freedom would be threatened on account of his race, religion, nationality,

membership in a particular social group, or political affiliation, implement U.S. treaty

obligations under the Convention Against Torture and Other Cruel, Inhuman or

Degrading Treatment or Punishment, and the 1967 Protocol to the U.N. Convention

relating to the Status of Refugees.

11

*21.*   Given the diplomatic, legal, and policy sensitivities surrounding immigration issues, even small changes in U.S. immigration laws, policies, and practices can provoke a substantial international reaction -- both in the immigration context and across American diplomatic concerns.  It is for this reason that, although federal law recognizes that states and localities may play beneficial roles in assisting in the enforcement of federal immigration law, *see* 8 U.S.C. § 1357(g)(10), the authority to directly regulate immigration has been assigned exclusively to the federal government.

*22.*   Indeed, countries routinely raise concerns about such changes in bilateral, regional and multilateral arenas.  The exercise of immigration functions can quickly provoke a significant bilateral or multilateral problem that harms U.S. interests if handled without appropriate consideration of relevant foreign policy impacts.  The Department of State is often in the position of interacting directly with foreign governments in managing the impact of these bilateral problems.  For example, decisions regarding the issuance of individual visas to controversial figures, such as leaders of foreign governments with which the United States experiences significant diplomatic tensions, prominent individuals with checkered pasts, and delegates to international bodies, require a full review of U.S. government equities, including foreign policy interests and consideration of international treaties to which the United States is a party.  Requirements that a consular officer adjudicating a visa application obtain a Security Advisory Opinion ("SAO") or Advisory Opinion ("AO") can significantly delay visa processing and create tension, particularly, but not only, when the applicant is a foreign government official or other high profile individual.  The broad terrorism-related provisions in the INA have also

12

been criticized by foreign governments and officials and raised as obstacles to bilateral cooperation.

A. *Reciprocal Harm to U.S. Citizens Abroad*

23. Specifically, U.S. immigration policies and practices can have immediate and substantial impacts on the treatment of U.S. nationals abroad. INA § 221(c), for example, requires the length of validity for visas to be reciprocal as far as practicable. Even relatively non-controversial issues such as the period of validity of a visa and the fees charged are the subject of discussion, negotiation, and agreement among countries and have a direct impact on how other governments treat U.S. citizens who wish to travel abroad. For example, in the recent past, some countries have responded to changes in U.S. visa charges by significantly raising the entry fees charged to U.S. nationals by those countries. The Enhanced Border Security and Visa Entry Reform Act of 2002, which requires the fingerprinting of foreign nationals for the visa application process and in order to enter the United States, was the subject of much criticism by other governments and caused some governments to consider taking reciprocal retaliatory action against U.S. nationals. For example, Brazil reserves the right to require a thumbprint of Americans upon entry into Brazil.

24. In the area of consular services, how we treat foreign nationals who are present in the United States likewise can impact how a foreign government treats U.S. citizens present in its country. For example, the Department of State proactively takes a number of steps to ensure U.S. compliance with our obligation under Article 36 of the Vienna Convention on Consular Relations ("VCCR"), which requires that all foreign

13

nationals in custody in the United States be informed of their option to request to meet with a consular official. The Department does so in important part in order to increase the likelihood that such notification and consular access are provided to U.S. citizens who are detained abroad.

25. Accordingly, the State Department not only considers carefully the foreign policy goals and consequences of its immigration-related decisions, but also the potential impact of those decisions on the reciprocal treatment of U.S. citizens by the relevant foreign government.

B. *Impact in Regional and Multilateral Fora*

26. The situation of foreign nationals within a country, particularly questions relating to the protection of the human rights of migrants, regardless of their immigration status, is a matter of international concern and is addressed by international treaties. The United Nations and regional bodies such as the Organization of American States ("OAS"), a regional intergovernmental organization comprised of all thirty-five States of the Americas, have established institutions and mechanisms for the discussion, examination, and oversight of international migration policy. As a matter of longstanding human rights and humanitarian policy, the United States government strongly supports international efforts to protect migrants, who are typically especially vulnerable to mistreatment and abuse. Accordingly, the United States as a matter of its foreign policy engages actively in regional and multilateral human rights fora, through which the United States promotes respect for human rights (including the human rights of migrants), the rule of law, and respect for other U.S. values.

14

27. As part of the international migration framework, the United States has ratified several global human rights treaties which impose obligations on States Parties regarding the rights of persons, including migrants, within their territories, often without regard to the legal status of a non-national within a State's territory. Such treaties include the International Covenant on Civil and Political Rights, the International Convention on the Elimination of All Forms of Racial Discrimination, and the Convention Against Torture. The United States is party to law enforcement conventions that address multilateral cooperation on immigration issues and the rights of certain migrants, including the United Nations Convention Against Transnational Organized Crime and two of its supplementing Protocols: the Protocol Against the Smuggling of Migrants by Land, Sea and Air and the Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children. These protocols require States Parties to protect the rights of smuggled aliens. Other relevant conventions include the 1967 Protocol relating to the Status of Refugees, the Vienna Convention on Consular Relations, and various bilateral Friendship, Commerce and Navigation treaties creating reciprocal treatment obligations toward foreign nationals.

28. Many UN human rights conventions, including those referenced above, establish expert treaty bodies which are responsible for monitoring compliance by reviewing and commenting upon reports from States Parties regarding implementation of their treaty obligations. These expert bodies routinely address immigration and migration-related issues, and criticize states, including the United States, for laws and policies which, in their view, raise questions about unfair, arbitrary, or racially

15

discriminatory treatment of migrants, or other human rights concerns. Such criticisms are public, are often the subject of further discussion in UN bodies, and may be raised directly with the United States in bilateral exchanges with foreign countries.

29. Additionally, the United Nations General Assembly and other UN organs routinely adopt resolutions regarding the human rights and protection of migrants. The UN has also established "special mechanisms" or "independent experts," including special rapporteurs, that investigate and issue reports and make recommendations regarding the human rights of migrants.

30. At the regional level, the OAS has several organs in which issues related to migration policy and the treatment of migrants are raised. Like the UN General Assembly, the OAS General Assembly adopts resolutions on a range of topics including the human rights of migrants. Additionally, within the OAS system, the Inter-American Commission on Human Rights ("IACHR"), which is based in Washington, D.C., promotes respect for human rights, including by issuing statements and reports and holding hearings and adopting findings in response to individual petitions regarding a breach of a Member State's human rights commitments. The IACHR often expresses concern about the treatment of migrants by OAS Member States, including the United States. For example, in addition to recent hearings related to the enforcement of U.S. immigration laws and policies, the IACHR is in the process of preparing a thematic report which we understand will address issues related to enforcement of U.S. immigration laws and policies.

31. Other intergovernmental organizations and international bodies, not

specifically focused on issues related to the human rights of migrants, also provide
venues in which States address issues related to migration generally, and which often
include issues related to the treatment of migrants within a State's domestic legal and
policy framework. These include the International Organization for Migration, the
Regional Conference on Migration (Western Hemisphere), the UN High Level Dialogue
on International Migration and Development, the Global Forum on Migration and
Development, the International Labor Organization, the UN Office for Drug Control and
Crime Prevention, and others.

 *32.*  As both a matter of international law and practice, the federal government
is held accountable internationally for the actions of state and local authorities regarding
our treatment of foreign nationals. International bodies and foreign governments do not
typically distinguish between the conduct of the national government and the conduct of
an individual state within a federal system. This is starkly evidenced by the United
States' experience in cases where state and local government authorities have failed to
comply with U.S. obligations under the VCCR to provide consular notification to all
foreign nationals in U.S. custody. Failure to provide such notice by state officials has led
to three suits by Paraguay, Germany and Mexico against the United States in the
International Court of Justice, an advisory opinion sought by Mexico in the Inter-
American Court of Human Rights, a petition against the United States in the Inter-
American Commission on Human Rights, and bilateral complaints by numerous foreign
governments.

 *33.*  The United States takes seriously allegations that it has failed to adhere to

17

its international law obligations and foreign policy commitments and engages in these fora to address such claims. Although the government is fully prepared to defend U.S. practices against unjustified claims of human rights shortcomings, criticism from an international body over immigration human rights issues can directly undercut the credibility of U.S. efforts to advance human rights and can lead to significant diplomatic obstacles – both on immigration issues of bilateral concern and on other interests that might be the subject of diplomatic negotiations. As discussed below, in this context, S.B 1070's sweep into subjects left properly to federal direction and control subjects the United States to this criticism while denying the United States the tools to decide for itself whether and how to adjust such policies. The federal government should have to make its defenses or consider appropriate modifications only with regard to policies that are adopted through a considered process that reflects the interests of all the American people, not with regard to the views of one state.

## III.   Arizona Law S.B. 1070's Harm to U.S. Foreign Relations

*34.* Given the diplomatic and foreign relations sensitivities surrounding U.S. immigration policy generally, and the significant foreign relations consequences that can result from even small changes in these policies, and given that S.B. 1070 purports to impose Arizona's own immigration policy of "attrition through enforcement" through, among other provisions, mandatory verification of immigration status and state criminal enforcement of alien registration, it is not surprising that S.B. 1070 already has provoked significant international controversy. The law elevates the criminal aspect of federal immigration enforcement above all others, threatening state criminal penalties for

18

violations of federal immigration law.  United States immigration law – and our uniform

foreign policy regarding the treatment of foreign nationals – has been that the unlawful

presence of a foreign national, without more, ordinarily will not lead to that foreign

national's criminal arrest or incarceration, but instead to civil removal proceedings.  This

is a policy that is understood internationally and one which is both important to and

supported by foreign governments.  S.B. 1070 violates this aspect of American

immigration law and foreign policy by effectively allowing for criminal sanctions based

on unlawful presence alone.  It deviates from federal law by imposing mandatory

verification of immigration status and criminal enforcement of alien registration, and by

criminalizing work and travel by foreign nationals beyond the restrictions imposed by

U.S. law.  In so doing, the law has already provoked significant negative reaction in U.S.

bilateral relationships and in regional and multilateral fora.

    *35.*  Such criticism is not without costs.  To the contrary, the criticism provoked

by the Arizona law threatens at least three direct harms to U.S. foreign relations.  As

noted above, such a change in immigration policy invariably risks the adoption of

harmful reciprocal policies toward U.S. nationals by foreign governments.  It also

undermines the willingness of foreign states to engage bilaterally and multilaterally with

the United States to advance U.S. foreign policy goals, and it erodes the credibility of

United States efforts in regional and multilateral intergovernmental bodies to advance

human rights.

    A.  *Impact on Bilateral Relationships*

    *36.*  S.B. 1070 has unquestionably generated negative reaction that has damaged

the public image of the United States and has thereby undermined the United States'
ability to pursue various diplomatic objectives. The law has provoked numerous public
criticisms by governments with which the United States maintains important and
sensitive diplomatic relations.

37. In Mexico, S.B. 1070 has precipitated a sharply negative public perception
of the attitude toward immigrants in Arizona (and potentially by extension elsewhere in
the U.S.), which in turn has negatively affected diplomatic processes with Mexican
government officials. The Mexican President, Mexican Cabinet Members, the Mexican
Congress, and opinion makers in Mexico all have reacted strongly in response to the law.
These voices have also expressed concern about the safety of Mexicans in Arizona.

38. During his recent visit to Washington, for example, Mexico's President
Calderón pointedly criticized the law, both during his joint press conference with
President Obama on May 19 and in his address to the United States Congress on May 20.
Speaking to the Congress, he emphasized the need for comprehensive immigration
reform and focused attention specifically on the Arizona law:

> I am convinced that comprehensive immigration reform is also crucial to
> secure our common border. However, I strongly disagree with the recently
> adopted law in Arizona. It is a law that not only ignores a reality that
> cannot be erased by decree but also introduces a terrible idea: using racial
> profiling as a basis for law enforcement. And that is why I agree with
> President Obama, who said the new law "carries a great amount of risk
> when core values that we all care about are breached." I want to bridge the
> gap of feelings and emotions between our countries and our peoples. I
> believe in this. I believe in communications, I believe in cooperation, and
> we together must find a better way to face and fix this common problem.

39. President Calderón's criticisms reflect how negatively S.B. 1070 has

affected public attitudes in Mexico toward the United States. A recent poll in Mexico by the Pew Global Attitudes Project, for example, indicates that whereas before the adoption of the Arizona law 62 percent of those polled had a favorable attitude toward the United States and only 27 percent had an unfavorable attitude, following its adoption only 44 percent had a favorable attitude toward the U.S., while 48 had an unfavorable attitude. *See The Arizona Effect on U.S. Favorability in Mexico,* available at www.pewglobal.org. The poll demonstrates that an effort to establish a divergent immigration policy by a single state, which has not yet even gone into effect, nevertheless can significantly harm foreign attitudes toward the United States as a whole. Such effect in turn can seriously undermine support among important Mexican constituencies for Mexico's cooperation with the United States.

40. Bolivia's President Morales, Ecuador's President Correa, El Salvador's President Funes and Guatemala's President Colom have also voiced public criticism of the Arizona law. Other governments, including that of Brazil, Colombia, Honduras, and Nicaragua have issued statements criticizing the law. Additionally, the National Assemblies in Ecuador and Nicaragua, and the Central American Parliament based in Guatemala, have adopted critical resolutions or other statements. S.B. 1070 has also been raised with high level U.S. officials by various foreign states on a number of occasions in nonpublic settings.

41. Concrete steps also have been taken in response to S.B. 1070. For example, Mexico and El Salvador have issued travel warnings or alerts to their citizens traveling in the United States.

*42.*  S.B. 1070 also already has negatively affected other American interests. As a direct result of the Arizona law, at least five of the six Mexican Governors invited to travel to Phoenix to participate in the September 8-10, 2010 U.S.-Mexico Border Governors' Conference have declined the invitation.  Although not a formal binational government-to-government meeting, this annual conference is an important venue for improving binational coordination of border issues that inherently involve federal, state, and other levels of government.  It is normally attended by most of the 10 U.S. and Mexican state governors, as well as some federal U.S. and Mexican government representatives who serve as technical advisors.

*43.*  The Mexican Senate stated it would postpone review of a U.S.-Mexico agreement on emergency management cooperation to address natural disasters and accidents signed on October 23, 2008 because of the new Arizona law.

*44.*  Negative effects such as these are only likely to intensify if S.B. 1070 goes into effect.

B. *Impact on Regional and Multilateral Relationships*

*45.*  The Arizona legislature's adoption of S.B. 1070 also prompted harsh criticism of the law in human rights forums, demonstrating in practical terms the negative consequences that unilateral action by a single U.S. state can have on U.S. foreign policy interests.  The law has diminished our credibility in advocating for human rights compliance abroad by others, and if allowed to go into effect, will continue to do so.

*46.*  A number of U.N. and regional intergovernmental organizations and bodies,

22

including those whose mandates explicitly include the promotion of human rights, have

criticized S.B. 1070.  For example, on May 10, 2010, six UN human rights experts (the

Special Rapporteur on the Human Rights of Migrants, the Special Rapporteur on

Contemporary Forms of Racism, Racial Discrimination, Xenophobia and Related

Intolerance, the Special Rapporteur on the Situation of Human Rights and Fundamental

Freedoms of Indigenous People, the Independent Expert in the Field of Cultural Rights,

the Special Rapporteur on the Right to Education, and the Independent Expert on

Minority Issues) issued a joint statement specifically addressing the Arizona law:

> A disturbing pattern of legislative activity hostile to ethnic minorities and
> immigrants has been established with the adoption of an immigration law
> [in Arizona] that may allow for police action targeting individuals on the
> basis of their perceived ethnic origin…. In Arizona, persons who appear to
> be of Mexican, Latin American, or indigenous origin are especially at risk
> of being targeted under the law.

> The UN independent experts stressed that "legal experts differ on the
> potential effects of recent amendments to the immigration law that relate to
> the conditions for the official detention of suspected illegal aliens," and
> expressed concern about the "vague standards and sweeping language of
> Arizona's immigration law, which raise serious doubts about the law's
> compatibility with relevant international human rights treaties to which the
> United States is a party."

47.  Additionally, in June 2010, at the 14th session of the UN Human Rights

Council, the membership body within the United Nations system charged with promoting

human rights and addressing situations of human rights violations, many countries

criticized laws that criminalize irregular migration and discriminatory practices in the

enforcement of immigration laws, and several states explicitly singled out S.B. 1070 for

criticism in their plenary remarks.

48.   Within the Inter-American regional system, on April 28, 2010, OAS

Secretary General José Miguel Insulza stated that S.B. 1070 "is an issue of concern to all

citizens of the Americas" and warned against the possibility of creating an environment

of discrimination in the United States, in light of its significant Hispanic population.  He

added that "the rich tradition we all admire, of recognizing immigrants in the United

States has been harmed, undermined."  He recognized the efforts of the U.S. government

to legislate on the matter in a constructive way, adding,

> This has been a painful moment, difficult for everyone, and it is why we
> recognize and salute with energy the way in which the government of
> President Barack Obama has reacted faced with this fact.  For our part, we
> are going to follow up and always act with greater unity of purpose because
> I believe that all of us here present share the problems this law creates.

Many permanent representatives of OAS Member States also criticized the law both at

the Permanent Council in Washington and at the June 2010 OAS General assembly in

Lima, Peru.

49.   Separately, on April 28, 2010, the IACHR voiced its concern over the "high

risk of racial discrimination in the implementation of the law" and expressed concern

"with the criminalization of the presence of undocumented persons."  The IACHR

exhorted "U.S. authorities to find adequate measures to modify the recently approved law

in the State of Arizona in order to bring it into accordance with international human rights

standards for the protection of migrants."

50.   Finally, on May 4, 2010, heads of government at a summit of the Union of

South American Nations ("UNASUR"), which is comprised of Argentina, Bolivia, Brazil,

Chile, Colombia, Ecuador, Guyana, Paraguay, Peru, Suriname, Uruguay, and Venezuela,

adopted a statement condemning the law, claiming it could lead to the legitimization of racist attitudes and the latent risk of violence.

51.   In short, the passage of Arizona S.B. 1070 has provoked broad-based criticism and concern among U.S. allies in the Western Hemisphere, by human rights experts, and in numerous intergovernmental fora.   Nor can such criticism be readily dismissed.   Such criticism, particularly when provoked by an independent immigration enforcement policy being pursued by a U.S. state, and which the national government does not control or endorse, affects the United States' standing in bilateral, regional and international relationships, and ultimately the leadership role of the United States as we seek to advance a wide range of policy goals within the international community.   It risks retaliatory harms against to the legal rights of U.S. nationals abroad.   And it compromises our ability to engage effectively in bilateral, regional and multilateral conversations regarding human rights.

C. *Future Ramifications*

52.   If S.B. 1070 were to enter into effect, criticism will likely increase, and the risk of such harms will escalate.   The Arizona law could have an increasingly caustic impact on the United States' relations with important regional allies, undermine additional diplomatic arrangements or opportunities for international cooperation, constitute an ongoing irritant in U.S. bilateral, regional and multilateral relationships, and subject the United States to ongoing criticism in international fora.

53.   A few such circumstances are readily foreseeable.   This fall, for example,

25

the United States will send a high level U.S. delegation to the UN Human Rights

Council's Universal Periodic Review in Geneva, at which the United States will be

questioned by other UN Member States regarding our human rights practices. This

Universal Periodic Review is conducted once every four years for each UN Member

State, and the United States will be presenting for the first time. It is highly likely that

the Arizona law will be one of the concerns raised during the questioning by other

delegations.

54. Likewise, the United States would undoubtedly be criticized for S.B. 1070

by UN human rights treaty monitoring bodies in the context of U.S. human rights treaty

reporting requirements. Within the next two years alone, the United States will be

expected to report to both the UN Human Rights Committee and the Committee on the

Elimination of Racial Discrimination, and thereafter will be expected to appear before

each body to defend the United States' record of human rights compliance. S.B. 1070, if

still in effect, would very likely be the subject of criticism before both bodies.

55. If S.B. 1070, Arizona's attempt to set its own immigration policy in pursuit

of "attrition through enforcement," were to go into effect, it would directly call into

question the ability of the United States to speak with one voice at the international level

on issues related to immigration and migration policy. Only the national government is

in a position to accurately assess the impact of a policy such as S.B. 1070 on our overall

foreign relations agenda and to balance the competing foreign relations considerations

involved in the adoption and enforcement of such a law. When the United States incurs

criticism of immigration law and policies adopted at the federal level, the United States is

normally in a position to review the criticism and determine whether to defend the practices against attack or else to take appropriate action to modify its practices. The United States is also able to develop and implement immigration policy in anticipation of these and other foreign relations concerns. In this case, however, the policy being pursued has not been developed, nor would it be implemented, with sensitivity to the full range of foreign policy information and considerations available to the national government, and the United States is unable to calibrate its immigration and foreign policies to respond effectively to these claims.

56.  If the several states were each allowed to pursue independent immigration enforcement policies such as the Arizona law, these serious concerns would be multiplied significantly, as the United States could be subjected to a cacophony of competing immigration enforcement priorities and agendas, with little regard for the sensitive diplomatic and foreign relations considerations that immigration policy addresses, and with an extreme adverse impact on the United States' ability to speak with one voice.

57.  S.B. 1070 – and in particular the mandatory verification regime requirement – thus poses a risk of provoking retaliatory treatment against U.S. nationals by other states, and threatens ongoing adverse consequences for important and sensitive bilateral relationships with U.S. allies such as Mexico, for our regional relations in the western hemisphere, and for our global relations in regional and multilateral institutions. It is likely to hinder our ability to secure the cooperation of other states in efforts to promote U.S. interests internationally across a range of trade, security, tourism, and other interests unrelated to immigration. Finally, it is likely to undermine the United States'

ability to engage effectively with the international community to promote the advancement and protection of human rights.  Moreover, repairing such harm to international relations and U.S. stature in bilateral, regional and multilateral relationships after the fact can be extremely difficult.

58.  Accordingly, after having analyzed S.B. 1070, considered how it would interact with existing federal immigration policy and practice, and assessed the international reaction to it, I have concluded that S.B. 1070 runs counter to American foreign policy interests, and that its enforcement would further undermine American foreign policy.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge and belief.  Executed the ___ day of July, 2010 in Washington, D.C.

James B. Steinberg

28