# EXHIBIT 8

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| THE UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. |
| THE STATE OF ARIZONA, et al., | ) |
| Defendants. | ) |

## DECLARATION OF TONY ESTRADA

Pursuant to 28 U.S.C. 1746, I, Tony Estrada, declare and state as follows:

1. I have been the Sheriff of Santa Cruz County, Arizona for seventeen years, since 1993. I was previously Captain for the City of Nogales, Arizona Police Department. I have more than forty years of law enforcement experience in Santa Cruz County, which is a border county.

2. As the County Sheriff, I am responsible for protecting and ensuring the public safety of all people living and traveling in my jurisdiction, regardless of their immigration status. Santa Cruz County has a population of approximately 50,000 people but more than 40,000 people legally come across its 53-mile border with Mexico every day to shop or visit family or for other activities.

3. As the County Sheriff, I am also responsible for establishing policies and enforcement priorities for the department and my officers. The department has forty officers who engage in a broad range of law enforcement activities and actions, including but not limited to investigating and solving serious and violent crimes, responding to domestic violence calls, taking and responding to complaints from the public, and working with the community to encourage

1

reporting of crime and cooperation with police. I am bound, however, in many instances to follow the dictates of the state government.

4. Arizona S.B. 1070, which was signed into law on April 23, 2010 and becomes effective July 29, 2010, mandates that my officers determine the immigration status of any person they lawfully stop, detain or arrest in every case in which there is reasonable suspicion that the person is in the country unlawfully, regardless of the severity of the suspected or actual offense at issue. In such cases, my officers will be required to detain the target of the stop pending confirmation of the individual's immigration status. SB 1070 requires us to detain the individual for however long it takes to verify immigration status. If my department does not enforce the State's immigration laws without exception, we risk being sued by private parties under this new law. The threat and real possibility of litigation requires that my officers determine the immigration status of every person they stop, detain or arrest if they have any reason to suspect that the person is in the country unlawfully.

5. S.B 1070 undermines my ability to set law enforcement priorities for my agency. As the Sheriff, I am responsible for setting my agency's law enforcement priorities. My top priority is investigating, preventing and deterring the most violent and serious crimes. This new law requires me to expend substantial and already scarce resources on immigration matters at the expense of combating serious crime. Currently, my department reports to U.S. Customs and Border Protection (CBP) the aliens whom we arrest for non-immigration crimes. The new law will require that we not only verify the immigration status of those whom we stop or arrest, if we have reason to suspect they are in the country unlawfully, but also investigate and arrest those who cannot prove their lawful status and, as a result, whom we will now have reason to suspect, or have probable cause to believe, are in violation of other S.B. 1070 misdemeanor provisions.

6.  CBP is an important partner in our law enforcement efforts. I frequently reach out to CBP for information and assistance. Under this new law, my department will be making unlimited number of additional inquiries to CBP every year. If CBP cannot respond to this increased volume with an immediate verification of the immigration status of every person my officers stop, detain or arrest and who they suspect is in the country unlawfully, this law will require my officers to either hold people for prolonged periods of time to verify their status (and face potential liability for unlawful detention) or release people and face liability for not enforcing S.B. 1070 strictly enough.

7.  Because of this law, my officers will be required in many cases to determine the immigration status of U.S. citizens and other people who are in the country lawfully but cannot easily produce documentation that proves their status. For example, my officers frequently come into contact with U.S. citizens and non-citizens lawfully living in or visiting Arizona who do not have the type of identification that would prevent my officers from having to validate immigration status under S.B. 1070. Along the border, we also encounter U.S. citizens and non-citizens with lawful status who do not speak English and regularly travel to and from Mexico to visit family or friends in Mexico – factors that we might consider in a "reasonable suspicion" determination with respect to immigration status. Obviously, these same factors are likely to apply to both lawfully present aliens and unlawfully present aliens. We also frequently come into contact with minors who usually do not have any sort of government-issued identification. Under this new law, the lack of such documentation would raise suspicion as to their lawful status and therefore require my officers to conduct immigration-status checks even if the person encountered is in the country lawfully and was stopped for a minor offense. If these minors are not cataloged in the federal immigration authorities' database, there is no limit to how long S.B. 1070 requires my officers to detain these American citizens and lawful aliens.

8. Immigration law and immigration status are complex, and my officers are not experts in immigration matters. There is a real risk that determining a person's immigration status will result in that person's prolonged and unlawful detention, violating that person's constitutional and civil rights and further subjecting the department to liability.

9. No amount of training prescribed by Arizona Governor Brewer will sufficiently prepare my officers to become experts on immigration law and immigration enforcement. The immigration laws are complex, and I am concerned that the state training will not equip my officers with the necessary knowledge and expertise that would allow them to reasonably suspect when someone is in the country unlawfully or has committed a public offense that makes them removable.

10. To enforce all of S.B. 1070's provisions, my department will be forced to divert significant resources and incur additional costs. At a minimum, we will be forced to pay $63 per day for every person we book in the county jail for violating one of S.B. 1070's criminal provisions. If the person we arrest is injured or needs medical treatment—which is common along the border where we encounter migrants who are usually dehydrated or have injuries resulting from having walked through the desert—we cannot book them until we take them to the hospital for medical treatment. The time and resources spent on taking the person to the hospital and paying their hospital costs will not be insignificant. The additional cost of holding them in our jail is particularly significant given my department's already scarce resources and limited bed space. Our county jail is designed to hold only fifty-two inmates. We are averaging seventy-six inmates daily and do not have a classification system designed to deal with inmates we arrest under this new law.

11. S.B. 1070 will also undermine the necessary trust between my department and community members whom we have a duty to protect and serve. Being labeled an "immigration

officer" will have serious consequences for community policing. It will deter immigrants, including those who are here legally, and other individuals, particularly those in the Latino community, from coming forward and interacting with the police, because they will fear being questioned about their status and possibly arrested for violating one of Arizona's new state immigration crimes. This will undoubtedly damage my department's ability to investigate and solve serious and violent crimes.

12. I am concerned that S.B. 1070's new immigration crimes will also lead private citizens to report people they suspect are in the country unlawfully in the same way they might report other crimes. This will drive immigrants in my community further underground.

13. Many families in my community live in "mixed status" households, meaning that some members of the household are either U.S. citizens or otherwise have legal immigration status, while others do not have legal status. This law will make it more difficult to secure cooperation in the investigation of violent crimes from U.S. citizens, because I believe that many of them will not come forward out of concern that police will question and arrest their family members who lack legal status.

14. Immigrant victims and witnesses of crime are made more vulnerable by S.B. 1070. It is standard police practice to identify victims and witnesses of crimes. Many victims or witnesses do not have a valid Arizona driver's license, non-operating identification license, tribal identification, or any other state, federal or local identification that is only issued upon proof of legal presence in the United States. Under this new law, the lack of such identification will raise suspicion that such victims or witnesses are in the country unlawfully and thus possibly in violation of the state alien-registration requirement or another new state immigration crime. My officers will be placed in the precarious position of deciding whether to treat the person as a crime

Case 2:10-cv-01413-SRB   Document 6-8   Filed 07/06/10   Page 7 of 8

victim/witness or as a possible immigration violator, effectively undermining our law enforcement priorities and ability to protect people from serious crime.

15. My officers investigate domestic violence cases, in which many victims are undocumented and their assailants take advantage of this fact. Based on my years of law enforcement experience, I know that victims of domestic violence are less likely to come forward and report crimes if they fear that police are there not to protect them but instead to report them to immigration officials. This new law will serve to push these victims further underground and make our job to identify and arrest the perpetrators of such crimes that much more difficult.

16. The combined effect of the provisions of S.B. 1070 will force my officers to devote a substantial amount of their time to arresting aliens based on unlawful status. Section 3 of SB 1070 requires my officers to arrest aliens for registration violations – a new state crime that will allow for the arrest and prosecution of almost every unlawful alien. And Sections 4 and 5 create other state crimes that largely turn on an alien's unlawful presence. In light of S.B. 1070's command that my officers enforce state law to the maximum extent allowed by federal law, these various provisions require my officers to round up for criminal prosecution aliens who my officers believe to be unlawfully present.

17. My officers investigate human trafficking cases, in which most of the victims and witnesses are undocumented and their assailants take advantage of this fact. Based on my years of law enforcement experience, I know that victims and witnesses of human trafficking are less likely to come forward and report crimes if they fear that the police is there not to protect them but instead to report them to immigration officials. This new law will serve to push these victims and witnesses further underground and make our job to identify and arrest the perpetrators of such crimes that much more difficult.

18.     My officers investigate alien smuggling cases, in which those being smuggled are undocumented. Under this new law, my officers will be required to determine the immigration status of those persons being smuggled and will be forced to arrest them for failing to carry alien registration documents or violating other state immigration crimes. Without the victims' cooperation, my officers will have difficulty identifying and arresting the smugglers themselves.

19.     I am very concerned that S.B. 1070 will also impact my county's relationship with our Mexican neighbors and Mexican law enforcement. Nogales, Arizona, which is in Santa Cruz County, and Nogales, Sonora, Mexico share not only a common name but also a long and intertwined history. Members of the same families have always lived on both sides of the border. Anywhere between 40,000 and 50,000 people travel between the two Nogales ports of entry every day. Mexican nationals with border-crossing cards enter the U.S. daily to shop and visit family. I have been informed by residents and Mexican officials that Mexican nationals are scared to enter Nogales for fear that they will be stopped and arrested, even if they have a valid border-crossing card to enter the United States.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

_____
TONY ESTRADA

Sheriff of Santa Cruz County, Arizona

Executed the 28th day of June, 2010 in Nogales, Arizona.