Tony West
Assistant Attorney General
Dennis K. Burke
United States Attorney
Arthur R. Goldberg
Assistant Director, Federal Programs Branch
Varu Chilakamarri (NY Bar #4324299)
Joshua Wilkenfeld (NY Bar #4440681)
U.S. Department of Justice, Civil Division
20 Massachusetts Avenue, N.W.
Washington, DC 20530
Tel. (202) 616-8489/Fax (202) 616-8470
varudhini.chilakamarri@usdoj.gov
*Attorneys for the United States*

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| The United States of America,<br><br>Plaintiff,<br><br>v.<br><br>The State of Arizona; and Janice K. Brewer, Governor of the State of Arizona, in her Official Capacity,<br><br><br>Defendants. | No. 2:10-cv-1413-NVW<br><br>**PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW IN SUPPORT THEREOF**<br><br>ORAL ARGUMENT REQUESTED |

# TABLE OF CONTENTS

**Page**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.   FEDERAL STATUTORY & REGULATORY FRAMEWORK
     GOVERNING IMMIGRATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

     A.   Federal Laws and Discretion Regarding the Entry, Removal,
          and Treatment of Aliens Within the United States . . . . . . . . . . . . . . . . . . 4

     B.   Federal Immigration Enforcement and the Cooperation of
          States and Localities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II.  ARIZONA'S S.B. 1070 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

     A.   Section 2 – Arizona's Mandatory Alien Inspection Scheme . . . . . . . . . . 7

     B.   Section 3 – Arizona's Alien Registration Crime . . . . . . . . . . . . . . . . . . . 8

     C.   Section 4/Ariz. Rev. Stat. 13-2319 – Arizona's
          Alien Smuggling Crime . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

     D.   Section 5 – Arizona's Alien Work Crime . . . . . . . . . . . . . . . . . . . . . . . . 9

     E.   Section 5 – Arizona's Alien Transporting and Harboring Crime . . . . . . . 9

     F.   Section 6 – Arizona's Warrantless Arrest of "Removable" Aliens . . . . . 10

LEGAL STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

I.   THE UNITED STATES IS LIKELY TO PREVAIL ON THE MERITS . . . . . 11

     A.   Relevant Principles of Preemption . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

     B.   The Overall Statutory Scheme of S.B. 1070 is Preempted Because
          it Sets a State-Level Immigration Policy That Interferes with Federal
          Administration and Enforcement of the Immigration Laws . . . . . . . . . . 12

          1.   S.B. 1070 Represents an Unlawful Attempt to Set Immigration
               Policy at the State Level . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

          2.   S.B. 1070's Policy of "Attrition Through Enforcement"
               Conflicts with the Federal Immigration Framework . . . . . . . . . . . 15

3. S.B. 1070 Interferes with U.S. Foreign Policy Objectives That Inform Federal Administration and Enforcement of the Immigration Laws ............................... 22

C. The Individual Sections of S.B. 1070 Are Preempted By Federal Law .. 25

1. Sections 2 and 6 Are Preempted Because Their Mandatory Requirements for Determining Immigration Status Conflict with Federal Law and Priorities ............................. 25

a. Section 2 of S.B. 1070 Will Result in the Harassment of Lawfully Present Aliens and is Therefore at Odds with Congressional Objectives .................. 26

b. Section 2 of S.B. 1070 Will Burden Federal Resources and Impede Federal Enforcement and Policy Priorities ... 30

c. Section 6 of S.B. 1070 Extends Arizona's Warrantless Arrest Authority to Out-of-State "Removable" Offenses and is Preempted Because it Will Lead to the Harassment of Aliens ........................... 32

2. Section 3 of S.B. 1070 – Arizona's "Complete or Carry an Alien Registration Document" Provision – Is Preempted by Federal Law ......................................... 34

a. Section 3 Interferes with Comprehensive Federal Alien Registration Law ........................ 34

b. Section 3 is Preempted Because it Seeks to Criminalize Unlawful Presence and Will Result in the Harassment of Aliens ...................... 37

3. Section 4 of S.B. 1070 Amends Arizona's Alien Smuggling Statute, Which is Preempted Because it Conflicts with Federal Law ......................................... 39

4. Section 5 of S.B. 1070 – Arizona's New Criminal Sanction Against Unauthorized Aliens Who Solicit or Perform Work – is Preempted by the Federal Employer Sanctions Scheme ....... 42

5. Section 5 of S.B. 1070 – Arizona's Transporting, Harboring, or Concealing Provision – Violates Preemption and Dormant Commerce Clause Principles ........................... 44

II. THE UNITED STATES WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION ....................... 46

III.   A BALANCING OF EQUITIES FAVORS THE UNITED STATES
       AND DEMONSTRATES THAT THE PUBLIC INTEREST WOULD
       BE SERVED BY GRANTING INJUNCTIVE RELIEF  . . . . . . . . . . . . . . . . . . 52

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Pursuant to Federal Rule of Civil Procedure 65, the United States hereby moves this Court to preliminarily enjoin enforcement of Arizona's S.B. 1070 (Laws 2010, Chapter 113), as amended by H.B. 2162, to preserve the status quo until this matter can be adjudicated.

## **INTRODUCTION**

In our constitutional system, the power to regulate immigration is exclusively vested in the federal government. The immigration framework set forth by Congress and administered by federal agencies reflects a careful and considered balance of national law enforcement, foreign relations, and humanitarian concerns – concerns that belong to the nation as a whole, not a single state. The Constitution and federal law do not permit the development of a patchwork of state and local immigration policies throughout the country. Although a state may adopt regulations that have an indirect or incidental effect on aliens, a state may *not* establish its own immigration policy or enforce state laws in a manner that interferes with federal immigration law.

The State of Arizona has crossed this constitutional line. In acknowledged disagreement with the manner in which the federal government has regulated immigration and in contravention of these constitutional principles, Arizona recently enacted S.B. 1070[1] – a comprehensive set of immigration provisions explicitly designed to "work together" to "discourage and deter the unlawful entry and presence of aliens" by making "attrition through enforcement the public policy" of Arizona. To carry out Arizona's "public policy," S.B. 1070 creates new state crimes that penalize an alien's failure to meet federal registration requirements, an alien's unauthorized attempt to solicit work, and the commercial transportation of unlawfully present aliens. And to achieve maximum enforcement of its new immigration policy, S.B. 1070 establishes a new state-wide mandatory immigration status-verification system to be employed whenever practicable by every law enforcement officer who, during the course of a stop, has reasonable suspicion of a person's "unlawful presence." Further, any private citizen of Arizona may sue a local law enforcement agency

---

[1]    Throughout this memorandum, the term "S.B. 1070" refers to the statute as amended by H.B. 2162.

for money damages if that agency fails to enforce immigration laws to the fullest extent possible.

Both separately and in concert, S.B. 1070's provisions would subvert and interfere with federal immigration laws and objectives; the law is therefore preempted. *First*, Arizona impermissibly seeks to create a state-specific "attrition through enforcement" policy that is expressly designed to supplant the federal government's immigration policy. As such, Arizona's immigration policy does not simply provide legitimate assistance to the federal government but instead exceeds a state's role with respect to aliens, interferes with the federal government's balanced administration of the immigration laws, and critically undermines U.S. foreign policy objectives. S.B. 1070 therefore exceeds constitutional boundaries. The states are not permitted to set their own independent immigration policies, with varying and potentially conflicting enforcement systems and priorities. Were a number of states to act as Arizona has and strike out on their own, federal immigration policy and enforcement efforts would be crippled. *Second*, individual provisions of S.B. 1070 separately conflict with federal law and are therefore preempted. S.B. 1070's new state-wide mandatory immigration status verification scheme and warrantless arrest provision will result in the harassment and incarceration of foreign nationals and lawful resident aliens – and even U.S. citizens who will not have readily available documentation to demonstrate their citizenship. In addition, this scheme will divert and burden federal immigration resources that are needed to target high-priority aliens. The federal government has prioritized enforcement against dangerous aliens who pose a threat to national security and public safety, but Arizona's indiscriminate approach will stand in the way of the federal government's focused efforts to get the most dangerous aliens off the streets. And S.B. 1070's criminal provisions are preempted because they each conflict with congressional objectives underlying specific federal immigration laws.

A preliminary injunction against S.B. 1070 is necessary to preserve the status quo, because the United States is likely to prevail on the merits of this case, and absent injunctive relief, the United States will continue to suffer irreparable harm. Enforcement of S.B. 1070

will disrupt the constitutional order by undermining the federal government's control over the regulation of immigration and immigration policy and by interfering with its ability to balance the purposes and objectives of federal law and to pursue its chosen enforcement priorities.  Moreover, S.B. 1070 will result in the harassment of lawfully present aliens and even U.S. citizens.  Implementation of the law will damage the United States' ability to speak with a single and authoritative voice to foreign governments on immigration matters and is already having negative effects on long-standing and vital international relationships.  S.B. 1070 will also impede the federal government's ability to provide measured enforcement of criminal sanctions so as to accommodate the many other objectives that Congress enacted into the immigration laws.  As a matter of law and in the public interest, this Court should enter a preliminary injunction to prevent S.B. 1070 from going into effect.

## BACKGROUND

## I.     FEDERAL STATUTORY & REGULATORY FRAMEWORK GOVERNING IMMIGRATION

The Constitution vests the political branches with exclusive and plenary authority to establish the nation's immigration policy.  *See* U.S. Const., art. I § 8, cl. 4 (Congress has the authority to "establish an uniform Rule of Naturalization"); U.S. Const., art. I § 8, cl. 3 (Congress has the authority to "regulate Commerce with foreign Nations"); *see also* U.S. Const., art. II § 3 (vesting the President with the authority to "take Care that the Laws be faithfully executed").  Pursuant to this authority, over several decades, Congress has enacted and refined a detailed statutory framework governing immigration – a task that has involved reconciling the complex and often competing interests of national security and public safety, foreign relations, and humanitarian concerns.  *See, e.g.*, Declaration of James B. Steinberg, Deputy Secretary of State (attached as Exhibit 1), ¶¶ 5-6.  The federal immigration scheme, largely enacted as part of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101, *et seq.*, empowers the Department of Homeland Security ("DHS"), the Department of Justice ("DOJ"), and the Department of State, among other federal agencies, to administer and enforce the immigration laws, and it provides for the considerable exercise of discretion to

direct enforcement in a manner consistent with federal policy objectives.

## A. Federal Laws and Discretion Regarding the Entry, Removal, and Treatment of Aliens Within the United States

The INA sets forth the conditions under which a foreign national may be admitted to and remain in the United States. As part of these conditions, Congress created a comprehensive alien registration system for monitoring the entry and movement of aliens within the United States. *See* 8 U.S.C. §§ 1201(b), 1301-1306; *see also* 8 C.F.R. Part 264. If an alien enters the United States without inspection, presents fraudulent documents at entry, violates the conditions of his admission, or engages in certain proscribed conduct, the federal government (through DHS) may place him in removal proceedings. *See* 8 U.S.C. §§ 1225, 1227, 1228, 1229, 1229c, 1231. In addition to removal, DHS and DOJ may employ civil and criminal sanctions against the alien for particular violations of the federal immigration laws.[2] *See, e.g.,* 8 U.S.C. §§ 1325, 1306, 1324c.

To prevent the unlawful entry of aliens into the United States, Congress further criminalized certain activities of third parties, such as the smuggling of unlawfully present aliens into the country, and the facilitation of unlawful immigration within the nation's borders. *See* 8 U.S.C. § 1324. Critically, Congress provided for the civil removal of unlawfully present aliens, but did not criminally penalize their mere presence or movement within the country absent other factors. Nor did Congress impose criminal penalties on aliens for solely seeking or obtaining employment in the country without authorization, *see* H.R. Rep. No. 99-682(I) at 46, electing instead to prohibit employers from hiring unauthorized aliens. *See* 8 U.S.C. § 1324a(a)(1).

Under this framework, administering agencies are empowered to exercise their

---

[2] Under federal law, an alien's mere unlawful presence in the United States is not a crime, although it may subject the alien to removal from the United States. *See* 8 U.S.C. §§ 1182(a)(6)(A)(i), 1227(a)(1) (B)&(C). Unlawful presence becomes an element of a criminal offense, however, when an alien is found in the United States after having been formally removed or after voluntarily departing from the United States pending execution of a final removal order. *See* 8 U.S.C. § 1326. Unlawful *entry* into the United States is a crime. *See* 8 U.S.C. § 1325.

4

discretion not to apply a specific sanction to an alien who has unlawfully entered or remained in the United States. For example, DHS has authority to permit aliens, including those who would otherwise be inadmissible, to temporarily enter and remain the United States (*i.e.*, "parole") for "urgent humanitarian reasons" or "significant public benefit." 8 U.S.C. § 1182(d)(5)(A). In addition, DHS and DOJ may withhold or cancel the removal of an alien under a variety of special circumstances, including those relating to family unity and domestic abuse. *See* 8 U.S.C. § 1227(a)(1)(E)(iii); 8 U.S.C. §§ 1229b (providing DOJ discretion to cancel the removal of an otherwise inadmissible or removable alien under certain circumstances); *see also* 8 U.S.C. § 1182(a)(6)(A) (excluding from inadmissibility certain aliens who have been subjected to battery or extreme cruelty). Further, both DHS and DOJ may grant an otherwise unlawfully present or removable alien relief from removal – and potentially adjust that alien's immigration status – if the alien meets certain conditions. If an alien has a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion, he may be eligible for asylum in the United States, "irrespective of [his] status." *See* 8 U.S.C. § 1158.[3] Similarly, an alien may be afforded temporary protected status and remain in the United States if he is an eligible national of a country that DHS has designated as experiencing ongoing armed conflict, natural disaster, or another extraordinary circumstance. *See* 8 U.S.C. § 1254a. Under certain circumstances, moreover, an alien may be provided employment authorization while the federal government evaluates his immigration status. *See, e.g.*, 8 C.F.R. § 274a.12(c)(14); Declaration of Michael Aytes, Senior Advisor to the Director of U.S.

---

[3] The United States is likewise bound by international treaty obligations not to remove, with limited exceptions, a refugee to any country where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion (*see* 1967 Protocol relating to the Status of Refugees, incorporating by reference Art. 33(1) of the 1951 Convention relating to the Status of Refugees), and not to remove or extradite any individual to a country where it is more likely than not that he would be tortured (*see* Art. 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment).

5

Citizenship & Immigration Services (attached as Exhibit 2), ¶¶ 6, 12, 14, 15, 18.[4]

Although not an exhaustive description of the complex and detailed federal immigration framework, these provisions reflect that the federal immigration laws do not focus on one, singular interest but instead seek to further multiple competing objectives.

## B. Federal Immigration Enforcement and the Cooperation of States and Localities

DHS is the federal agency primarily tasked with enforcing the immigration laws, mainly through its components, U.S. Immigration and Customs Enforcement ("ICE"), U.S. Customs and Border Protection ("CBP"), and U.S. Citizenship and Immigration Services ("USCIS"). *See* 6 U.S.C. §§ 251–52, 271; 8 U.S.C. § 1103. DHS receives state and local cooperation. *See, e.g.*, 8 U.S.C. § 1103(a)(10) (authorizing DHS to empower state or local law enforcement with immigration enforcement authority when an "actual or imminent mass influx of aliens . . . presents urgent circumstances"). In addition, Congress prescribed by statute a number of ways in which states may assist the federal government in its enforcement of the immigration laws. 8 U.S.C. § 1357(g) (1)–(9) (enabling DHS to enter into agreements to authorize appropriately trained and supervised state and local officers to perform enumerated immigration related functions); 8 U.S.C. § 1373(a)-(b); 8 U.S.C. § 1252c (authorizing state and local law enforcement to arrest aliens who are unlawfully present in the United States because they were previously removed after being convicted of a felony in the United States). DHS works cooperatively with states and localities through a variety of programs. For example, ICE administers the Law Enforcement Support Center ("LESC"), which serves as a national enforcement operations center that promptly provides

---

[4] In addition to formal policies that provide exceptions from removal, federal authorities have discretion not to remove certain unlawfully present aliens where the exercise of discretion would further one of the INA's policy objectives. For example, in the wake of the recent earthquake in Haiti – and before the institution of a formal Temporary Protected Status program for Haiti – the federal government exercised discretion to suspend the removal of Haitian nationals. Similarly, the President's foreign affairs authority allows for "deferred enforced departure," pursuant to which the executive branch may use its discretion to suspend removal proceedings where doing so would further humanitarian, foreign policy, or other law enforcement goals. *See, e.g.*, http://www.whitehouse.gov/the_press_office/Presidential-Memorandum-Regarding-Deferred-Enforced-Departure-for-Liberians.

immigration status and identity information to local, state, and federal law enforcement agencies regarding aliens suspected of, arrested for, or convicted of criminal activity. Declaration of David C. Palmatier, Unit Chief for LESC (attached as Exhibit 3), ¶¶ 3-6. Further, ICE and CBP respond to requests from state and local law enforcement officers on a variety of immigration matters.[5]  Palmatier Decl. ¶ 3; Declaration of David V. Aguilar, Deputy Commissioner, CBP (attached as Exhibit 5), ¶ 22.

## II.     ARIZONA'S S.B. 1070

On April 23, 2010, Governor Janice Brewer signed into law S.B. 1070, a comprehensive and unprecedented state effort to regulate immigration.  Expressly intended to make "attrition through enforcement the public policy of all state and local government agencies in Arizona," S.B. 1070 is a set of mostly criminal provisions governing police procedures, immigration enforcement, alien registration, transportation, and employment – all of which are intended to "work together to discourage and deter the unlawful entry and presence of aliens."  S.B. 1070 § 1.  One week later, Governor Brewer signed H.B. 2162, which amended S.B. 1070 for the purpose of responding to those who "expressed fears that the original law would somehow allow or lead to racial profiling."  Statement by Governor Jan Brewer (Apr. 30, 2010), at http://azgovernor.gov/dms/upload/PR_043010_StatementGovBrewer.pdf.  The law will go into effect on July 29, 2010.

### A.     Section 2 – Arizona's Mandatory Alien Inspection Scheme

The first pillar of Arizona's new immigration policy is a mandatory alien inspection scheme.  As amended by H.B. 2162, Section 2 of S.B. 1070 (adding Ariz. Rev. Stat. 11-1051) mandates that for any lawful "stop, detention or arrest made by a law enforcement official or . . . agency" in the enforcement of any state or local law (including civil ordinances) where reasonable suspicion exists that an individual is an "unlawfully present"

---

[5] Another one of these programs is the Law Enforcement Agency Response program ("LEAR"), an Arizona-specific program that is operational 24 hours a day, 7 days a week, for responding to requests for assistance from ICE regarding suspected unlawfully present aliens.  Declaration of Daniel H. Ragsdale, Executive Associate Director for Management & Administration, ICE (attached as Exhibit 4), ¶ 45.

7

alien in the United States, the officer must make a reasonable attempt to determine the individual's immigration status when practicable.[6] The officer is required to verify the person's status, either through the federal government pursuant to 8 U.S.C. § 1373(c) or through a federally qualified law enforcement officer.[7] S.B. 1070 § 2. Section 2 also requires that "[a]ny person who is arrested shall have the person's immigration status determined before the person is released." *Id.* § 2. Because this clause does not depend on "reasonable suspicion" of unlawful presence, it requires Arizona law enforcement to verify the immigration status of every person who is arrested in the state.

Section 2 further provides that any legal resident of Arizona may bring a civil action in a state court to challenge any official or agency that "adopts or implements a policy that limits or restricts the enforcement of federal immigration laws . . . to less than the full extent permitted by federal law." S.B. 1070 § 2.

## B. Section 3 – Arizona's Alien Registration Crime

Going beyond the mandatory inspection scheme in Section 2, Section 3 of S.B. 1070 (adding Ariz. Rev. Stat. 13-1509), makes it a new state criminal offense for an alien in Arizona to violate 8 U.S.C. § 1304(e), which requires every alien to "at all times carry with him and have in his personal possession any certificate of alien registration or alien registration receipt card issued to him," or 8 U.S.C. § 1306(a), which penalizes the willful failure to apply for registration when required. S.B. 1070 § 3. Section 3 provides a state penalty of up to $100 and twenty days imprisonment for a first offense and thirty days

---

[6] On the same day that she signed S.B. 1070 into law, Governor Brewer issued an executive order requiring law enforcement training to "provide clear guidance to law enforcement officials regarding what constitutes reasonable suspicion," and to "make clear that an individual's race, color or national origin alone cannot be grounds for reasonable suspicion to believe any law has been violated." Arizona State Executive Order 2010-09 (Apr. 23, 2010).

[7] Section 2(B) excuses law enforcement from determining a person's immigration status where the determination may hinder or obstruct an investigation. S.B. 1070 § 2(B). Under Section 2, a person is presumed not to be "unlawfully present" upon showing a valid Arizona driver's license, non-operating identification license, tribal identification, or any other state, federal, or local identification that is only issued upon proof of legal presence in the United States. *Id.*

imprisonment for any subsequent violation. *Id.* Section 3 may be enforced through an immigration status determination that is triggered by Section 2. *See id.*, §§ 1-3. Section 3's focus on criminalizing unlawful presence is revealed by an exception which renders the section's criminal penalties inapplicable "to a person who maintains authorization from the federal government to remain in the United States." S.B. 1070 § 3(F).

**C.      Section 4/Ariz. Rev. Stat. 13-2319 – Arizona's Alien Smuggling Crime**

Section 4 of S.B. 1070 amends Ariz. Rev. Stat. 13-2319 (collectively, Arizona's "alien smuggling prohibition"). S.B. 1070 § 4. Arizona's alien smuggling prohibition makes it a felony for "a person to intentionally engage in the smuggling of human beings for profit or commercial purpose." Ariz. Rev. Stat. 13-2319. The statute defines "smuggling of human beings" as the "transportation, procurement of transportation or use of property . . . by a person or an entity that knows or has reason to know that the person or persons transported . . . are not United States citizens, permanent resident aliens or persons otherwise lawfully in this state or have attempted to enter, entered or remained in the United States in violation of law." *Id.* § 13-2319(F)(3). A violation of Arizona's alien smuggling prohibition constitutes at least a class 4 felony, with a presumptive sentence of 2.5 years imprisonment. *See* Ariz. Rev. Stat. 13-2319(B); Ariz. Rev. Stat. 13-702(D). This provision, in conjunction with Arizona's conspiracy statute, allows for an alien to be prosecuted for "smuggl[ing] oneself." *State v. Barragan Sierra*, 196 P.3d 879, 888 (Ariz. App. Div. 2008).

**D.      Section 5 – Arizona's Alien Work Crime**

Arizona's new immigration policy also regulates the employment of unlawfully present aliens. Section 5 of S.B. 1070 adds Ariz. Rev. Stat. 13-2928, which makes it a new state crime for any person who is "unauthorized" and "unlawfully present" in the United States to solicit, apply for, or perform work. S.B. 1070 § 5(C)-(E). A violation of this provision is a class 1 misdemeanor, with a sentence of up to six months imprisonment. S.B. 1070 (Ariz. Rev. Stat. 13-2928), § 5(F); Ariz. Rev. Stat. 13-707(A).

**E.      Section 5 – Arizona's Alien Transporting and Harboring Crime**

Section 5 of S.B. 1070 also adds Ariz. Rev. Stat. 13-2929, which makes it a new state

crime for a person committing any criminal offense to (1) "transport . . . an alien . . . , in furtherance of the illegal presence of the alien in the United States, . . . if the person knows or recklessly disregards" that the alien is here unlawfully; (2) "conceal, harbor or shield an alien from detection . . . if the person knows or recklessly disregards the fact that the alien" is here unlawfully; or (3) "encourage or induce an alien to come to or reside in [Arizona] if the person knows or recklessly disregards the fact that such . . . entering or residing in [Arizona] is or will be in violation of law." S.B. 1070 § 5.

**F.    Section 6 – Arizona's Warrantless Arrest of "Removable" Aliens**

Section 6 of S.B. 1070, in keeping with S.B. 1070's focus on "attrition through enforcement," further augments the authority of law enforcement officials to enforce immigration law.  Section 6 amends a preexisting Arizona criminal statute (Ariz. Rev. Stat. 13-3883) governing the circumstances under which law enforcement officers can make a warrantless arrest, by allowing the arrest of anyone whom the officer has probable cause to believe "has committed any public offense that makes the person removable from the United States." S.B. 1070 § 6.  This new warrantless arrest authority applies to persons who have committed an offense in another state when an Arizona law enforcement official believes that offense would make the person removable from the United States. *See* Ariz. Rev. Stat. 13-105(26).

**LEGAL STANDARD**

A preliminary injunction is warranted where, as here, the movant has established that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) a preliminary injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc*., 129 S. Ct. 365, 374 (2008); *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009); *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1021 (9th Cir. 2009)*; see* Fed. R. Civ. P. 65.

**ARGUMENT**

**I.** **THE UNITED STATES IS LIKELY TO PREVAIL ON THE MERITS**

    **A.** **Relevant Principles of Preemption**

       The Supremacy Clause of the U.S. Constitution provides that federal laws and treaties are "the supreme Law of the Land." U.S. Const., art. VI, cl. 2. In some cases, the Constitution – through its own force – can preempt state action in a field exclusively reserved for the federal government. *See De Canas v. Bica*, 424 U.S. 351, 356 (1976). Statutes enacted by Congress may also preempt – either expressly or impliedly – otherwise permissible state action. *See Gade v. Nat'l Solid Waste Mgmt. Ass'n*, 505 U.S. 88, 98 (1992). The Supreme Court has recognized two bases by which state or local laws may be impliedly preempted. "Field preemption" exists when a "scheme of federal regulation [is] so pervasive as to make reasonable the inference that Congress left no room to supplement it" because "the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject," or because "the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose." *Pacific Gas and Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 204 (1983) (internal quotations marks omitted). "Conflict preemption" occurs when a party cannot comply with both state and federal law, *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963), or when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941); *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995); *see also Kobar v. Novartis Corp.*, 378 F. Supp. 2d 1166, 1169 (D. Ariz. 2005) (Bolton, J.). These bases for preemption are not "rigidly distinct," however, and "field pre-emption may be understood as a species of conflict pre-emption." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (internal citations omitted).

       Moreover, "that the supremacy of the national power in the general field of foreign affairs, including power over immigration, naturalization and deportation, is made clear by the Constitution, was pointed out by authors of The Federalist in 1787, and has since been

given continuous recognition by [the Supreme] Court." *Hines*, 312 U.S. at 62. Although this federal power does not preclude "every state enactment which in any way deals with aliens," *De Canas v. Bica*, 424 U.S. at 355, or *bona fide* state cooperation in the enforcement of the federal immigration laws, *see, e.g.*, 8 U.S.C. § 1357(g)(10); *Gonzales v. Peoria*, 722 F.2d 468, 474 (9th Cir. 1983), it has long been recognized that the "[p]ower to regulate immigration is unquestionably exclusively a federal power." *De Canas*, 424 U.S. at 354; *see also Toll v. Moreno*, 458 U.S. 1, 11 (1982) ("determining what aliens shall be admitted to the United States, the period they may remain, regulation of their conduct before naturalization, and the terms and conditions of their naturalization" are matters exclusively reserved to the federal government); *Mathews v. Diaz*, 426 U.S. 67, 84 (1976) ("[I]t is the business of the political branches of the Federal Government, rather than that of either the States or the Federal Judiciary, to regulate the conditions of entry and residence of aliens."). Further, a state exceeds its power to enact regulations touching on aliens generally if the regulation is not passed pursuant to state "police powers" that are "focuse[d] directly upon" and "tailored to combat" what are "essentially local problems." *De Canas*, 424 U.S. at 356–57.

### B. The Overall Statutory Scheme of S.B. 1070[8] is Preempted Because it Sets a State-Level Immigration Policy That Interferes with Federal Administration and Enforcement of the Immigration Laws

As explained in detail in the next section, individual provisions of S.B. 1070 are invalid under the Supremacy Clause because each separately conflicts with federal immigration law and policy. But the statute, taken as a whole, also suffers from a fundamental, overarching defect: It impermissibly attempts to set immigration policy at the

---

[8] Sections 7-9 of S.B. 1070 amend preexisting provisions of Arizona law at issue in *Chamber of Commerce of the United States of America v. Candelaria*, 130 S. Ct. 534, *cert. granted*, 78 U.S.L.W. 3065 (U.S. June 28, 2010) (No. 09-115). The instant motion does not seek to enjoin those provisions of S.B. 1070; the views of the United States regarding those provisions are reflected in the Government's brief to the Supreme Court. *See* Brief for the United States as Amicus Curiae, 2010 WL 2190418 (May 28, 2010). Section 10 is preempted insofar as it is based on the state law violations identified in Sections 4 and 5, which are preempted for the reasons discussed herein. Sections 11-14 are administrative provisions which are not the subject of this dispute.

12

state level and is therefore preempted.

Dissatisfied with the federal government's response to illegal immigration,[9] Arizona has sought, through S.B. 1070, to override the considered judgment of Congress regarding the formulation of immigration policy, and the judgment of the executive branch regarding how to balance competing objectives in implementing the federal immigration laws. Arizona's monolithic "attrition through enforcement" policy pursues only one goal of the federal immigration system – maximum reduction of the number of unlawfully present aliens – to the exclusion of all other objectives. To make matters worse, even in pursuing that goal, Arizona's policy will disrupt federal enforcement priorities and divert federal resources needed to target dangerous aliens. S.B. 1070 is therefore preempted, because (1) it is an unlawful attempt to set immigration policy at the state level, (2) the policy it advances conflicts with federal objectives animating federal administration and enforcement of the INA, and (3) it interferes with U.S. foreign policy objectives and foreign relations more broadly. Standing alone, Arizona's state-level immigration policy is intolerable under the Constitution and federal law. But the court should also consider the consequences that would follow were Arizona's approach to be allowed. The Supremacy Clause protects the federal system against the chaos that would result were states and localities across the country allowed to fashion their own immigration schemes according to their own (potentially conflicting) policy choices and subject the federal government to the demands of multiple enforcement priorities.

### 1. S.B. 1070 Represents an Unlawful Attempt to Set Immigration Policy at the State Level

Only the federal government may establish immigration policy – namely, the process of "determin[ing] who should or should not be admitted into the country, " *De Canas,* 424 U.S. at 355, and the "conditions lawfully imposed by Congress upon . . . residence of aliens," *Takahashi v. Fish and Game Comm'n*, 334 U.S. 410, 419 (1948). *See also Ferreira v.*

---

[9] *See* Signing Statement by Governor Jan Brewer, April 23, 2010, available at http://www.azgovernor.gov/dms/upload/PR_042310_StatementByGovernorOnSB1070.pdf (stating that S.B. 1070 was motivated by what Arizona referred to as the federal government's "misguided policy" and its "refus[al] to fix" immigration problems).

*Ashcroft*, 382 F.3d 1045, 1050 (9th Cir. 2004) ("In the immigration context . . . the need for national uniformity is paramount."); *Arres v. IMI Cornelius Remcor, Inc.*, 333 F.3d 812, 815 (7th Cir. 2003) ("Federal immigration power is not just superior to that of the states; it is exclusive of any state power over the subject. Illinois is not entitled to have a policy on the question [of] what precautions should be taken to evaluate the credentials of aliens.").

This prohibition on state formulations of immigration *policy* does not preclude a state from cooperating with the federal government on immigration matters, nor does it restrict a state from adopting state laws that have incidental effects on aliens. *See De Canas*, 424 U.S. at 355-56 ("local regulation" with only a "purely speculative and indirect impact on immigration" is not "a constitutionally proscribed regulation of immigration"). Indeed, state participation in cooperative immigration enforcement is specifically contemplated by federal law. *See, e.g.*, 8 U.S.C. § 1357(g). No mechanical test defines the limit of state power to promulgate, under their police powers, regulations incidentally affecting immigration. But at a minimum, a state is generally barred from enacting a "comprehensive scheme" for immigration, *i.e.*, a system of state laws that affects "a direct and substantial impact on immigration." *League of United Latin Am. Citizens v. Wilson*, 908 F. Supp. 755, 769–70 (C.D. Cal 1995).[10] S.B. 1070 falls on the prohibited side of this line because, as discussed below, the statute (i) explicitly refers to itself as creating "public policy" for the State of Arizona on immigration issues and was intended to rival or supplant federal immigration policy, (ii) establishes interlocking regulations to further the State's policy, and (iii) effectuates the "policy" through the criminal and procedural sections of the statute, which include a private right of action to ensure the maximum state enforcement of immigration laws. S.B. 1070 § 2(H); *see also* Part I.C, *infra*.

According to the statute's statement of "intent," S.B. 1070 is not meant to exercise

---

[10] *See also De Canas*, 424 U.S. at 356-59; *Hines*, 312 U.S. at 66; *League of United Latin Am. Citizens*, 908 F. Supp. at 769-71; *Pennsylvania v. Nelson*, 350 U.S. 497, 507 (1956) ("Congress having thus treated seditious conduct as a matter of vital national concern, it is in no sense a local enforcement problem. . . . [T]he [state] Statute presents a peculiar danger of interference with the federal program."); *cf. Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 419& n.11 (2003).

14

traditional state police powers but rather seeks to establish an Arizona-specific immigration "public policy." S.B. 1070 § 1.[11] The substantive provisions of S.B. 1070 effectuate Section 1's statement of intent, establishing various bases for detaining and incarcerating aliens in Arizona in order to achieve the overarching goal of regulating immigration through "attrition through enforcement." Sections 2 and 6 expand the set of suspected aliens whose immigration status will be verified by Arizona officials. Sections 3, 4, and 5 provide several means of criminally sanctioning any alien who is unlawfully present in the state – a status which is not a federal crime but which is the focus of Sections 2 and 6. And the private right of action embodied in Section 2 ensures, on pain of a private lawsuit for money damages, that state and local officials in Arizona maximally enforce the provisions of S.B. 1070, thereby establishing an Arizona immigration policy that promotes sanctions to the exclusion of other interests that animate the federal immigration laws and that disrupts federal enforcement priorities, including the focus on dangerous aliens. In stated purpose and necessary operation, therefore, the provisions of S.B. 1070 demand that Arizona pursue at all costs a policy designed to deter unlawfully present aliens from moving into the state and to inspect, investigate, detain, and in some cases criminally sanction those already in the state. For these reasons, S.B. 1070 is a comprehensive and aggressive effort to set state-specific immigration policy that will have a "direct and substantial impact" on immigration, and it is therefore preempted as a matter of law. *See League of United Latin Am. Citizens*, 908 F. Supp. at 769–70.

### 2. S.B. 1070's Policy of "Attrition Through Enforcement" Conflicts with the Federal Immigration Framework

The Supreme Court has made clear that state laws may be preempted where they fail to account for, or seek to countermand, the considered balance between competing interests

---

[11] Legislative history confirms that S.B. 1070 was animated by the belief that "citizens have a constitutional right to expect the immigration laws to be enforced" – resulting in a statute in which maximal "enforcement" is the solitary concern. *See* Minutes of Meeting of Committee on Military Affairs and Public Safety, Consideration of S.B. 1070, March 31, 2010, at 3.

struck by Congress in enacting a statute,[12] or by the executive branch in enforcing that statute. S.B. 1070 falls squarely within this prohibited category.

In *Crosby v. National Foreign Trade Council*, for example, the Court held that a Massachusetts law restricting purchases from companies doing business with Burma interfered with the executive branch's authority over economic sanctions against that country. 530 U.S. at 376. The Court determined that Congress had not only given the executive branch the authority to impose certain sanctions against Burma, but that in doing so, it provided the discretion and flexibility to levy and relieve those sanctions in a manner that would advance human rights and democracy in Burma and be consistent with the national security interests of the United States. *Id.* at 374-75. Massachusetts's "sanction" on Burma was preempted because it would have permitted the state to effectively second-guess the specific balance of sanctions (whether levied or withheld) that was available to and employed by the United States. *Id.* at 376. Notably, even though many aspects of the Massachusetts sanction regime nominally could have been pursued by the executive branch under existing law, the state law was still deemed invalid because the state's imposition of sanctions necessarily impeded executive discretion as to the appropriate balance of interests to be reflected in U.S. policy towards Burma.[13]

*Buckman Co. v. Plaintiffs' Legal Committee* supports the same conclusions. In *Buckman*, the Court determined that the Food, Drug, and Cosmetic Act (FDCA) empowered the FDA with a "variety of enforcement options that allow it to make a measured response

---

[12] *See, e.g., Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 152 (1989) ("[S]tate regulation of intellectual property must yield to the extent that it clashes with the balance struck by Congress in our patent laws. . . . Where it is clear how the patent laws strike that balance in a particular circumstance, that is not a judgment the States may second-guess."); *Felder v. Casey*, 487 U.S. 131, 143 (1988) ("[H]owever understandable or laudable the State's interest in controlling liability expenses might otherwise be, it is patently incompatible with the compensatory goals of the federal legislation, as are the means the State has chosen to effectuate it.").

[13] In fact, the Supreme Court treated the very grant of discretion as evidence that Congress impliedly preempted state actions that would interfere with the executive branch's exercise of enforcement discretion. *Id.* at 376 ("It is simply implausible that Congress would have gone to such lengths to empower the President if it had been willing to compromise his effectiveness by deference to every provision of state statute or local ordinance that might, if enforced, blunt the consequences of discretionary Presidential action.").

16

to suspected fraud," and that under the statutory scheme, the "FDA pursues difficult (and often competing) objectives," such as ensuring that medical devices are reasonably safe, while allowing devices on the market as soon as possible, and regulating medical devices without interfering with the practice of medicine. 531 U.S. 341, 349 (2001). The *Buckman* Court held that the FDCA's enforcement scheme preempted state law tort claims premised on fraud committed against the FDA, noting that the relationship between the federal government and those it regulates is a matter for the federal government and not part of the states' traditional police powers. The Court further reasoned that because the FDA pursues a particular balance of competing objectives, states are precluded from taking action that could skew the "balance sought by the Administration" through its calibrated enforcement policies. *Id.* at 348. This Court has likewise interpreted *Buckman* as cautioning against the "inherent difficulty" that arises when states try to "substitute their judgment for that of the" federal government. *Kobar*, 378 F. Supp. 2d at 1173–74 (Bolton, J.).

Those principles are dispositive here. To begin with, it is beyond question that the federal immigration regime established by Congress, no less than the regulatory regimes at issue in *Crosby* and *Buckman*, is complex, and requires a balance among multiple and sometimes competing objectives. *See U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950) (immigration control and management is "a field where flexibility and the adaptation of the congressional policy to infinitely variable conditions constitute the essence of the program").[14] It is certainly a primary objective of federal law to prevent aliens from

_____

[14]  *See also New Jersey v. United States*, 91 F.3d 463, 470 (3d Cir. 1996) ("Decisions about how best to enforce the nation's immigration laws in order to minimize the number of illegal aliens crossing our borders patently involve policy judgments about resource allocation and enforcement methods. Such issues fall squarely within a substantive area committed by the Constitution to the political branches."); *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 187-88 (1993); *I.N.S. v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999); *Rogers v. Larson*, 563 F.2d 617, 626 (3d Cir. 1977) (finding state restrictions on employment of nonresident alien workers preempted by federal law, because although the state and federal laws "share some common purposes" of "assur[ing] an adequate labor force on the one hand and [ ] protect[ing] the jobs of citizens on the other," the "conflict arises because the Virgin Islands and the United States strike the balance between these two goals differently"); *Lozano v. City of Hazleton*, 496 F. Supp. 2d 477, 527 (M.D. Pa 2007) (several laws that
(continued...)

17

unlawfully entering and residing in the United States, and Congress has empowered DHS and DOJ with a range of enforcement options to this end. *See, e.g.*, 8 U.S.C. §§ 1182, 1225, 1227, 1229, 1306, 1324, 1324c, 1325. But the federal immigration laws also take into account other uniquely national interests and priorities, such as facilitating trade and commerce; welcoming foreign nationals who visit or immigrate lawfully and ensuring their fair and equitable treatment wherever they reside; and responding to humanitarian and foreign affairs concerns at the global and individual levels. Consequently, there are situations in which other congressional policy objectives weigh against removal or incarceration of certain unlawfully present aliens.[15] Similarly, the federal government prioritizes its enforcement efforts by targeting highly threatening aliens who pose a danger to national security and public safety.

As a result of the complexities inherent in the enforcement of the federal immigration scheme, DHS and DOJ necessarily must (i) establish global policy objectives that attempt to strike a balance between employing criminal sanctions and other immigration values, and (ii) exercise their authority and discretion on a case-by-case basis consistent with those global objectives. *See* Homeland Security Act, Pub. L. No. 107-296, 116 Stat. 2135 (2002); 8 U.S.C. § 1103; 8 U.S.C. § 1252(g); *see also Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 484 (1999) (describing deferred action as a "commendable exercise

---

[14] (...continued)
turned on immigration status held to be preempted because they "strike a different balance" than that reflected in federal immigration policy).

[15] For example, Congress has clearly anticipated circumstances in which an alien may have unlawfully entered the United States or violated the conditions of his admission, but for whom the United States nonetheless has an interest in providing humanitarian relief. *See, e.g.*, 8 U.S.C. § 1158 (asylum); § 1254a (temporary protected status); § 1227(a)(1)(E)(iii) (humanitarian waiver of deportability to assure family unity); § 1229b (cancellation of removal); § 1182 (d)(5) (parole); *see also* Ragsdale Decl. ¶¶ 18, 26, 47–50 (describing humanitarian aspect to immigration enforcement policy). These humanitarian programs demonstrate that one of many objectives of federal immigration policy is to welcome such individuals to the United States, notwithstanding possible temporary unlawful presence. It would therefore violate federal policy to prosecute or detain these types of aliens for unlawful presence – a situation often known to the federal government and, for affirmative policy reasons, not used as the basis for a removal proceeding or criminal prosecution.

in administrative discretion, developed without express statutory authorization"); Ragsdale Decl. ¶¶ 7, 16.

In enacting a state policy of "attrition through enforcement," Arizona's S.B. 1070 ignores every objective of the federal immigration system, save one: the immediate apprehension and criminal sanction of all unlawfully present aliens. *See* S.B. 1070 § 1. Arizona's one-size-fits-all approach to immigration policy and enforcement undermines the federal government's ability to balance the variety of objectives inherent in the federal immigration system, including the federal government's focus on the most dangerous aliens. By requiring local police officers to engage in maximum inquiry and verification (on pain of civil suit) and by providing for the conviction and incarceration of certain foreign nationals in Arizona for their failure to register, for entering or traveling throughout the state using commercial transportation, or for soliciting work, the "balance" struck by S.B. 1070 is not only different from that of the federal government, but it will *interfere* with the federal government's ability to administer and enforce the immigration laws in a manner consistent with the aforementioned concerns that are reflected in the INA. Despite the statute's self-serving claim that it "shall be implemented in a manner consistent with federal laws regulating immigration," S.B. 1070 § 12, the act mandates a conflicting, Arizona-specific immigration policy – "attrition through enforcement" – and prescribes various provisions that implement that policy in conflict with federal priorities. To permit a hodgepodge of state immigration policies, such as the one Arizona has attempted in S.B. 1070, would impermissibly interfere with the federal government's balance of uniquely national interests and priorities in a number of ways.

*First,* Arizona's across-the-board "attrition through enforcement" policy will interfere with federal enforcement priorities. The federal government, which exercises significant enforcement discretion, has prioritized for arrest and detention those "aliens who pose a danger to national security or a risk to public safety" (Ragsdale Decl. ¶ 17), principally targeting "aliens engaged in or suspected of terrorism or espionage; aliens convicted of

19

crimes, with a particular emphasis on violent criminals, felons, and repeat offenders; certain gang members; and aliens subject to outstanding criminal warrants . . . [and] fugitive aliens, especially those with criminal records." *Id*. ¶¶ 17-18 (discussing need for prioritization); *Id*. ¶ 27 (discussing memorandum from Assistant Secretary John Morton outlining enforcement priorities) . But S.B. 1070, which requires Arizona law enforcement officials to target any and all suspected aliens without regard to dangerousness, will "divert existing [federal] resources from other duties, resulting in fewer resources being available to dedicate to cases and aliens" that the federal government has identified as posing the greatest immediate threats to the United States. *Id*. ¶ 44. "Diverting resources to cover the influx of referrals from Arizona (and other states, to the extent similar laws are adopted) could, therefore, mean decreasing [the federal government's] ability to focus on priorities such as protecting national security or public safety in order to pursue aliens who are in the United States illegally but pose no immediate or known danger or threat to the safety and security of the public." *Id*.; *see also* Part I.C.1. *infra*. S.B. 1070 is therefore preempted because it will force a diversion of federal resources away from federal priorities. *See Kobar*, 378 F. Supp. 2d at 1170, 1173–74 (Bolton, J.) (finding Arizona statute preempted, in part, because it would result in "deluge" of information to the FDA, thereby interfering with other FDA priorities); *see also Garrett v. City of Escondido*, 465 F. Supp. 2d 1043, 1057 (S.D. Cal. 2006) (acknowledging serious concerns regarding the city's use of federal authorities to determine the immigration status of tenants because the process would "likely place burdens on the Departments of Justice and Homeland Security that will impede the functions of those federal agencies").

*Second*, Arizona's new immigration policy will substantially interfere with the federal government's ability to administer and enforce the immigration laws in a manner consistent with congressional objectives. Congress has clearly anticipated circumstances in which an alien may have unlawfully entered the United States or violated the conditions of his admission, but for whom the United States nonetheless has an interest in providing what it calls humanitarian relief. *See, e.g.*, 8 U.S.C. § 1158 (asylum); § 1254a (temporary protected

20

status); § 1227(a)(1)(E)(iii) (humanitarian waiver of deportability to assure family unity); § 1229b (cancellation of removal); § 1182 (d)(5) (parole); *see also* Ragsdale Decl. ¶¶ 18, 26, 47–50 (describing humanitarian aspect to immigration enforcement policy). For example, were DHS to come into contact with a foreign national from a specially designated country (such as Nicaragua, Honduras, or El Salvador), or one who has survived the earthquake in Haiti, or is a victim of trafficking or persecution, DHS might choose not to detain or penalize the alien for immigration violations incidental to his entry into the United States and instead permit that alien to stay in the United States under a variety of programs. *See* Ragsdale Decl. ¶¶ 26, 28, 47-50. These programs demonstrate that one aspect of federal immigration policy is to assist and welcome such victims in the United States, notwithstanding their possible temporary unlawful presence. By contrast, under S.B. 1070, any other potential immigration concern falls away in favor of Arizona's decision to pursue "attrition through enforcement," which, as implemented through the remainder of the statute, promotes the incarceration and arrest of all unlawfully present aliens, no matter what other congressionally mandated concern might be implicated or whether the person's status is known to the federal government. In that way, S.B. 1070 will interfere with established federal immigration priorities concerning the treatment of aliens who may be eligible for humanitarian relief. *See* Declaration of Mariko Silver, Acting Assistant Secretary for International Affairs and Deputy Assistant Secretary for International Policy, DHS (attached as Exhibit 6), ¶ 10.

*Third*, Arizona's focus on criminal sanctions is at odds with the federal policy of channeling certain unlawfully present aliens into civil removal proceedings or permitting them to leave the country without criminal penalty or incarceration. *See* 8 U.S.C. § 1229c (voluntary departure); § 1225(a)(4) (withdrawal of application for admission); Ragsdale Decl. ¶ 19. There are numerous reasons why it is in the national interest not to exact criminal penalties on every alien who attempts to enter or enters the country without a visa or other necessary documentation. *See* Ragsdale Decl. ¶¶ 7, 16, 19 (describing DHS discretion to opt for civil enforcement rather than criminal penalties where doing so would promote fair

consideration of appropriate treatment of aliens). For example, the application of criminal sanctions to a particular alien who was a victim of trafficking or labor abuse may prevent federal authorities from obtaining evidence against other aliens who pose a greater threat to public safety or national security. *See* Ragsdale Decl. ¶ 33-34 (discussing reliance on unlawfully present aliens in prosecutions). Similarly, the United States may deem it unduly harsh or counterproductive to its humanitarian efforts or foreign relations to incarcerate a woman with young children who has attempted to cross the border for the first time. *See generally* Ragsdale Decl. ¶ 47.[16] In addition, there may be times when civil removal is a more appropriate enforcement tool because criminal sanctions would have immigration consequences that would interfere with the United States' ability to provide a particular immigration benefit in the future. *See*, *e.g.,* 8 U.S.C. § 1254a(c)(2)(B). S.B. 1070 recognizes no such nuance. As such, the law undoubtedly strikes "a different balance" than the policy advanced by federal law and thereby "stands as an 'obstacle' to the accomplishment of . . . federal law." *See Lozano*, 496 F. Supp. 2d at 527–28; *see also Crosby*, 530 U.S. at 378. And even if S.B. 1070 could be said to promote federal immigration policy in some abstract sense, the methodology chosen by Arizona conflicts with that chosen by the federal government, and is therefore preempted. *See Gade*, 505 U.S. at 103; *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987).[17]

> **3.** **S.B. 1070 Interferes with U.S. Foreign Relations and U.S. Foreign Policy Objectives That Inform Federal Administration and Enforcement of the Immigration Laws**

S.B. 1070 is independently preempted because it impermissibly conflicts with U.S. foreign policy. Immigration policy is intimately connected with U.S. foreign affairs and

---

[16] On the other hand, it may be appropriate to exact the full panoply of federal sanctions against a repeat offender, or the leader of a smuggling ring. *See* DHS Model 287(g) MOA, *available at* http://www.ice.gov/doclib/foia/media-requests/09foia4646moutemplate.pdf.

[17] Indeed, although S.B. 1070's conflict with federal immigration policies and objectives is palpable and sharp, the Supremacy Clause would nullify S.B. 1070 even for less substantial conflict with federal law in light of the strong interest of the federal government in the immigration context. *See Boyle v. United Technologies Corp.*, 487 U.S. 500, 507-08 (1988) ("[In] an area of uniquely federal interest," "[t]he conflict with federal policy need not be as sharp as that which must exist for ordinary pre-emption").

diplomacy. *See Chy Lung v. Freeman*, 92 U.S. 275, 279-80 (1875); *California v. United States*, 104 F.3d 1086, 1091 (9th Cir. 1997); *see also* Steinberg Decl. ¶¶ 5–6 ("U.S. federal immigration law incorporates foreign relations concerns . . . . [and] is designed to accommodate a range of complex and important U.S. foreign relations priorities that are implicated by immigration policy."); Silver Decl. ¶ 4. The Supreme Court has recognized the "Nation's need to 'speak with one voice' in immigration matters." *Zadvydas v. Davis*, 533 U.S. 678, 700 (2001); *Garamendi*, 539 U.S. at 424. Because the immigration laws are deeply imbued with foreign policy significance, a state immigration law can, in certain situations, be preempted if it interferes with U.S. foreign policy. As the Ninth Circuit has explained, "'foreign policy' . . . may carry . . . preemptive force . . . . 'where . . . there is evidence of clear conflict between the policies adopted by'" a state and the federal government." *Movsesian v. Victoria Versicherung AG,* 578 F.3d 1052, 1056 (9th Cir. 2009) (quoting *Garamendi*, 539 U.S. at 421).

In addition, individual immigration enforcement decisions can have profound implications for U.S. foreign policy interests. *See, e.g.*, *Quinchia v. U.S. Att'y Gen.*, 552 F.3d 1255, 1259 (11th Cir. 2008) ("[I]mmigration cases often involve complex public and foreign policy concerns with which the executive branch is better equipped to deal."); *Francis v. Immigration & Naturalization Service*, 532 F.2d 268, 272 (2d Cir. 1976) ("Enforcement of the immigration laws is often related to considerations . . . of foreign policy."); Steinberg Decl. ¶¶ 6, 12, 17-20. These decisions directly implicate foreign relations and demand federal control because, as the Supreme Court has explained, where a state inserts itself into immigration enforcement, "a single State can, at her pleasure, embroil us in disastrous quarrels with other nations." *Chy Lung*, 92 U.S. at 280; *Hines*, 312 U.S. at 64 ("Experience has shown that international controversies of the gravest moment, sometimes even leading to war, may arise from real or imagined wrongs to another's subjects inflicted, or permitted, by a government."). Foreign governments properly understand the federal government to have a range of civil and criminal enforcement authorities available to it in the administration of the immigration laws, and, indeed, they often raise concerns about the administration and

enforcement of immigration laws in bilateral and multilateral diplomatic discussions. *See* Steinberg Decl. ¶¶ 22, 32.

S.B. 1070 is preempted under these principles because it undermines the ability of the United States to speak with one voice in the immigration context and wrests primacy over immigration enforcement away from the federal government.[18] By imposing a mandatory criminal sanctions regime against certain aliens – necessarily without any mechanism for accounting for the foreign policy consequences of such criminal enforcement – S.B. 1070 interferes with the federal government's ability to exercise prosecutorial discretion based on diplomatic and foreign policy concerns. *See Clayco Petroleum Corp. v. Occidental Petroleum Corp.*, 712 F.2d 404, 408-09 (9th Cir. 1983) (recognizing necessity of executive control of prosecutions under the Foreign Corrupt Practices Act, because "any prosecution under the Act entails risks to our relations with the foreign governments involved" such that "any governmental enforcement" should only result from "a judgment on the wisdom of bringing a proceeding, in light of the exigencies of foreign affairs"); *see also United States v. Delgado-Garcia*, 374 F.3d 1337, 1351 (D.C. Cir. 2004) ("The executive's expert exercise of prosecutorial discretion and foreign diplomacy" will serve as crucial safeguards for "avoid[ing the] conflicts" with other nations that might arise out of the extraterritorial enforcement of the federal alien smuggling laws).

Here, the State Department has concluded that S.B. 1070's interference with the federal government's exclusive control over the foreign policy implications of an area of law unquestionably imbued with foreign policy significance "runs counter to American foreign policy interests" and, if uninterrupted, "would further undermine American foreign policy." Steinberg Decl. ¶ 58. S.B. 1070 represents an impediment to U.S. foreign policy and U.S. diplomatic interests – both with Mexico and with other countries. *Id.* ¶¶ 36-51. And the law "poses a risk of provoking retaliatory treatment against U.S. nationals by other states." *Id.*

_____

[18] Although not all state laws that touch upon aliens or immigration implicate these principles, S.B. 1070 – especially when taken as a whole – represents an unparalleled and explicit effort to establish a state policy that intensifies the enforcement of particular federal immigration laws, while ignoring key goals of others, thereby contravening federal foreign policy prerogatives.

¶ 57. This assessment of the effect of S.B. 1070 on U.S. foreign policy is worthy of deference. *See Holder v. Humanitarian Law Project*, 2010 U.S. LEXIS 5252, at *58 (2010); *see also Movesian*, 578 F.3d at 1061; *In re Assicurazioni Generali*, 592 F.3d 113, 119 (2d Cir. 2010).

Indeed, the impact of S.B. 1070 on U.S. foreign policy has been immediate and negative. As discussed in greater detail in Part II, *infra*, the mere passage of S.B. 1070 has resulted in numerous, specific, and serious diplomatic reactions that threaten multiple United States interests – both in the immigration field and elsewhere. *See* Steinberg Decl. ¶¶ 34–58. This substantial effect on U.S. foreign policy interests is not surprising. In enacting (out of disagreement with existing federal policy) a comprehensive, novel, and aggressive set of immigration provisions, Arizona has predictably provoked the ire of those foreign nations whose citizens are being targeted for detention and criminalization – and has thereby damaged the United States' broader set of diplomatic relations with those same nations. *See* Steinberg Decl. ¶ 57 ("S.B. 1070 . . . threatens ongoing adverse consequences for important and sensitive bilateral relationships with U.S. allies."). S.B. 1070 is therefore preempted.

**C.    The Individual Sections of S.B. 1070 Are Preempted By Federal Law**

**1.    Sections 2 and 6 Are Preempted Because Their Mandatory Requirements for Determining Immigration Status Conflict with Federal Law and Priorities**

S.B. 1070 effectively creates an immigration status verification scheme that is unprecedented in breadth, mandatory in nature, and necessarily works toward the singular goal of criminally prosecuting aliens suspected of being unlawfully present. Before passage of S.B. 1070, Arizona police had the same discretion to decide whether to verify immigration status during the course of a lawful stop as any other state or federal law enforcement officer. Sections 2 and 6, however, do not merely authorize state officers to assist in the federal enforcement of the immigration laws. Instead, these new provisions *mandate* that state and local law enforcement officers effectuate an immigration status verification scheme as the first step toward arrest, detention, incarceration (utilizing Sections 3, 4, and 5), or removal, in a manner that is indifferent to the federal government's enforcement priorities (such as

prioritizing dangerous aliens). And these provisions are likewise indifferent to the risk of harassment of lawful aliens (and even citizens) and the burdens placed on the federal government that inevitably follow from S.B. 1070's regime of unrestrained enforcement of particular criminal provisions.[19]

### a. Section 2 of S.B. 1070 Will Result in the Harassment of Lawfully Present Aliens and is Therefore at Odds with Congressional Objectives

Section 2 effectively removes the existing discretion of law enforcement officers by requiring that they verify immigration status whenever "reasonable suspicion" that a person is unlawfully present arises during a stop and it is practicable to do so; they must also verify status during any arrest. This unprecedented mandatory verification scheme conflicts with federal law because it necessarily imposes substantial burdens on lawful immigrants in a way that frustrates the concern of Congress for nationally-uniform rules governing the treatment of aliens throughout the country – rules designed to ensure "our traditional policy of not treating aliens as a thing apart." *Hines*, 312 U.S. at 73-74. As the Court held in *Hines*, Congress has "plainly manifested a purpose to . . . protect the personal liberties of law-abiding aliens . . . and to *leave them free from the possibility of inquisitorial practices and police surveillance* that might not only affect our international relations but might also generate the very disloyalty which the law has intended guarding against." *Id.* at 74 (emphasis added). It is for the federal government, not the individual states, to determine the relationship between the Nation and aliens, and the federal government has long rejected a system by which aliens' papers are routinely demanded and checked. Section 2 is at odds with this longstanding federal policy and practice.

Although the intent of Arizona's new statute may be to deter unauthorized aliens from entering or remaining in Arizona, Section 2 necessarily places lawfully present aliens (and even U.S. citizens) in continual jeopardy of having to demonstrate their lawful status to non-federal officials, and having their liberty restricted while their status is verified. There are

---

[19] The discussion herein is not meant to foreclose state authority to verify immigration status in a manner that is consistent with federal priorities and that will not unduly burden either federal resources or the interests of lawfully present aliens.

numerous categories of individuals who will be lawfully present but who will not have readily available documentation to demonstrate that fact. For example, some lawful foreign travelers visiting from countries participating in the Visa Waiver Program will not have a form of identification sufficient to demonstrate lawful presence under Section 2. *See* Aytes Decl. ¶¶ 2, 20-21. Several categories of individuals who have applied for asylum, temporary protected status, U or T non-immigrant visas for victims of crimes who are providing assistance to law enforcement,[20] or abused women petitioning for immigration relief under the Violence Against Woman Act, will also not have a form of identification sufficient to demonstrate lawful presence under Section 2. *Id.* ¶¶ 2, 5, 9, 13, 17, 19; *see also* S.B. 1070 § 2(B). Moreover, United States citizens are of course not required to carry proof of citizenship and some will not have easy access to documents that readily satisfy Arizona. Many U.S. citizens do not have or carry a government-issued photo identification, such as minor children and others who do not have a driver's license.[21] And if Arizona officers contact DHS about a citizen's immigration status, DHS may not be able to confirm the person's citizenship, as many citizens have no entries in DHS databases. *See* Palmatier Decl. ¶ 19.

Lawfully present individuals will inevitably be swept within Section 2's broad "reasonable suspicion" provision and subject to the state's inquisitorial burdens. While Section 2 is triggered by an officer's "reasonable suspicion" of unlawful presence, "the requirement of reasonable suspicion is not a requirement of absolute certainty," *N.J. v. T.L.O.*, 469 U.S. 325, 346 (1985), meaning that many lawful aliens will be directly subjected

---

[20] U and T visas are available for victims of certain enumerated crimes – such as trafficking and other violent crimes – and their families. *See* Aytes Dec. ¶¶ 14-17.

[21] Arizona does not necessarily accept out-of-state drivers licenses as proof of lawful residency. For example, New Mexico does not require proof of citizenship to obtain a driver's license. *See* N.M. STAT. ANN. § 66-5-9(B). So if a U.S. citizen from New Mexico is stopped while driving in Arizona, that citizen might be subject to lengthy detention while Arizona seeks to verify the citizen's "immigration status." Estrada Decl. ¶¶ 7, 14 (discussing categories of aliens and citizens who likely will not be able to produce documentation necessary to avoid detention, including minors and visitors from other states).

to Section 2.[22]  What is more, many factors used to support a "reasonable suspicion" that an alien is unlawfully present could also apply to lawfully present aliens.  *See* Declaration of Tony Estrada, Sheriff of Santa Cruz County (attached as Exhibit 8), ¶ 7.[23]

The breadth of Arizona's mandatory immigration verification scheme is unparalleled and serves to exacerbate the conflict with federal law.  The constant threat of police inquisition is not limited to persons who are suspected of serious criminal offenses because S.B. 1070 mandates immigration status inquiries, when practicable, for *every* lawful stop where there is "reasonable suspicion" of unlawful presence –  regardless of the seriousness of the underlying alleged state offense.  Immigration status verifications accordingly are mandated even for suspected minor, non-criminal infractions of state or local law – such as a minor traffic offense, jaywalking, *see* Ariz. Rev. Stat. 28-793, failing to have a dog on a leash, *see* Ariz. Rev. Stat. 11-1012, or riding a bicycle on a sidewalk, *see* City of Flagstaff Ord. 9-05-001-0013 – or suspected violations of Sections 3-5 of S.B. 1070.  A lawfully present alien may also be subjected to an immigration status inquiry where he is lawfully stopped, but the underlying justification for the initial stop has ceased, or when the alien is merely a passenger in a car whose driver is stopped for a traffic offense.  *See* S.B. 1070 § 2.

The substantial impact on lawfully present aliens is compounded by the fact that S.B. 1070 provides no assurance that the duration for which a lawfully present alien may be detained during the pendency of an immigration status verification will be limited.  S.B. 1070, standing alone, does not suggest that the alien will be released, or that any detention would be of only minimal duration; indeed, the only assurance that is provided is that a

---

[22]  *See also Safford Unified School Dist. No. 1 v. Redding*, 129 S.Ct. 2633, 2647 (2009) ("[R]easonable suspicion does not deal with hard certainties, but with probabilities. To satisfy this standard, more than a mere hunch of wrongdoing is required, but considerably less suspicion is needed than would be required to satisf[y] a preponderance of the evidence standard." (internal citations omitted)).

[23]  Even under Arizona's own training standards, factors that apply equally to lawfully- and unlawfully-present aliens would bring them within the ambit of Section 2's "reasonable suspicion" standard.  *See, e.g.*, Arizona Peace Officers Standards & Training Board, Arizona S.B. 1070 Training Video, available at http://www.azpost.state.az.us/SB1070infocenter.htm (stating that inability to speak English and dress can be factors in determining reasonable suspicion).

private citizen of Arizona can sue a local law enforcement agency for money damages if that agency *fails* to enforce the immigration laws to the fullest extent possible.[24] Thus, if forced to decide between holding and releasing a lawfully present alien during the pendency of a status verification, the statute is clearly designed to encourage Arizona police authorities to opt for continued detention. *See, e.g.*, Estrada Decl. ¶¶ 4, 6. There is also no assurance that if a lawfully present alien is subjected to an immigration status verification under Section 2, he will not be subjected to another inspection the very next time he is stopped by the police for any reason – raising the specter that the same lawfully present residents will be subject to repeated police intrusion.[25] Moreover, if a lawfully present alien is arrested for any reason, S.B. 1070 forbids his release – irrespective of whether he has been cleared of any wrongdoing – until *state and local authorities* are satisfied as to his immigration status.

Section 2 will therefore necessarily increase police intrusion into the lives of lawfully present aliens and compel them to prove their lawful status to the satisfaction of state or local authorities, which is exactly the type of inquisition and special burden cautioned against by *Hines*.[26] *See also De Canas*, 424 U.S. at 358 n.6 ("Of course, state regulation not congressionally sanctioned that discriminates against aliens lawfully admitted to the country is impermissible if it imposes additional burdens not contemplated by Congress").

---

[24] Indeed, DHS advises that there will be times where it will be unable to verify whether an individual is unlawfully present in the United States without taking significant time to consult a variety of databases and even paper files. *See* Palmatier Decl. ¶¶ 11, 19; Declaration of Dominick Gentile, Division Chief, USCIS (attached as Exhibit 7), ¶¶ 6–7.

[25] Some of the criteria that would support a "reasonable suspicion" would not fluctuate over time. *See* Estrada Decl. ¶ 7 ("[F]actors that we might consider in a 'reasonable suspicion' determination with respect to immigration status. . . . are likely to apply both to lawfully present aliens and unlawfully present aliens.").

[26] *See Hines*, 312 U.S. 65-66 ("Legal imposition[s] . . . upon aliens – such as subjecting them alone, though perfectly law-abiding, to indiscriminate and repeated interception and interrogation by public officials – thus bears an inseparable relationship to the welfare and tranquillity of all the states, and not merely to the welfare and tranquillity of one."); *see also Mathews v. Diaz*, 426 U.S. 67, 81-82 (1976); *League of United Latin Am. Citizens*, 908 F. Supp. at 769.

### b. Section 2 of S.B. 1070 Will Burden Federal Resources and Impede Federal Enforcement and Policy Priorities

A state law is preempted where it imposes a burden on a federal agency's resources that impedes the agency's functions. *See, e.g., Buckman*, 531 U.S. at 349-51 (preempting state law cause of action in part because it would encourage third parties to submit a deluge of unnecessary information to the FDA, thereby burdening the agency's ability to evaluate drug applications in a timely fashion); *Garrett*, 465 F. Supp. at 1057 (acknowledging serious concerns regarding the city's use of federal authorities in determining immigration status); *Kobar*, 378 F. Supp. 2d at 1170, 1173–74. S.B. 1070 is preempted under this standard because it will create an unprecedented quantity of verification demands directed to the federal government (or federally qualified officials) and will impermissibly shift the allocation of federal resources away from federal priorities.

Section 2 requires local law enforcement officers to obtain immigration status information from the federal government, which will primarily be accomplished by making a request to LESC under 8 U.S.C. § 1373(c).[27] *See* Palmatier Decl. ¶¶ 3, 6, 15. Because Arizona has imposed an across-the-board requirement that its law enforcement officers verify the immigration status of *every* person stopped who is reasonably suspected to be unlawfully present and *every* person arrested in the state, the number of requests made to DHS will undoubtedly be significant. *See* Estrada Decl. ¶ 6; Declaration of Jack Harris, Phoenix Police Chief (attached as Exhibit 10), at 6. But LESC resources are currently dedicated in part to critical national security and law enforcement functions. Palmatier Decl. ¶ 4. LESC's mission is broad. It includes processing FBI requests for immigration-related background information on individuals seeking to purchase firearms, U.S. Secret Service requests for individuals seeking access to a protected area (*e.g.*, the White House Complex), and requests related to employment issues at sensitive locations that could be vulnerable to sabotage,

---

[27] 8 U.S.C. § 1373(c) provides that DHS "shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status . . . for any purpose authorized by law, by providing the requested verification or status information."

attack, or exploitation. *Id.* LESC also analyzes information received from the public about suspicious or criminal activity and then disseminates that information to ICE field offices for investigation. *Id.* ¶ 14. With respect to inquiries from law enforcement agencies, "the LESC prioritizes its efforts in order to focus on criminal aliens and those most likely to pose a threat to their communities." *Id.* ¶ 7. DHS has advised that "SB 1070 will inevitably result in a significant increase in the number of" immigration verification queries, and that such an increase will "reduc[e] [LESC's] ability to provide timely responses to law enforcement on serious criminal aliens." Palmatier Decl. ¶¶ 15–16, 7. This increase in requests therefore creates a significant risk that the federal government will be forced to shift resources away from its chosen priorities. *See id.* ¶¶ 15–18; Ragsdale Decl. ¶ 44. DHS's resources will further be strained by increased demands for testimony by DHS officials at criminal proceedings implicating immigration status. *See* Gentile Decl. ¶ 9. In light of DHS's fixed resources, this dramatic surge in verification requests as a result of Section 2 (as well as some of the other provisions of S.B. 1070) will necessitate a shift away from other federal priorities so as to accommodate the workload generated by Section 2. *See* Palmatier Decl. ¶¶ 15-16; Ragsdale Decl. ¶ 44.[28]

In assessing the scope of the conflict between Section 2 and federal priorities, moreover, the Court must consider the impact that would result if other states follow suit with similar laws. *See, e.g., North Dakota v. United States*, 495 U.S. 423, 458 (1990) (Brennan, J., concurring in the judgment in part and dissenting in part) (considering that the difficulties presented by state requirement would "increase exponentially if additional States adopt[ed] equivalent rules," and noting that such a nation-wide consideration was "dispositive" in *Public Utility Commission of the State of California v. United States*, 355 U.S. 534, 546 (1958)). In this case, this aggregation of effects is not purely speculative:

---

[28] Additionally, under the terms of the statute, Arizona will not release those arrested while the immigration status check is ongoing. Accordingly, Arizona's new law places DHS in the impossible dilemma of choosing between prioritizing California's § 1373(c) requests over the various law enforcement requests of other states and federal entities or risking that aliens (and even U.S. citizens) in Arizona will be subjected to prolonged detentions.

several states have already begun considering similar measures.[29] Enactments by additional states of Section 2-like mandates will only further burden DHS's ability to pursue its immigration policy objectives and other law enforcement objectives. Palmatier Decl. ¶ 20; Ragsdale Decl. ¶ 44; *see also Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 863 (2000) (granting deference to expert agency's views on conflict between state law and statutory objectives); *Chae v. SLM Corp.*, 593 F.3d 936, 948-49 (9th Cir. 2010) (similar).

Accordingly, as informed by DHS's determination that S.B. 1070's mandatory verification requirement will "reduc[e DHS's] ability to provide timely responses to law enforcement on serious criminal aliens," thereby potentially allowing "very serious violators [to] escape scrutiny and be released before the LESC can respond to police and inform them of the serious nature of the [unlawfully present] alien they have encountered," (Palmatier Decl. ¶ 17), this Court should hold that Section 2 of S.B. 1070 represents an impermissible burden on federal resources.

      **c.**       **Section 6 of S.B. 1070 Extends Arizona's Warrantless Arrest Authority to Out-of-State "Removable" Offenses and is Preempted Because it Will Lead to the Harassment of Aliens**

Section 6 is similarly preempted under the principles articulated in *Hines*, because Section 6 will also lead to further harassment of lawfully present aliens. Section 6 expands the circumstances under which law enforcement officers can make warrantless arrests by allowing Arizona peace officers to arrest anyone whom they have probable cause to believe "has committed any public offense that makes the person removable from the United States." Arizona law defines "public offense" to mean "conduct for which a sentence to a term of imprisonment or of a fine is provided by any law of the state in which it occurred." Ariz. Rev. Stat. § 13-105(26). Because, prior to the enactment of Section 6, Arizona law already allowed for warrantless arrests for misdemeanors and felonies committed in Arizona, the

---

[29] *See, e.g.*, Kirk Adams, *The Truth Behind the Arizona Law*, Wash. Post, May 28, 2010 (Bus. Sec.) ("[A]t least 18 other states are considering adopting similar immigration laws."); Ginger Rough, *Arizona Immigration Law: Other States Mull Over Versions of Migrant Law*, May 13, 2010, *available at* http://www.azcentral.com/arizonarepublic/news/articles/2010/05/13/20100513arizona-immigration-law-followers.html.

effect of Section 6 is to allow warrantless arrests based on (i) out-of-state crimes which (ii) the police officer determines would subject the alien to removal. Notably, warrantless arrest authority under Section 6 does not depend on coordination with DHS to verify removability.

This provision is preempted because it will result in the arrest and harassment of lawfully present aliens. Section 6 depends on a threshold determination of whether a "public offense makes [a] person removable," S.B. 1070 § 6, a determination that requires expertise regarding a complex corpus of immigration law. As Justice Alito has explained, the removability consequences "for a particular offense . . . [are] often quite complex" in that "determining whether a particular crime" will potentially render an alien removable "is not an easy task." *See Padilla v. Kentucky*, 130 S. Ct. 1473, 1488 (2010) (Alito, J., concurring). For this reason, the federal government has exclusive authority to determine whether the commitment of a crime by a lawfully present alien – state or federal – would render the alien removable from the United States. *See* 8 U.S.C. § 1182(a)(2) (setting forth certain criminal convictions as grounds for inadmissibility); 8 U.S.C. § 1227(a)(2) (same for deportation).

Nonetheless, Arizona now demands that local law enforcement officers engage in this complicated analysis of removability by folding such warrantless arrest authority into its scheme of "attrition through enforcement." But this is an analysis which Arizona's peace officers are ill prepared to make. Almost by definition, Section 6 is triggered only by non-Arizona crimes (with which Arizona police are unlikely to be familiar), and will demand an instantaneous judgment on the highly contextual and fact specific removability calculus – a matter which is the subject of intense training for federal officers and which lies squarely outside of Arizona peace officers' general expertise.[30] Adding to the complexity of this determination, various federal officers are empowered to order reprieves from the

---

[30] *See* Estrada Decl. ¶¶ 8-9 ("[M]y officers are not experts in immigration matters. . . . I am concerned that the state training will not equip my officers with the necessary knowledge and expertise that would allow them to reasonably suspect when someone is in the country unlawfully or has committed a public offense that makes them removable."); Declaration of Roberto Villaseñor, Chief of Police, Tucson Police Department (attached as Exhibit 9), ¶ 6 ("While my officers are comfortable establishing the existence or non-existence of reasonable suspicion as to criminal conduct, they are not at all familiar with reasonable suspicion as to immigration status, not being trained in Federal immigration law."); Harris Decl. at 7.

33

immigration consequences of state crimes. *See, e.g.*, 8 U.S.C. §§ 1229b(a), 1253(a)(3). For that reason alone, not every alien who has committed a "public offense" that might make him removable will actually be removed from the United States. Arizona police officers will undoubtedly erroneously arrest many aliens who could not legitimately be subject to removal – whether because the Arizona police mistakenly identify an out-of-state crime as a removal predicate, the Arizona police wrongfully assess whether an out-of-state crime will result in a conviction, the Arizona police wrongly assess the removability calculus, or the particular immigration consequence of the alien's conduct has already been resolved by the federal government.[31] That outcome cannot be squared with the Supreme Court's concern for the imposition of distinct and extraordinary state burdens on aliens. *See Hines*, 312 U.S. at 65–66. The impropriety of Arizona's action is underscored by the fact that Section 6 is not "focuse[d] directly upon" a legitimate state criminal law function. *De Canas*, 424 U.S. at 357. The statute's exclusive concern for crimes that give rise to removability consequences belies a focus on the conduct of aliens, and not an effort "tailored to combat" local problems. *Id*.

### 2. Section 3 of S.B. 1070 – Arizona's "Complete or Carry an Alien Registration Document" Provision – Is Preempted by Federal Law

Arizona's new alien registration requirement, codified in Section 3 of S.B. 1070, is preempted because it legislates in an area fully occupied by Congress and conflicts with federal law and enforcement priorities in that field.

### a. Section 3 Interferes with Comprehensive Federal Alien Registration Law

Through the federal alien registration scheme, Congress has created a comprehensive system for monitoring the entry and location of aliens within the United States. Congress has provided very specific measures ranging from which aliens must register, *see* 8 U.S.C. §§ 1201, 1301, when they must register, *see* 8 U.S.C. § 1302, the content of the registration forms and what special circumstances may require deviation, 8 U.S.C. § 1303, the

---

[31] The risk of harassment is not limited to aliens who have committed out-of-state crimes. Section 6 also allows for arrest for Arizona crimes.

confidential nature of registration information, 8 U.S.C. § 1304, the circumstances under which an already-registered alien must report his change of address to the government, 8 U.S.C. § 1305, and the penalties for failing to register or failing to notify the government of a change in address, 8 U.S.C. § 1306. Registered aliens are required to carry their "certificate[s] of alien registration" or "alien registration receipt card[s]," subject to punishment of up to thirty days of imprisonment and a monetary fine. 8 U.S.C. § 1304(e); 18 U.S.C. § 3571. Willful failure to apply for registration is a federal misdemeanor, punishable under the registration statute by up to six months of imprisonment and a monetary fine. 8 U.S.C. § 1306(a); 18 U.S.C. § 3571; *see also* 8 C.F.R. Part 264.

This registration system is a quintessential example of a pervasive and comprehensive scheme of federal regulation that leaves no room for state legislation. Indeed, in *Hines*, the Supreme Court recognized that federal alien registration law manifests Congress's intent to monitor aliens through a system that would be "uniform," "single," "integrated," and "all-embracing." *Id.* at 74. The Court considered the precursor to the current federal alien registration system,[32] and held that it precluded Pennsylvania from enforcing its own alien registration requirements, because:

> [T]he federal government, in the exercise of its superior authority in this field, has enacted a complete scheme of regulation and has therein provided a standard for the registration of aliens, [and] states cannot, inconsistently with the purpose of Congress, conflict or interfere with, curtail or complement, the federal law, or enforce additional or auxiliary regulations.

*Hines*, 312 U.S. at 66-67. Put simply, *Hines* held that Congress intended the federal government to exercise exclusive control over all issues related to alien registration.

Arizona's new alien registration provision conflicts with the federal goal, recognized in *Hines*, of uniformity and singularity in registration (a field which so closely touches on foreign relations). Section 3 removes federal control of prosecution for registration violations by creating state-specific crimes based on federal alien registration requirements.

---

[32] *Hines* considered the alien registration requirements imposed by the Alien Registration Act of 1940, 54 Stat. 670. Sections 1304 and 1306 were adopted in 1953 as part of the INA, which "incorporate[d] in substance the provisions of the Alien Registration Act, 1940, relating to the registration of aliens," and added additional registration requirements. H.R. Rep. 82-1365, 2d Session, 1952, 1952 U.S.C.C.A.N. 1653, 1723.

Arizona's criminal sanctions apply to aliens who violate either 8 U.S.C. § 1304(e), because they failed to carry their registration cards, or § 1306(a), because they failed to register with the federal government. S.B. 1070 § 3. But *Hines* held that states were precluded from supplementing the federal immigration scheme, even if such regulations appear to complement that scheme. *See, e.g., Hines*, 312 U.S. at 66-67; *Garamendi*, 539 U.S. at 420 n.11. Having piggybacked on the requirements of federal law, Arizona imposes its own corresponding set of state imprisonment terms and fines for federal registration violations. S.B. 1070 § 3(H). These state penalties can be imposed on an alien regardless of whether the alien has already been punished by the federal government under the federal alien registration scheme, and they therefore allow for increased and varied punishment for registration violations that happen to occur in Arizona. *Id.*[33] Arizona's creation of a state-specific criminal scheme for individuals who violate the federal alien registration laws directly contravenes the choices made by Congress in providing uniform standards under federal control. *See Hines*, 312 U.S. at 74. Arizona's auxiliary penalties for violations of the federal alien registration laws are therefore preempted.

What Arizona has done is no different from what the Supreme Court prohibited in *Wisconsin Department of Industry, Labor and Human Relations v. Gould, Inc.*, 475 U.S. 282 (1986), where the Supreme Court struck down a Wisconsin law that prohibited certain violators of the National Labor Relations Act ("NLRA") from doing business with the State. *Id.* at 283-84. The Court held that where states had no independent authority to "regulate activity that the NLRA protects, prohibits, or arguably protects or prohibits," so, too, are states prohibited from "*providing their own regulatory or judicial remedies* for conduct prohibited or arguably prohibited by the Act." *Id.* at 286 ("The rule is designed to prevent 'conflict in its broadest sense' with the 'complex and interrelated federal scheme of law, remedy, and administration,' . . . and this Court has recognized that '[c]onflict in technique

_____

[33] Unlike S.B. 1070, Congress carefully calibrated and imposed *different* penalties for each specific alien registration violation. *Compare* 8 U.S.C. § 1304, *with* § 1306, *and with* S.B. 1070 § 3(H).

can be fully as disruptive to the system Congress erected as conflict in overt policy.'"
(emphasis added)). Undoubtedly, under *Hines*, Arizona is barred from establishing its own
registration standards. So, just as in *Gould*, Section 3 "functions unambiguously as a
supplemental sanction for [federal] violations" over which the state is powerless to control.
*Id.* at 288; *see also Kobar*, 378 F. Supp. 2d at 1174-75 (Bolton, J.) (finding state fraud claims
preempted where proving a violation of federal law was an essential element of the claim).

Here, if Arizona's supplemental sanctions were deemed valid, aliens in Arizona and
any other state that imposed similar sanctions would be penalized in a different manner than
aliens who were subjected solely to the federal penal system – causing the inconsistent
treatment of aliens across the United States. Such a result, *Hines* held, would violate the
congressional demand for uniform treatment of alien registration. *See Hines*, 312 U.S. at 72;
*see also Nelson*, 350 U.S. at 505-06. Moreover, the enforcement of obligations arising from
the relationship between the federal government and persons it regulates – here, aliens
required to register under the INA – is for the federal government itself, and not an area of
traditional state regulation. *See Buckman*, 531 U.S. at 347; *Nelson*, 350 U.S. at 515 ("Alien
registration is not directly related to control of undesirable conduct; consequently there is no
imperative problem of local law enforcement.").

> **b.** **Section 3 is Preempted Because it Seeks to Criminalize Unlawful Presence and Will Result in the Harassment of Aliens**

Finally, Section 3 of S.B. 1070 is preempted because it is a thinly veiled and
impermissible attempt to criminalize unlawful presence. Section 3 is termed a "registration"
law, but on its face seeks to criminalize only those aliens who are unlawfully present, by
providing an exception for any "person who maintains authorization from the federal
government to remain in the United States." S.B. 1070 § 3(F). The existence of this
exception makes clear that, although Section 3 superficially tracks federal registration
provisions (which is itself impermissible, as described above), its aim is to criminalize
unlawful presence, thus affording a basis for stopping and inspecting aliens (Section 2) and
criminally prosecuting them. The legislators who enacted S.B. 1070 have routinely

confirmed that the goal of the statute was to "mak[e] it a state crime to be in this country illegally."[34]

Whatever powers a state may have to enact laws that incidentally or indirectly touch on aliens, a state may not criminalize unlawful presence – an immigration status created by the federal scheme and of purely federal concern. *See De Canas*, 424 U.S. at 356–57. Further, this focus on criminalizing unlawful presence is at odds with the policy objectives underlying the federal scheme, in which Congress has repeatedly considered and rejected attempts to criminalize unlawful presence. *See* S. 2454, 109th Cong. §§ 206, 275 (2006); H.R. 4437, 109th Cong. § 203 (2005); *see also* Steinberg Decl. ¶ 34 ("United States immigration law – and our uniform foreign policy regarding treatment of foreign nationals – has been that the mere unlawful presence of a foreign national, without more, ordinarily will not lead to that foreign national's criminal arrest or incarceration. . . . This is a policy that is understood internationally and one which is both important to and supported by foreign governments.").

Moreover, in pursuing this improper goal, the scheme imposed by Arizona is inconsistent with federal immigration laws and would result in the harassment of aliens who are lawfully present or whose presence is known and accepted by the federal government. As noted above, in many cases, aliens who are lawfully in the United States or seeking lawful status will not be provided documentation that satisfies federal regulations governing

---

[34] Kirk Adams, *The Truth Behind the Arizona Law*, Wash. Post, May 28, 2010 (Bus. Sec.) (editorial from speaker of the Arizona House of Representatives). Section 3's legislative history also confirms that the statute was crafted specifically out of concern for unlawfully present aliens. The section criminalizing violations of federal registration law was originally referred to as a "Trespassing" provision. Although Arizona has since changed the title for this statutory section, the labeling was not accompanied by any change to the substance of the provision that might suggest a changed intent for the statute. In fact, the sponsors of S.B. 1070 continued to refer to Section 3 as the "trespassing" provision even after amending the section's heading. *See* Minutes of Meeting of Committee on Military Affairs and Public Safety, Consideration of S.B. 1070, March 31, 2010, at 2 (referring to the registration requirements as constituting a "trespassing" provision). And one sponsor of S.B. 1070, Arizona Senator Russell Pearce, made clear that the changed label simply represented a "change [to] the title to reflect a federal issue" and that, notwithstanding the changed label, the purpose of this section was to "say[] that if you're in Arizona . . . in violation of federal law, that you can be arrested under state law." *See* Recording of Meeting of House Committee on Military Affairs and Public Safety, March 31, 2010, 18:15–18:39, *available at* http://azleg.granicus.com/MediaPlayer.php?view_id=13&clip_id=7286.

registration, and the federal government properly takes that fact into account in its enforcement of the registration statute. *See* Aytes Decl. ¶¶ 2, 5, 13, 17, 19.[35] Section 3 thus conflicts with and otherwise stands as an obstacle to the provisions of federal law and policy allowing for certain types of humanitarian relief. For these reasons, Arizona's attempt to utilize the federal registration scheme to incarcerate those who are unlawfully present will necessarily result in the broad harassment and detention of many aliens who have a legitimate immigration claim and whom the United States would not punish, *see* Aytes Decl. ¶¶ 2, 7, 12; Ragsdale Decl. ¶¶ 46, 47, 49. Section 3 is therefore independently preempted.

### 3. Section 4 of S.B. 1070 Amends Arizona's Alien Smuggling Statute, Which is Preempted Because it Conflicts with Federal Law

Although ostensibly crafted to resemble the federal smuggling statute, Section 4 of S.B. 1070 and the provisions of Arizona law it amends conflict with Congress's scheme concerning smuggling and regulation of the unlawful presence of aliens. Arizona's smuggling laws will also result in the harassment of lawfully present aliens.[36] They are therefore preempted.

The INA embodies Congress's considered judgment as to the appropriate punishments for the commercial facilitation of unlawful immigration. In particular, the federal alien smuggling provisions of the INA criminalize knowing attempts to bring an alien into the United States "at a place other than a designated port of entry or place other than as designated by [DHS]" and also penalizes a person who, in "*knowing or in reckless disregard* of the fact that an alien has come to, entered, or remains in the United States in violation of

---

[35] For example, those aliens who are lawfully visiting the United States from countries participating in the Visa Waiver Program will not have evidence of registration. Aytes Decl. ¶ 21. Similarly, aliens who are seeking humanitarian relief by submitting applications for asylum, temporary protected status, or other forms of relief based on victim status, will not have completed or received a document evidencing "registration," despite having a legitimate claim and application in process.

[36] Although several Arizona decisions have analyzed preemption challenges to the smuggling provision, none have addressed the specific issues addressed herein. *See We Are America/Somos America, Coalition of Arizona v. Maricopa County Board of Supervisors*, 594 F. Supp. 2d 1104 (D. Ariz. 2009) (appeal pending); *Arizona v. Flores*, 188 P.3d 706 (Ariz. App. Div. 1 2008); *State v. Barragan Sierra*, 196 P.3d 879 (Ariz. App. Div. 1 2008).

law," attempts to "transport or move such alien within" the United States "*in furtherance of such violation of law*." 8 U.S.C. § 1324(a) (emphasis added). Thus, in enacting this provision, Congress decided that "smuggling" occurs only when transportation *furthers* an alien's illegal entry or unlawful presence in the country. *See United States v. Rodriguez*, 587 F.3d 573, 584 (2d Cir. 2009); *United States v. Angwin*, 271 F.3d 786, 805 (9th Cir. 2001); *see also United States v. Barajas-Chavez*, 162 F.3d 1285, 1288 (10th Cir. 1999). In addition, the federal smuggling scheme allows for prosecution of the transportation provider, and *not* of the unlawfully present alien. *See United States v. Hernandez-Rodriguez*, 975 F.2d 622, 626 (9th Cir. 1992).

Arizona's smuggling provision differs from and conflicts with the federal smuggling statute in several critical respects. *First*, Arizona's smuggling provision is not related to transportation that is provided "in furtherance" of unlawful immigration, as in the federal alien smuggling statute. Indeed, a state prosecution under this provision would not require that the state even prove, as an element of the crime, that the travel was "in furtherance" of an immigration violation. Instead, Arizona law criminalizes the provision of *any* commercial transportation services – including taxis and buses – to an unlawfully present alien so long as some objective basis should trigger the driver's suspicion that the passenger is unlawfully present. *See* Az. Rev. Stat. § 13-2319(A); *see Flores*, 218 Ariz. at 412. *Second*, Arizona's smuggling laws, coupled with Arizona's conspiracy statute, diverges from federal smuggling law by imposing criminal sanctions on the alien "smugglee" himself. *See Barragan Sierra*, 196 P.3d at 888. *Third*, Arizona's smuggling provision is not targeted at smuggling across the United States' international borders or at facilitation of an immigration crime, thus widening the reach of the state law smuggling crime.

In addition to significantly expanding the scope of criminality far beyond the careful balance that Congress struck in the INA, these variances from federal law operate both separately and in tandem to establish an anti-smuggling scheme that allows Arizona to punish mere unlawful presence in the country by criminalizing the use of paid transportation services. This conflicts with federal law. As evidenced by the fact that the Arizona laws

40

allow for the punishment of "self smuggling" and broadly target the use of commercial transportation, the real purpose and effect of Arizona law is to criminally punish unlawful presence. *See De Canas*, 424 U.S. at 356–57; *see Oxygenated Fuels Ass'n v. Davis,* 331 F.3d 665, 672 (9th Cir. 2003) ("In analyzing conflict preemption, however, we examine not only the purpose of [a state law]; we also examine its effects. Whatever the purpose . . . of the state law, preemption analysis cannot ignore the effect of the challenged state action on the pre-empted field."); *see also Anderson v. Mullaney*, 191 F.2d 123, 127 (9th Cir. 1951) (preemption concerns judged by effect of state law in addition to claimed intent of state law). But Congress, which controls the sanctions available for unlawful presence, chose *not* to subject an unlawfully present alien to incarceration for merely using commercial transportation where such use has no bearing on the alien's unlawful presence. *See De Canas*, 424 U.S. at 355-56. Arizona's criminalization of unlawful presence coupled with the natural byproducts of unlawful presence – *e.g.*, use of commercial transportation and "self-smuggling" – is directly at odds with Congress's calibrated scheme of sanctions.

The Supreme Court has repeatedly held that state action is preempted if it seeks to impose additional burdens on aliens beyond those authorized by Congress. *See, e.g.*, *Chy Lung*, 92 U.S. at 281 (statute regulating arrival of passengers from foreign port); *Henderson v. Mayor of the City of N.Y.*, 92 U.S. 259 (1875) (same); *cf. De Canas*, 424 U.S. at 357 (distinguishing state law as non-preempted where it is "focus[ed]" and "tailored" on local problem). Arizona's smuggling laws conflict with Congress's manifest intent to deter and penalize unlawful immigration through a very specific set of mechanisms. *See Crosby*, 530 U.S. at 380 (internal citations omitted); *cf. Wells Fargo Bank N.A. v. Boutris*, 419 F.3d 949, 966 (9th Cir. 2005) ("Where such a decision not to regulate represents . . . a considered determination that no regulation is appropriate, that choice preempts contrary state law imposing governing standards." (internal quotation marks omitted)).

If that were not enough, Arizona's smuggling statute will also result in the harassment of lawful alien residents, conflicting with the federal immigration laws' careful balance of enforcement and civil liberties articulated by the Court in *Hines*. By criminalizing the

provision of transportation services based on immigration status (as opposed to conduct), and by subjecting transportation providers to the statute's criminal penalties upon a showing of simple negligence,[37] Arizona's smuggling provisions will necessarily result in special and unique burdens on and discrimination against lawful aliens. Because, under Arizona law, a transportation provider can be charged with a felony for the merely negligent transportation of unlawfully present aliens (*i.e.*, for providing transportation to an alien who one *might* objectively believe to be unlawfully present), risk-averse transportation providers will inevitably (i) reject business from lawfully present aliens so as to protect themselves against a charge that they "should have known" that a passenger was an unlawfully present alien, or (ii) demand that lawfully present aliens provide documentation to prove their immigration status prior to using paid transportation services. The smuggling provision thus subjects lawfully present aliens to specialized burdens of the type rejected in *Hines*. 312 U.S. at 73–74.

### 4. Section 5 of S.B. 1070 – Arizona's New Criminal Sanction Against Unauthorized Aliens Who Solicit or Perform Work – is Preempted by the Federal Employer Sanctions Scheme

Section 5 of S.B. 1070, which establishes criminal penalties for unlawfully present aliens who solicit or perform work in Arizona, is preempted by Congress's comprehensive scheme, set forth in the Immigration Reform and Control Act of 1986 ("IRCA"), for regulating the employment of aliens.

IRCA reflects Congress's deliberate choice *not* to criminally penalize unlawfully present aliens for performing work, much less for attempting to perform it.[38] IRCA's

---

[37] Whereas Congress has opted to only criminalize intentional smuggling, Arizona's statute is triggered by the transportation provider's simple negligence in evaluating immigration status. *Compare* 8 U.S.C. § 1324(a)(1)(A) (federal alien smuggling statute is only implicated where transportation provider "know[s] or . . . reckless[ly] disregard[s] the fact that an alien" has unlawfully entered the United States), *with* Az. Rev. Stat. § 13-2319(E)(3) (state smuggling statute is triggered wherever a transportation provider "knows *or has reason to know*" that the persons transported have unlawfully entered or remained in the United States (emphasis added)); *see also generally United States v. Townsend*, 924 F.2d 1385, 1391 n.2 (7th Cir. 1991) ("[U]sually in the law to say that someone has 'reason to know' something means that he would be *negligent* in not knowing it." (emphasis added)).

[38] *See Puerto Rico Dept. of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S. 495, (continued...)

42

"comprehensive scheme" places a primary emphasis on employer sanctions. *See Hoffman Plastic Compounds v. NLRB*, 535 U.S. 137, 147 (2002); *Lozano,* 496 F. Supp. 2d at 477, 524-25. IRCA provides robust penalties for employers of unlawfully present aliens, and no criminal penalties for unlawfully present aliens who simply perform or solicit employment. *See* 8 U.S.C. § 1324a, *et seq*. Among its many provisions targeting employers, IRCA punishes employers for knowingly hiring unauthorized workers, 8 U.S.C. § 1324a(a)(1)(A); prohibits employers from recruiting or referring for a fee such workers, *id.*; prohibits continuing employment by employers of unauthorized workers, *id.* § 1324a(a)(2); sanctions employers who use contracts or subcontracts to hire unauthorized workers, *id.* § 1324a(a)(4); and requires employers to comply with a new "employment verification system," *id.* § 1324a(b). IRCA also created a detailed compliance scheme to enforce an employer's obligations under the new law, with various monetary penalties for initial violations, larger monetary penalties for subsequent violations, as well as the prospect of injunctive sanctions. *See id.* § 1324a(e)(4); 8 C.F.R. § 274a.10. While IRCA's primary focus is on employer sanctions, Congress has demonstrated what sanctions would be appropriate for employees, by providing very targeted sanctions against certain conduct of unauthorized aliens, such as the presentation of fraudulent documents to demonstrate work eligibility. *See* 8 U.S.C. § 1324c.

But beyond these penalties linked to specific acts, IRCA does not criminalize the mere performance or solicitation of work by an unlawfully present alien. Congress's focus on employers was intentional, and reflected its belief that sanctions on employees were

---

[38] (...continued)
503 (1988) ("Where a comprehensive federal scheme intentionally leaves a portion of the regulated field without controls, then the pre-emptive inference can be drawn – not from federal inaction alone, but from inaction joined with action."); *Adkins v. Mireles*, 526 F.3d 531, 539 (9th Cir. 2008) ("State law may constitute an impermissible obstacle to the accomplishment of purposes of Congress by regulating conduct that federal law has chosen to leave unregulated." (internal quotation marks omitted)); *accord Transcontinental Gas Pipe Line Corp. v. State Oil & Gas Bd. of Miss.*, 474 U.S. 409, 422 (1986) ("To the extent that Congress denied FERC the power to regulate affirmatively particular aspects of the first sale of gas, it did so because it wanted to leave determination of supply and first-sale price to the market. A federal decision to forgo regulation in a given area may imply an authoritative federal determination that the area is best left unregulated, and in that event would have as much preemptive force as a decision to regulate." (internal quotation marks omitted)).

inappropriate. As the Ninth Circuit has explained, although Congress "discussed the merits of fining, detaining or adopting criminal sanctions against the *employee*, it ultimately rejected all such proposals. . . . Instead, it deliberately adopted sanctions with respect to the *employer* only." *See Nat'l Ctr. for Immigrants' Rights v. INS*, 913 F.2d 1350, 1368 (9th Cir. 1990) (*rev'd on other grounds*, 502 U.S. 183 (1991)) (emphasis in original). IRCA therefore embodied a "congressional policy choice [that was] clearly elaborated" in favor of sanctions only for the employer. *Id.* at 1370. IRCA's legislative history further confirms that Congress affirmatively rejected criminal penalties for the unlawfully present employee for important policy reasons. Congress's concern about the humanitarian consequences of criminally punishing employees prompted it to exclusively enact punishments for the employer and reject such punishments for the employee.[39]

By attempting to override Congress's conscious choice not to criminally punish unlawful aliens for soliciting or performing work, Arizona has created a clear conflict with federal law. *See Crosby*, 530 U.S. at 380; *Puerto Rico Dept. of Consumer Affairs*, 485 U.S. at 503. But the Supremacy Clause does not permit Arizona to second-guess Congress's decision not to impose sanctions on employees. *See, e.g., Thunder Craft Boats, Inc.,* 489 U.S. at 152; *Felder*, 487 U.S. at 143.

>    **5.**     **Section 5 of S.B. 1070 – Arizona's Transporting, Harboring, or Concealing Provision – Violates Preemption and Dormant Commerce Clause Principles**

The second provision of Section 5 of S.B. 1070 makes it illegal for a person, who is in violation of a criminal offense, to (1) transport an alien in Arizona in furtherance of the unlawful presence of the alien in the United States; (2) conceal, harbor, or shield an alien from detection in any place in the state; and (3) encourage or induce an alien to come to or

---

[39]   *See* H.R. Rep. No. 99-682(I) at 46 ("Now, as in the past, the Committee remains convinced that legislation containing employer sanctions is the most humane, credible and effective way to respond to the large-scale influx of undocumented aliens."); *see also Nat'l Ctr. for Immigrants' Rights*, 913 F.2d at 1366, 1369 ("The emphasis on employer sanctions in IRCA militates against reading in the authority to detain individuals to prevent them from working."); Ragsdale Decl. ¶ 21. And Congress's intent not to punish unauthorized aliens for seeking employment was further evidenced through the simultaneous passage of other sections of IRCA, which coupled new employer sanctions with the adjustment of status for certain alien workers present in the United States. *See* 8 U.S.C. §§ 1160, 1255a.

44

reside in this state if the person knows that such coming to, entering or residing in this state is or will be in violation of law. S.B. 1070 § 5(A) (§ 13-2929). This provision represents an invalid incursion on federal authority for two reasons.

*First*, to the extent that Section 5 is not a restriction of interstate movement, it is necessarily a restriction on unlawful entry into the United States. As a border state, Arizona's boundaries are in part the boundaries of the United States. Section 5 represents an attempt to regulate entry into the *nation* – a definitively federal area of concern in which state regulations are barred by the U.S. Constitution. *See De Canas*, 424 U.S. at 355 (a state may not attempt to regulate "who should or should not be admitted into the country, and the conditions under which a legal entrant may remain"). The degree of Arizona's intrusion into the uniquely federal area of unlawful entry is further underscored by the fact that Arizona construes such prohibitions on immigration conduct to apply to the alien himself. *See, e.g.*, *Barragan-Sierra*, 196 P.3d at 888.

*Second,* this provision offends the Dormant Commerce Clause by restricting the interstate movement of aliens. Article I, Section 8 of the Constitution grants Congress the right to regulate commerce between the states – a positive grant of power that forbids state regulations that intentionally interfere with interstate commerce. The "Dormant Commerce Clause" forbids certain state regulations attempting to discourage or otherwise restrict the movement of people between states. *See Edwards v. California*, 314 U.S. 160, 172-73 (1941). *Edwards* involved a challenge to a depression-era California statute prohibiting "the 'bringing' or transportation of indigent persons into California." *Id.* at 173. The Supreme Court invalidated the statute under the Dormant Commerce Clause, which "prohibit[s] attempts on the part of any single State to isolate itself from difficulties common to all of them by restraining the transportation of persons and property across its borders." *Id.*; *see also Camps Newfound/Owatonna v. Town of Harrison*, 520 U.S. 564, 584 (1997) (reaffirming that the Dormant Commerce Clause prohibits certain limitations on the interstate transportation of persons); *Anderson v. Mullaney*, 191 F.2d 123, 127 (9th Cir. 1951) (holding that Alaska violated the Dormant Commerce Clause in enacting a scheme of regulations that

discouraged the movement of out-of-state fishermen into Alaska).

Arizona's prohibition on encouraging movement into the state similarly violates the Dormant Commerce Clause. The prohibition on "encourag[ing] an alien to come to or reside in" Arizona aims to restrict the movement of unlawfully present aliens from other states into Arizona. Although the statute claims only to apply where an alien's "entering or residing in [Arizona] is or will be in violation of law," S.B. 1070 § 5(A), unlawfully present aliens who are subject to Section 3 of S.B. 1070 will usually meet this condition. Even though Arizona's statute is phrased in similar terms as the federal alien smuggling statute, the latter deals with actual immigration – the movement across an international border – whereas the former also regulates movements *within* the United States. This restriction on movement within the states is prohibited by the Dormant Commerce Clause.[40]

## II. THE UNITED STATES WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION

Upon demonstrating a likelihood of success on the merits, a plaintiff must also establish that, absent the preliminary injunction, there is a likelihood that the defendant's conduct will cause irreparable harm. *See Winter*, 129 S. Ct. at 375. Preliminary injunctive relief is necessary here because S.B. 1070 is causing irreparable harm to the United States, and this harm will only be magnified if the law goes into effect.[41] If not enjoined, S.B. 1070 will continue to cause irreparable harm to the United States in at least three significant ways.

*First*, S.B. 1070 irreparably undermines the federal government's control over the

---

[40] Additionally, Section 5 of S.B. 1070 directly conflicts with a section of the federal alien smuggling statute (8 U.S.C. § 1324(a)(1)(C)), which provides a distinct carve-out for certain religious organizations which would now be punishable under Arizona law. Certain religious organizations that meet the requirements of § 1324(a)(1)(C) and which conceal, harbor, or shield an alien whom they know to have illegally entered or remained in the United States, would be in violation of Section 5 of the Arizona law, despite an express command from Congress that such behavior not be subject to criminal sanctions.

[41] The Ninth Circuit has traditionally used a "sliding scale" approach to the irreparable harm standard, pursuant to which the burden for demonstrating irreparable harm decreases as the likelihood of success on the merits increases. *See Stormans*, 526 F.3d at 412. The Supreme Court has recently held that this approach may not allow preliminary relief upon a showing of only a "possibility" of irreparable harm. *Winter*, 129 S.Ct. at 375–76. However, regardless of whether a "sliding scale" is employed here, injunctive relief is appropriate because, as discussed below, the United States will suffer irreparable harm absent an injunction.

46

regulation of immigration and immigration policy and thereby interferes with the federal government's ability to achieve the purposes and objectives of federal law and to pursue its chosen enforcement priorities. If S.B. 1070 is permitted to become effective on July 29, 2010, the federal government's chosen policy balance with respect to immigration enforcement will be altered and, during the pendency of this action, the federal government's ability to balance the various interests that animate the federal immigration laws will be seriously damaged. Among other things, as discussed above, S.B. 1070 seeks to override, and would impair the ability of DHS to execute, the federal enforcement priority to locate, detain, prosecute and remove violent criminal aliens who pose significant risks to the safety and security of our Nation's citizens. This assault on federal priorities is not speculative; it is the avowed purpose of S.B. 1070. *See* S.B. 1070 § 1. By violating the Constitution's structural reservation of authority to the federal government to set immigration policy, S.B. 1070 effects ongoing irreparable harm to the constitutional order. Indeed, the Supreme Court has suggested that irreparable harm inherently results from the enforcement of a preempted state law. *See New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 366-67 (1989) (suggesting that "irreparable injury may possibly be established . . . by a showing that the challenged state statute is flagrantly and patently violative . . . . of the express constitutional prescription of the Supremacy Clause").

*Second*, the enforcement of S.B. 1070 will inflict irreparable injury on the United States' ability to manage foreign policy. The mere existence of Arizona's "attrition through enforcement" policy – with its concomitant promise of the sweeping criminalization of immigrant populations – has already had negative effects on U.S. foreign policy interests, and these consequences will intensify if S.B. 1070 is permitted to operate. *See* Steinberg Decl. ¶ 34-44. Harm to the federal government's ability to address issues of concern to the United States and its citizens in foreign affairs – such as immigration, national security, and economic policy – cannot be undone by court order.

Foreign leaders from around the Western Hemisphere and elsewhere, including the government of Mexico, have criticized S.B. 1070, and that has undermined the United States'

ability to pursue various diplomatic objectives. *See* Steinberg Decl. ¶¶ 34-40. In one instance, because of the passage of S.B. 1070, Mexico postponed consideration of a bilateral agreement with the United States for coordinating responses to natural disasters and accidents. *See id.* ¶ 43. In another case, at least five of six Mexican governors have announced their refusal to participate in the U.S.-Mexico Border Governors' conference, wherein significant cross-border issues would have been discussed. *See id.* ¶ 42. And Mexico has further limited its participation in the Merida initiative, a partnership aimed at confronting violent transnational gangs. *See* Silver Decl. ¶ 7. Mexican President Calderón has publicly stated that he views S.B. 1070 as undermining Mexican popular goodwill toward the United States, and complicating his country's ability to remain focused on a positive bilateral agenda of critical importance to U.S. national interests. *See, e.g.*, Travel Alert, Secretaría de Relaciones Exteriores, Mexico, Apr. 27, 2010; Mexican President Calderón's Address to Joint Meeting of Congress, May 20, 2010.[42] Such reactions are the predictable result of a state immigration policy whose exclusive aim is "attrition" of foreign nationals in Arizona through a policy of maximum "enforcement" of particular criminal sanctions – a policy given teeth by a mandatory, discretion-less verification scheme that enforces a series of interlocking and virtually automatic criminal penalties. Steinberg Decl. ¶ 22 ("The exercise of immigration functions can quickly provoke a significant bilateral or multilateral problem that harms U.S. interests if handled without appropriate consideration of relevant foreign policy impacts."), ¶¶ 20, 32 ("[D]omestic processes for arrest, detention, and removal . . . are of great interest to foreign governments," and as a "matter of international law and practice, the federal government is held accountable . . . for the actions of state and local authorities regarding our treatment of foreign nationals."). These foreign policy consequences, which will only be magnified by S.B. 1070's implementation, are paradigmatic examples of irreparable harm: Once opportunities for cooperation are lost, they cannot be

---

[42] *See also* Brief of the United Mexican States as *amicus curiae*, *Friendly House v. Whiting*, No. 10-CV-1061 (D. Ariz.) (describing Mexico's objections to S.B. 1070 and impediments that S.B. 1070 will create to certain cooperative arrangements with the United States).

recovered by a favorable judgment at the conclusion of this case.

More generally, the State Department has advised that S.B. 1070 represents an impediment to U.S. foreign policy and diplomatic interests – both with Mexico and with other countries. *See* Steinberg Decl. ¶ 58 ("I have concluded that S.B. 1070 runs counter to American foreign policy interests, and that its enforcement would further undermine American foreign policy."). And such damage to foreign relations will have an adverse effect on federal immigration enforcement. *See* Ragsdale Decl. ¶ 54 ("Should there be any decreased cooperation from foreign governments in response to Arizona's enforcement of SB 1070, the predictable result . . . would be an adverse impact on the effectiveness and efficiency of ICE's enforcement activities"); *id.* ¶¶ 29-32 (cooperation with Mexico is critical to border security and for effectuating removal of dangerous or criminal aliens from the United States). The State Department carefully cultivates relationships with foreign governments so as to enable maximum cooperation on issues of concern to the United States and its citizens – such as immigration, national security, and economic policy. Damage that is done to these relationships is irreparable, as it cannot be undone by court order. Nor is this damage speculative; it has already manifested itself due to the passage of S.B. 1070, and it will only increase significantly if S.B. 1070 is allowed to be enforced. Indeed, with the deepest understanding of these complex foreign relationships, the State Department advises that S.B. 1070 "is likely to hinder our ability to secure the cooperation of other states in efforts to promote U.S. interests internationally across a range of trade, security, [and] tourism," is "likely to undermine the United States' ability to engage effectively with the international community to promote the advancement and protection of human rights," and "risk[s] provoking retaliatory treatment against U.S. nationals by other states." Steinberg Decl. ¶ 57. This ongoing and expected irreparable harm to weighty foreign policy interests alone warrants preliminary injunctive relief. *See Garamendi*, 539 U.S. 396 (upholding district court's injunction due to interference with foreign policy).

Similarly, for the multiple reasons discussed above, S.B. 1070 will result in the harassment of lawfully present aliens, which frustrates the United States' relationship with

immigrant communities and damages the United States' reputation as a welcoming country for lawfully admitted aliens. *See* Steinberg Decl. ¶ 20 (explaining that foreign governments take great interest in domestic processes for arrest and detention of aliens, because of "the impact these processes have on foreign nationals and their families."); *see generally Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) (recognizing that injuries to reputation constitute irreparable harm); *Apple Computer, Inc. v. Formula Int'l, Inc.*, 725 F.2d 521, 526 (9th Cir. 1984) (same).

In addition, DHS, which "maintains the primary interest in the humane treatment of aliens and the fair administration of federal immigration laws," has advised that such "humanitarian interests would be undermined" if certain aliens or categories of aliens are "detained or arrested by Arizona authorities for being illegally present in the United States," Ragsdale Decl. ¶ 47, including aliens eligible for or seeking asylum, *id.* ¶ 48, aliens seeking protection under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *id.* ¶ 50, and aliens in various other circumstances which require individualized discretion, *id.* ¶¶ 47, 49. However, because it is impossible for the state to know when ICE would apply such discretion, and because S.B. 1070's blanket and mandatory "attrition through enforcement" policy makes any such knowledge irrelevant, it is all but guaranteed that S.B. 1070 will work a very real and irreparable interference with Congress's humanitarian objectives and enforcement priorities, which are now carried out by ICE's measured exercise of discretion. *See* Ragsdale Decl. ¶¶ 18, 24, 25 (explaining uses of discretion for humanitarian interests). A court cannot undo the interference with federal enforcement priorities, nor can it undo the effect of a victimized alien's detention or incarceration, or the message that such treatment would convey abroad.

*Finally*, irreparable harm will result because the enforcement of S.B. 1070 will, as discussed above, place a significant burden on DHS resources and force DHS to react to Arizona's enforcement of S.B. 1070 at the expense of its own policy priorities – namely, aliens presenting threats to national security and public safety. *See* Ragsdale Decl. ¶ 41 ("[T]he burdens placed by SB 1070 on the Federal Government will impair ICE's ability to

pursue its enforcement priorities."); Palmatier Decl. ¶ 15-17.  Section 2 of S.B. 1070 will result in a dramatic increase in verification requests to DHS.  Such an increase is not speculative; it is the exact point of the law.  *See* Palmatier Decl. ¶ 15 ("Arizona's new law will result in an increase in the number [of queries] . . . reducing our ability to provide timely responses to law enforcement on serious criminal aliens."); Ragsdale Decl. ¶ 44 ("[T]o respond to the number of referrals likely to be generated by enforcement of SB 1070 would require ICE to divert existing resources from other duties."); *id.* ¶ 52 (noting that without diverting resources from federal priorities, ICE is not staffed to provide testimony in additional hearings against aliens in Arizona).  And, as explained above, the greater share of DHS's attention that Arizona receives as a result will reduce the federal ability to pursue highly dangerous aliens.  If S.B. 1070 is not enjoined, every day the federal government is forced to focus on managing the output of S.B. 1070 rather than on these dangerous aliens will constitute an irreparably lost opportunity to focus on higher priority targets.  This, in turn, poses significant and irreparable risks to the safety and security of our Nation's citizens.

Enforcement of S.B. 1070's mandatory attrition provisions will similarly interfere with ICE's outreach program, which ensures the assistance of unlawfully present aliens in the prosecution of higher priority threats and will also endanger federal immigration authorities' capacity to apprehend highly dangerous targets.  *See id.* ¶ 33 (S.B. 1070 "would . . . interfere with ICE's ability to pursue the prosecution or removal of aliens who pose particularly significant threats to public safety or national security."); ¶ 38 ("[V]ictims and witnesses of crime may hesitate to come forward to speak to law enforcement officials"); Palmatier Decl. ¶ 17 (predicting that, as a result of S.B. 1070, "serious violators may well escape scrutiny and be released before the LESC can respond to police and inform them of the serious nature of the [unlawfully present] alien they have encountered.").  Once this type of damage is done to ICE's enforcement priorities during the period in which "attrition through enforcement" supplants the federal government's balanced set of values, no final judgment can undo it.

### III. A BALANCING OF EQUITIES FAVORS THE UNITED STATES AND DEMONSTRATES THAT THE PUBLIC INTEREST WOULD BE SERVED BY GRANTING INJUNCTIVE RELIEF

Finally, injunctive relief is necessary because a consideration of the public interest and the balance of hardships between the parties favors enjoining S.B. 1070. *See Stormans*, 586 F.3d at 1127. In this action, which seeks to protect the interests of the United States as a whole, the burdens that will result absent injunctive relief are directly tied to the public benefits that will be protected if this Court issues the requested injunction. *Cf. Nken v. Holder*, 129 S. Ct. 1749, 1762 (2009) (stating, in the related context of criteria governing stay of removal, that the criteria of "harm to the opposing party" and "the public interest" "merge when the Government is the opposing party" because harm to the Government is harm to the public interest). That is particularly the case given that this lawsuit seeks to vindicate the supremacy of federal law. *See California Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 853 (9th Cir. 2009) (noting, in considering the balance of equities in the context of preliminary injunction, that "the interest of preserving the Supremacy Clause is paramount" and citing Ninth Circuit precedent "considering the public interest represented by the Constitution's declaration that federal law is to be supreme" (internal quotation marks omitted)).

As discussed throughout this memorandum, a variety of national, public interests are endangered by the operation of S.B. 1070, and will be promoted by the issuance of the requested injunction. Preliminary injunctive relief will help relieve federal immigration authorities of the burdens created by S.B. 1070, thereby allowing them to focus on high priority issues of national security and public safety. The prospect of interference with federal priorities is a clear burden on the United States, just as the ability to pursue these priorities without interruption from S.B. 1070 would benefit the public interest. Additionally, absent an injunction, S.B. 1070's damage to foreign policy will continue unabated – thereby limiting the federal government's ability to productively cooperate with other countries on issues of public importance, such as national security, trade, tourism, and the environment. The operation of S.B. 1070 will also harm U.S. interests by imposing

special burdens on lawfully present aliens – thereby endangering cooperative relationships with this community while directly injuring the reputation and goodwill of the United States. Injunctive relief will serve the public interest by helping to prevent these burdens to aliens specifically and American goodwill generally.

By contrast, a preliminary injunction will not meaningfully burden Arizona. S.B. 1070 has not yet gone into effect, so an injunction in this context would have the effect of merely preserving the status quo. *See U.S. Philips Corps. v. KBC Bank*, 590 F.3d 1091, 1094 (9th Cir. 2010) ("[T]he very purpose of a preliminary injunction . . . is to preserve the status quo and the rights of the parties until a final judgment issues in the cause."). Were this Court ultimately to conclude that S.B. 1070 does not offend the Supremacy Clause, Arizona would then be able to implement and enforce S.B. 1070 without having suffered any substantial burden. What is more, given that this litigation largely concerns immigration law and policy – in which, by any plausible account, the federal interest is paramount and the state interest is (at most) minimal, *see, e.g.*, *De Canas*, 424 U.S. at 355 – the burden on Arizona from a preliminary injunction would be modest. Indeed, Arizona has no legitimate interest in the enforcement of a law that likely violates the Supremacy Clause. *See Chamber of Commerce of U.S. v. Edmonson*, 594 F.3d 742, 771 (10th Cir. 2010) ("Oklahoma does not have an interest in enforcing a law that is likely constitutionally infirm.").

## CONCLUSION

For the foregoing reasons, the Court should grant the United States' Motion for a Preliminary Injunction.

DATED: July 6, 2010

Respectfully Submitted,

Tony West
Assistant Attorney General

Dennis K. Burke
United States Attorney

Arthur R. Goldberg
Assistant Director, Federal Programs Branch

*/s/ Varu Chilakamarri*
Varu Chilakamarri (NY Bar #4324299)
Joshua Wilkenfeld (NY Bar #4440681)
U.S. Department of Justice, Civil Division
20 Massachusetts Avenue, N.W.
Washington, DC 20530
Tel. (202) 616-8489/Fax (202) 616-8470
varudhini.chilakamarri@usdoj.gov
*Attorneys for the United States*