| | |
|---|---|
| Carolyn B. Lamm (*pro hac vice pending*) | Sara Elizabeth Dill (*pro hac vice pending*) |
|    *Counsel of Record* | Perry, Krumsiek & Jack, LLP |
| President | P.O. Box 578924 |
| American Bar Association | Chicago, Illinois 60657 |
| 321 North Clark Street | (312) 857-3455 |
| Chicago, Illinois 60654-7598 | sdill@pkjlaw.com |
| (312) 988-5000 | |
| clamm@whitecase.com | Andrew Silverman (entry of appearance pending) |
| | Arizona State Bar No. 002440 |
| Stephen N. Zack (*pro hac vice pending*) | Joseph M. Livermore Professor and |
| President-Elect |    Director, Clinical Programs |
| American Bar Association | James E. Rogers College of Law |
| 321 North Clark Street | University of Arizona |
| Chicago, Illinois 60654-7598 | P.O. Box 210176, Tucson, AZ 85721-0176 |
| (312) 988-5000 | (520) 621-1975 |
| szack@bsfllp.com | silverman@law.arizona.edu |

*Attorneys for Amicus Curiae AMERICAN BAR ASSOCIATION*

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| The United States of America,<br>   Plaintiff,<br><br>v.<br><br>The State of Arizona and Janice K. Brewer,<br>   Governor of the State of Arizona, in her<br>   Official Capacity,<br>   Defendants. | Civil No. 10-CV-01413-SRB<br><br>REVISED BRIEF OF AMICUS CURIAE<br>AMERICAN BAR ASSOCIATION<br>IN SUPPORT OF<br>PLAINTIFF'S MOTION FOR<br>PRELIMINARY INJUNCTION |

### INTRODUCTION AND STATEMENT OF INTEREST OF AMICUS CURIAE, AMERICAN BAR ASSOCIATION

The American Bar Association ("ABA"), as *amicus curiae*, respectfully submits this brief in support of Plaintiff's Motion for Preliminary Injunction. While the ABA typically files amicus briefs only in the highest federal or state court that will consider a matter, the ABA believes the issues before this Court are of such significance to the American people, its lawyers and the practice of law that they require an amicus brief in this Court. The ABA will limit this *amicus* brief to a discussion of one of these issues: a state's attempted usurpation of exclusive federal authority to make immigration law, which has long been a

1

policy issue of considerable importance to the ABA.[1]  This policy concern has been reflected in ABA policies from at least 1983 through the present, including ABA Resolution 114C (Policy adopted Aug. 1983), which urged the federal government to prohibit state and local police from exercising powers of immigration officers except in cases of alien smuggling,[2] and ABA Resolution 105 (Policy adopted Feb. 2004), which "[u]rges that the Federal Government retain exclusive jurisdiction over civil immigration matters" and "[o]pposes delegation of legal authority to state, territorial and local police to enforce federal civil immigration laws."[3]

The ABA is the largest voluntary professional membership organization and leading organization of legal professionals in the United States.  Its nearly 400,000 members, from each state, territory and the District of Columbia, include attorneys in private firms, corporations, non-profit organizations, and government agencies; and from prosecutorial, public defender and law enforcement and corrections fields, as well as judges, legislators, law professors, law students, and non-lawyer associates in allied fields.[4]

Since its founding in 1878, the ABA has worked for civil rights, just laws, and fair legal process.[5]  It works to improve the quality of legal representation, including for persons charged in criminal cases who cannot afford a lawyer, by promoting competence, ethical conduct and professionalism.[6]  The ABA has pressed "federal, state, local and territorial governments to enact effective legislation, policies, and

---

[1] Only positions adopted by the ABA's House of Delegates ("HOD") become ABA policy.  The HOD is composed of approximately 560 representatives, including those elected by ABA members in each state, territory and the District of Columbia; those representing each state bar association, larger local bar associations, affiliated national legal organizations, and ABA's substantive practice sections and divisions; and the United States Attorney General, among others.  *See* ABA General Information, *available at* http://www.abanet.org/leadership/delegates.html (last visited July 13, 2010).

[2] ABA Report and Recommendation #114C (Policy adopted Aug. 1983), *available from* the ABA.

[3] ABA Report and Recommendation #105 (Policy adopted Feb. 2004) *available at* www.abanet.org/leadership/2004/dj/105.pdf (last visited July 13, 2010).

[4] No member of the ABA Judicial Division Council participated in the preparation of this brief.

[5] *See* ABA Mission and Association Goals, *available at* http://www.abanet.org/about/goals/html (last visited July 13, 2010).

[6] For example, through broadly representative task forces, the ABA continues to develop the ABA MODEL RULES OF PROFESSIONAL CONDUCT, ABA STANDARDS FOR CRIMINAL JUSTICE, and ABA MODEL CODE OF JUDICIAL CONDUCT, each of which have been frequently referred to and adopted by courts, legislatures and executive branch law enforcement agencies.  *E.g., Padilla v. Kentucky,* 559 U.S. ____, 130 S.Ct. 1473, 1482 (2010) ("The weight of prevailing professional norms supports the view that counsel must advise her client regarding risk of deportation.") (citing, *inter alia,* ABA STANDARDS FOR CRIMINAL JUSTICE, PROSECUTION FUNCTION AND DEFENSE FUNCTION 4-5.1(a), at 197 (3d ed. 1993)).

procedures to ban law enforcement's use of [racial or ethnic profiling]."[7]  Since the 1940s, the ABA has also been actively involved in immigration law reform; since that time, it has advocated for constitutional and statutory rights, regardless of citizenship, and for the due process rights of noncitizens in immigration proceedings.[8]  In February 2010, the ABA Commission on Immigration issued a comprehensive report, REFORMING THE IMMIGRATION SYSTEM: PROPOSALS TO PROMOTE INDEPENDENCE, FAIRNESS, EFFICIENCY, AND PROFESSIONALISM IN THE ADJUDICATION OF REMOVAL CASES (ABA 2010) ("ABA Commission on Immigration 2010 Report"), which evaluated the federal immigration system and identified reforms needed within that system.[9]  The ABA respectfully suggests that its views may be of value to this Court as it considers the questions now before it.

## ARGUMENT

The ABA has long opposed initiatives such as S.B. 1070 that, by their plain language, can only be implemented by usurping the federal government's exclusive authority to make immigration law and set immigration policy.  While the ABA believes, as discussed in the ABA Commission on Immigration 2010 Report, that the federal immigration system must be reformed, and while the ABA appreciates Arizona's desire to tackle the problems faced by that state, the ABA also urges that our Constitution does not allow for unilateral state action in the formulation of immigration law.  Immigration matters are and must remain federal, and states should not be permitted to enforce immigration law independently of specific federal authorization; the practical result of the contrary would be the undermining of uniformity in immigration law and immigration law enforcement.  S.B. 1070 should be ruled invalid because it attempts to establish

---

[7] ABA Report and Recommendation #104C (Policy adopted Aug. 2008) (resolution defining racial and ethic profiling as the "use of racial or ethnic characteristics not justified by specific and articulable facts suggesting that an individual may be engaged in criminal behavior"), *available at* www.abanet.org/leadership/2008/annual/adopted/OneHundredFourC.doc (last visited July 12, 2010); *see also* ABA Report and Recommendation #121B (Policy adopted Aug. 2004) (resolution urging "states, territories, and the federal government to strive to eliminate actual and perceived racial and ethnic bias in the criminal justice system by . . . require[ing] law enforcement agencies to develop and implement policies and procedures to combat racial and ethnic profiling"), *available at* www.abanet.org/leadership/2004/annual/dailyjournal/121B.doc (last visited July 14, 2010).
[8] *E.g.,* ABA Report and Recommendation #G (Policy adopted 1955), *available from* the ABA (resolving that "an alien should not be excluded except upon record of evidence taken at a hearing").
[9] Report a*vailable at* http://new.abanet.org/Immigration/PublicDocuments/aba_complete_full_report.pdf (last visited June 28, 2010).

policies at the state level for immigration law enforcement, management and supervision, all of which have been exclusively entrusted to the federal government.

>    A.  **S.B. 1070 Is An Attempt By Arizona To Usurp Exclusive Federal** Authority To **Manage And Supervise Immigration Law Enforcement.**

The Supremacy Clause provides that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land." U.S. Const., art. VI, cl. 2. As it pertains to this case, the Constitution has vested exclusive power over naturalization matters with the federal government, U.S. Const. art. I, § 8, cl. 4, and the Supreme Court, recognizing that immigration is uniquely a federal matter, has stated, "The authority to control immigration . . . is vested solely in the federal government." *Truax v. Raich,* 239 U.S. 33, 42 (1915). The federal government's exclusive authority to regulate immigration matters is confirmed by numerous acts of Congress, including the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101, *et seq.* Consistent with its long-standing policies on preemption issues,[10] the ABA therefore endorses the argument set forth in the Plaintiff's Motion for Preliminary Injunction that "S.B. 1070 is therefore preempted, because (1) it is an unlawful attempt to set immigration policy at the state level, [and] (2) the policy it advances conflicts with federal objectives animating federal administration and enforcement of the INA . . . ." Pl. Mot. at 13; *see also id.* at 11-21.

The independent state action contemplated under S.B. 1070 represents a clear attempt to usurp exclusive federal authority. Further, this independent state action is unnecessary, except as an attempt to bypass federal management and supervision of the state's immigration law enforcement activities because, under Section 287(g) of the INA, Congress has given the Department of Homeland Security ("DHS"), through the U.S. Immigration and Customs Enforcement ("ICE"), statutory authority to operate federal enforcement programs with state and local agencies through memoranda of agreement ("287(g) MOAs").[11] As stated in the DHS Office of Inspector General's March 2010 report ("OIG Report"), such 287(g) MOAs

---

[10] *E.g.,* ABA Report and Recommendation #114C (Policy adopted Aug. 1983), *supra* note 2, and ABA Report and Recommendation #105 (Policy adopted Feb. 2004), *supra* note 3.
[11] Section 287(g) of the INA is codified at 8 U.S.C. § 1357(g).

set out general parameters for program activities, establish the process for supervision and management, and designate local or state officers who will perform immigration enforcement functions.[12]

In S.B. 1070, Arizona has attempted to bypass the requirements of ICE supervision and management of its immigration enforcement activities under a 287(g) MOA. This attempt is particularly troubling since, according to the OIG Report, Appendix E, there are currently eight 287(g) MOAs in place and one pending with Arizona jurisdictions.[13] It is also problematic because, as noted in the OIG Report, "[o]ne aspect of DHS' primary mission is to ensure that civil rights and civil liberties are not diminished by its efforts, activities and programs." *Id.* at 22, citing 6 U.S.C. § 111(b)(1)(G). Even so, the OIG Report stated:

> Claims of civil rights violations have surfaced in connection with several LEAs [state or local law enforcement agencies] participating in the program. Two LEAs currently enrolled in the program were defendants in past racial profiling lawsuits that they settled by agreeing to collect extensive data on their officers' contacts with the public during traffic stops, and adopt policies to protect the community against future racial profiling. Another jurisdiction is the subject of (1) an ongoing racial profiling lawsuit related to 287(g) program activities; (2) a lawsuit alleging physical abuse of a detained alien; and (3) a DOJ investigation into alleged discriminatory police practices, unconstitutional searches and seizures, and national origin discrimination. DHS is a defendant in a lawsuit regarding the allegedly improper detention and deportation of a U.S. citizen by a 287(g) officer from yet another participating LEA.

*Id.* at 23.[14] These claims arose even though state and local officers operating under Section 287(g) MOAs are required to undergo a four-week training program conducted by certified instructors.[15] They are also required "to pass examinations equivalent to those given to ICE officers before they can use federal immigration enforcement authorities." *Id.* at 27. And, ICE field offices are responsible for determining whether 287(g) officers "have engaged in conduct that would make them unsuitable to continue in a federal immigration enforcement capacity." *Id.* at 18.

---

[12] U.S Department of Homeland Security, Office of Inspector General, *The Performance of 287(g) Agreements,*" at 1 (March 2010), *available at* http://www.dhs.gov/xoig/assets/mgmtrpts/OIG_10-63_Mar10.pdf (last visited June 25, 2010).

[13] *Id.* at 83. The jurisdictions with 287(g) MOUs are the Arizona Department of Corrections, Arizona Department of Public Safety, City of Mesa Police Department, City of Phoenix Police Department, Florence Police Department, Maricopa County Sheriff's Office, Pima County Sheriff's Office, Pinal County Sheriff's Office, and Yavapai County Sheriff's Office.

[14] *See also id* at 23 n. 9 citing *GAO, Immigration Enforcement – Better Controls Needed over Program Authorizing State and Local Enforcement of Federal Immigration Laws (GAO-09-109),* January 30, 2009, *available at* www.gao.gov/ (last visited June 28, 2010).

[15] U.S. Immigration and Customs Enforcement Programs, "Delegation of Immigration Authority Section 287(g) Immigration and Nationality Act," August 18, 2008, *available at* www.ice.gov/partners/287g/Section 287_g.htm (last visited June 25, 2010).

In contrast, the Arizona Peace Officer Standards and Training Board ("AzPOST") announced plans to create an electronic training program on enforcement of S.B. 1070, to be sent to every law enforcement agency in the state by the end of June; this was anticipated to count for about two hours of the eight hours of training officers must receive each year to maintain their certification.[16]  However, according to Lyle Mann, executive director of the AzPOST board, deciding whether officers participate in the S.B. 1070 training will be "an agency-by-agency issue."[17]  There was no mention of management, supervision or oversight of Arizona law enforcement agencies in their S.B. 1070 enforcement activities.[18]

S.B. 1070 thus bypasses not only a state requirement of training and oversight but also that required by the federal government under programs such as the 287(g) MOAs.  In order to maintain uniformity in immigration law and immigration law enforcement, and unless Congress determines to the contrary, a state should not be permitted to usurp exclusive federal authority to manage and supervise immigration law enforcement activities.

**B.   Uniformity In Immigration Law And Immigration Law Enforcement Leaves No Place For Laws Like S.B. 1070.**

The U.S. Supreme Court has held that immigration decisions "take into account the character of the relationship between the alien and this country."  *Matthews v. Diaz,* 426 U.S. 67, 80 (1976).  They implicate "foreign relations and international commerce," and call for "delicate policy judgments."  *Plyler v. Doe,* 457 U.S. 202, 205 (1982).

The uniformity in immigration law and immigration law enforcement that is essential to the federal government's ability to maintain consistent national immigration policies and foreign relations leaves no place for independent actions by states in passing laws such as S.B. 1070.  This is because state and local police power derives not from federal law but rather from state and local law, with natural

---

[16] J.J. Hensley, "SB 1070 training is unveiled," azcentral.com, May 20, 2010, *available at* www.azcentral.com/news/articles/2010/05/20/20100520training0520.html (last visited June 25, 2010).

[17] *Id.* This article also quoted Deputy Chief Paul Chagolla, of the Sheriff's Office of Maricopa County, as stating that the Sheriff's Office will determine whether the instruction already offered is sufficient, and "[b]ecause [S.B.] 1070 mirrors what's already in federal law, there's not a lot of training Maricopa County deputies will need because that's what they've already been trained on."  The article also noted that this same Maricopa County Sheriff's Office is the subject of a federal Department of Justice investigation into allegations of racial profiling and is the subject of multiple lawsuits alleging the deputies target Hispanics in immigration enforcement efforts that have led to the arrest or detention of U.S. citizens.

[18] *See id.*

variations occurring between local jurisdictions within a state, and from state to state.  Unless S.B. 1070 is enjoined, Arizona's state and local *criminal* law enforcement personnel will engage in *civil* immigration enforcement activities and, in doing so, they will stop and detain persons, not based on national immigration policies and laws, but based on standards developed for enforcing laws in their jurisdictions.

Under S.B. 1070, these officers – whose primary role and training is to ensure public safety, and as discussed in Part A, above, who will have limited training in the enforcement of S.B. 1070 – will nevertheless be required to detain an individual for whom they have formed a "reasonable suspicion" that the individual is "unlawfully present" in the United States, and to make a "reasonable attempt … when practicable" to determine the individual's immigration status.  The detained individuals may include asylum seekers, those who have been victims of human trafficking, those who appear to be out of status because information in a federal data base is not accurate, and those with valid immigration appeal rights.

Further, although citizens are not required to carry identification, S.B. 1070 will necessarily result in the detention of citizens – even if a police officer has already determined that they have committed no criminal offense – solely because they are not carrying identification.  S.B. 1070 places on these citizens the burden of proof that they should not be indefinitely detained, without any requirements of arraignment or representation of counsel.  While verification of a citizen's status would intuitively appear to present little problem, an unpublished 2006 study by the Vera Institute of Justice identified 125 people in federal immigration detention centers who immigration lawyers believed had valid U.S. citizenship claims.[19]  In another instance, the American Civil Liberties Union cited reports of "dozens of U.S. citizens who have been wrongfully arrested, detained, or deported."[20]  Further, the operation of E-Verify and the Social Security no-match letter litigation have shown that federal databases are poorly integrated and often incomplete or inaccurate.  And, even though this law has not yet become effective, wrongful detention has been documented in Arizona.[21]  Such detention until legal status is proved may cause unjustified and indeed ruinous ripple effects for citizens and those lawfully in the country, such as loss of employment, loss

---

[19] *See* Marisa Taylor, "U.S. Citizen's near deportation not a rarity," Minneapolis Star Tribune, *available at* http://www.startribune.com/nation/14456137.html (last visited June 17, 2010).
[20] *ACLU Demands ICE End Illegal Deportation of U.S. Citizens,* Feb. 13, 2008, *available at* http://www.aclu.org/immigrants/gen/34108prs20080213.html?s_src=RSS (last visited June 17, 2010).
[21] Mary Romero & Marwah Serag, *Violation of Latino Civil Rights Resulting From INS and Local Police's Use of Race, Culture and Class Profiling: The Case of the Chandler Roundup in Arizona*, 52 Clev. St. L. Rev. 75, 79-86 (2005).

of housing due to nonpayment of rent or mortgage, and the consequences that detention may have on these individuals' ability to care for their families.

Further, as noted by the ABA Criminal Justice Section in a 2008 report to the ABA House of Delegates, there already exists "'new evidence of possible racial-profiling by the Arizona Department of Public Safety' showing that Highway Patrol officers were 'more than twice as likely to search vehicles driven by Hispanics and Blacks than those operated by Anglos during 2006.'"[22]

As the Supreme Court has stated: "Once an alien enters the country, the legal circumstances change, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary or permanent." *Zadvydas v. Davis,* 533 U.S. 678, 693 (2001). The ABA has long opposed laws such as S.B. 1070 because of the risks they pose to both the civil rights and civil liberties of minority communities.

Enforcement of laws such as S.B. 1070, moreover, will adversely affect the ability of state and local law enforcement personnel to perform their traditional and necessary public safety functions. It will adversely affect their ability to gain and maintain the trust of immigrant residents, both legally and unlawfully present, and will result in many avoiding contact with local law enforcement, putting entire communities at risk. These residents will quickly understand that if they – as victims, witnesses or concerned residents – have contact with the police, they or their family members will risk detention. Immigrant survivors of domestic violence, sexual assault, trafficking and other crimes will not feel safe approaching law enforcement officials, even for immediate emergency assistance when their lives are in danger.

As mandated by the Constitution, federal statutory law, and decades of Supreme Court authority, and as urged in ABA policy passed by our House of Delegates, states should not be permitted to enforce individual immigration laws such as S.B. 1070. Rather, it is the federal government that is charged with establishing, maintaining and enforcing uniform immigration policy and law.

---

[22] Report and Recommendation 104C at 9 n. 10, *supra* note 7 (quoting Dennis Wagner, *Racial Trends Found in DPS Traffic Sto*ps, Arizona Republic, 7 November 2007, *available at* http://www.azcentral,com/arizonarepublic/news/articles/1107dps1107.html (last visited July 9, 2010)).

**Conclusion**

For the reasons set forth above, the ABA respectfully submits that Plaintiff's Motion for Preliminary Injunction should be granted.

Respectfully submitted this 14th day of July, 2010

/s/ Carolyn B. Lamm
_____
Carolyn B. Lamm

/s/ Stephen N. Zack
_____
Stephen N. Zack

/s/ Sara Elizabeth Dill
_____
Sara Elizabeth Dill

/s/ Andrew Silverman
_____
Andrew Silverman

*Attorneys for Amicus Curiae*
AMERICAN BAR ASSOCIATION


**CERTIFICATE OF SERVICE**

I, Carolyn B. Lamm, certify that this Revised Memorandum Brief of Amicus Curiae American Bar Association In Support of the Plaintiff's Motion For a Preliminary Injunction was filed and served using the court's CM/ECF system for all registered users on the 14th day of July, 2010.

/s/ *Carolyn B. Lamm*
_____
CAROLYN B. LAMM