John J. Bouma (#001358)
Robert A. Henry (#015104)
Joseph G. Adams (#018210)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren
Phoenix, AZ  85004-2202
Phone: (602) 382-6000
Fax: (602) 382-6070
jbouma@swlaw.com
bhenry@swlaw.com
jgadams@swlaw.com

Joseph A. Kanefield (#015838)
Office of Governor Janice K. Brewer
1700 W. Washington, 9th Floor
Phoenix, AZ  85007
Telephone: (602) 542-1586
Fax: (602) 542-7602
jkanefield@az.gov

*Attorneys for Defendants the State of Arizona and Janice K.
Brewer, Governor of the State of Arizona*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| The United States of America,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>The State of Arizona; and Janice K.<br>Brewer, Governor of the State of<br>Arizona, in her Official Capacity,<br><br>　　　　　Defendants. | No. 10-CV-01413-PHX-SRB<br><br><br>**LODGED: PROPOSED RESPONSE<br>TO MOTION FOR PRELIMINARY<br>INJUNCTION ATTACHED** |

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

11751129

John J. Bouma (#001358)
Robert A. Henry (#015104)
Joseph G. Adams (#018210)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren
Phoenix, AZ 85004-2202
Phone: (602) 382-6000
Fax: (602) 382-6070
jbouma@swlaw.com
bhenry@swlaw.com
jgadams@swlaw.com

Joseph A. Kanefield (#015838)
Office of Governor Janice K. Brewer
1700 W. Washington, 9th Floor
Phoenix, AZ 85007
Telephone: (602) 542-1586
Fax: (602) 542-7602
jkanefield@az.gov

*Attorneys for Defendants the State of Arizona and Janice K.*
*Brewer, Governor of the State of Arizona*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| The United States of America, | No. 10-CV-01413-PHX-SRB |
|---|---|
| Plaintiff, | |
| v. | |
| The State of Arizona; and Janice K. Brewer, Governor of the State of Arizona, in her Official Capacity, | **DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| Defendants. | |

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

11751129

**TABLE OF CONTENTS**

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ...................................................1

I.   THE SUPREMACY CLAUSE ....................................................................1

II.  CONGRESS' REGULATION OF IMMIGRATION ...................................3

    A.   Federal Immigration Laws and Enforcement Agencies.....................3

    B.   Congressional Acts Designed to Encourage Cooperation
        Between Federal, State, and Local Authorities.................................3

III. ARIZONA'S ENACTMENT OF SB 1070.......................................................7

    A.   The Impact of Illegal Immigration on Arizona.................................7

    B.   The Pertinent Provisions of SB 1070.................................................9

        1.   Section 2 (A.R.S. § 11-1051).................................................9

            i.   A.R.S. § 11-1051(B) does not require an
                investigation into the immigration status of
                every person arrested ...................................................10

            ii.  A.R.S. § 11-1051(B) does not authorize
                indefinite detention ....................................................11

        2.   Section 3 (A.R.S. § 13-1509).................................................12

        3.   Section 4 (A.R.S. § 13-2319).................................................12

        4.   Section 5 (A.R.S. §§ 13-2828 and 13-2929).........................13

        5.   Section 6 (A.R.S. § 13-3883).................................................14

IV.  LEGAL STANDARD ................................................................................14

V.   PLAINTIFF IS NOT LIKELY TO SUCCEED ON THE MERITS...........15

    A.   Plaintiff Has a Heavy Burden of Establishing that Sections 2
        through 6 of SB 1070 Are Facially Unconstitutional .......................15

    B.   None of the Challenged Sections of SB 1070 Are Preempted.........16

        1.   A.R.S. §§ 11-1051 and 13-3883(A) (Sections 2 and 6)
            do not conflict with federal law and priorities.....................17

            i.   A.R.S. §§ 11-1051 and 13-3883(A) will not
                result in the harassment of lawfully present
                persons ........................................................................17

**TABLE OF CONTENTS**
(continued)

Page

ii.   A.R.S. §§ 11-1051 and 13-3883(A) will not burden federal resources ............................................... 20

2.   A.R.S. § 13-1509 (Section 3) neither conflicts with federal law nor regulates in a federally occupied field .......... 21

3.   A.R.S. § 13-2319 (Section 4) does not conflict with federal law .......................................................... 22

4.   Federal law does not occupy the field of employee sanctions .......................................................... 24

5.   A.R.S. § 13-2929 (Section 5) does not regulate immigration .......................................................... 26

C.   Plaintiff's Argument that SB 1070 Interferes with Foreign Policy Objectives Is Merely An Attempt to Side-Step the *De Canas* Test ......................................................... 27

D.   SB 1070 Correctly Adopts Federal Law as the Policy of Arizona .......................................................... 28

E.   Section 5 of SB 1070 Does Not Violate the Commerce Clause ....... 30

1.   A.R.S. § 13-2929 does not restrict interstate movement of aliens .......................................................... 31

2.   A.R.S. § 13-2929 does not violate the commerce clause .......................................................... 31

i.   A.R.S. § 13-2929 does not discriminate against out-of-state interests or burden interstate commerce .......................................................... 32

ii.   A.R.S. § 13-2929 does not impose an undue burden on interstate commerce ............................... 33

VI.   PLAINTIFF HAS NOT ESTABLISHED IRREPARABLE HARM .......... 34

A.   The Federal Government Cannot Be Harmed By Having to Comply With the Express Intent of Congress .................................... 35

B.   Plaintiff's Alleged Harm Is Hypothetical and Not Well Founded .......................................................... 36

C.   Any Impact to Foreign Policy Based on SB 1070's Enactment Is Based Entirely Upon Misconceptions About the Act .................. 38

VII.   THE BALANCE OF EQUITIES TIPS SHARPLY IN ARIZONA'S FAVOR .......................................................... 39

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

-ii-

1

**TABLE OF CONTENTS**
**(continued)**

2
                                                                                    **Page**

3          IX.     CONCLUSION ............................................................................................42

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Snell & Wilmer
—— L.L.P. ——
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1  Janice K. Brewer ("Governor Brewer") and the State of Arizona oppose plaintiff's

2  Motion for Preliminary Injunction (doc. 27), which seeks to enjoin enforcement of the

3  "Support Our Law Enforcement and Safe Neighborhoods Act," as amended ("SB 1070"

4  or the "Act").   SB 1070 is Arizona's legitimate and constitutionally permissible response

5  to the crushing personal, environmental, criminal, and financial burdens thrust upon the

6  State as a consequence of illegal immigration and the lack of comprehensive enforcement

7  activity by the federal government and certain Arizona "sanctuary" cities.  The Arizona

8  Legislature enacted SB 1070 primarily to require that Arizona's law enforcement officers

9  cooperate in the enforcement of federal immigration laws and, pursuant to the State's

10  broad police powers, to establish state crimes that mirror existing federal laws.

11  Plaintiff seeks to enjoin SB 1070 as facially unconstitutional.  Plaintiff's claims

12  find no support in the Constitution or federal law and, in many instances, contravene

13  express congressional intent.  Plaintiff bears a heavy burden of establishing that Sections

14  2 through 6 of SB 1070 are unconstitutional in *all* of their applications, that plaintiff will

15  be *irreparably* harmed if the law is not enjoined, and that plaintiff's interests in enjoining

16  Sections 2 through 6 outweigh Arizona's interests in having SB 1070 implemented.[1]

17  Plaintiff attempts to meet this burden by relying on faulty premises and inapposite case

18  law.  Plaintiff will not suffer *any* harm, much less irreparable harm, if SB 1070 is

19  implemented because the Act requires only that Arizona's law enforcement officers act in

20  accordance with their constitutional authority and congressionally established federal

21  policy.  Plaintiff is not entitled to an injunction.

22  **MEMORANDUM OF POINTS AND AUTHORITIES**

23  **I.**     **THE SUPREMACY CLAUSE**

24  The Supremacy Clause of the United States Constitution states:

25  [T]he Laws of the United States . . . and all Treaties made, or which shall
   be made, under the Authority of the United States, shall be the supreme
26  Law of the Land; and the Judges in every State shall be bound thereby, any
   Thing in the Constitution or Laws of any State to the Contrary
27  notwithstanding.

28  _____
   [1] Plaintiff asks the Court to enjoin SB 1070, but plaintiff's Motion addresses only the
   bases upon which plaintiff believes the Court should enjoin Sections 2 through 6.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

U.S. Const. art. VI., cl. 2.  The Supremacy Clause governs state action in two ways.

First, it requires states to uphold federal law:  "[F]ederal law is as much the law of the

several States as are the laws passed by their legislatures.  Federal and state law 'together

form *one system of jurisprudence*, which constitutes the law of the land for the State . . .'"

*Haywood v. Drown*, 129 S. Ct. 2108, 2114-17 (2009) (emphasis added) (holding that a

New York law divesting its state courts of jurisdiction to hear certain claims brought

under 42 U.S.C. § 1983 violated the Supremacy Clause because "having made the

decision to create courts of general jurisdiction that regularly sit to entertain analogous

suits, New York is not at liberty to shut the courthouse door to federal claims that it

considers at odds with its local policy").

In upholding federal law, "[a] state is required to treat federal law on a parity with

state law, and thus is not entitled to relegate violations of federal law or policy to second-

class citizenship."  *Brandon v. Anesthesia & Pain Mgmt. Assocs.*, 277 F.3d 936, 942 (7th

Cir. 2002).  In *Brandon*, the Seventh Circuit held that an employee who was terminated

after he complained about the company's noncompliance with federal law could sustain a

claim for retaliatory discharge because the termination contravened a "clear mandate of

Illinois public policy."  277 F.3d at 941, 947.  In so holding, the Seventh Circuit reversed

the district court's finding that "*federal* criminal statutes could not provide a basis for

*Illinois* public policy" because the Supremacy Clause requires Illinois "to treat federal

law on a parity with state law" and the Illinois courts had "explicitly stated that it is a

clearly established policy of Illinois to prevent its citizens from violating federal law."

*Id.* at 942-43.[2]

Second, the Supremacy Clause prohibits states from regulating in areas reserved to

the federal government and from enacting "laws that 'interfere with, or are contrary to'

federal law."  *Kobar v. Novartis Corp.*, 378 F. Supp. 2d 1166, 1169 (D. Ariz. 2005)

(citation omitted).  However, "[t]he Supremacy Clause . . . requires that pre-emptive

---

[2] The court further held that "the Illinois courts are under no illusions about the status of federal law as a source of public policy for the state of Illinois" and that "Illinois has an undeniable interest in ensuring that its citizens are obedient to federal law."  *Brandon*, 277 F.3d at 942-43.

Snell & Wilmer

L.L.P.

LAW OFFICES

One Arizona Center, 400 E. Van Buren

Phoenix, Arizona 85004-2202

(602) 382-6000

11751129

effect be given only . . . to federal standards and policies that are set forth in, or necessarily follow from, the statutory text that was produced through the constitutionally required bicameral and presentment procedures."  *Wyeth v. Levine*, 129 S. Ct. 1187, 1207 (2009) (Breyer, J., concurring).

Plaintiff frames the issues in this lawsuit in terms of federal preemption, arguing that Arizona's legitimate policy choices contravene federal immigration policy and priorities.  SB 1070 does nothing of the sort.  Arizona merely seeks to assist with the enforcement of existing federal immigration laws in a constitutional manner.  It is plaintiff that is attempting to impose immigration policies and priorities that contravene and conflict with federal law and unambiguous congressional intent.

## II.      CONGRESS' REGULATION OF IMMIGRATION

### A.      Federal Immigration Laws and Enforcement Agencies

The Immigration and Nationality Act ("INA"), which Congress originally enacted in 1952,[3] is codified in Title 8, Chapters 12-15 of the United States Code.  *See* 8 U.S.C. §§ 1103-1778.  The INA generally regulates the conditions upon which aliens may enter and remain in the country and, with limited exceptions, charges the Secretary of the Department of Homeland Security ("DHS") with the administration and enforcement of the nation's immigration and naturalization laws.  8 U.S.C. § 1103.

The DHS agencies charged with securing the nation's borders are: (1) ICE; (2) U.S. Customs and Border Protection; (3) the Transportation Security Administration; and (4) the U.S. Coast Guard.  ICE is responsible for interior enforcement of the federal immigration laws.  Its mandate includes, among other things, "detaining illegal immigrants and ensuring their departure (or removal) from the United States."[4]

### B.      Congressional Acts Designed to Encourage Cooperation Between Federal, State, and Local Authorities

The federal government has faced two significant obstacles in the interior

---

[3] *See* Pub. L. 82-414, 66 Stat. 163 (1952).

[4] *See* Adams Decl. Tab 24 at 3.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

enforcement of its immigration laws.  First, "[h]istorically, Congress and [DHS] have devoted over five times more resources in terms of staff and budget on border enforcement than on interior enforcement."  Adams Decl. Tab 1; *See also* Cutler Decl. ¶¶ 11, 26.  Second, certain state and local governments have implemented policies that either discourage or severely restrict law enforcement officers from assisting in the enforcement of federal immigration laws.  *See*, *e.g.*, *City of New York v. United States*, 179 F.3d 29, 31 (2d Cir. 1999) (addressing the Executive Order the Mayor of New York City issued in 1989 prohibiting, with limited exceptions, "any City officer or employee from transmitting information regarding the immigration status of any individual to federal immigration authorities").  Interior enforcement problems have had serious consequences.  *See* Cutler Decl. ¶¶ 36-41.  For example, the Center for Immigration Studies found that eight of the 48 *al Qaeda* foreign born terrorists operating in the United States since 1993 worked in the United States illegally.  Adams Decl. Tab 2.[5]

Both the Executive and Congress each have expressed the desire to improve interior enforcement through increased cooperation between federal, state, and local authorities.  In 1995, the President issued a Memorandum stating that:  "It is a fundamental right and duty for a nation to protect the integrity of its borders and its laws.  This Administration shall stand firm against illegal immigration and the continued abuse of our immigration laws."  Memorandum on Deterring Illegal Immigration, 60 FR 7885, 1995 WL 17211539 (Feb. 7, 1995).  To further this objective, the President directed the Department of Justice ("DOJ") to, among other things, ensure that "all necessary steps [be] taken to increase coordination and cooperative efforts with State, and local law enforcement officers in identification of criminal aliens."  *Id.*

In 1996, Congress established a federal policy of encouraging cooperation between federal, state, and local authorities in enforcing the federal immigration laws through two amendments to the INA: (1) the Personal Responsibility and Work

---

[5] *See also* Adams Decl. Tab 2 (referencing a Government Accountability Office study finding that of 35,318 criminal aliens released between 1994 and 1999, at least 11,605 went on to commit new crimes).

Opportunity Reconciliation Act of 1996 (the "Welfare Reform Act"), Pub. L. 104-193, 110 Stat. 2105 (1996); and (2) the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), Pub. L. 104-208, 110 Stat. 3009 (1996). Section 434 of the Welfare Reform Act, which is codified at 8 U.S.C. § 1644, states:

> Notwithstanding any other provision of Federal, State, or local law, no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from [ICE] information regarding the immigration status, lawful or unlawful, of an alien in the United States.

Congress' stated purpose for enacting 8 U.S.C. § 1644 was "to give State and local officials the authority to communicate with [ICE] regarding the presence, whereabouts, or activities of illegal aliens" based on Congress' belief that:

> [I]mmigration law enforcement is *as high a priority as other aspects of Federal law enforcement, and that illegal aliens do not have the right to remain in the United States undetected and apprehended.*

*City of New York*, 179 F.3d at 32-33 (quoting S. Rep. No. 104-249, at 19-20 (1996)) (emphasis added).

Several provisions of IIRIRA also were designed to encourage cooperation between federal, state, and local law enforcement officers regarding violations of federal immigration laws. First, Section 133 of IIRIRA, which is codified at 8 U.S.C. § 1357(g), authorizes the Attorney General to enter into agreements with states or any political subdivision thereof for the purpose of qualifying state and local law enforcement officers to function, essentially, as immigration officers. Recognizing the importance of continued assistance from state and local law enforcement (and concerned, apparently, that statutes like this might later be construed to be limiting, rather than expansive), Section 133 also explicitly recognizes that no such agreement is required for state and local law enforcement officers or agencies:

> [T]o communicate with the Attorney General regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States; or . . . otherwise to cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States.

*See* 8 U.S.C. § 1357(g)(10).

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

11751129

Finally, Section 642 of IIRIRA, which is codified at 8 U.S.C. § 1373, prohibits restrictions on communications between federal, state, and local law enforcement officers regarding an individual's immigration status and requires ICE to respond to such inquiries.  Specifically, 8 U.S.C. § 1373 states:

> (a) IN GENERAL—Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [ICE] information regarding the citizenship or immigration status, lawful or unlawful, of any individual.
>
> (b) ADDITIONAL AUTHORITY OF GOVERNMENT ENTITIES—Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual:
>
> (1) Sending such information to, or requesting or receiving such information from [ICE].
>
> (2) Maintaining such information.
>
> (3) Exchanging such information with any other Federal, State, or local government entity.
>
> (c) OBLIGATION TO RESPOND TO INQUIRIES—[ICE] shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information.

Congress enacted 8 U.S.C. § 1373 based on its finding that:

> [T]he acquisition, maintenance, and exchange of immigration-related information by State and local agencies *is consistent with, **and potentially of considerable assistance to**, the Federal regulation of immigration and the achieving of the purposes and objectives of the [INA]*.

S. Rep. No. 104-249, at 19-20 (1996) (emphasis added).

In accordance with these federal policies and statutes, numerous federal, state, and local governments have successfully cooperated in the enforcement of federal immigration laws.  *See* Judd Decl. ¶¶ 20-22; Vaughan Decl. ¶¶ 40-43; Vasquez Decl. ¶¶ 23-25; Kirkham Decl. ¶ 6; Cutler Decl. ¶¶ 5-6; Switzer Decl. ¶ 9; Tardy Decl. ¶ 5; Adams

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

Decl. Tab 3, at v-vii (survey of SCAAP[6] fund recipients reflecting that the overwhelming majority of respondents inform ICE when they have someone in custody they believe may be an undocumented alien, inquire into arrestees' immigration status, and alert ICE before releasing undocumented criminal aliens from custody).

## III.   ARIZONA'S ENACTMENT OF SB 1070

### A.   The Impact of Illegal Immigration on Arizona

Despite these strong federal policies of cooperative enforcement of the federal immigration laws, interior enforcement remains weak.[7]  In 2006, the House Committee on Homeland Security concluded that "[t]he existing resources of the U.S. Border Patrol and local law enforcement *must continue to be enhanced* to counter the cartels and the criminal networks [illegal aliens] leverage to circumvent law enforcement."  Adams Decl. Tab 33 at 6. (emphasis added).  Yet, federal law enforcement estimates that *only* "10 percent to 30 percent of illegal aliens are actually apprehended and 10 percent to 20 percent of drugs are seized."  *Id*. at 3; *see also* Kirkland Decl. ¶¶ 12-17 (discussing death threats to Nogales police officers and lack of adequate resources to compete with drug cartels); Streed Decl. ¶ 9 (stating that Border Patrol Officers are "outmanned, outgunned, and are operating at a tactical disadvantage when compared to those persons crossing the Mexico/U.S. border without passing through designated ports of entry").  As President Obama aptly stated: "the system is broken" and "everybody knows it."  Adams Decl. Tab 17.

These enforcement problems have been particularly acute in Arizona for two reasons.  First, the federal government has failed to secure Arizona's border.  Second, several Arizona cities implemented "sanctuary" policies – in direct contravention to 8

---

[6] SCAAP is the State Criminal Alien Assistance Program.

[7] Since 1996, the Executive Branch has expressed a "vigorous enforcement" policy and intent to carry out Congress' objectives by "enforc[ing] the immigration laws to the fullest extent, including the detection and deportation of illegal aliens."  *See* Exec. Order No. 12989, 61 FR 6091 (Feb. 13, 1996); Exec. Order No. 13465, 73 FR 33285 (June 6, 2008).  Yet the federal government has failed to achieve this objective.  *See, e.g.*, Glenn Decl. ¶¶ 11-20, 26; Thrasher Decl. ¶¶ 7-9, 17; Adams Decl. Tab 7 at 3; Adams Decl. Tab 31 (describing the arrests of numerous sexual predators who were also illegal aliens).

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

U.S.C. §§ 1373(a) and 1644 – limiting or restricting law enforcement officers' ability to cooperate with the federal government in the enforcement of the federal immigration laws.  Cutler Decl. ¶¶ 35-42; Glover Decl. ¶¶ 15-16.  This cooperative *non*-enforcement of the federal immigration laws has resulted in a significant presence of illegal aliens in Arizona and numerous incidents of serious violence against Arizonans, including the homicide of eight Phoenix police officers since 1999.  Adams Decl. Tab 28 at 46:47, Tab 34 at 1:53:19; Tab 29 at 36:06 (statement of Sen. Linda Gray);[8] *see also* Adams Decl. Tab 33 at 4 ("Mexican drug cartels operating along the southwest border are more sophisticated and dangerous than any other organized criminal enterprise.")  Almost 50% of illegal aliens enter the United States through Arizona.  Adams Decl. Tab 10.  The Arizona Department of Corrections has estimated that criminal aliens make up more than 17% of Arizona's prison population and 21.8% of felony defendants in Maricopa County Superior Court.  *See* Dolny Decl.; Adams Decl. Tab 25 at 5; *see also* Adams Decl. Tab 23 (noting that 10% of illegal aliens captured on the border already have serious criminal records in the United States); Dever Decl. ¶ 10.  Further, during a 60-day period between February and March 2010, 850 known illegal aliens traveled a path from Mexico into Arizona.  Adams Decl. Tab 8.[9]

Faced with the ever-escalating social, economic, and environmental costs caused by illegal immigration, the Arizona Legislature determined that it had to take action.  *See generally* Adams Decl. Tabs 28, 29, 39 & 36.  After considering these issues and receiving input from numerous and diverse organizations, such as the Phoenix Law Enforcement Association ("PLEA"), the Border Action Network, the American Civil Liberties Union, and Arizona Chamber of Commerce & Industry, the Arizona Legislature

---

[8] *See also* Glidewell Decl. ¶¶ 3-6, 10-15 (discussing being shot in the chest during a routine traffic stop by an illegal alien who was wanted for attempted murder in El Salvador and explaining the two or three occasions prior to that date in which a "sanctuary" policy prevented police officers from contacting ICE or Border Patrol to ascertain the alien's identity).

[9] In 2007, the Deputy Commissioner of U.S. Customs and Border Patrol acknowledged that certain areas in Arizona had the potential for a small group to cross the border and that illegal crossers present an unacceptable risk of harm to the United States and its citizens.  Ahern Decl. ¶¶ 19, 23.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1    enacted SB 1070 to eliminate sanctuary city policies, to encourage – and, in some

2    instances, mandate – assistance with the enforcement of federal immigration law, and,

3    pursuant to the State's broad police powers, to adopt state crimes that mirror existing

4    federal laws.  Adams Decl. Tabs 38-39; Adams Decl. Tab 29 (Senator Verschoor

5    explaining his vote in favor of SB 1070 on the basis that SB 1070 "will take the hand

6    cuffs off" the local protectors).

7         **B.**      **The Pertinent Provisions of SB 1070**

8              **1.**      **Section 2 (A.R.S. § 11-1051)**

9         Section 2 of SB 1070 has twelve subsections.  *See* A.R.S. § 11-1051(A)-(L).

10   Plaintiff purports to challenge all of Section 2, but addresses only subsections B and H in

11   its Motion.  *See* Pl. Mot. at 7-8.  Subsection B states, in pertinent part:

> For any lawful stop, detention ***or arrest*** made by a law enforcement official
> or a law enforcement agency of this state . . . in the enforcement of any
> other law or ordinance of a county, city or town or this state where
> ***reasonable suspicion*** exists that the person is an alien ***and*** is unlawfully
> present in the United States, a reasonable attempt shall be made, when
> practicable, to determine the immigration status of the person, except if the
> determination may hinder or obstruct an investigation.  Any person who is
> arrested shall have the person's immigration status determined before the
> person is released.  The person's immigration status shall be verified with
> the federal government pursuant to 8 United States Code Section 1373(c).
> A law enforcement official or agency of this state or a county, city, town or
> other political subdivision of this state may not consider race, color or
> national origin in implementing the requirements of this subsection except
> to the extent permitted by the United States or Arizona Constitution. . .

20   A.R.S. § 11-1051(B) (emphasis added).[10]  A.R.S. § 11-1051(H) permits "[a] person who

21   is a legal resident of [Arizona] . . . [to] bring an action in superior court to challenge any

---

[10] A lawful stop or brief detention requires "specific, articulable facts which, together
with objective and reasonable inferences, form a basis for suspecting that [a] particular
person detained is engaged in criminal activity." *United States v. Hernandez-Alvarado*,
891 F.2d 1414, 1416 (9th Cir. 1989); *see also United States v. Salinas-Calderon*, 728
F.2d 1298, 1301 n.3 (10th Cir. 1984) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)).  A
prolonged detention or arrest requires probable cause.  *See Muehler v. Mena*, 544 U.S.
93, 101 (2005); *United States v. Tarango-Hinojos*, 791 F.2d 1174, 1175-76 (5th Cir.
1986).  Not only are the probable cause and reasonable suspicion standards well
established, but they are a core component of the training that *all* Arizona peace officers
receive as a condition of their certification.  *See* Adams Decl. Tab 41 at 6-7 (AzPOST
Model Lesson Plan: Laws of Arrest 2.2) (defining probable cause and reasonable
suspicion).

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

11751129

official or agency of this state or a county, city, town or other political subdivision of this state that adopts or implements a policy that limits or restricts the enforcement of federal immigration laws . . . to less than the full extent permitted by federal law."

       i.     A.R.S. § 11-1051(B) does not require an investigation into the immigration status of every person arrested

Plaintiff argues that A.R.S. § 11-1051(B) will require Arizona's law enforcement officers "to verify the immigration status of every person who is arrested in the state," even if no reasonable suspicion of unlawful presence exists. Pl. Mot. at 8. However, this interpretation is inconsistent with the State's interpretation. Moreover, the plaintiff's interpretation ignores recognized principles of statutory construction and defies common sense.

The State interprets A.R.S. § 11-1051(B) to read that *only* where a reasonable suspicion exists that a person arrested is an alien and is unlawfully present in the United States *must* the person's immigration status be determined before the person is released. The State recognizes that this sentence of the statute might well have been more artfully worded, but principles of statutory construction, and common sense, support the State's interpretation. "[A]n important principle of statutory construction . . . [is] that a court should not construe a statute so as to create a result the legislature could not possibly have intended." *Porter v. Triad of Ariz. (L.P.)*, 203 Ariz. 230, 233, 52 P.3d 799, 802 (App. 2002). Here, the Arizona Legislature could not have intended to compel Arizona's law enforcement officers to determine and verify the immigration status of *every single person* arrested – even for United States citizens and when there is absolutely no reason to believe that the person is unlawfully present in the country.

Plaintiff's interpretation suggests the word "person" in the second sentence should be understood to mean both United States citizens and aliens. However, a United States citizen does not have an immigration status and nowhere in the INA does federal law ascribe an immigration status to any category of United States citizen. Accordingly, the only interpretation of the second sentence that is plausible is that "person" means "such

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

person" – namely, aliens referred to in the first sentence where reasonable suspicion exists that the alien is unlawfully present in the United States.[11]  *See*, *e.g.*, *United Savs. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988) ("Statutory construction . . . is a holistic endeavor.  A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme – because the same terminology is used elsewhere in a context that makes its meaning clear, . . . or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law.") (internal citations omitted).

ii.    A.R.S. § 11-1051(B) does not authorize indefinite detention

A.R.S. § 11-1051(B) does not expressly limit the time during which a law enforcement officer may detain an arrested person (after the arrest is processed and the person is otherwise free to go) pending an investigation into his or her immigration status.  Here, too, the principles of statutory construction require that the sentence be construed in a manner that preserves its constitutionality and is consistent with the Arizona Legislature's intent.  *See Ariz. Downs v. Ariz. Horsemen's Found.*, 130 Ariz. 550, 554-55, 637 P.2d 1053, 1057-58 (1981) (noting the obligation to avoid unconstitutional interpretations).  In *Zadvydas v. Davis*, 533 U.S. 678, 682 (2001), for example, the Supreme Court considered whether a statute authorized the Attorney General to detain a removable alien beyond the removal period "*indefinitely* . . . or only for a period *reasonably necessary* to secure the alien's removal."  After concluding that indefinite detention "would raise serious constitutional concerns, [the Court] construe[d] the statute to contain an implicit 'reasonable time' limitation, the application of which is subject to federal-court review."  *Id.*

Both A.R.S. § 11-1051(L) and the statutory history confirm that the Arizona Legislature did *not* intend for A.R.S. § 11-1051(B) to authorize indefinite detention. A.R.S. § 11-1051(L) states that the section "shall be implemented in a manner consistent

---

[11] Plaintiff relies heavily on its interpretation to support its argument that SB 1070 will impede the federal government's enforcement of its immigration laws.  Because the State of Arizona is not suggesting that its law enforcement officers read (or implement) SB 1070 in the manner plaintiff suggests, plaintiff's purported harm is speculative.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1    with federal laws regulating immigration, protecting the civil rights of all persons and

2    respecting the privileges and immunities of United States citizens."  A.R.S. § 11-1051(L).

3    And the Arizona Legislative Council issued an analysis of A.R.S. § 11-1051(B) to the

4    Arizona Legislature while the legislation was being considered, which states that:

5    "A.R.S. section 11-1051 does not allow for the indefinite duration of an individual."

6    Adams. Decl. Tab 40.  Thus, A.R.S. § 11-1051(B) must be construed to limit the

7    detention of any person pending an investigation into the person's immigration status to a

8    reasonable time.[12]

9                    **2.     Section 3 (A.R.S. § 13-1509)**

10       A.R.S. § 13-1509 reinforces and mirrors federal law: "In addition to any violation

11   of federal law, a person is guilty of willful failure to complete or carry an alien

12   registration document if the person is in violation of 8 [U.S.C. §§] 1304(e) or 1306(a)."

13   A.R.S. § 13-1509(A).  A.R.S. § 13-1509 further mirrors federal law by imposing the

14   *same* misdemeanor penalties as federal law imposes for violations of 8 U.S.C. § 1304(e):

15   a maximum fine of $100 and a maximum imprisonment of 30 days.  A.R.S. § 13-

16   1509(A), (H).  The only difference between this provision and the federal statutes is that

17   A.R.S. § 13-1509 "does not apply to a person who maintains authorization from the

18   federal government to remain in the United States."  A.R.S. § 13-1509(F).

19                    **3.     Section 4 (A.R.S. § 13-2319)**

20       Section 4 of SB 1070 modifies A.R.S. § 13-2319, a statute enacted in 2005 that

21   makes it "unlawful for a person to intentionally engage in the smuggling of human beings

22   for profit or commercial purpose."  A.R.S. § 13-2319(E).  The sole change SB 1070 made

23   _____

24   [12] As a practical matter, law enforcement officers can, and often do, call ICE to obtain
     information regarding a person's immigration status – even during a traffic stop.  *See*,
     *e.g.*, *Estrada v. Rhode Island*, 594 F.3d 56, 61-62 (1st Cir. 2010); *United States v.

25   Soriano-Jarquin*, 492 F.3d 495, 497 (4th Cir. 2007); *United States v. Rodriguez-Arreola*,
     270 F.3d 611, 614 (8th Cir. 2001); *see also* ICE Programs, Law Enforcement Support

26   Center, available at http://www.ice.gov/partners/lesc/lesc_factsheet.htm ("The primary
     users of the LESC are state and local law enforcement officers in the field who need

27   information about foreign nationals they encounter.… 24 hours a day, 365 days a year.");
     Cramer Decl. ¶¶ 17, 19-21; *see also* Vasquez Decl. ¶¶ 23-25; Marino Decl. ¶¶ 25-26.  If
     there is probable cause of an immigration violation, that would provide an *independent*

28   *basis* to detain the person.  *See Martinez v. Nygaard*, 831 F.2d 822, 828 (9th Cir. 1987).

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

to this statute is to codify law enforcement officers' existing authority to "stop any person who is operating a motor vehicle if the officer has reasonable suspicion to believe the person is in violation of any civil traffic law."  At least two Arizona courts have already addressed and rejected preemption challenges to the balance of A.R.S. § 13-2319, which (again) has been law since 2005.  *See State v. Barragan-Sierra*, 219 Ariz. 276, 286-88, 196 P.3d 879, 889-91 (App. 2008); *We Are Am./Somos Am. v. Maricopa Cnty. Bd. of Supervisors*, 594 F. Supp. 2d 1104, 1113-14 (D. Ariz. 2009), *aff'd in relevant part by* No. 09-15281, U.S. App. LEXIS 14198 (9th Cir. July 12, 2010).

### 4.    Section 5 (A.R.S. §§ 13-2828 and 13-2929)

Section 5 of SB 1070 will add two provisions to the Arizona Criminal Code.  First, A.R.S. § 13-2928 will make it a Class 1 misdemeanor for:

> [A]n occupant of a motor vehicle that is stopped on a street, roadway or highway to attempt to hire or hire and pick up passengers for work at a different location if the motor vehicle blocks or impedes the normal movement of traffic[;]

> [A] person to enter a motor vehicle that is stopped on a street, roadway or highway in order to be hired by an occupant of the motor vehicle and to be transported to work at a different location if the motor vehicle blocks or impedes the normal movement of traffic[; and]

> [A] person who is unlawfully present in the United States and who is an unauthorized alien to knowingly apply for work, solicit work in a public place or perform work as an employee or independent contractor in this state.

Second, A.R.S. § 13-2929 will make it unlawful for a person **who is in violation of a criminal offense** to transport, move, conceal, harbor, or shield unlawful aliens, or to encourage an alien to come to this state if the person knows or recklessly disregards that the would be violating immigration laws to do so.[13]  A.R.S. § 13-2929 is designed to deter persons from inducing persons to enter or remain in the state unlawfully for the

---

[13] This statute would apply if, for example, a law enforcement officer conducts a routine traffic stop and discovers that the driver is transporting both drugs and illegal aliens.  This statute could also apply if law enforcement officers, while executing a valid search of a person's home, discover both a criminal violation (*e.g.*, possession of drugs) and that the homeowner is harboring illegal aliens.  This statute does not apply to otherwise law-abiding persons who, for example, induce a family member to enter the state unlawfully or transport an unlawfully present family member to the hospital, church, *etc.*

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1  purpose of assisting with their criminal enterprise.  *See*, *e.g.*, Glover Decl. ¶¶ 10-13

2  (discussing his experience in combating the importation of "black tar heroin" from

3  Mexico and the fact that 100% of the runners his team has arrested for selling the heroin

4  in Arizona have been unlawfully present in the country).

5             **5.    Section 6 (A.R.S. § 13-3883)**

6             Section 6 of SB 1070 adds to the authority Arizona peace officers have under

7  A.R.S. § 13-3883(A) to arrest a person without a warrant by authorizing such arrests

8  when "the officer has probable cause to believe . . . [t]he person to be arrested has

9  committed any public offense that makes the person removable from the United States."

10  A.R.S. § 13-3883(A)(5).  This provision is based upon a memorandum the DOJ's Office

11  of Legal Counsel prepared in which it concluded that federal law does not "preclude[]

12  state police from arresting aliens on the basis of civil deportability."  *See* Adams Decl.

13  Tab 4 at 13.  In reaching these conclusions, however, the DOJ presumed that the "States

14  have conferred on state police the necessary state-law authority to make arrests for

15  violations of the federal immigration laws."  *Id.* at 2.  A.R.S. § 13-3883(A) provides the

16  requisite authority for Arizona's law enforcement officers.

17             Neither Section 6 nor any other federal, state, or local law authorizes Arizona's

18  law enforcement officers to determine whether a person is removable.  If, however, a law

19  enforcement officer receives confirmation from the federal government or its authorized

20  agent that a person is removable, this provision permits the officer to handle the initial

21  arrest and processing.  A.R.S. § 11-1051(D) further reduces the federal government's

22  burden by permitting the officer to transport the person to a federal facility.

23  **IV.    LEGAL STANDARD**

24             "A plaintiff seeking a preliminary injunction must establish that he is likely to

25  succeed on the merits, that he is likely to suffer irreparable harm in the absence of

26  preliminary relief, that the balance of equities tips in his favor, and that an injunction is in

27  the public interest."  *Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365, 374

28  (2008); *see also Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009).  "[I]t has

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1   long been held that an injunction is 'to be used sparingly, and only in a clear and plain

2   case.'"  *Rizzo v. Goode*, 423 U.S. 362, 378 (1976) (quoting *Irwin v. Dixion*, 9 How. 10,

3   33 (1850)); *see also Moore v. Consol. Edison Co. of N.Y.*, 409 F.3d 506, 510 (2d Cir.

4   2005) (a preliminary injunction "'is an extraordinary and drastic remedy . . . that should

5   not be granted unless the movant, by a clear showing, carries the burden of persuasion'")

6   (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).

7   **V.   PLAINTIFF IS NOT LIKELY TO SUCCEED ON THE MERITS**

8         **A.   Plaintiff Has a Heavy Burden of Establishing that Sections 2 through 6
9               of SB 1070 Are Facially Unconstitutional**

10        "A facial challenge to a legislative Act is . . . the most difficult challenge to mount

11  successfully, since the challenger must establish that no set of circumstances exists under

12  which the Act would be valid."  *United States v. Salerno*, 481 U.S. 739, 745 (1987).

13  When considering a facial challenge, the Court "must be careful not to go beyond the

14  statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases."

15  *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008).[14]  In

16  *California Coastal Commission v. Granite Rock Co.*, for example, the Supreme Court

17  rejected a facial challenge to the Coastal Commission's permit requirements under the

18  Supremacy Clause even though application of the requirements *could* conflict with

19  federal law.  480 U.S. 572 (1987).  The Court specifically rejected the plaintiff's

20  argument "that the Coastal Commission's true purpose in enforcing a permit requirement

21  [was] to prohibit [the plaintiff's] mining entirely" and held that the plaintiff's facial

22  challenge "must stand or fall on the question [of] whether *any possible* set of conditions

23  attached to the Coastal Commission's permit requirement would be pre-empted."  *Id.* at

24  588 (emphasis added).  The Court then held that the Commission's "identification of a

25  possible set of permit conditions not pre-empted by federal law [was] sufficient to rebuff

---

26  [14] Facial challenges are disfavored because they: (1) "often rest on speculation;" (2) "run
27  contrary to the fundamental principle of judicial restraint" with respect to constitutional
    challenges; and (3) "threaten to short circuit the democratic process by preventing laws
28  embodying the will of the people from being implemented in a manner consistent with
    the Constitution."  *Wash. State Grange*, 552 U.S. at 450-51.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

11751129

1   [the plaintiff's] facial challenge to the permit requirement."  *Id.* at 589.

2           Plaintiff must also overcome three well established rules that militate against a

3   finding that Sections 2 through 6 are unconstitutional.  First, "[w]here a construction of a

4   statute would raise serious constitutional problems, courts 'will construe the statute to

5   avoid such problems unless such construction is plainly contrary to the intent of [the

6   legislature].'"  *Ctr. for Bio-Ethical Reform, Inc. v. L.A. Cnty. Sheriff Dep't*, 533 F.3d 780,

7   790 (9th Cir. 2008) (quoting *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. &*

8   *Constr. Trades Council*, 485 U.S. 568, 575 (1988)).[15]  Second, that "States traditionally

9   have had great latitude under their police powers to legislate as to the protection of the

10  lives, limbs, health, comfort, and quiet of all persons."  *Medtronic, Inc. v. Lohr*, 518 U.S.

11  470, 475 (1996) (quoting *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756

12  (1985)).  Finally, plaintiff must overcome the presumption that Arizona's law

13  enforcement officers will implement SB 1070 in a constitutional manner.  *See Panama*

14  *Refining Co. v. Ryan*, 293 U.S. 388, 446 (1935) ("Every public officer is presumed to act

15  in obedience to his duty until the contrary is shown . . .."); *United States v. Booker*, 543

16  U.S. 220, 279-80 (2005) ("[In] facial invalidity cases . . . we ought to presume whenever

17  possible that those charged with writing and implementing legislation will and can apply

18  'the statute consistently with the constitutional command.'") (quoting *Time, Inc. v. Hill*,

19  385 U.S. 374, 397 (1967)).

20  **B.    None of the Challenged Sections of SB 1070 Are Preempted[16]**

21          To establish its claim that federal law impliedly preempts SB 1070, plaintiff must

22  _____

[15] *See also Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 939 (9th Cir. 2006) ("[I]f an otherwise
23  acceptable construction of a statute would raise serious constitutional problems, and
    where an alternative interpretation of the statute is 'fairly possible,' [courts] are obligated
24  to construe the statute to avoid such problems.") (citations omitted).

25  [16] Governor Brewer objects to the following portions of the declarations upon which
    plaintiff relies on the grounds that they contain legal conclusions or pure speculation: (1)
26  Steinberg Decl. (doc. 27-1) ¶¶ 9-11, 13-14, 33, 34, 44, 45, 52-54, 57; (2) Silver Decl.
    (doc. 27-6) ¶¶ 6-10; (3) Estrada Decl. (doc. 27-8) ¶¶ 4-9, 11, 12-15, 17-19; (4) Villasenor
27  Decl. (doc. 27-9) ¶¶ 4-8; (5) Harris Decl. (doc. 27-10) ¶¶ at 1:23-24; 2:1-2; 2:15-17; 3:1-
    9; 3:12-16, 3:23-25; 4:3-10, 4:11-13; 5:13-20; 6:20-23; (6) Aytes Decl. (doc. 27-2) ¶¶ 13,
28  21; (7) Ragsdale Decl. (doc. 27-4) ¶¶ 40-42, 44-45, 47-48, 50-52, 54; (7) Palmatier Decl.
    (doc. 27-3) ¶¶ 4, 15-17, 20; and (8) Gentile Decl. (doc. 27-7) ¶ 10.

11751129

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

demonstrate that: (1) SB 1070 purports to regulate immigration, an exclusively federal power; (2) federal law occupies the field; or (3) SB 1070 conflicts with federal law.  *See De Canas v. Bica*, 424 U.S. 351, 355-63 (1976).[17]  "Conflict preemption" is present only "when 'compliance with both State and federal law is impossible, or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"  *Ariz. Contractors Ass'n v. Napolitano*, No. CV07-1355-PHX-NVW, 2007 U.S. Dist. LEXIS 96194, at *25 (D. Ariz. Dec. 21, 2007) (citations omitted). Neither "[t]ension between federal and state law" nor a "hypothetical conflict" is sufficient to establish conflict preemption.  *Incalza v. Fendi N. Am., Inc.*, 479 F.3d 1005, 1010 (9th Cir. 2007) (citations omitted).   Plaintiff must also overcome the presumption, which the Supreme Court has held applies "[i]n all pre-emption cases, . . . that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'"  *Wyeth*, 129 S. Ct. at 1194-95 (citation omitted).  Plaintiff has not met that burden with respect to any of its challenges to Sections 2 through 6 of SB 1070.

### 1. A.R.S. §§ 11-1051 and 13-3883(A) (Sections 2 and 6) do not conflict with federal law and priorities

#### i. A.R.S. §§ 11-1051 and 13-3883(A) will not result in the harassment of lawfully present persons

Plaintiff argues that A.R.S. §§ 11-1051 and 13-3883(A) conflict with "federal law and priorities" because their enforcement will result in the harassment of lawfully present aliens and, therefore, are "at odds with congressional objectives."  Pl. Mot. at 25-29, 32-34.[18]  The premises underlying this argument demonstrate its absurdity.  First, plaintiff states that, before SB 1070, "Arizona police had the same discretion to decide whether to verify immigration status during the course of a lawful stop as any other state or federal

---

[17] "Federal preemption can be either express or implied." *Chicanos Por La Causa, Inc. v. Napolitano*, 558 F.3d 856, 863 (9th Cir. 2009), *cert. granted*, 2010 U.S. LEXIS 5321 (June 28, 2010); *Altria Group, Inc. v. Good*, 129 S. Ct. 538, 543 (2008).  Plaintiff has not argued that any provision of federal law expressly preempts SB 1070.

[18] Plaintiff separately addresses the alleged harassment that Sections 2 and 6 will cause, but they are more succinctly addressed as one argument.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

law enforcement officer."  Pl. Mot. at 25.  As a factual matter, plaintiff is incorrect.  One of the primary reasons that the Arizona Legislature enacted SB 1070 was that certain law enforcement agencies in Arizona had implemented policies *restricting* law enforcement officers from exercising such discretion.  *See*, *e.g.*, Glover Decl. ¶¶ 15-16; Glidewell Decl. ¶ 13; *see also* Cutler Decl. ¶¶ 35-42 (discussing the negative impact of sanctuary policies).  However, by conceding that the Constitution and federal law permit Arizona's law enforcement officers "to verify immigration status during the course of a lawful stop," plaintiff's statement defeats its argument that such inquiries will result in the harassment of lawfully present aliens.  A.R.S. § 11-1051(B) will not interfere with any congressional objectives because it merely codifies existing authority and prohibits law enforcement officers from repeatedly ignoring possible immigration violations.[19]

Second, plaintiff takes issue with the fact that "reasonable suspicion is not a requirement of absolute certainty" and will necessarily result in investigations into the immigration status of persons who are lawfully present in the country.  Pl. Mot. at 26-27.  Law enforcement has never operated (and could never operate) in absolute certainties.  But it is well established that an investigation predicated upon "reasonable suspicion" of *any* violation of law – including immigration violations – is proper.  *See*, *e.g.*, *Arizona v. Johnson*, 129 S. Ct. 781, 786 (2009); *Muehler*, 544 U.S. at 100-01; *Rodriguez-Arreola*, 270 F.3d at 617.  This is the same standard the federal government has long employed for investigating immigration violations.  *See*, *e.g.*, Brief for Appellee at 10, *United States v.*

---

[19] Even plaintiff has strongly opposed the notion that state and local law enforcement officers should ignore possible immigration violations.  *See*, *e.g.*, Brief for Resp't at 14, *Samayoa-Martinez v. Gonzales*, No. 04-74220 (9th Cir. Feb. 10, 2006) (sharply disputing the petitioners' view of the law that "either [the military police officer] was legally required to ignore Petitioners' illegal status and let them go, or the INS was legally required to ignore Petitioners' voluntary and uncoerced confession of their illegal status and let them go" and arguing that "[*e*]*ither interpretation results in wholly emasculated law enforcement*," which the federal government argued was "patently absurd and is not the state of immigration law as it has been enforced for decades"), *available at* 2006 WL 2362319 (emphasis added); Brief for Resp't at 10, *Martinez-Medina v. Mukasey*, No. 06-75778 (9th Cir. Jan. 18, 2008) (arguing that once "Martinez admitted that he did not have a 'green card' . . . without offering any other explanation to demonstrate that he was lawfully present, the [Oregon] police officer had sufficient justification to detain Martinez until the INS officer could further investigate his immigration status"), *available at* 2008 WL 588460.

1    *Guillen*, No. 97-50645 (9th Cir. 1988) (arguing that "[t]he district court correctly found

2    that [the Border Patrol Agent had] reasonable suspicion to stop Sanchez-Guillen's car").

3    Plaintiff would presumably concede that its law enforcement officers (in all areas) are

4    capable of operating under these well established principles and standards.  So, too,

5    should Arizona's law enforcement officers be presumed to know how to do their job.

6          Third, plaintiff suggests that an investigation into a person's immigration status is

7    only appropriate for "persons who are suspected of serious criminal offenses."  Pl. Mot.

8    at 28.  But Congress has established no such priority or policy objective.  *See*, *e.g.*, 8

9    U.S.C. §§ 1373 and 1644.  This statement also fails to recognize that there are numerous

10   instances in which law enforcement officers have stopped violent criminals in connection

11   with minor offenses and let the criminals go without any investigation into their

12   immigration status, only to have the criminal commit *another* violent crime before his

13   apprehension.  *See*, *e.g.*, Glidewell Decl. ¶¶ 3-6, 10-15.

14         Fourth, plaintiff argues that A.R.S. § 13-3883(A), which authorizes warrantless

15   arrests of aliens who are removable, "does not depend upon coordination with DHS to

16   verify removability."  Pl. Mot. at 33.  This is simply incorrect.  Nothing in either SB 1070

17   or any other provision of state or federal law authorizes Arizona's law enforcement

18   officers to make determinations regarding a person's removability.  Under A.R.S. § 11-

19   1051, Arizona's law enforcement officers will regularly communicate with DHS

20   regarding the immigration status of aliens.  There is a substantial likelihood that, in doing

21   so, DHS will confirm that a particular alien is removable.  If DHS does so, A.R.S. § 13-

22   3883(A) merely provides Arizona's law enforcement officers with the ability to arrest

23   and, in connection with A.R.S. § 11-1051(D), transport the person directly to DHS for

24   processing, thereby *reducing* the burden on DHS.

25         None of plaintiff's arguments suggest that implementation of A.R.S. §§ 11-1051

26   and 13-3883(A) will *necessarily* result in the harassment of lawfully present aliens.  And

27   because this is a facial challenge, the mere *possibility* that A.R.S. § 11-1051(B) *could*

28   result in harassment of lawfully present aliens is insufficient to invalidate it.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

ii.     A.R.S. §§ 11-1051 and 13-3883(A) will not burden federal resources

Plaintiff's second argument – that A.R.S. §§ 11-1051 and 13-3883(A) are preempted because they will "burden federal resources and impede federal enforcement and policy priorities" (Pl. Mot. at 30-32) – is equally flawed.  The sole mission of DHS is to carry out the will of Congress.  As the Supreme Court held in rejecting the Department of Defense's ("DoD") preemption challenge to a North Dakota law:  "It is Congress—not the DoD—that has the power to pre-empt otherwise valid state laws . . ." *North Dakota v. United States*, 495 U.S. 423, 442 (1990).  Here, Congress has not only codified a federal policy of *encouraging* cooperation among federal, state, and local authorities in the enforcement of federal immigration laws, but it has *mandated* that DHS respond to the inquiries Arizona's law enforcement officers will make under A.R.S. § 11-1051(B).  *See* 8 U.S.C. §§ 1373 and 1644.  DHS simply has no choice but to allocate its resources in a manner that enables it to comply with this congressional mandate.  Further, under the Supremacy Clause, Arizona's law enforcement officers are expected to "to treat federal law on a parity with state law." *Brandon*, 277 F.3d at 942; *see also* 8 U.S.C. §§ 1373 and 1644.

In any event, plaintiff's speculation that A.R.S. §§ 11-1051 and 13-3883(A) will "burden federal resources and impede federal enforcement and policy priorities" is based entirely upon plaintiff's misconception that Arizona's law enforcement officers will contact LESC for "*every* person stopped who is reasonably suspected to be unlawfully present *and every* person arrested in the state." Pl. Mot. at 30 (emphasis added).  Not only is this argument inconsistent with the manner in which Arizona expects the Act to be appropriately implemented, but it ignores the qualifications in A.R.S. § 11-1051(B), the fact that Arizona's 287(g) officers can verify individuals' immigration status without any imposition on ICE at all, and the fact that many law enforcement agencies across the country already are doing precisely what A.R.S. § 11-1051(B) requires. *See e.g.* Vasquez Decl.¶¶ 23-25; Marino Decl. ¶¶ 25-26; Kirkham Decl. ¶ 6; Gafvert Decl. ¶¶ 9-10;

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1  McGlone Decl. ¶¶ 21-22.  Plaintiff simply has not (and cannot) demonstrate that A.R.S.

2  §§ 11-1051 and 13-3883(A) will *necessarily* burden federal resources or interfere with

3  any federal policies that would justify a finding that the provisions are preempted on their

4  face.

5          **2.    A.R.S. § 13-1509 (Section 3) neither conflicts with federal law**
           **nor regulates in a federally occupied field**

6

7          Plaintiff first argues that Section 3 (A.R.S. § 13-1509), which incorporates the

8  federal penalties for violations of 8 U.S.C. §§ 1304(e) and 1306, "is preempted because it

9  legislates in an area fully occupied by Congress."  Pl. Mot. at 34-36.  To establish

10 preemption under this theory, plaintiff must demonstrate that it was the "clear and

11 manifest purpose of Congress" to preclude harmonious state action.  *See De Canas*, 424

12 U.S. at 357.[20]  Nothing in the history of the INA supports such a conclusion.  Congress

13 enacted these statutes in 1952 and has since amended the INA five times,[21] but has never

14 expressly preempted concurrent state regulation.  *See*, *e.g.*, *Wyeth*, 129 S. Ct. at 1200

15 ("'The case for federal pre-emption is particularly weak where Congress has indicated its

16 awareness of the operation of state law in a field of interest, and has nonetheless decided

17 to stand by both concepts and to tolerate whatever tension there [is] between them.'")

18 (citation omitted).  Further, the applicable federal regulations (8 C.F.R. Part 264) do not

19 indicate any intent to preempt state law and the Supreme Court has repeatedly held that it

20 expects "an administrative regulation to declare any intention to pre-empt state law with

---

[20] The Supreme Court has also expressly considered and rejected the possibility that the
INA might be so comprehensive that it leaves no room for state action.  *See De Canas*,
424 U.S. at 358.  Whether *other* congressional acts are so comprehensive as to preempt
state law is simply irrelevant.  *See Wis. Dep't of Indus., Labor & Human Relations v.
Gould, Inc.*, 475 U.S. 282, 285-87 (1986) (holding that the National Labor Relations Act
preempted concurrent state regulation); *Buckman Co. v. Pls.' Legal Comm.*, 531 U.S.
341, 347 (2001) ("State law fraud-on-the-FDA claims inevitably conflict with the FDA's
responsibility to police fraud."); *Kobar*, 378 F. Supp. 2d at 1169-75 (applying *Buckman*
to preempt a statute that immunized drug manufacturers from punitive damages unless
the plaintiff proved fraud on the FDA).

[21] *See* 66 Stat. 224 and 66 Stat. 225 (June 27, 1952); P.L. 99-653, § 10, 100 Stat. 3657
(Nov. 14, 1986); P.L. 100-525, § 8(i), 102 Stat. 2517 (Oct. 24, 1988); P.L. 101-649, Title
V, Subtitle A, § 503(b)(2), 104 Stat. 5049 (Nov. 29, 1990); P.L. 104-208, Div C, Title IV,
Subtitle B, § 415, 110 Stat. 3009-669 (Sept. 30, 1996).

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1   some specificity." *Cal. Coastal Comm'n*, 480 U.S. at 582-83 (citing *Hillsborough Cnty.*
2   *v. Automated Med. Labs., Inc.*, 471 U.S. 707, 718 (1985)).

3       The Supreme Court's holding in *Hines v. Davidowitz*, 312 U.S. 52, 63-64 (1941) –
4   which the Court decided 11 years before Congress enacted the INA – does not support a
5   conclusion that Congress intended to oust state law.  The Pennsylvania statute the
6   Supreme Court invalidated in *Hines* imposed *additional* registration requirements and
7   payment of annual fees, which the Court found conflicted with the federal government's
8   provision "for alien registration in a single integrated and all-embracing system."  312
9   U.S. at 56, 74.  A.R.S. § 13-1509 adds nothing to an alien's registration requirements.  It
10  only permits Arizona to impose the same penalties that federal law may impose for
11  violations of the exact same federal registration requirements.  A.R.S. § 13-1509 is even
12  narrower than federal law because it "does not apply to a person who maintains
13  authorization from the federal government to remain in the United States."  A.R.S. § 13-
14  1509(F).  Because the state and federal statutes have identical purposes, there is no
15  preemption.  *See Plyler*, 457 U.S. at 225; *Gonzales v. Peoria*, 722 F.2d 468, 474 (9th Cir.
16  1983), *overruled on other grounds by Hodgers-Durgin v. De La Vina*, 199 F.3d 1037 (9th
17  Cir. 1999)).

18      Plaintiff also argues that A.R.S. § 13-1509 "conflicts with federal law and
19  enforcement priorities in that field."  Pl. Mot. at 34.  But all A.R.S. § 13-1509 does is
20  require that persons comply with federal law.  "Where state law 'mandates compliance
21  with the federal immigration laws and regulations, it cannot be said [that state law] stands
22  as an obstacle to accomplishment and execution of congressional objectives embodied in
23  the INA.'"  *In re Jose C.*, 198 P.3d 1087, 1100 (Cal. 2009), *cert. denied*, 129 S. Ct. 2804
24  (2009) (citations omitted).

25         **3.**    **A.R.S. § 13-2319 (Section 4) does not conflict with federal law**
26      Plaintiff's argument that Arizona's smuggling statute (A.R.S. § 13-2319) conflicts
27  with federal law confuses several principles of preemption.  First, plaintiff erroneously
28  contends that a mere *difference* between A.R.S. § 13-2319 and the federal smuggling

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

11751129

1   statute (8 U.S.C. § 1324) is a conflict.  *See Ariz. Contractors Ass'n*, 2007 U.S. Dist.

2   LEXIS 96194, at *25 ("A mere difference between state and federal law is not conflict.").

3   To establish conflict preemption, plaintiff must demonstrate that "'compliance with both

4   State and federal law is impossible, or [that] the state law stands as an obstacle to the

5   accomplishment and execution of the full purposes and objectives of Congress.'"  *Id.*

6   (citation omitted).  The only alleged conflict that plaintiff identifies is that the Arizona

7   statute is broader than the federal statute.  *See* Pl. Mot. at 40-41.  This fact, however,

8   neither impedes the federal government's ability to prosecute persons for smuggling

9   under *its* smuggling statute (8 U.S.C. § 1324) nor makes it impossible for a person to

10  comply with both laws.

11      Second, plaintiff ignores the requisite mental state for a conviction under A.R.S. §

12  13-2319.  Under the plain language of the statute, a person can be convicted of smuggling

13  *only* if the State proves beyond a reasonable doubt that the person charged: (1) "with the

14  intent to promote or aid human smuggling"; (2) "intentionally transport[s] or procure[s]

15  the transport of a person who is [unlawfully present] . . . in Arizona"; (3) for a

16  commercial purpose; and (4) "while knowing or having reason to know that the person

17  being transported is [unlawfully present] . . . in Arizona."  *See State v. Barragan-Sierra*,

18  219 Ariz. 276, 283, 196 P.3d 879, 886 (App. 2008).  The statute, therefore, requires both:

19  (1) intent to smuggle for a commercial purpose *and* (2) knowledge that the person is

20  unlawfully present in the country.  Arizona's Criminal Code makes clear that the State

21  can establish the "knowledge" element only by establishing knowledge or intent –

22  criminal negligence is not enough.  *See* A.R.S. § 13-202(C).[22]  Plaintiff ignores these

23  statutorily-defined mental states and, instead, cites, *United States v. Townsend*, 924 F.2d

24  1385 (7th Cir. 1991), to support its argument that mere negligence is sufficient.  Pl. Mot.

25  at 42 n.37.  The *Townsend* court, which addressed the knowledge element for the crime

26  of conspiracy under federal law, held:

27  ─────────────────

28  [22] Under Arizona law, the culpable mental states for criminal liability are "intentionally,
    knowingly, recklessly or with criminal negligence."  A.R.S. § 13-105(10).

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1
2
3
4
5

> The cases sometimes say must know, less frequently must have reason to know. Taken literally the latter formulation would imply something very curious indeed, that a conviction can be upheld without proof beyond a reasonable doubt of an element of the crime (knowledge of the conspiracy)." *Cerro*, 775 F.2d at 911. . . . But as we went on to point out in *Cerro*, "it should not be taken literally. Although usually in the law to say that someone has 'reason to know' something means that he would be negligent in not knowing it, ***in the present context it means only that knowledge can be inferred from circumstantial evidence***.

6 *Townsend*, 924 F.2d at 1391 n.2.[23]  There is no reason to believe that taxi and bus drivers

7 will be impacted by the statute.  Therefore, plaintiff's argument that the statute will cause

8 transportation providers to "reject business from lawfully present aliens" is

9 unsupportable.

10        Third, plaintiff erroneously argues that A.R.S. § 13-2319 criminalizes unlawful

11 presence because it "allow[s] for the punishment of 'self-smuggling.'"  Pl. Mot. at 41.  In

12 *Barragan-Sierra*, the Arizona Court of Appeals rejected an argument that the self-

13 smuggling aspect of A.R.S. § 13-2319 was preempted by federal law.  219 Ariz. at 287,

14 196 P.3d at 890.  In so holding, the Court "ha[d] no difficulty finding that Arizona's

15 human smuggling law furthers, ***by a classic example of its police power***, the legitimate

16 state interest of attempting to curb the 'culture of lawlessness' that has arisen around this

17 activity."  *Id.* (emphasis added); *see also We Are Am./Somos Am.*, 594 F. Supp. 2d at

18 1113 (finding that Maricopa County's smuggling policy "appears to fill the interstices of

19 the INA . . . by allowing for the prosecution of undocumented immigrants conspiring to

20 smuggle themselves").

21        **4.**      **Federal law does not occupy the field of *employee* sanctions**

22        Plaintiff next argues that A.R.S. § 13-2928 conflicts with federal law because the

23 Immigration Reform and Control Act of 1986 ("IRCA") "reflects Congress's deliberate

24 choice *not* to criminally penalize unlawfully present aliens for performing [or attempting

25 to perform] work."  Pl. Mot. at 42-44.  To demonstrate that Congress has occupied the

26 field (regulation of the employment of illegal aliens), plaintiff must demonstrate that a

27
28

[23] As it has with other sections of the Act, plaintiff also argues that the statute will result in the harassment of lawfully present aliens.  Plaintiff fails to present any *evidence* of any harassment that has resulted since the Arizona Legislature enacted A.R.S. § 13-2319 in 2005.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

11751129

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1   "complete ouster of state power including state power to promulgate laws not in conflict

2   with federal laws was '*the clear and manifest purpose of Congress.*'"  *De Canas*, 424

3   U.S. at 357 (emphasis added).  Again, "'[t]he case for federal pre-emption is particularly

4   weak where Congress has indicated its awareness of the operation of state law in a field

5   of interest, and has nonetheless decided to stand by both concepts and to tolerate

6   whatever tension there [is] between them.'"  *Wyeth*, 129 S. Ct. at 1200 (citation omitted).

7       Here, Congress could have, but chose not to, expressly preempt state and local

8   laws that impose civil or criminal sanctions upon employees.  *See* 8 U.S.C. §

9   1324a(h)(2); *Wyeth*, 129 S. Ct. at 1196 ("[W]hen Congress enacted an express pre-

10  emption provision for medical devices in 1976 . . . it declined to enact such a provision

11  for prescription drugs.").  Plaintiff's argument that Congress considered and rejected

12  adopting criminal sanctions against the employee (Pl. Mot. at 44) only underscores this

13  point because it demonstrates that Congress recognized the potential for such regulations,

14  yet chose *not* to expressly preclude them at the state level.

15      Preemption cannot be lightly inferred in this instance because "States possess

16  broad authority under their police powers to regulate the employment relationship to

17  protect workers within the State."  *De Canas*, 424 U.S. at 356.  In *De Canas*, the

18  Supreme Court recognized the important state interests that such regulation serves:

19          Employment of illegal aliens in times of high unemployment deprives
            citizens and legally admitted aliens of jobs; acceptance by illegal aliens of
20          jobs on substandard terms as to wages and working conditions can
            seriously depress wage scales and working conditions of citizens and
21          legally admitted aliens; and employment of illegal aliens under such
            conditions can diminish the effectiveness of labor unions. These local
22          problems are particularly acute in California in light of the significant
            influx into that State of illegal aliens from neighboring Mexico.
23

24  *Id.* at 356-57.  Arizona is also a border state that receives a "significant influx . . . of

25  illegal aliens from neighboring Mexico" and the California problems the *De Canas* Court

26  identified are equally acute here.  *See* Borjas Aff. Ex. 1 at ¶ 7 (stating, among other

27  things, that the loss resulting to Arizona's low-skilled authorized workers as a result of

28  illegal immigration "amounts to more than $200 million"); *Ariz. Contractors Ass'n Inc. v.*

*Candelaria*, 534 F. Supp. 2d 1036, 1049 (D. Ariz. 2008).  And, just like the California statute at issue in *De Canas*, SB 1070 "focuses directly upon these essentially local problems and is tailored to combat effectively the perceived evils."  424 U.S. at 357. Accordingly, A.R.S. § 13-2928 is well within Arizona's police powers and is not preempted by federal law.

### 5.   A.R.S. § 13-2929 (Section 5) does not regulate immigration

Plaintiff's argument that A.R.S. § 13-2929 (from Section 5 of SB 1070) is a regulation of immigration, Pl. Mot. at 44-45, takes an overly broad and unsupported view of what it means to "regulate immigration."  A statute is a "regulation of immigration" if it defines "who should or should not be admitted into the country, and the conditions under which *a legal entrant* may remain."  *De Canas*, 424 U.S. at 354-55 (emphasis added).  The Supreme Court "has never held that every state enactment which in any way deals with aliens is a regulation of immigration and thus per se pre-empted by this constitutional power."  *Id.* at 355.  In fact, the Court has expressly held that "the States do have some authority to act with respect to illegal aliens, at least where such action mirrors federal objectives and furthers a legitimate state goal."[24]  *Plyler v. Doe*, 457 U.S. 202, 225 (1982).

A.R.S. § 13-2929 does not purport to regulate who should or should not be admitted to the United States or the conditions upon which *a legal entrant* may remain. Rather, A.R.S. § 13-2929 will make it unlawful for a person **who is in violation of a criminal offense** to transport, move, conceal, harbor, or shield unlawful aliens, or to encourage an alien to come to this state if the person knows or recklessly disregards that the person would be violating immigration laws to do so.  The fact that this statute applies *only* to persons who engage in such conduct while committing some other

---

[24] Colorado, Georgia, Oklahoma, Missouri, Utah, and Washington have statutory schemes similar to SB 1070.  *See* C.R.S. 29-29-103(1) (2009); O.C.G.A. § 42.4.14 (2010); Mo. Rev. Stat. § 577.680, 67.307, 577.675; 21 Okl. St. § 446(A) (2010); 22 Okl. St. § 171 (2010); U.C.A. § 17-22-9.5; Va. Code Ann. § 19.2-81.6 (2010).  Rhode Island relies upon an Executive Order and state police policies to verify immigration status.  *See* Doherty Decl. ¶¶ 4-9 (describing Rhode Island State Police's implementation of Rhode Island Executive Order 08-01).

11751129

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1  criminal offense demonstrates that it is designed to deter *criminals* from using illegal

2  aliens to assist in their criminal conduct or enterprise.

3  **C.     Plaintiff's Argument that SB 1070 Interferes with Foreign Policy**
       **Objectives Is Merely An Attempt to Side-Step the *De Canas* Test**

4

5       Plaintiff's argument that SB 1070 "is independently preempted because it

6  impermissibly conflicts with U.S. foreign policy" is unsupported by the controlling

7  Supreme Court precedent and the authorities upon which plaintiff relies.  Pl. Mot. at 22-

8  25.  The premise of plaintiff's argument is that, because SB 1070 applies to illegal aliens,

9  it is *per se* preempted under the federal government's foreign affairs power.  In support,

10  plaintiff cites numerous cases and declarations that stand for the unremarkable and

11  undisputed proposition that immigration policy has foreign policy implications.  But

12  plaintiff fails to recognize that the Supreme Court has already rejected the position

13  plaintiff advances and explicitly held that "the fact that aliens are the subject of a state

14  statute" does not mandate a finding of preemption.  *Id.* at 355.  As the *De Canas* Court

15  recognized:

16       [T]here would have been no need, in cases such as Graham, Takahashi, or
        *Hines v. Davidowitz*, 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941), even
17       to discuss the relevant congressional enactments in finding pre-emption of
        state regulation if all state regulation of aliens was *ipso facto* regulation of
18       immigration, for the existence *vel non* of federal regulation is wholly
        irrelevant if the Constitution of its own force requires pre-emption of such
19       state regulation.

20  *Id.*

21       The *De Canas* Court acknowledged "the predominance of federal interest in the

22  fields of immigration and foreign affairs" that led to the preemption of Pennsylvania

23  statutes in *Hines*, 312 U.S. 52 and *Pennsylvania v. Nelson*, 350 U.S. 497 (1956).  *See De*

24  *Canas*, 424 U.S. at 363.  However, the Court also made clear that the infirmity in the

25  statutes at issue in *Hines* and *Nelson* – which involved state-specific alien registration

26  requirements and criminal sanctions for sedition against the United States – is that they

27  sought to regulate purely national concerns and "imposed burdens on aliens ***lawfully***

28  ***within the country*** that ***created conflicts with various federal laws***."  *Id.* at 362-63

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

(emphasis added).  The Court distinguished such regulation from the state law before it, which did not implicate the same foreign policy concerns because it was "fashioned to remedy local problems" and related solely "to individuals whom the Federal Government has already declared cannot work in this country."  *Id.* at 363.  The Supreme Court later reiterated this distinction in *Plyler*, holding that "the States do have some authority to act with respect to illegal aliens, at least where such action mirrors federal objectives and furthers a legitimate state goal."  *Plyler*, 457 U.S. at 225.

Both *De Canas* and *Plyler* addressed the same type of regulation that is at issue here – regulation designed to address harm specific to Arizona and that touches upon aliens that the federal government has determined are ***not lawfully present*** in the country. None of the cases plaintiff cites involve the preemption of state regulation touching upon illegal aliens.[25]  *De Canas* controls the preemption inquiry and, for the reasons set forth above, plaintiff has not demonstrated preemption under the *De Canas* test.

### D.   SB 1070 Correctly Adopts Federal Law as the Policy of Arizona

Plaintiff also seeks to invalidate SB 1070 on the ground that it allegedly attempts to set immigration policy at the state level.  Pl. Mot. at 12-22.  However, Arizona's policy of cooperative enforcement of the federal immigration laws and "attrition through enforcement" incorporate, among other things: (1) the cooperative enforcement policies that Congress clearly established in statutes such as 8 U.S.C. §§ 1373 and 1644 and (2) the "vigorous enforcement" policy the Executive Branch established in 1996 and reaffirmed in 2008, *see* Exec. Order 12989 (Feb. 13, 1996); Exec. Order 13465 (June 6,

---

[25] *See Chy Lung v. Freeman*, 92 U.S. 275, 279-80 (1875) (state regulation of a person's admission to the country); *California v. United States*, 104 F.3d 1086 (9th Cir. 1997) (state claims against the federal government seeking to recover from adverse impact of the federal immigration policy); *Zadvydas*, 533 U.S. 678 (2001) (construction of a federal statute addressing detention of an alien post-removal); *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 401 (2003) (preemption of California statute requiring "any insurer doing business in that State to disclose information about all policies sold in Europe between 1920 and 1945"); *Movsesian v. Victoria Versicherung AG*, 578 F.3d 1052 (9th Cir. 2009) (preemption of California statute of limitations for claims brought by Armenian Genocide victims); *Quinchia v. U.S. Attorney Gen.*, 552 F.3d 1255 (11th Cir. 2008) (construction of INA § 212(h)); *Francis v. INS*, 532 F.2d 268 (2d Cir. 1976) (construction of INA § 106); *Clayco Petroleum Corp. v. Occidental Petroleum Corp.*, 712 F.2d 404 (9th Cir. 1983) (dismissal of an antitrust suit under the state action doctrine); *United States v. Delgado-Garcia*, 374 F.3d 1337 (D.C. Cir. 2004) (criminal convictions under 8 U.S.C. § 1324(a)).

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1    2008).  Even plaintiff acknowledges that:  "It is certainly a primary objective of federal

2    law to prevent aliens from unlawfully entering and residing in the United States . . ."  Pl.

3    Mot. at 17-18.  And, plaintiff cannot cite to any *congressional* policy that SB 1070

4    supposedly contravenes.

5          Plaintiff's argument also neglects to demonstrate how the policies underlying SB

6    1070 will (on their face) interfere with any DHS or DOJ enforcement priorities.  Arizona

7    cannot require the federal government to take any action with respect to any illegal alien

8    within Arizona's borders – nor does SB 1070 attempt to do so.  SB 1070 merely requires,

9    in limited circumstances, that Arizona's law enforcement officers exercise their existing

10   authority to communicate with the federal government regarding possible immigration

11   violations.  This requirement cannot, as plaintiff argues, "force a diversion of federal

12   resources away from federal priorities" because *Congress* determines federal priorities

13   and Congress has not only invited such inquiries but has *required* ICE to respond to

14   them.  *See* 8 U.S.C. §§ 1373 and 1644.[26]  Further, because SB 1070 does not (and could

15   not) provide Arizona's law enforcement officers any authority to determine who should

16   or should not remain in the country, SB 1070 does not interfere with the federal

17   government's interest in providing humanitarian relief.  In fact, A.R.S. § 11-1051(L)

18   expressly requires that the section "be implemented in a manner consistent with federal

19   laws regulating immigration."

20         None of the cases plaintiff cites support its argument that the policy expressed in

21   SB 1070 provides a basis for invalidating the Act.  In *League of United Latin American*

22   *Citizens v. Wilson*, 908 F. Supp. 755, 769-70 (C.D. Cal. 1995), for example, a California

23   District Court invalidated portions of California's Proposition 187 on the ground that the

24   provisions had "a direct and substantial impact on immigration."  The *Wilson* case,

25   however, was decided before Congress enacted 8 U.S.C. §§ 1373 and 1644, which *invite*

26   the type of assistance that SB 1070 is designed to provide.  In *Arres v. IMI Cornwlius*

---

[26] The California District Court case upon which plaintiff relies to support its argument
that SB 1070 will impermissibly "burden" federal resources neither acknowledged nor
addressed the federal statutes that require DHS to provide such information.  *See* Pl. Mot.
at 20 (citing *Garrett v. City of Escondido*, 465 F. Supp. 2d 1043, 1057 (S.D. Cal. 2006)).

27

28

*Remcor, Inc.*, 333 F.3d 812, 815 (7th Cir. 2003), the plaintiff was terminated for insisting upon a procedure for determining the immigration status of employees that federal law did not support.  In holding that the termination did not contravene a clearly established policy of Illinois, the Seventh Circuit held that: "Whether persons in Arres' position are entitled to implement ***private understandings*** of federal immigration policy, free from any risk to their status within the firm, is a question of federal law alone."  *Id.* (emphasis added).[27]

### E.   Section 5 of SB 1070 Does Not Violate the Commerce Clause

The only provision of SB 1070 that plaintiff claims violates the Commerce Clause is A.R.S. § 13-2929 (from Section 5).  *See* Pl. Mot. at 44-46.  Statutes that do not discriminate and impose no burdens on interstate commerce do not violate the Commerce Clause.  Further, even statutes that impose incidental burdens on interstate commerce do not violate the Commerce Clause if they regulate even-handedly to effectuate a legitimate local public interest, and the burden imposed is outweighed by the benefits to the state.  Plaintiff generally alleges that A.R.S. § 13-2929 "restricts the interstate movement of aliens in a manner that is prohibited by [the Commerce Clause]."  Compl. ¶ 67.[28]  Plaintiff's argument is misguided as A.R.S. § 13-2929 does not restrict the interstate movement of aliens nor discriminate against or burden interstate commerce.

---

[27] *See also Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 366-78 (2000) (finding that a state law "restricting the authority of its agencies to purchase goods or services from companies doing business with Burma" was preempted because "Congress manifestly intended to limit economic pressure against the Burmese Government to a specific range" and the state law "penalize[ed] individuals and conduct that Congress has explicitly exempted or excluded from sanctions"); *Buckman*, 531 U.S. 341 (finding that the Food, Drug, and Cosmetic Act preempted state law claims that required plaintiffs to prove fraud on the FDA); *Kobar*, 378 F. Supp. 2d 1166 (applying *Buckman* to preempt a statute that immunized drug manufacturers from punitive damages unless the plaintiff proved fraud on the FDA).

[28] Plaintiff does not allege that the Act violates *intra*state movement.  Since A.R.S. § 13-2929(A)(1) and (2) relate exclusively to movement within the state, plaintiff is seemingly challenging only A.R.S. § 13-2929(A)(3), which relates to "encourag[ing] or induc[ing] an alien to come to or reside in this state" in violation of law.  Notably, this subsection does not distinguish between in-state and out-of-state illegal aliens, as a person could conceivably encourage or induce an illegal alien, who is in-state *or* out-of-state, to reside in Arizona.  *See* A.R.S. § 13-2929(A)(3).

11751129

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

**1.    A.R.S. § 13-2929 does not restrict interstate movement of aliens**

A.R.S. § 13-2929 makes it unlawful for a person, *while in violation of a criminal offense*, to (1) transport, move or attempt to transport or move an alien in this state, *in furtherance of the illegal presence of the alien*, if the person knows or recklessly disregards that the alien has come to, has entered or remains in the United States in violation of law; (2) conceal, harbor, shield or attempt to conceal, harbor or shield an alien from detection in this state, if the person knows or recklessly disregards that the alien has come to, has entered or remains in the United States in violation of law; or (3) encourage or induce an alien to come to or reside in this state if the person knows or recklessly disregards that such coming to, entering or residing in this state is or will be a violation of law. (emphasis added).[29]

A.R.S. § 13-2929 does not "restrict the movement of unlawfully present aliens from other states into Arizona."  Pl. Mot. at 46.  In fact, it does not even address whether aliens can or cannot come to the State, nor does it regulate entry in any way.  *See* A.R.S. § 13-2929.  It simply provides that individuals, *who are in violation of a criminal offense*, cannot also transport, move, conceal, harbor or shield *illegal* aliens within the state *in furtherance of their unlawful presence*, nor can they encourage an *illegal* alien to *illegally* enter or reside in the state.  *Id.* (emphasis added).

**2.    A.R.S. § 13-2929 does not violate the commerce clause**

By negative implication, the Commerce Clause has been interpreted as a restriction on permissible state regulation.  *See*, *e.g.*, *On the Green Apartments, L.L.C. v. City of Tacoma*, 241 F.3d 1235, 1238 (9th Cir. 2001); *see also* U.S. Const. art. I, § 8, cl. 3.  The dormant Commerce Clause principally focuses on statutes that discriminate against interstate commerce.  *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 87 (1987).  However, "[l]egislation, in a great variety of ways, may affect commerce and persons engaged in it without constituting a regulation of it, within the meaning of the

---

[29] Exceptions apply for emergency services and Child Protective Services.  *See* A.R.S. § 13-2929(E).

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1  Constitution."  *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 444 (1960)

2  (citation omitted).  The Commerce Clause was not intended "to cut the States off from

3  legislating on all subjects relating to the health, life, and safety of their citizens, though

4  the legislation might indirectly affect the commerce of the country."  *Id*. at 443-44.[30]

5
        i.      <u>A.R.S. § 13-2929 does not discriminate against out-of-state</u>

6  <u>interests or burden interstate commerce</u>

7  A.R.S. § 13-2929 creates no barriers against interstate commerce, nor does it

8  prohibit the flow of interstate goods, place added costs upon them, or distinguish between

9  in-state and out-of-state companies in the retail market.  *See Exxon v. Governor of Md.*,

10  437 U.S. 117, 126 (1978) (discussing that "[t]he absence of any of these factors fully

11  distinguishes this case from those in which a State has been found to have discriminated

12  against interstate commerce."); *see also CTS Corp.*, 481 U.S. at 88 (rejecting the

13  contention that an Indiana statute discriminates against interstate commerce "because

14  nothing in the Indiana Act imposes a greater burden on out-of-state offerors than it does

15  on similarly situated Indiana offerors").[31]

16  "The central rationale for the rule against discrimination is to prohibit state or

17  municipal laws whose object is local economic protectionism, laws that would excite

18  those jealousies and retaliatory measures the Constitution was designed to prevent."  *On*

19

20

21

22

---

23  [30] "As long as a state does not needlessly obstruct interstate trade or attempt to 'place

24  itself in a position of economic isolation,' it retains broad regulatory authority to protect
the health and safety of its citizens and the integrity of its natural resources."  *Maine v.*

25  *Taylor*, 477 U.S. 131, 151 (1986) (internal citation omitted) (holding that Maine's ban on
the importation of live baitfish did not violate the Commerce Clause as it served a

26  legitimate local purpose).

27  [31] "The term discrimination in this context means differential treatment of in-state and
out-of-state economic interests that benefits the former and burdens the latter."  *Town of*

28  *Southold v. Town of E. Hampton*, 477 F.3d 38, 47 (2d Cir. 2007) (internal quotations
omitted) (citing *Or. Waste Sys., Inc. v. Dep't of Envt'l Quality*, 511 U.S. 93, 99 (1994)).

*the Green*, 241 F.3d at 1238 (citation omitted).[32]  Further, a hypothetical possibility that a statute *may* burden interstate commerce cannot sustain a facial challenge.  *Arkansas Elec. Co-op. Corp. v. Arkansas Pub. Serv. Comm'n*, 461 U.S. 375, 395 (1983) (citation omitted) (holding that a particular rate structure was not in violation of the Commerce Clause even though "[i]t is not inconceivable that [it] . . . would be so unreasonable as to disturb appreciably the interstate market for electric power.").  Since A.R.S. § 13-2929 does not discriminate against or burden interstate commerce, plaintiff's claim must fail.[33]

        ii.    <u>A.R.S. § 13-2929 does not impose an undue burden on interstate commerce</u>

Even if A.R.S. § 13-2929 imposed a burden on interstate commerce, which it does not, then a balancing test would still be employed to determine whether the provision is unduly burdensome. [34]  *See Arkansas Elec.*, 461 U.S. at 393-94 (1983) (citing *Pike v. Bruce Church*, 397 U.S. 137 (1970) ("Where [a] statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are

---

[32] Plaintiff attempts to support its claim by relying on two inapposite cases.  In *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, the Supreme Court held that a disparate real estate tax exemption provided to certain institutions violated the Commerce Clause because the statute "encourage[d] affected entities to limit their out-of-state clientele, and penalize[d] the principally nonresident customers of businesses catering to a primarily interstate market."  520 U.S. 564, 575-76 (1997).  In *Anderson v. Mullaney*, the Ninth Circuit held that a statute imposing a $5.00 commercial license fee for residents, but $50.00 for nonresidents was an unjustified discriminatory burden on nonresidents.  191 F.2d 123, 127-32 (9th Cir. 1951).  *Camps* and *Anderson* are irrelevant to plaintiff's challenge of A.R.S. § 13-2929, as A.R.S. § 13-2929 does not favor in-state or out-of-state commerce nor does it distinguish between in-state and out-of-state commerce, as the real estate tax exemption and license fees did.

[33] There is no violation of the Commerce Clause as laws prohibiting illegal aliens from entering or residing in the country effectively prohibit their transportation into Arizona as well.  *See, e.g.*, *Seke v. Com.*, 482 S.E.2d 88, 92 (Va. App. 1997) (holding that a Virginia statute prohibiting the transportation of certain controlled substances does not violate the Commerce Clause since "laws prohibiting the possession of controlled substances effectively prohibit their transportation wholly within the Commonwealth as well.").  A.R.S. § 13-2929 does not violate the Commerce Clause because it does not "imped[e] free private trade in the national marketplace."  *See Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 287 (1997) (citation omitted).  Even if a statute is believed to discriminate against commerce, it will still be upheld if there is a legitimate local purpose that can now be served as well by available nondiscriminatory means.  *Maine*, 477 U.S. at 138.

[34] "Evenhanded local regulation to effectuate a legitimate local public interest is valid unless pre-empted by federal action, or unduly burdensome on . . . interstate commerce."  *Huron*, 362 U.S. at 443.

Snell & Wilmer

L.L.P.

LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1    only incidental, it will be upheld unless the burden imposed on such commerce is clearly

2    excessive in relation to putative local benefits.").

3        For example, in *Minnesota v. Clover Leaf Creamery Co.*, the Supreme Court held

4    that a Minnesota statute, which prohibited milk retailers from selling their products in

5    plastic, nonreturnable milk containers, without regard to whether the milk, the containers,

6    or the sellers are from outside the State, did not violate the Commerce Clause, as it

7    imposed only a minor burden on interstate commerce.  449 U.S. 456, 471-72 (1981).

8    Further, the Court explained that the statute "regulates evenhandedly," and the burden did

9    not outweigh the state's legitimate purpose.  *Id*. at 471-72, 474.

10        Plaintiff cites only three cases to support its argument that Section 5 violates the

11    Commerce Clause.  Pl. Mot. at 45.  None of these cases address the transportation of

12    *illegal* aliens and none are applicable to this case.[35]  Plaintiff's misunderstanding about

13    the application of SB 1070 and its speculation about the Act's alleged potential impact on

14    interstate commerce is not sufficient to establish a violation of the Commerce Clause.  SB

15    1070 does not discriminate against out-of-state interests, burden commerce, or create a

16    preference for in-state commerce.

17    **VI.    PLAINTIFF HAS NOT ESTABLISHED IRREPARABLE HARM**

18        The purpose of a preliminary injunction is "to prevent existing or presently

19    threatened injuries.  A preliminary injunction will not be granted against something

20    merely feared as liable to occur at some indefinite time in the future."  *Connecticut v.*

21    *Massachusetts*, 282 U.S. 660, 674 (1931) (denying injunctive relief to Connecticut based

22    on Massachusetts' alleged intent to divert water from the watershed of the Connecticut

23    River at some point in the future).  In *Caribbean Marine Services Co., Inc. v. Baldrige*,

24    ────────────────────

[35] Plaintiff relies on *Edwards v. California* to support its claim that A.R.S. § 13-2929
25    intentionally interferes with interstate commerce.  *See* Pl. Mot. at 45 (citing 314 U.S. 160,
172-73 (1941)).  Plaintiff's reliance is misplaced.  In *Edwards*, the statute that was the
26    subject of the challenge restricted individuals from bringing into the state *indigent*
persons who are not residents of the state.  *Id*. at 161.  The Supreme Court held that an
27    "attempt by a State to prohibit the transportation of indigent non-residents into its
territory" is not permitted.  *Id*. at 174, 177.  Notably, it is not illegal to be indigent, and
the restrictions are not in the furtherance of any legitimate interest, as found in SB 1070.
28    Plaintiff also cites *Camps* and *Anderson*, which are inapposite for the reasons described
in footnote 34.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

844 F.2d 668, 674 (9th Cir. 1988), for example, the Ninth Circuit reversed the issuance of a preliminary injunction that prohibited the government "from placing female observers on board commercial tuna boats" because the declarations plaintiffs submitted to support their claim of irreparable harm merely "speculate[d] that accommodation of a female federal observer may be costly." The court further found that because "[m]ultiple contingencies must occur before [the plaintiffs'] injuries would ripen into concrete harms. . . . [the] injury is too speculative to constitute an irreparable harm justifying injunctive relief." *Id.* at 675.

### A.     The Federal Government Cannot Be Harmed By Having to Comply With the Express Intent of Congress

SB 1070 codifies Arizona's policies of "cooperative enforcement of federal immigration laws" and "attrition through enforcement." SB 1070, § 1. Plaintiff acknowledges that "attrition through enforcement" *is* "one goal of the federal immigration system." Pl. Mot. at 13. And, Arizona's policy of cooperative enforcement is not only consistent with, but is mandated by, the federal policies set forth in 8 U.S.C. §§ 1373 and 1644. Nevertheless, plaintiff argues that enforcement of SB 1070 will cause plaintiff irreparable harm by "plac[ing] a significant burden on DHS resources" by requiring DHS to respond to inquiries from Arizona's law enforcement officers "at the expense of [DHS's] own policy priorities." Pl. Mot. at 50-51. The fatal flaw in this argument is that Congress establishes the policies and priorities with which DHS must comply and Congress has established a policy of cooperation between federal, state, and local agencies in the identification of persons unlawfully present in the country. *See* 8 U.S.C. §§ 1373 and 1644. It defies logic to suggest that DHS will suffer "irreparable harm" by providing information to state and local authorities that Congress has *compelled* DHS to provide. 8 U.S.C. §§ 1373(c).

Ignoring this congressional mandate, DHS argues that SB 1070 is in conflict with federal law based on *new* priorities and policies DHS adopted (through ICE) on June 30, 2010 – two months after Governor Brewer signed SB 1070 into law. *See* Pl. Mot. at 18-

22 & Ragsdale Decl. ¶ 27.[36]  To the extent these new policies and priorities conflict with

SB 1070 they conflict with Congress' intent and, therefore, cannot provide a basis for

plaintiff to demonstrate irreparable harm.

### B.     Plaintiff's Alleged Harm Is Hypothetical and Not Well Founded

Not only can plaintiff's newly-adopted policies not support plaintiff's claim of

irreparable harm as a matter of law, but, in any event, plaintiff cannot demonstrate that

implementation of SB 1070 will actually burden plaintiff's resources.  First, the "burden

on DHS resources" that plaintiff fears is not well founded because it is based on *its*

interpretation of SB 1070.  For the reasons set forth in Section III.B, however, plaintiff's

interpretation is not consistent with the State of Arizona's interpretation, the principles of

statutory construction, nor common sense.

Second, plaintiff's alleged harm is wholly speculative.  SB 1070 primarily codifies

state and local enforcement officers' *existing* authority to investigate violations of federal

immigration laws and to cooperate with the federal government in their enforcement.

*See*, *e.g.*, Pl. Mot. at 25 (acknowledging that state and local police officers have such

authority).  Under SB 1070, Arizona's law enforcement officers will, *within their*

*discretion*, make inquiries *only* in connection with an investigation into the immigration

status of persons for whom reasonable suspicion exists that the person has engaged in

unlawful conduct ***and*** is unlawfully present in the state.  *See* A.R.S. § 11-1051(B).

Although SB 1070 is designed to increase inquires into individuals' immigration

status,[37] SB 1070 does not (and cannot) control what DHS does with the information

Arizona provides.  If DHS determines that the person is unlawfully present but low

---

[36] Ragsdale executed his declaration the following day – July 1, 2010.

[37] As a practical matter, most people stopped, detained, or arrested have identification or
other indicia of lawful presence so SB 1070's provisions will generally not be triggered.
*See*, *e.g.*, Vasquez Decl. ¶ 20; Marino Decl. ¶ 8; Adams Decl. Tab 5 (ICE brochure with
examples of common forms of identification establishing lawful presence).  Also, an
inquiry into a person's immigration status does not necessarily require *any* action from
DHS because Arizona has 287(g) officers with access to ICE's computer databases.  *See*
McGlone Decl. ¶ 5 ("As a 287(g) certified officer, I have direct access to ICE maintained
databases that contain information about a person's immigration status.  These databases
have the ability to search phonetic spellings and automatically provide likely spellings.")

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1   priority, DHS can simply instruct Arizona's law enforcement officers to release the

2   person. *See*, *e.g.*, Vasquez Decl. ¶¶ 23-25; Marino Decl. ¶¶ 24-25 (describing the process

3   in which a local officer turns suspects over to federal agents). If, however, DHS

4   determines that the person is top priority because he or she "pose[s] a danger to national

5   security or a risk to public safety," Arizona's law enforcement officers can detain the

6   person until DHS has an opportunity to apprehend the person or, pursuant to A.R.S. § 11-

7   1051(D), transport the person directly to federal law enforcement authorities.

8   The fact that the federal government has posted "Danger – Public Warning Travel

9   Not Recommended" signs in Arizona demonstrates the federal government's awareness

10  of high-priority illegal aliens in Arizona. *See* Smith Decl. and attached exhibits.[38] Rather

11  than wait for these persons to commit (and be apprehended for) additional "high priority"

12  crimes, SB 1070 provides an opportunity for DHS to apprehend them in connection with

13  *any* offense. *See*, *e.g.*, Vaughan Decl. ¶¶ 41-43 (discussing ICE's reliance on referrals

14  and stating that "federal immigration authorities cannot properly do their jobs without the

15  active participation of local law enforcement"). Thus, SB 1070 does nothing more than

16  incentivize Arizona's law enforcement officers to provide assistance that DHS

17  undoubtedly requires to enforce the federal immigration laws.[39] Such assistance serves to

18  benefit, not harm, the United States. *See Marsh v. United States*, 29 F.2d 172, 174 (2d

19  Cir. 1928) ("[I]t would be unreasonable to suppose that [the federal government's]

---

20  [38] The warning signs, in their entirety, read:

21  **DANGER – PUBLIC WARNING**
    **TRAVEL NOT RECOMMENDED**

22  • **Active Drug and Human Smuggling Area**

23  • **Visitors May Encounter Armed Criminals and Smuggling Vehicles Traveling at High Rates of Speed**

    • **Stay Away From Trash, Clothing, Backpacks, and Abandoned Vehicles**

24  • **If You See Suspicious Activity, <u>Do Not Confront</u>! Move Away and Call 911**

25  • **BLM Encourages Visitors to Use Public Lands North of Interstate 8**

    *See* Smith Decl. and attached Exs.

26  [39] ICE established the Law Enforcement Support Center ("LESC") for the purpose of providing state and local law enforcement officers with "timely and accurate information

27  to law enforcement officers on the immigration status and identities of individuals who have been arrested or are under investigation for criminal activity." Adams Decl. Tab 6;

28  Vaughan Decl. ¶¶ 44-48 (describing the LESC and its ability to respond).

Snell & Wilmer

L.L.P.

LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

purpose was to deny itself any help that the states may allow.").

C.    **Any Impact to Foreign Policy Based on SB 1070's Enactment Is Based Entirely Upon Misconceptions About the Act**

Plaintiff also seeks to establish that it will suffer irreparable harm if SB 1070 is enacted by arguing that SB 1070 will interfere with plaintiff's "ability to manage foreign policy." Pl. Mot. at 47. This argument fails to establish irreparable harm because the criticism Arizona has received following SB 1070's passage has had little (if anything) to do with any provision in the Act. Arizona and Mexico continue to work together on areas of mutual concern. Emmermann Decl. ¶¶ 3, 15.[40] And, federal officials have, at the very least, been a substantial factor in coloring foreign officials' negative perceptions. For example, before Governor Brewer even signed SB 1070, President Obama criticized the Act by stating – during a naturalization ceremony in the White House Rose Garden for active duty service members from 24 countries – that it was "misguided" and instructed the DOJ to evaluate whether the law would violate civil rights. Adams Decl. Tab 22. President Obama further stated that a federal solution was necessary to avoid "open[ing] the door to irresponsibility by others," and referred to "the recent efforts in Arizona" as "threaten[ing] to undermine basic notions of fairness that we cherish as Americans." *Id.* DHS Secretary Janet Napolitano also appeared on television to assert that SB 1070 was "bad law enforcement law," after which she admitted that she had not read the Act. Adams Decl. Tab 20. Eric Holder expressed a concern about the bill as it relates to racial profiling even though he later acknowledged having only "glanced at the bill." Adams Decl. Tab 21. And, various State Department officials have made

---

[40] The fact that the Mexican government opposes SB 1070 or that others suggest SB 1070 impairs international relations must be weighed against Mexico's own Reglamento de la Ley General de Poblacion, which includes a provision that permits federal and local authorities to request that foreigners present documents confirming their immigration status before performing particular acts or contracts. *See* Ley General de Poblacion (General Population Act), as amended, art. 67 Diaro Oficial d la Federacion, 14 de Abril de 2009 (Mex.). Moreover, to the extent plaintiff relies on criticism from countries such as Ecuador, Bolivia, El Salvador, and Guatemala, such reliance is unfounded. Reich Decl. ¶ 46 ("These countries are among the most virulently anti-American governments in the world. These countries routinely criticize U.S. policy for purely political reasons.").

11751129

1   disparaging comments about SB 1070.  Reich Decl. ¶ 26 (former ambassador noting that

2   Secretary of State Hillary Clinton "announced to the world" that the DOJ was filing a

3   lawsuit and that the State Department "should have expected a significant negative

4   response from the international community"); Adams Decl. Tabs 37 & 18 (Letter from

5   Arizona Senator John McCain and Jon Kyl demanding retraction of state department

6   official comments comparing Arizona and 1070 to Communist China); Adams Decl. Tab

7   19 (reporting the public statements Assistant Secretary of State Michael Posner made

8   criticizing SB 1070).

9       Instead of educating the international community about existing United States

10   immigration laws, President Obama, Secretary Napolitano, Attorney General Holder, and

11   Secretary Clinton have allowed SB 1070 to be distorted in Latin America and around the

12   world.  Reich Decl. ¶ 24 ("If the U.S. Attorney General and the Secretary of Homeland

13   Security did not read the law before criticizing it, it is fair to assume the reporters in Latin

14   America and the general public did not read it.").[41]  Based on all these statements and

15   misrepresentations, it is impossible to determine to what extent, if any, the foreign policy

16   impact of SB 1070 arises out any actual provision of the Act.[42]

### VII.    THE BALANCE OF EQUITIES TIPS SHARPLY IN ARIZONA'S FAVOR

18       In determining whether to issue a preliminary injunction, "'courts of equity should

19   pay particular regard for the public consequences in employing the extraordinary remedy

20   of injunction.'"  *Winter*, 129 S. Ct. at 376-77 (quoting *Weinberger v. Romero-Barcelo*,

21   456 U.S. 305, 312 (1982)).  In *Winter*, the Supreme Court held that "a proper

22   consideration of [the irreparable injury and public interest] factors alone require[d] denial

23   of the requested injunctive relief" without regard for whether "plaintiffs have also

24   established a likelihood of success on the merits."  *Id*. at 376; *see also Yakus v. United*

---

[41] *See also* Reich Decl. ¶ 28 (it appears that diplomatic efforts have not been made to educate the public – domestic or international – about SB 1070, except to "incite criticism and fear as it relates to the enforcement of the litigation").

[42] Most of SB 1070's critics insist that the Act will lead to racial profiling, but such criticisms are not well founded because Arizona's law enforcement officers receive extensive training related to racial profiling.  Vasquez Decl. ¶ 5; Gafvert Decl. ¶ 7; Bolton Decl. ¶ 8; Adams Decl. Tab 35, at 14-15.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

*States*, 321 U.S. 414, 440 (1944) ("The award of an interlocutory injunction by courts of equity has never been regarded as strictly a matter of right, even though irreparable injury may otherwise result to the plaintiff."); *Piedmont Heights Civic Club, Inc. v. Moreland*, 637 F.2d 430, 443 (5th Cir. 1981) (affirming the denial of an injunction based on its finding that "the harm to the defendants and the general public" as a result of "serious traffic and safety hazards that result from . . . overcrowded highways" outweighed the harm to the plaintiffs).

Plaintiffs bear an especially heavy burden when they seek to enjoin the State. "When a plaintiff seeks to enjoin the activity of a government agency . . . his case must contend with the well-established rule that the Government has traditionally been granted the widest latitude in the 'dispatch of its own internal affairs.'" *Rizzo*, 423 U.S. at 378-79 (citation omitted). "Where, as here, the exercise of authority by state officials is attacked, federal courts must be constantly mindful of the 'special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law.'" *Id.* at 378 (quoting *Stefanelli v. Minard*, 342 U.S. 117, 120 (1951)). "The more serious the threat to the state's welfare, the more drastic the remedy which may be applied." *Id.*; *Yakus*, 321 U.S. at 443 ("Even the personal liberty of the citizen may be temporarily restrained as a measure of public safety.").[43]

Plaintiff will not suffer any harm (let alone irreparable harm) if SB 1070 goes into effect. Arizona, by contrast, is suffering serious consequences under the status quo. There can be no dispute that Arizona has a serious illegal immigration problem. In 2009, there were approximately 500,000 people in Arizona who were not lawfully present in this country. Adams Decl. Tab 26 at 4; *see also* Adams Decl. Tab 30 (discussing severe harm to the land due to illegal immigration); Adams Decl. Tab 32 (same).

Arizona has repeatedly asked for federal assistance in dealing with the influx of

---

[43] *See also Hawaii Housing Auth. v. Midkiff*, 467 U.S. 229, 239 (1984) ("[W]hen the legislature has spoken, the public interest has been declared in terms well-nigh conclusive. In such cases, the legislature, not the judiciary, is the main guardian of the needs to be served by social legislation . . .") (citation omitted).

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

illegal aliens in Arizona.[44]  *See, e.g.,* Letter from J. Napolitano, Governor of Arizona, to D. Rumsfeld, DoD Secretary (Dec. 30, 2005) (Adams Decl. Tab 10); Letter from J. Napolitano, Governor of Arizona, to D. Rumsfeld, DoD Secretary and M. Chertoff, DHS Secretary (Mar. 7, 2006) (Adams Decl. Tab 11); Letter from J. Napolitano, Governor of Arizona, to M. Chertoff, DHS Secretary (Mar. 11, 2008) (Adams Decl. Tab 12); Letter from John M. Roll, Chief Judge, Arizona District Court, to Congressional Staff Members (June 3, 2010) (Adams Decl. Tab 9); Letter from Dean Martin, Treasurer of Arizona, to J. Napolitano, DHS Secretary (Jan. 4, 2010) (Adams Decl. Tab 14).  On June 23, 2010, Governor Brewer wrote to President Obama and explained that "the need for action to secure Arizona's border could not be clearer" and proposed a four-point strategy for addressing Arizona's border-control issues.  Adams Decl. Tab 13 at 1.  And, as recently as July 2010, Arizona Attorney General Terry Goddard wrote to President Obama to address the "rampant trafficking of drugs, humans, guns and money across our border" caused by the Mexican drug cartels, which Goddard believes to be "responsible for the murders of more than 22,700 people south of our border since 2007."  Adams Decl. Tab 27 at 1.

Arizona's interest in having SB 1070 enforced substantially exceeds plaintiff's supposed interest in having SB 1070 enjoined.  Enjoining the enforcement of SB 1070 would inflict significant and tangible, irreparable harm upon the State and its citizens.  Among the documented harms demonstrated by the State herein are:

(i)   Citizens, including police officers and their families, are exposed to injury and death;

(ii)  Individuals are subjected to the presence of drug cartels and criminal activity; and

(iii) Citizens are denied the use of public lands deemed unsafe and dangerous.

These are not speculative, hypothetical harms.  These are real-life experiences which have substantially affected the quality of life in Arizona and will continue to do so at an

---

[44] Arizona's senators have also sought help in addressing Arizona's border problems.  Adams Decl. Tab 15; *see also* Adams Decl. Tab 16.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1    increasing rate if SB 1070 is enjoined.

2    IX.    **<u>CONCLUSION</u>**

3        For the foregoing reasons, Governor Brewer and the State of Arizona respectfully

4    request that the Court deny plaintiff's requested injunction.

5        DATED this 20th day of July, 2010.

6                                   SNELL & WILMER L.L.P.

7

8                        By: s/ John J. Bouma
9                            John J. Bouma
                            Robert A. Henry
10                           Joseph G. Adams
                            One Arizona Center
11                           400 E. Van Buren
                            Phoenix, AZ  85004-2202
12
                            and
13
                        By  s/Joseph A. Kanefield *with permission*
14                           Joseph A. Kanefield
                            Office of Governor Janice K. Brewer
15                           1700 W. Washington, 9th Floor
                            Phoenix, AZ  85007
16
                            *Attorneys for the State of Arizona and Janice K.*
17                           *Brewer, Governor of the State of Arizona*

18

19

20

21

22

23

24

25

26

27

28

Snell & Wilmer
——— L.L.P. ———
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

11751129

1

**CERTIFICATE OF SERVICE**

2     I hereby certify that on July 20, 2010 I electronically transmitted the foregoing

3 document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

4 Notice of Electronic Filing to the following CM/ECF registrants:

5     Tony West
   Dennis K. Burke
6     Arthur R. Goldberg
   Varu Chilakamarri
7     Joshua Wilkenfeld
   U.S. Department of Justice, Civil Division
8     20 Massachusetts Avenue, N.W.
   Washington, D.C. 20530

9

10

11                                    s/John J. Bouma

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000