Michael Meehan, Of Counsel
(AZ Bar # 2892)
Munger Chadwick, P.L.C.
333 N. Wilmot, Suite 300
Tucson, Arizona 85711
(520)721-1900
(520)747-1550 (fax)
mmeehan@mungerchadwick.com

Michael M. Hethmon*
Garrett Roe*
IMMIGRATION REFORM LAW INSTITUTE
25 Massachusetts Ave, NW  Suite 335
Washington, DC  20001
(202) 232-5590
(202) 464-3590 (fax)
mhethmon@irli.org
groe@irli.org

Jay Alan Sekulow*
Colby M. May*
AMER. CENTER FOR LAW & JUSTICE
201 Maryland Ave., NE
Washington, DC  20002
(202) 546-8890
(202) 546-9309 (fax)
jsekulow@aclj.org
cmmay@aclj-dc.org

*Not admitted in this jurisdiction

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

|  |  |  |
|---|---|---|
| _____ | ) | |
| United States of America, | ) | |
| | ) | |
| *Plaintiff* | ) | |
| v. | ) | |
| | ) | CASE NO. CV-10-1413-SRB |
| The State of Arizona; and | ) | |
| Janice K. Brewer, Governor | ) | |
| of the State of Arizona, in her | ) | |
| Official Capacity, | ) | |
| *Defendant*. | ) | |
| _____ | ) | |

**BRIEF OF *AMICI CURIAE*, MEMBERS OF THE UNITED STATES CONGRESS TRENT FRANKS, BRIAN BILBRAY, SENATOR JOHN BARRASSO, SENATOR JIM DEMINT, SENATOR JAMES INHOFE, SENATOR DAVID VITTER, SENATOR ROGER WICKER, ROBERT ADERHOLT, RODNEY ALEXANDER, MICHELE BACHMANN, SPENCER BACHUS, GRESHAM BARRETT, GUS BILIRAKIS, ROB BISHOP, MARSHA BLACKBURN, JOHN BOOZMAN, KEVIN BRADY, PAUL BROUN,**

**GINNY BROWN-WAITE, MICHAEL BURGESS,  KEN CALVERT, JOHN CAMPBELL, JOHN CARTER, JASON CHAFFETZ, HOWARD COBLE, MIKE COFFMAN, JOHN CULBERSON, GEOFF DAVIS, DAVID DREIER, JOHN DUNCAN, JOHN FLEMING, RANDY FORBES, VIRGINIA FOXX, ELTON GALLEGLY, SCOTT GARRETT, PHIL GINGREY, LOUIE GOHMERT, BOB GOODLATTE, TOM GRAVES, WALLY HERGER, PETE HOEKSTRA, DUNCAN HUNTER, LYNN JENKINS, WALTER JONES, JIM JORDAN, STEVE KING, JACK KINGSTON, JOHN KLINE, DOUG LAMBORN, ROBERT LATTA, JERRY LEWIS, CYNTHIA LUMMIS, MICHAEL MCCAUL, TOM MCCLINTOCK, THADDEUS MCCOTTER, PATRICK MCHENRY, GARY MILLER, JEFF MILLER, JERRY MORAN, TIM MURPHY, SUE MYRICK, RANDY NEUGEBAUER, JOE PITTS, TODD PLATTS, TED POE, BILL POSEY, TOM PRICE, PHIL ROE, MIKE ROGERS, DANA ROHRABACHER, ED ROYCE, JEAN SCHMIDT, JOHN SHADEGG, MIKE SIMPSON, LAMAR SMITH, CLIFF STEARNS, JOHN SULLIVAN, GENE TAYLOR, TODD TIAHRT, ED WHITFIELD, ROB WITTMAN[1]**

---

[1] This brief is filed upon Motion to the Court. No counsel for any party authored in whole or in part this brief and no monetary contribution to the preparation of this brief was received from any person or entity other than *amici curiae*.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................................................ii

INTEREST OF *AMICI* ...................................................................................................... 1

ARGUMENT ....................................................................................................................... 1

I.   CONGRESS HAS PLENARY POWER OVER IMMIGRATION, AND
PLAINTIFF'S CLAIM THAT ITS AUTHORITY TO ENFORCE THE LAW
PREEMPTS S.B. 1070 IS MERITLESS........................................................................... 1

II.  S.B. 1070 IS FULLY CONSONANT WITH FEDERAL IMMIGRATION POLICY
THAT PROMOTES INCREASINGLY GREATER ROLES FOR STATES IN
ENFORCING IMMIGRATION LAW ............................................................................ 4

EXHIBIT A--20 Op. Off. Legal Counsel 26 (1996)

EXHIBIT B--Mem. from Jay S. Bybee, Assistant Attorney General, Office of Legal
Counsel, for the Attorney General, *Re: Non-preemption of the authority of state and local
law enforcement officials to arrest aliens for immigration violations*, (Apr. 3, 2002),
*available at* http://www.aclu.org/files/ FilesPDFs/ACF27DA.pdf

# TABLE OF AUTHORITIES

***United States Supreme Court Cases***

*Altria Group, Inc. v. Good*, 129 S. Ct. 538 (2008) .......................................................... 4, 5

*De Canas v. Bica*, 424 U.S. 351 (1976) ............................................................ 10

*Harisiades v. Shaughnessy*, 342 U.S. 580 (1952) ............................................... 3

*Hillsborough County v. Automated Med. Lab., Inc.*, 471 U.S. 707 (1985) ........................ 4

*INS v. Chadha*, 462 U.S. 919 (1983) ............................................................... 1, 2

*Jama v. ICE*, 543 U.S. 335 (2005) ................................................................ 2, 3

*Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355 (1986) ......................................... 3, 4

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ....................................................... 7

*Michigan Canners & Freezers v. Agric. Mktg. and Bargaining Bd.*,
467 U.S. 461 (1984) ................................................................................ 9-10

*Nishimura Ekiu v. United States*, 142 U.S. 651 (1893) ............................................ 2

*Oceanic Navigation Co. v. Stranahan*, 214 U.S. 320 (1909) ....................................... 3

*Rice* v. *Santa Fe Elevator Corp.*, 331 U.S. 218 (1947) .......................................... 4

*United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537 (1950) ............................... 2

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ..................................... 3

*Zadvydas v. Davis*, 533 U.S. 678 (2001) .......................................................... 2

***Ninth Circuit Cases***

*Gonzales v. City of Peoria*, 722 F.2d 468 (9th Cir. 1983) ........................................ 5

*Martinez-Medina v. Holder*, No. 06-75778, 2010 U.S. App. LEXIS 10663 (9th Cir. May 25, 2010) ..................................................................................................................... 8

**Other Cases**

*City of New York v. United States*, 179 F.3d 29 (2d Cir. 1999) ........................................... 6

*Estrada v. Rhode Island*, 594 F.3d 56 (1st Cir. 2010) ........................................................ 8

*State v. Reyes*, 989 So. 2d 770 (La. Ct. App. 2008) ......................................................... 10

*United States v. Salinas-Calderon*, 728 F.2d 1298 (10th Cir. 1984) ............................. 5, 9

*United States v. Soriano-Jarquin*; 492 F.3d 495 (4th Cir. 2007) ....................................... 9

*United States v. Vasquez-Alvarez*, 176 F.3d 1294 (10th Cir. 1999) ............................ 5, 6, 9


**Constitutional Provisions and Statutes**
**Federal**

U.S. Const. art. I. Sec. 8, Cl. 1 ........................................................................................ 7

8 U.S.C. § 1103 (2006) ................................................................................................. 5, 8

8 U.S.C. § 1231 (2006) ..................................................................................................... 2

8 U.S.C. § 1252c (2006) ................................................................................................... 5

8 U.S.C. § 1304 (2006) ..................................................................................................... 9

8 U.S.C. § 1306 (2006) ..................................................................................................... 9

8 U.S.C. § 1324 (2006) ..................................................................................................... 9

8 U.S.C. § 1324a (2006) ................................................................................................... 9

8 U.S.C. § 1357 (2006) ................................................................................................. 5, 7

8 U.S.C. § 1373 (2006) ............................................................................................... 5, 6, 9

8 U.S.C. § 1644 (2006) ................................................................................................. 5, 6

REAL ID Act of 2005, Pub. L. 109-13, 119 Stat. 302. ...................................................... 7

**State**
S.B. 1070, Leg. 49, 2d Sess. (Ariz. 2010) ................................................................. *passim*

***Other Sources***

Complaint ....................................................................................................... 1, 2, 3

142 Cong. Rec. 4619 (1996) (comments of Rep. Doolittle) ............................................. 5

Kris W. Kobach, *Reinforcing the Rule of Law:  What States Can and Should Do to Reduce Illegal Immigration*, 22 Geo. Immigr. L.J. 459 (2008) .......................................... 7

Kris W. Kobach, *The Quintessential Force Multiplier: The Inherent Authority of Local Police to Make Immigration Arrests*, 69 Alb. L. Rev. 179, 180 (2005) ............................. 8

Mem. from Jay S. Bybee, Assistant Attorney General, Office of Legal Counsel, for the Attorney General, *Re: Non-preemption of the authority of state and local law enforcement officials to arrest aliens for immigration violations*, (Apr. 3, 2002), *available at* http://www.aclu.org/files/ FilesPDFs/ACF27DA.pdf .................................................... 8

20 Op. Off. Legal Counsel 26 (1996)................................................................................ 8

Pl.'s Mot. for Prelim. Inj. and Mem. of Law in Supp. Thereof................................. *passim*

**INTEREST OF *AMICI***

*Amici*, the above-captioned Members of Congress, are currently serving in the One Hundred Eleventh Congress. *Amici* are committed to the constitutional principles of federalism and separation of powers, both of which are jeopardized by the Plaintiff's attack against Arizona.

**ARGUMENT**

**I.   CONGRESS HAS PLENARY POWER OVER IMMIGRATION, AND PLAINTIFF'S CLAIM THAT ITS AUTHORITY TO ENFORCE THE LAW PREEMPTS S.B. 1070 IS MERITLESS.**

Congress has plenary power over immigration law, *INS v. Chadha*, 462 U.S. 919, 940 (1983), and as Plaintiff notes, the immigration laws Congress has passed reflect national and foreign policy goals. Cmpl. ¶ 19. S.B. 1070, Leg. 49, 2d Sess. (Ariz. 2010) ("S.B. 1070"), does not interfere with U.S. foreign policy goals as prescribed by Congress.

Plaintiff argues that "S.B. 1070 is independently preempted because it impermissibly conflicts with U.S. foreign policy," Pl.'s Mot. for Prelim. Inj. and Mem. of Law in Supp. Thereof ("Pl. Br.") at 22. Plaintiff claims that S.B. 1070 infringes on the Executive's "broad authority over foreign affairs," Cmpl. ¶ 16, to ensure immigration law has minimal impact on U.S. foreign policy. *See id.* ¶¶ 2, 4, 19, 22, 36-39, 42, 62, 65. Plaintiff imagines that this "broad authority" comes from a congressional grant of "discretion" in the immigration laws to balance "multiple interests as appropriate," such

as humanitarian and foreign policy interests.  Cmpl. ¶¶ 17, 19. Plaintiff misapprehends the nature of its authority to enforce immigration law.

While the Executive has power to conduct United States foreign policy, Congress has plenary power to prescribe the immigration laws.  *Chadha*, 462 U.S. at 940 ("The plenary authority of Congress over aliens . . . is not open to question"); *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1893) (identifying different sources for Congress's power over aliens).  Where Congress has prescribed those laws, the Executive must follow Congress's direction.  *See, e.g., Zadvydas v. Davis*, 533 U.S. 678, 696-99 (2001) (holding the Attorney General had no power to detain aliens indefinitely because that power conflicted with 8 U.S.C. § 1231(a)(6)); *Jama v. ICE*, 543 U.S. 335, 368 (2005) (Souter, J., dissenting) ("Congress itself . . . significantly limited Executive discretion by establishing a detailed scheme that the Executive must follow in removing aliens").[2]

As Plaintiff notes, "[t]he Supreme Court has recognized the 'Nation's need to "speak with one voice" in immigration matters.'"  Pl. Br. at 23 (quoting *Zadvydas*, 533 U.S. at 700). Plaintiff also recognizes that, "[i]n crafting federal immigration law and policy, Congress has necessarily taken into account multiple and often competing

---

[2] *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537 (1950), is not contrary to this principle.  One issue in *Knauff* was whether Congress unconstitutionally delegated legislative power to the President.  *Id*. at 542. The Court found that it had not, noting that "[t]he exclusion of aliens is a fundamental act of sovereignty" that "stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation."  *Id*. Thus, "Congress may in broad terms authorize the executive to exercise the power . . . ."  *Id*. at 543. "Executive officers may be entrusted with the duty of specifying the procedures *for carrying out the congressional intent*."  *Id*. (emphasis added).  *Knauff* thus presupposes that the Executive must act in accord with Congress's wishes.

national interests," including foreign policy.  Cmpl. ¶ 19; *see Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952) (Immigration policy "is vitally and intricately interwoven with contemporaneous policies in regard to [among other things] the conduct of foreign relations.").  While some immigration laws grant Executive officials discretion, the laws balance these concerns within the constraints of each statute's text, not the Executive's exercise of prosecutorial discretion. *Cf., Oceanic Navigation Co. v. Stranahan*, 214 U.S. 320, 339-40 (1909) (Congressional authority over aliens "embraces every conceivable aspect of that subject."); *Jama*, 543 U.S. at 368 (Souter, J., dissenting) ("Talk of judicial deference to the Executive in matters of foreign affairs, then, obscures the nature of our task here, which is to say not how much discretion we think the Executive ought to have, but how much discretion Congress has chosen to give it.").  Where Congress exercises plenary power to prescribe laws, Executive officers must work within those constraints. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952) ("President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker.").

Federal agency regulation only preempts state law when the agency is acting within the scope of its congressionally-delegated authority.  *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 369 (1986).  The Department of Homeland Security ("DHS") has no formal regulations expressly preempting S.B. 1070.  Instead, Plaintiff relies on a novel claim that a general implied "prosecutorial discretion" not to impose federal sanctions on an alien violator, based on complex political policy considerations, can preempt in lieu of actual regulations.  Pl. Br. at 24. However, where agency preemption is only implied, the presumption *against* preemption is at its strongest:

3

> [A]gencies normally deal with problems in far more detail than does Congress. To infer pre-emption whenever an agency deals with a problem comprehensively is virtually tantamount to saying that whenever a federal agency decides to step into a field, its regulations will be exclusive. Such a rule, of course, would be inconsistent with the federal-state balance embodied in our Supremacy Clause jurisprudence.

*Hillsborough County v. Automated Med. Lab., Inc.*, 471 U.S. 707, 717 (1985).  As for the scope of the agency's delegated authority, the Court may not, "simply . . . accept an argument that the [agency] may . . . take action which it thinks will best effectuate a federal policy" because "[a]n agency may not confer power upon itself." *Louisiana Public Serv. Comm'n*, 476 U.S. at 374.  "To permit an agency to expand its power in the face of a congressional limitation on its jurisdiction would be to grant to the agency power to override Congress." *Id.* at 374-75.

The Executive's power to enforce federal immigration law does not confer the power to preempt state immigration enforcement by choosing, for foreign policy or other reasons, to selectively enforce the laws. Only Congress's "'clear and manifest purpose'" preempts state laws.  *Altria Group, Inc. v. Good*, 129 S. Ct. 538, 543 (2008) (quoting *Rice* v. *Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).  As Section II describes below, S.B. 1070 is not preempted because it is fully consonant and integrated with federal immigration laws.

## II.   S.B. 1070 IS FULLY CONSONANT WITH FEDERAL IMMIGRATION POLICY THAT PROMOTES INCREASINGLY GREATER ROLES FOR STATES IN ENFORCING IMMIGRATION LAW.

As discussed above, Acts of Congress express federal immigration policy, not the Executive's enforcement authority or the current Administration's political views.

Congress has passed numerous acts that welcome state involvement in immigration control. Congress has expressed its intent by (1) expressly reserving inherent state authority in immigration law enforcement (8 U.S.C. § 1357(g)(10) (2006)), (2) banning sanctuary policies that interfere with the exercise of that authority (8 U.S.C. §§ 1373(a)-(b), 1644 (2006)), (3) requiring federal officials to respond to state inquiries (8 U.S.C.§ 1373(c) (2006)), (4) simplifying the process for making such inquiries (Law Enforcement Support Center ("LESC")), (5) deputizing state and local officers as immigration agents (8 U.S.C. § 1357(g)(1) (2006)), and (6) compensating states that assist (8 U.S.C. § 1103(a)(11) (2006)).  This body of law illustrates that it was not Congress's "clear and manifest purpose" to preempt state laws such as S.B. 1070.  *See Altria Group*, 129 S. Ct. at 543.

In encouraging cooperative enforcement of immigration law, Congress did not displace State and local enforcement activity.  *See Gonzales v. City of Peoria*, 722 F.2d 468, 474 (9th Cir. 1983); *United States v. Salinas-Calderon*, 728 F.2d 1298, 1301 n.3 (10th Cir. 1984) (State and local officers have "general investigatory authority to inquire into possible immigration violations.").  Instead, Congress wanted to expand state authority because it worried that "perceived federal limitations" could "'tie[] the hands of . . . law enforcement officials . . . .'"  *United States v. Vasquez-Alvarez*, 176 F.3d 1294, 1298 (10th Cir. 1999) (quoting 142 Cong. Rec. 4619 (1996) (comments of Rep. Doolittle)).  Congress enacted 8 U.S.C. § 1252c (2006) to clarify that federal law does not preempt state and local officers from arresting an illegally present alien convicted of a felony and ordered deported.  *Vasquez-Alvarez*, 176 F.3d at 1298.  However, Section

1252c does not preempt states from assisting in enforcement outside of those preconditions, as Plaintiff implies, Pl. Br. at 6, but instead "displace[s] a perceived federal limitation on the ability of state and local officers to arrest aliens . . . in violation of Federal immigration laws." *Vasquez-Alvarez*, 176 F.3d at 1298-99.

Congress was also concerned that cities were prohibiting officers from contacting the then-INS about possible immigration violations. *See, e.g., City of New York v. United States*, 179 F.3d 29, 31-32 (2d Cir. 1999). In response, Congress passed two statutes in 1996 to ban such sanctuary policies.[3]   8 U.S.C. § 1644 forbids state or local official actions that "prohibit[] or in any way restrict[]" a state or local government entity's ability to "send[] to or receiv[e] . . . information regarding the immigration status, lawful or unlawful, of an alien in the United States."   8 U.S.C. § 1373(a)-(b) expands preemption of sanctuary policies to those that prohibit or restrict government entities or officials from sending or receiving information regarding "citizenship or immigration status," and also preempts laws that prohibit or restrict immigration status information sharing. Arizona integrated Congress's preemption of sanctuary policies into S.B. 1070. *See, e.g.,* S.B. 1070, § 2.

To ensure cooperation by federal officials, Congress *required* immigration authorities to respond to state and local inquiries seeking to "verify or ascertain the citizenship or immigration status of any individual . . . ." 8 U.S.C. § 1373(c). Congress had already begun allocating funds to create the LESC, which is now the primary point of

---

[3] Although Plaintiff claims to be concerned that our country "speak with one voice in the immigration context," *see* Pl. Br. at 24, it has not sued any cities with sanctuary policies.

contact between state officers and federal immigration agents for verifying immigration status. *See* Pl. Br. at 6. Citing § 1373(c), Arizona incorporated Congress's intent that DHS must respond to such inquiries. *See* S.B. 1070, § 2(B),(D). Plaintiff appears to refuse to comply with this mandate by claiming that Section 2 distracts DHS from other "priorities." *See* Pl. Br. at 19-20, 30-32 (DHS will have to divert resources to answer more local inquiries). But when Congress tells an agency to act, the agency must comply. *See Massachusetts v. EPA*, 549 U.S. 497, 533 (2007) (agency cannot refuse to obey statutory commands to pursue its own priorities).

In 1996, Congress also enacted 8 U.S.C. § 1357(g)(1), which allows state and local officers to be deputized as immigration agents. This congressionally-delegated authority is distinct from officers' inherent authority to inquire into immigration status and arrest for immigration violations. Kris W. Kobach, *Reinforcing the Rule of Law: What States Can and Should Do to Reduce Illegal Immigration*, 22 Geo. Immigr. L.J. 459, 478 (2008). But Congress reaffirmed that a state's inherent authority to enforce federal immigration law was not restricted and that states could continue to assist in immigration enforcement. 8 U.S.C. § 1357(g)(10). In claiming preemption, Plaintiff ignores Congress's intent expressed in 8 U.S.C. § 1357(g)(10). *See* Pl. Br. at 6, 12.

Congress also directs state motor vehicle departments to verify that alien applicants for state licenses are lawfully present. REAL ID Act of 2005, Pub. L. 109-13, 119 Stat. 302. Thus, Congress encouraged states to verify immigration status and further ensured that states are not safe-havens for illegal aliens. Finally, Congress has used its spending power, *see* Art. I Sec. 8, Cl. 1, to support cooperative immigration enforcement

by appropriating federal funds for state and local governments that assist in enforcing immigration laws.  *See e.g.* 8 U.S.C. § 1103(a)(11).

Plaintiff's lawsuit also ignores the Executive's fourteen-year recognition that Congress encourages concurrent immigration enforcement. Since 2001, the Department of Justice ("DOJ") has entered warrants ("detainers") for civil immigration violations into the National Crime Information Center database ("NCIC"), available nationally to state and local officers. Kris W. Kobach, *The Quintessential Force Multiplier: The Inherent Authority of Local Police to Make Immigration Arrests*, 69 Alb. L. Rev. 179, 180 (2005). In 1996, the DOJ's Office of Legal Counsel ("OLC") supported state and local enforcement of criminal INA provisions and also concluded that state and local officers could detain aliens for registration law violations. 20 Op. Off. Legal Counsel 26, 29, 37 (1996) (Exhibit A).[4]   In 2002, a revised OLC memo dropped the "criminal law enforcement only" limitation and analyzed the statutes and cases expressing Congress's intent to allow broad concurrent enforcement.  Mem. from Jay S. Bybee, Assistant Attorney General, Office of Legal Counsel, for the Attorney General, *Re: Non-preemption of the authority of state and local law enforcement officials to arrest aliens for immigration violations*, 5-8 (Apr. 3, 2002), *available at* http://www.aclu.org/files/FilesPDFs/ACF27DA.pdf (Exhibit B).

---

[4] Courts also recognize state and local authority to arrest aliens for violating alien registration laws.  *Martinez-Medina v. Holder*, No. 06-75778, 2010 U.S. App. LEXIS 10663, *2-4 (9th Cir. May 25, 2010); *see also Estrada v. Rhode Island*, 594 F.3d 56, 65 (1st Cir. 2010).

Because S.B. 1070 integrates this body of federal law, it is not preempted. Section 2 directs Arizona officers to verify immigration status through a statute that requires a federal response, regardless of the number of inquiries (8 U.S.C. §1373(c)).[5]  Section 3 mirrors the federal alien registration laws by relying on federal requirements and procedures, not creating its own state system (8 U.S.C. §§ 1304(e), 1306(a) (2006)). Section 4, prohibiting the smuggling of illegal aliens, reinforces federal laws criminalizing the same conduct (8 U.S.C. § 1324(a) (2006)).  Section 5 promotes federal laws that penalize employing illegal aliens (8 U.S.C. § 1324a(a)-(c) (2006)) and recognizes that Congress only preempted sanctions on *employers* employing unauthorized aliens, not unauthorized aliens' acceptance of employment.  (8 U.S.C. § 1324a(h)(2) (2006)).[6]  Section 5 also mirrors the federal "harboring" statutes (8 U.S.C. § 1324(a)(1)(A)(ii)-(iv) (2006)) by prohibiting the same conduct.  Section 6 is consistent with federal law reserving states' authority to arrest individuals for immigration violations.  *Salinas-Calderon*, 728 F.2d at 1301 n.3 (validating a warrantless arrest for a violation of immigration law and noting that officers have "general investigatory authority to inquire into possible immigration violations").  Finally, Section 12 clarifies that Arizona complied with federal immigration laws in enacting S.B. 1070. Complete integration between S.B. 1070 and federal law is not only possible, it is virtually guaranteed. *See Michigan Canners & Freezers v. Agric. Mktg. and Bargaining Bd.,* 467

---

[5] Section 2 codifies an officer's judicially-recognized power to detain and contact ICE on reasonable suspicion of unlawful status.  *See e.g. Vasquez-Alvarez*, 176 F.3d at 1297-99; *United States v. Soriano-Jarquin*; 492 F.3d 495, 497-99, 501 (4th Cir. 2007).

[6] The express preemption clause (8 U.S.C. § 1324a(h)(2)) shows that Congress could have, but did not, preempt sanctions against unauthorized alien employees.

U.S. 461, 469 (1984) (conflict preemption exists if it is impossible to comply with both state and federal law).   Because S.B. 1070 and federal law do not conflict, dual sovereignty allows them to coexist.   *De Canas v. Bica*, 424 U.S. 351, 358 n.5 (1976); *State v. Reyes*, 989 So. 2d 770, 777 (La. Ct. App. 2008).

## CONCLUSION

Congress has plenary authority to regulate aliens.   Congress has continuously encouraged states to assist in enforcing federal immigration law.   S.B. 1070 is consistent with that intent. Therefore, this Court should deny Plaintiff's motion for a preliminary injunction.

Respectfully submitted this 20th day of July, 2010,

/s/Michael Meehan

Michael M. Hethmon*
Garrett Roe*
IMMIGRATION REFORM LAW INSTITUTE
25 Massachusetts Ave, NW  Suite 335
Washington, DC  20001
(202) 232-5590
(202) 464-3590 (fax)
mhethmon@irli.org
groe@irli.org

Michael Meehan, Of Counsel
(AZ Bar # 2892)
Munger Chadwick, P.L.C.
333 N. Wilmot, Suite 300
Tucson, Arizona 85711
(520)721-1900
(520)747-1550 (fax)
mmeehan@mungerchadwick.com

Jay Alan Sekulow*
Colby M. May*
AMER. CENTER FOR LAW & JUSTICE
201 Maryland Ave., NE
Washington, DC  20002
(202) 546-8890
(202) 546-9309 (fax)
jsekulow@aclj.org
cmmay@aclj-dc.org

*Not admitted in this jurisdiction

*Attorneys for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on July 20, 2010, I electronically filed a copy of the foregoing Brief *Amici Curiae* using the ECF System for the District of Arizona, which will send notification of that filing to all counsel of record in this litigation.

Dated July 20, 2010

<u>/s/Michael Meehan</u>
Michael Meehan, Of Counsel
(AZ Bar # 2892)
Munger Chadwick, P.L.C.
333 N. Wilmot, Suite 300
Tucson, Arizona 85711
(520)721-1900
(520)747-1550 (fax)
mmeehan@mungerchadwick.com

# Assistance by State and Local Police in Apprehending Illegal Aliens

Subject to the provisions of state law, state and local police may constitutionally detain or arrest aliens for violating the criminal provisions of the Immigration and Naturalization Act.

State and local police lack recognized legal authority to stop and detain an alien solely on suspicion of civil deportability, as opposed to a criminal violation of the immigration laws or other laws.*

State and local police may detain aliens reasonably suspected of a criminal violation of the immigration laws for periods of as long as 45 to 60 minutes when detentions of that length are necessary to allow for the arrival of Border Patrol agents who are needed for the informed federal disposition of the suspected violations.

February 5, 1996

MEMORANDUM OPINION FOR THE UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF CALIFORNIA

## I. BACKGROUND AND SUMMARY OF CONCLUSIONS

This responds to your memorandum to Seth Waxman, Associate Deputy Attorney General. In that memorandum, you requested a legal opinion from this Office concerning the circumstances in which state and local police in California can assist the Immigration and Naturalization Service ("INS") in enforcing the federal immigration laws.

Your request for opinion was triggered by certain difficulties that have arisen in connection with local law enforcement assistance in the immigration area, particularly in detaining aliens who have entered the United States unlawfully. In particular, you referred to a policy of the San Diego Police Force that limits the period for which its officers may detain alien suspects stopped on "reasonable suspicion" to a maximum of 20 minutes. Although state and local police have been authorized to detain alien suspects in some circumstances, the proper investigation, processing, and arrest of suspected immigration violators generally requires the presence and assistance of agents of the United States Border Patrol. At present, however, we understand that local police will detain such persons for only 20 minutes after Border Patrol assistance is requested. You advise that Border Patrol agents in your district are rarely able to reach the scene of apprehension within 20 minutes. As a result, the 20-minute detention limit may cause state officers to release illegal alien entrants when Border Patrol agents have not arrived at the scene within that time period. You have therefore suggested that city and county authorities consider expanding the permitted period of detention from 20 minutes to as much as one hour, as permitted by law.

---

*Editor's Note: See Editor's Note to Section II.B.

26

*Assistance by State and Local Police in Apprehending Illegal Aliens*

In addition to the matters raised in your initial opinion request, you have subsequently requested our legal opinion on several additional related issues. Set forth below is our analysis of those issues. Our conclusions on the chief issues you raise may be summarized as follows:

1. Subject to the provisions of state law, state and local police [1] may constitutionally detain or arrest aliens who have violated the criminal provisions of the Immigration and Naturalization Act ("INA"). State police lack recognized legal authority to arrest or detain aliens solely for purposes of *civil* deportation proceedings, as opposed to criminal prosecution. (Sections II.A-B).*

2. California law allows state police to enforce the criminal provisions of federal immigration law, although they may not make warrantless arrests for INA misdemeanor violations unless the offense occurs in their presence. When illegally entering aliens have reached a place of repose within the United States, the offense is completed and is no longer subject to warrantless arrest by California police. (Sections II.A, II.C3).

3. State police may stop and detain carloads of illegal alien suspects only in circumstances that satisfy the requirements of "reasonable suspicion." These requirements are inherently fact-specific and therefore not readily reduced to clearcut rules. Nonetheless, several basic principles and considerations warrant emphasis. (Section II.C).

a. Persons may be detained for reasonable periods by state police on the basis of a reasonable suspicion of a criminal immigration law violation. The critical requirement for a reasonable suspicion detention is the existence of objective, articulable facts suggesting the commission of a criminal offense by the persons detained, rather than mere stereotypical assumptions, profiles, or generalities.

b. In particular, absent knowledge of an established federal policy of not prosecuting such offenses, state police may, in our opinion, legally detain alien suspects for disposition by federal agents when there is reasonable suspicion that the suspects have violated or are violating the two commonplace misdemeanor provisions of the INA, 8 U.S.C. § 1304(e) (lack of alien registration documents) or § 1325 (illegal entry), or other criminal provisions of the INA.

c. Written guidelines or policies adopted by state or local police forces may generate additional legal complications regarding otherwise valid detentions based on suspected violations of criminal immigration laws, insofar as such guidelines or policies state that suspects may only be detained based on reasonable suspicion of crimes that are unrelated to the immigration laws. Because any extended detention of a suspect must generally be based upon the law enforcement purposes served by the stop, a police force's official disclaimer of any immigration-related detention authority could undermine the validity of detaining suspects to await processing by Border Patrol officers.

---

* Editor's Note: See Editor's Note to Section II.B.

[1] For purposes of brevity, state and local police will sometimes be referred to herein simply as "state police."

4. Under governing judicial precedents, state police in California may constitutionally detain alien suspects for periods of as long as 45 to 60 minutes in circumstances where detentions of that length are *necessary* to allow for the arrival of Border Patrol agents (exercising due diligence) who are needed for the informed federal disposition of reasonably suspected violations of the INA. (Section II.D).

a. We caution, however, that one Ninth Circuit panel opinion issued in 1994 suggests a somewhat more restrictive approach to the permissible duration of such detentions.

b. If the Border Patrol agents do not promptly arrest the suspects upon their arrival at the scene of a reasonable suspicion detention, it must be assumed that the additional period of detention required by them before effecting an arrest would be counted by a court in calculating the permissible length of such detentions (e.g., a permissible 40-minute detention by state police awaiting the arrival of Border Patrol agents might be rendered impermissibly lengthy if the agents detain the suspects for, e.g., an additional 30 minutes before effecting an arrest).

5. As a general rule, the involuntary vehicular transportation of validly detained aliens by state police to Border Patrol agents would be deemed an arrest and require probable cause rather than mere reasonable suspicion. (Section II.E).

a. In unusual circumstances where the Border Patrol's necessary assistance may be more promptly obtained by transporting validly detained suspects to the agents than by awaiting the arrival of the latter, we believe such transportation (limited to reasonably proximate locations) would be sustainable even in the absence of probable cause under the principles applied in several pertinent judicial opinions in California and the Ninth Circuit. It cannot be assumed, however, that all reviewing courts would uphold the validity of such involuntary transportation in the absence of probable cause.

b. Interrogation undertaken by Border Patrol agents following such localized transport of detainees should take place in an open, non-coercive setting; interrogation of such transported detainees inside a Border Patrol office or other police office would likely transform the detention into an arrest under controlling judicial precedents.

6. Under one recent Ninth Circuit precedent, the question whether state police may validly arrest alien suspects on probable cause that they have violated the INA's requirement that aliens carry registration documents, *see* 8 U.S.C. § 1304(e), may also depend upon whether they have reason to believe that federal officials *actually prosecute* suspects for such violations. This is significant because that misdemeanor provision may sometimes provide the only basis for the arrest. To the extent that arrests by California police nominally based on such INA misdemeanor charges are found to be a pretext for civil deportation proceedings, they are likely to be invalidated by the courts. (Section II.C.2).

7. There is established statutory authority for the deputation of state law enforcement officers as Deputy United States Marshals. This mechanism has been most commonly used to allow state officers to perform federal enforcement functions

28

*Assistance by State and Local Police in Apprehending Illegal Aliens*

in joint federal-state law enforcement task forces (e.g., anti-drug and fugitive pursuit task forces). (Section II.F).

a. Where the Attorney General has exercised her authority to delegate supplemental INA enforcement duties to the U.S. Marshals Service, state and local officers can be specially deputized as Special Deputy United States Marshals in order to perform supportive federal immigration enforcement functions.

b. Such arrangements were previously authorized by an Attorney General Order in August 1994, for a period of one year, in order to deal with a potential mass immigration emergency in the State of Florida.

## II. ANALYSIS

A. *Validity and Scope of State Police Participation in Enforcing Federal Immigration Laws*

It is well-settled that state law enforcement officers are permitted to enforce federal statutes where such enforcement activities do not impair federal regulatory interests. *Ker v. California*, 374 U.S. 23 (1963); *Florida Avocado Growers, Inc. v. Paul*, 373 U.S. 132 (1963). This general principle extends to state enforcement of the Immigration and Naturalization Act as well. In *Gonzales v. City of Peoria*, 722 F.2d 468 (9th Cir. 1983), for example, the Ninth Circuit held that "federal law does not preclude local enforcement of the criminal provisions of the [Immigration and Naturalization] Act." *Id.* at 475.

At the same time, federal law does not *require* state law enforcement agencies to assist in enforcing the INA. That the INA permits state police officers to make arrests and detentions, *see, e.g.*, 8 U.S.C. § 1324(c), does not mean that states must permit their police to do so. Rather, the INA enforcement authority of state police is subject to the provisions and limitations of state law.

In *People v. Barajas*, 81 Cal. App.3d 999, 147 Cal. Rptr. 195 (1978), the California Court of Appeal upheld the authority of California local police officers to make arrests for violations of 8 U.S.C. § 1325 (the illegal entry misdemeanor) and § 1326 (felony for alien to re-enter United States after deportation). In rejecting the defendant's argument that the arrest was illegal under INA warrant requirements, *see* 8 U.S.C. § 1357, the court determined that those requirements applied only to arrests by federal officers and then stated: "In the absence of a specific [federal] law regulating the mode of such an arrest, the legality of an arrest by local officers is determined by the law of arrest of the state in which it occurs, unless such law conflicts with the federal Constitution." 81 Cal. App.3d at 1006. Upholding the arrest under the "reasonable cause" standard of section 836 of the California Penal Code, the court stated:

> [The state officers'] knowledge of defendant's evasive conduct (use of a false name, claim to possession of a "green card" not on

29

hand but at home, and lack of knowledge as to allow production
of the card) during the April 28 incident, coupled with [the INS
officer's] information, gave them ample probable cause to arrest
for violation of 8 U.S.C. section 1325 or 1326.

*Id.* at 1007.

A 1984 opinion of the California Attorney General also concluded that neither
federal nor California law bars state and local officials from assisting in the en-
forcement of federal immigration laws. *See* 67 Ops. Cal. Atty. Gen. 331, Opinion
No. 83–902 (July 24, 1984). The opinion stated that, in the absence of federal
statutory restrictions on such activity, ''we would look to California law to deter-
mine the role state and local officials in California may play in that regard.''
*Id.* The opinion's central conclusion was that there is no legally enforceable *re-
quirement* that California peace officers must report to the INS knowledge they
might have concerning persons who have entered the United States illegally, al-
though there is no prohibition against their doing so. More pertinently, the Attor-
ney General's opinion did point out one particularly significant restriction of Cali-
fornia law on INA enforcement by local police. In the case of *misdemeanor* viola-
tions, such as those covered by 8 U.S.C. §§ 1304(e) and 1325, an arrest may
only be made when the officer has reasonable cause to believe that the person
has committed the offense ''*in his presence.*'' 67 Ops. Cal. Atty. Gen. 331 n.10–
11; Cal. Penal Code § 836 (emphasis added).

Subject to such restrictive state law provisions, it is recognized that state and
local police may stop, detain, and arrest persons when there is reasonable sus-
picion or, in the case of arrests, probable cause that such persons have violated,
or are violating, the federal immigration laws. *Gonzales*, 722 F.2d at 474; *Barajas*,
81 Cal. App.3d at 999; 67 Ops. Cal. Att'y Gen. 331, Op. No. 83–902.

We also note that the INA itself recognizes the authority of state officers to
make arrests for criminal violations of federal immigration law. For example, 8
U.S.C. § 1324(c), governing the authority to arrest persons for bringing into the
United States or harboring illegal aliens, provides as follows:

> No officer or person shall have authority to make any arrest for
> a violation of any provision of this section except officers and em-
> ployees of the Service designated by the Attorney General, either
> individually or as a member of a class, *and all other officers whose
> duty it is to enforce criminal laws.* [emphasis added]

Moreover, in *Gonzales*, the Ninth Circuit explicitly rejected the claim that this
state arrest authority does not extend to other criminal provisions of the INA,
such as 8 U.S.C. §§ 1325 and 1326. *See* 722 F.2d at 475. The California Court
of Appeal reached the same conclusion in *Barajas*. *See* 81 Cal. App.3d at 1006.

30

## B. Civil Enforcement/Deportable Aliens *

Whether state officers may assist in enforcing the *civil* component of federal immigration law raises a separate issue. Deportation of aliens under the INA is a civil proceeding. For example, a lawfully admitted non-immigrant alien may become deportable if his visitor's visa expires or if his student status changes. In such circumstances, persons may become subject to civil deportation without having violated a criminal provision of the INA.

In *Gonzales*, the Ninth Circuit held that the authority of state officials to enforce the provisions of the INA "is limited to criminal violations." 772 F.2d at 476. The court based this distinction between the civil and criminal provisions of the INA on the theory that the former constitute a pervasive and preemptive regulatory scheme, whereas the latter do not.[2] Application of this rule would seem to preclude detentions by state officers based solely on suspicion of deportability (as opposed to *criminal* violations of the INA). *Accord Gates v. Superior Court*, 193 Cal. App.3d 205, 213, 238 Cal. Rptr. 592 (1987) ("The civil provisions of the INA constitute a pervasive regulatory scheme such as to grant exclusive federal jurisdiction over immigration, thereby preempting state enforcement.").

In an opinion issued in 1989,[3] this Office similarly recognized the distinction between the civil and criminal provisions of the INA for purposes of state law enforcement authority. We first expressed our belief that "the mere existence of a warrant of deportation for an alien does not provide sufficient probable cause to conclude that the criminal provisions [of the INA] have in fact been violated." 1989 OLC Op. at 8. We then concluded:

> Because 8 U.S.C. § 1251 makes clear that an alien who has lawfully entered this country, lawfully registered, and who has violated no criminal statute may still be deported for noncompliance with the noncriminal or civil immigration provisions, the mere existence of a warrant of deportation does not enable all state and local law enforcement officers to arrest the violator of those civil provisions.

*Id.* at 9.

---

* Editor's Note: In 2002, the Office of Legal Counsel withdrew the advice set forth in this section.

[2] As the court stated:

> We assume that the civil provisions of the Act regulating authorized entry, length of stay, residence status, and deportation, constitute such a pervasive regulatory scheme, as would be consistent with the exclusive federal power over immigration. However, this case does not concern that broad scheme, but only a narrow and distinct element of it — the regulation of criminal immigration activity by aliens.

722 F.2d at 475.

[3] Memorandum for Joseph R. Davis, Assistant Director, Federal Bureau of Investigation, from Douglas W. Kmiec, Assistant Attorney General, Office of Legal Counsel, *Re: Handling of INS Warrants of Deportation in Relation to NCIC Wanted Person File* at 5 (Apr. 11, 1989) ("1989 OLC Op.").

31

HeinOnline -- 20 Op. Off. Legal Counsel 31 1996

*Opinions of the Attorney General in Volume 20*

In that regard, 8 U.S.C. § 1357(a)(2) imposes substantial restrictions even upon the authority of *federal* officers to make warrantless arrests for purposes of civil deportation. It requires that the arresting officer reasonably believe the alien is in the United States illegally and that he is "likely to escape before a warrant can be obtained for his arrest." *See Mountain High Knitting, Inc. v. Reno*, 51 F.3d 216, 218 (9th Cir. 1995) (asserting that even INS agents have no legitimate basis for a warrantless arrest of aliens subject to civil deportation unless the arresting officer reasonably believes that the alien is likely to escape before an arrest warrant can be obtained).

Taking all these authorities into account, we conclude that state and local police lack recognized legal authority to stop and detain an alien *solely on suspicion of civil deportability*, as opposed to a criminal violation of the immigration laws or other laws.

### C. Legal Authority and Standards for Detention or Arrest of Alien Suspects

You have also asked for our opinion concerning the legal standards governing the detention of suspected illegal aliens under the circumstances most commonly confronted by police in the San Diego area. As an illustrative example of such circumstances, you have described the situation where a van or other vehicle carrying a number of possible illegal aliens is stopped by the police based on probable cause or reasonable suspicion that a state traffic violation or other criminal offense has been committed.[4] Although such circumstances clearly justify detention and processing of the driver and vehicle, the question arises as to what quantum or quality of indicators are necessary to sustain arrest or investigative detention of the alien passengers on the respective grounds of probable cause or reasonable suspicion. Additional issues concern the particular criminal provisions of the INA that may provide a valid basis for detention or arrest of alien suspects.

#### 1. General Principles and Permissible Considerations

Courts have made clear that federal and state officers have authority briefly to detain persons based on reasonable suspicion that they have committed or are committing a violation of federal law, including the immigration laws. *See, e.g., Martinez v. Nygaard*, 831 F.2d 822, 827 (9th Cir. 1987) ("[T]o detain a worker short of an arrest, an INS officer must have an objectively reasonable suspicion that the particular worker is an illegal alien."). The general standards governing reasonable suspicion detentions of aliens transported in vehicles were recently summarized by the Ninth Circuit in *United States v. Rodriguez-Sanchez*, 23 F.3d 1488, 1492 (1994):

---

[4] We note that where state officials establish a fixed checkpoint for purposes of detecting illegal entry and related crimes, vehicles may be stopped for brief questioning even in the absence of any reasonable or individualized suspicion. *See United States v. Martinez-Fuerte*, 428 U.S. 543 (1976). The operation of such fixed checkpoints need not be authorized in advance by a judicial warrant, *id.* at 564–66, and need not be in immediate proximity to the national border (the checkpoint upheld in *Martinez-Fuerte* was 66 miles north of the Mexican border).

32

Reasonable suspicion is not a mere phrase but has been given meaning such that suspicion is "reasonable" only if based on "specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicle contains aliens who may be illegally in the country." [quoting from *United States v. Brignoni-Ponce*, 422 U.S. at 884]

For example, the Ninth Circuit upheld a state officer's reasonable suspicion detention of alien passengers in a parked vehicle in *United States v. Ramirez-Sandoval*, 872 F.2d 1392, 1395 (9th Cir. 1989). There, a Los Angeles police officer observed a parked van occupied by two men in the front seat and a number of others in the rear who appeared to be Hispanic males. Merchants in the area had previously reported suspicious activity around this van, notably the extensive comings and goings from the van after it would park on the street after 6 p.m., when the local patrolman would be off duty. The detaining officer was also aware that there was considerable heroin dealing in the area in question. The officer approached the van, noticed a list of names and numbers on the van's visor, and elicited a response from one of the passengers that he had recently crossed the U.S.-Mexico border and had paid money to be illegally transported into the United States. The officer then detained the van's occupants while he contacted the INS. The court upheld the detention against a challenge that it was not based upon a reasonable suspicion of illegal activity. *Id.* at 1394. Citing the circumstances described above, the court stated: "Taken together, these factors provide a founded suspicion that the occupants of a van fitting the description of appellant's van may have been engaged in illegal activity." *Id.* Significantly, the court did not find it necessary to establish that the officer had any particular *felony* violation in mind when he formed his reasonable suspicion.

In assessing alien detention issues, it must also be recognized that when police stop a vehicle on the basis of traffic offenses or other suspected crimes they may not ordinarily detain the vehicle's passengers beyond the period required for disposition of the matter that justified the initial stop. *See Martinez*, 831 F.2d at 827. However, observations made while investigating or processing the primary offense may provide independent basis for reasonable suspicion that either the driver or the passengers are violating the federal immigration laws, which would then justify further detention to investigate such violations within the bounds permitted by *Terry* and its progeny. *See United States v. Wilson*, 7 F.3d 828, 834 (9th Cir. 1993), *cert. denied*, 511 U.S. 1134 (1994).[5] Moreover, police would be permitted to inquire as to the immigration status of passengers in such a stopped vehicle as long as they do not unnecessarily prolong the length of the

---

[5] *See also United States v. Bloomfield*, 40 F.3d 910, 918 (8th Cir. 1994), *cert. denied*, 514 U.S. 1113 (1995), where the court held, "If, during a traffic stop, an officer develops a reasonable, articulable suspicion that a vehicle is carrying contraband, he has 'justification for a greater intrusion unrelated to the traffic offense.' " (citation omitted). The same reasoning would apply when a traffic stop leads to a reasonable suspicion that the vehicle is carrying illegal aliens.

33

initial detention for that purpose. The responses to such inquiries could then provide a basis for detention or arrest of the passengers by creating a reasonable suspicion or probable cause that they have committed an illegal entry or are aliens lacking proper registration documents.

Courts have also recognized that a reasonable suspicion created by one person may also support a reasonable suspicion as to others accompanying him in appropriate circumstances. Thus, the "traveling companion of a person whom the police reasonably suspected of illegally crossing the border" may also be detained on reasonable suspicion when there are indications that the accompanying individuals are acting in concert or complicity with the initial suspect. *See United States v. Tehrani*, 49 F.3d 54, 59–60 (2d Cir. 1995); *United States v. Patrick*, 899 F.2d 169, 172 (2d Cir. 1990). It follows that when state police have reasonable suspicion that a stopped driver may be engaged in transporting illegal aliens, a reasonable suspicion of related immigration violations may also be justified as to his passengers.

Reasonable suspicion determinations are based on the totality of circumstances in each case and are "not readily reduced to 'a neat set of legal rules.'" *United States v. Hernandez-Alvarado*, 891 F.2d 1414, 1416 (9th Cir. 1989). Reliable predictions of judicial rulings in this area are especially difficult within the Ninth Circuit, where different panels have reached inconsistent conclusions in applying the reasonable suspicion standard to extremely similar factual situations. *Compare United States v. Franco-Munoz*, 952 F.2d 1055 (9th Cir. 1991), *cert. denied*, 509 U.S. 911 (1993) (reasonable suspicion upheld where heavily-laden vehicle driven by male of Hispanic appearance was traveling in area known for alien smuggling) *with United States v. Rodriguez*, 976 F.2d 592 (9th Cir. 1992), *amended*, 997 F.2d 1306 (9th Cir. 1993) (similar fact pattern held *insufficient* to support reasonable suspicion). Nonetheless, we believe several general principles are both relevant and well-established in the caselaw as guidelines for the permissibility of stops and detentions of vehicles or their passengers in this context:

a. Reasonable suspicion must be based upon an "objective basis" and "specific, articulable facts," rather than on "broad profiles which cast suspicion on entire categories of people without any individualized suspicion of the particular person . . . ." *United States v. Garcia-Camacho*, 53 F.3d 244, 246 (9th Cir. 1995). These specific, articulable facts must provide "a rational basis for separating out the illegal aliens from American citizens and legal aliens." *Nicacio v. INS*, 797 F.2d 700, 705 (9th Cir. 1985).

b. Officers may not arbitrarily stop all persons of Mexican or Hispanic appearance (or that of any other particular nationality or ethnic group) to question them regarding immigration/citizenship status without any other specific grounds for reasonable suspicion that they are illegal aliens. *See United States v. Brignoni-Ponce*, 422 U.S. 873 (1975); *Hernandez-Alvorado*, 891 F.2d at 1416. Likewise, Hispanic or foreign-sounding names do not in themselves provide a valid basis

34

for reasonable suspicion. *See Orhorhaghe v. INS*, 38 F.3d 488, 497–98 (9th Cir. 1994).

c. Neither the ramshackle appearance of the vehicle, nor the unkempt, ill-dressed, and nervous appearance of the passengers in itself provides a sound basis for reasonable suspicion. *See United States v. Ortega-Serrano*, 788 F.2d 299 (5th Cir. 1986).

d. As outlined by the Supreme Court in *Brignoni-Ponce*, 422 U.S. at 884–85, the following are some of the common factors that an officer *may* rely upon in combination with one another in determining whether a vehicle or its occupant aliens may be detained on reasonable suspicion of INA violations:

(1) characteristics of the area in which the vehicle is encountered (e.g., an established thoroughfare for alien smuggling);

(2) proximity of that area to the U.S. border;

(3) usual patterns of alien-smuggling traffic, including the time of day favored for such activity;

(4) knowledge that illegal border crossings have recently occurred in the area where the vehicle is spotted;

(5) the driver's extraordinary behavior or driving irregularities, such as a sudden and abrupt exit from the highway onto an exit ramp (*see Rodriguez-Sanchez*, 23 F.3d at 1493) or similarly striking evasive maneuvers that exceed the merely negligent;

(6) telltale characteristics of the vehicle or its passengers (e.g., "The vehicle may appear to be heavily loaded, it may have an extraordinary number of passengers, or the officers may observe persons trying to hide." *Brignoni-Ponce*, 422 U.S. at 885).

e. Other examples of the "more particularized information" that courts require to justify reasonable suspicion detentions of vehicles or passengers include the following, *see Hernandez-Alvarado*, 891 F.2d at 1417:

(1) tips from informants that a specific vehicle or address is being used for smuggling or concealing illegal aliens;

(2) evidence that a pickup or delivery of aliens is likely to be made in a particular place and at a particular time, derived from observable facts (e.g., large numbers of footprints leading to a highway on a known alien-smuggling route and then discontinuing at the same roadside point, *see United States v. Cortez*, 449 U.S. 411, 419–21 (1981);

(3) forms of particularized behavior associated with the evasive tactics used in illegal entry, such as manifestly coordinated evasive behavior and slouching or similar unusual movements designed to avoid detection of vehicular passengers, *see United States v. Garcia-Nunez*, 709 F.2d 559 (9th Cir. 1983); and

(4) persons manifestly conducting counter-surveillance or serving as lookouts.

2. *Detention on the Basis of Suspected Misdemeanor Violations and the "Pretext" Issue*

35

Both an alien's failure to carry alien registration documentation and a first of-
fense of illegal entry into the United States constitute federal misdemeanors. *See*
8 U.S.C. §§ 1304(e)[6] and 1325. We are advised that these are the provisions of
the INA that would most commonly provide the basis for a reasonable suspicion
that transient aliens have committed or are committing a crime.

Reliable indications that the suspect is an alien, coupled with his failure to
produce alien registration documentation or a "green card," may provide probable
cause for an arrest under the lack of documentation provision of § 1304(e). *See*
*Mountain High Knitting, Inc.,* 51 F.3d at 218; *Martinez,* 831 F.2d at 828. In the
former decision, however, the Ninth Circuit raised some doubts concerning reli-
ance on § 1304 as an independent basis for warrantless alien arrests. Without actu-
ally resolving the issue, the court indicated a strong predisposition to accept the
aliens' contentions that the INS did not actually arrest them for violating the lack
of documentation provision and that arrests on that basis were only a pretext for
*civil* arrests on suspicion of illegal entry for purposes of deportation. *Mountain*
*High Knitting, Inc.,* 51 F.3d at 218. On the basis of those contentions, the Ninth
Circuit remanded the case for the district court to assess "whether reasonable
INS officers would have arrested appellants solely for violating § 1304(e) absent
suspicion of illegal entry." *Id.* at 219.

With respect to § 1325's illegal entry provision, the Ninth Circuit has held that,
while the lack of documentation or "other admission of illegal presence may be
some indication of illegal entry," it does not without more provide probable cause
for a violation of 8 U.S.C. § 1325(a). *Mountain High Knitting, Inc.,* 51 F.3d at
218; *Gonzales,* 722 F.2d at 476–77. The Ninth Circuit has also stressed the signifi-
cance of the distinction between illegal *entry* (a crime that is subject to enforce-
ment by state officers) and mere "illegal presence," which generally provides
grounds only for civil deportation and is therefore not subject to non-federal en-
forcement. *Id.* That distinction has additional significance for purposes of Cali-
fornia law, which requires that warrantless arrests for misdemeanors (such as a
first illegal entry violation) may only be made when the offense is committed
in the arresting officer's presence.[7]

These considerations have raised concerns as to the viability of these frequently-
violated federal misdemeanor provisions as a basis for lawful detention or arrest
of alien suspects by state officers. Subject to the particular factual circumstances
and established federal prosecution practices, we nonetheless believe that Cali-

---

[6] The requirements of 8 U.S.C. § 1304(e) apply only to aliens who have been registered and issued a registration
receipt card. *See United States v. Mendez-Lopez,* 528 F. Supp. 972 (N.D. Okla. 1981). An alien's failure to register
with INS after remaining in the United States for 30 days or longer is separately prohibited under 8 U.S.C. § 1302.
Violations of the latter section are punishable by up to six months imprisonment under 8 U.S.C. § 1306 and con-
sequently also constitute misdemeanors under California law.

[7] This requirement could present special problems in connection with the illegal entry misdemeanors—which have
been considered complete and consummated (and thus no longer subject to an officer's personal observation) when
the alien has reached a "place of repose" within the United States. *See Gates,* 193 Cal. App.3d at 216. This issue
is discussed in further detail in section II.C.3, *infra.*

36

fornia police may validly rely upon the INA's misdemeanor offenses, as well as its felony offenses, in detaining alien suspects on reasonable suspicion of a federal criminal violation. We base this conclusion on several considerations.

Initially, we do not believe that the restrictive "pretext" holding in *Mountain High Knitting* should be considered generally applicable to investigative detentions of the type at issue here. Although *Mountain High Knitting* subjected a full-fledged *arrest* (based on probable cause of a § 1304(e) violation) to additional scrutiny for pretext, it does not purport to establish a general rule imposing this second layer of scrutiny upon the reasonable suspicion assessments that suffice to justify preventive detention.

By definition, a reasonable suspicion does not entail the same degree of specificity and certainty regarding the suspected offense as does a determination of probable cause.[8] In this regard, the courts have specifically upheld the validity of *Terry* detentions imposed by state officers in order to allow for the arrival of federal officers to make a more informed, expert assessment of probable cause. As explained by the Sixth Circuit in upholding a 45-minute detention of drug suspects to await arrival of trained DEA agents: "The sheriff's deputies were not trained as drug agents and needed the DEA agents' expertise to confirm or dispel their suspicions." *United States v. Winfrey*, 915 F.2d 212 (6th Cir. 1990), *cert. denied*, 498 U.S. 1039 (1991). This view is further confirmed by the Supreme Court's repeated observation that, in assessing the reasonableness of *Terry* stops, "the Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to simply shrug his shoulders and allow a crime to occur or a criminal to escape." *United States v. Montoya de Hernandez*, 473 U.S. 531, 544 (1985); *Adams v. Williams*, 407 U.S. 143, 145 (1972). As a general rule, therefore, we do not believe that state officers can be expected to make subtle judgments concerning the vagaries of federal prosecution policy in exercising their authority to detain suspects on reasonable suspicion that a criminal violation of the INA has occurred. Such complex assessments may properly be left to the federal officers who are responsible for making probable cause and arrest determinations when they arrive at the scene of detention. Thus, unless the state and local police are privy to firm and specific information that federal officials will *not* prosecute INA misdemeanor violations, we believe they may impose investigative detention based on reasonable suspicion that an alien has not registered with the INS as required, is not in possession of required registration documentation, or has illegally entered the United States.

Although the lack of proper documentation does not, without more, provide probable cause for arrest based on an illegal entry violation, the Ninth Circuit has acknowledged that it "may be some indication of illegal entry." *Gonzales*,

---

[8] This point is well-illustrated in *Ramirez-Sandoval*, 872 F.2d at 1395, where the Ninth Circuit upheld a reasonable suspicion detention based upon circumstances which indicated merely that the occupants of a parked van "may well have been engaged in illegal activity."

37

722 F.2d at 477. Accordingly, we believe that in appropriate circumstances—e.g., where there are other objective indicators of illegal entry, such as the time, place, and circumstances of the suspect's movements—lack of proper documentation may provide grounds for *reasonable suspicion* that an alien has committed an illegal entry. Armed with such reasonable suspicion that a federal crime has occurred, it is appropriate and consistent with relevant precedent for state officers to detain the undocumented alien for a reasonable period pending an expert determination of probable cause and suitability for arrest by the Border Patrol or other INS agents. *See Winfrey*, 915 F.2d at 217–18. Again, however, such reasonable detention practices would be vulnerable to challenge on the "pretext" grounds invoked in *Mountain High Knitting* if federal authorities have made it clear that illegal entry misdemeanors will not be prosecuted and that the sole remedy to be pursued for such violations is civil deportation.

Additionally, it is not clear that the California Code's provision that warrantless misdemeanor *arrests* can only be made when the misdemeanor was committed in the officer's presence is necessarily applicable to otherwise valid *investigative detentions*. In terms, that provision applies only to arrests, *see* Cal. Penal Code § 836(a) (West 1994), and investigative detentions under *Terry* are legally distinct from full-fledged arrests. In that regard, the California Court of Appeal described the California standard for investigative detentions as follows:

> An investigative detention is justified when the facts and circumstances known or apparent to the officer, including specific or articulable facts, cause him to suspect (1) a *crime* has occurred and (2) the person he intends to detain is involved in the criminal activity. (*In re Tony C.* (1978), 21 Cal.3d 888, 893, 148 Cal. Rptr. 366, 582 P.2d 957.)

*In re Carlos M.*, 220 Cal. App.3d 372, 380, 269 Cal. Rptr. 447, 452 (Cal. App. 4 Dist. 1990) (emphasis added). Significantly, the investigative detention standard requires only reasonable suspicion that a "crime" has occurred, and not necessarily a felony. Accordingly, while we would defer to the California legal authorities' interpretations of California law, we believe that alien suspects may be detained by state officers on reasonable suspicion of a misdemeanor violation of the INA even though the officer did not personally observe commission of the offense and therefore could not himself lawfully undertake a warrantless arrest of the suspect under California law. Although the state officers might not themselves be able to arrest the federal misdemeanor suspects—at least absent probable cause that a separate state felony has been committed—their authority to assist federal officers in doing so is well established.

3. *Illegal Entry as a Basis for Arrest—the Complete or Continuing Offense Issue*

As indicated above, special questions have been raised concerning the utility of the illegal entry statute, 8 U.S.C. § 1325(a), as a basis for detention or arrests by state officers. In *United States v. Rincon-Jimenez*, 595 F.2d 1192, 1194 (9th Cir. 1979), the Ninth Circuit held that illegal entry is not a continuing violation — that is, the offense is complete *for statute of limitations purposes* upon the alien's successful entry into the United States. In *Gonzales*, the Ninth Circuit indicated that *Rincon-Jimenez* also stands for the proposition that a § 1325 violation is also complete "at the time of entry" for purposes of determining whether the offense has been committed in the presence of an officer under applicable state law. *See* 722 F.2d at 475–76. Since § 1325 is a misdemeanor, a California officer cannot make a warrantless arrest for its violation unless it is committed in his presence. In light of these considerations, in *Gates v. Superior Court*, the court held: "Once an alien has reached a place of repose within the country, the misdemeanor of improper entry ends. At that point, an LAPD officer may not *arrest* for this offense because it did not occur in the officer's presence." 193 Cal. App.3d at 216 (emphasis added).

We should note, however, that aspects of the Supreme Court's opinion in *INS v. Lopez-Mendoza*, 468 U.S. 1032 (1984), cast some doubt upon the proposition that an illegal entry violation is complete upon entry and therefore cannot be considered a "continuing" crime that can be observed by an officer after the alien has cleared the border. In that opinion, the Court stated that the presence of an unregistered alien who had entered the United States illegally "without more, constitutes a crime" and that such an alien's "release within our borders would immediately subject him to criminal penalties." *Id.* at 1047. Notwithstanding the dissent's specific invocation of the holding in *Rincon-Jimenez*, *id.* at 1057 (White, J., dissenting), the Court stated, "We need not decide whether or not remaining in this country following an illegal entry is a continuing or a completed crime under § 1325." *Id.* at 1047. If the Court were to view an undetected illegal entry as a continuing crime, the "committed in the presence" requirement of California law would present no obstacle to warrantless arrests of illegal entrants by California officers.

Absent an authoritative clarifying decision on this issue, however, warrantless arrests by California state officers for illegal entry violations must be considered legally invalid when the alien has already completed his entry into the United States.

The law is not clear, however, as to exactly when an illegal entry is complete for purposes of determining whether it has occurred in the presence of the arresting officer. Without explanation, analysis, or citation of authority, the *Gates* opinion tersely states that an illegal entry is complete for that purpose when "an alien has reached a place of repose within the country," 193 Cal. App.3d at 216. Despite its lack of analysis, this statement remains the most authoritative interpretation of the California "in presence" requirement as applied to illegal entry viola-

39

tions. Applying that interpretation, we do not believe that aliens apprehended in the vehicle in which they have illegally crossed the border would be held to have reached a "place of repose" within the United States as long as the apprehension occurs before the aliens have been delivered to their immediate arrival destination within the United States. *Cf. United States v. Aslam*, 936 F.2d 751, 755 (2d Cir. 1991). Under those circumstances, we believe warrantless arrests would be permissible under the formulation adopted in *Gates.*

In any event, we believe that reasonable suspicion that such illegal entry has occurred enables state officers to detain such alien suspects for reasonable periods pending evaluation, processing, and possible arrest by Border Patrol officers. That raises the question of what constitutes a reasonable period for such purposes.

### D. *Length of Detention Issues*

In light of the San Diego Police Force policy of limiting the detention of alien suspects (pending the arrival of Border Patrol assistance) to 20 minutes, you have inquired whether longer detention periods of, for example, one hour would be consistent with Fourth Amendment requirements.

Where the police have *probable cause to arrest* the alien suspect, periods of detention lasting one-hour or more would present no constitutional problem. *See United States v. Mondello*, 927 F.2d 1463, 1471 (9th Cir. 1991) (90-minute detention of drug suspect upheld where positive canine sniff test had already established probable cause). The pertinent time limitation in the arrest context is the requirement that the arrestee must generally[9] be given a probable cause hearing before a magistrate or judge within 48 hours after arrest. Thus, an alien suspect who may be legitimately regarded as under arrest may be detained for periods exceeding one-hour pending the arrival of Border Patrol agents or other necessary federal enforcement resources. However, where the detention follows a mere investigative stop based on reasonable suspicion under *Terry v. Ohio*, 392 U.S. 1 (1968) — for example, where probable cause for arrest is lacking and does not materialize during the stop — detention for an excessive length of time under the circumstances may violate the Fourth Amendment's standard of reasonableness.

In *United States v. Sharpe*, 470 U.S. 675, 685 (1985), the Supreme Court established that there is "no rigid time limitation on *Terry* stops," but that a stop may be excessive if it involves "delay unnecessary to the legitimate investigation of the law enforcement officers," *id.* at 687.[10] As the Court more fully explained in upholding a 20-minute detention:

---

[9] The temporal limitation on detention of an arrestee without a magistrate's or judge's determination of probable cause may sometimes be less than 48 hours (i.e., the delay must never be "unreasonable" under the circumstances) and sometimes more (i.e., when there is a "bona fide emergency or other extraordinary circumstance"). *See County of Riverside v. McLaughlin*, 500 U.S. 44, 56–57 (1991).

[10] We do not believe that *United States v. Place*, 462 U.S. 696 (1983) establishes a hard rule that a detention for as long as 90 minutes, whether of luggage or person, is per se excessive and unreasonable. There, the Court held that the 90-minute detention of a suspect's luggage to arrange for a canine sniff test was excessive and unreason-

40

While it is clear that "the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion," we have emphasized the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes. Much as a "bright line" rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria.

*Id.* at 685 (quoting *United States v. Place*, 462 U.S. at 709 (citations omitted)). The Court reiterated this pragmatic approach to the length-of-detention issue in *Montoya de Hernandez*, where it upheld the reasonableness of a *16-hour* border detention of a suspected alimentary canal drug-smuggler. As the Court stated:

Here, respondent was detained incommunicado for almost 16 hours before inspectors sought a warrant; . . . . This length of time undoubtedly exceeds any other detention we have approved under reasonable suspicion. But we have also consistently rejected hard-and-fast time limits, *Sharpe, supra*; *Place, supra*, at 709, n.10. Instead, "common sense and ordinary human experience must govern over rigid criteria." *Sharpe, supra*, at 685.

473 U.S. at 542. However, the 16-hour detention in *Montoya de Hernandez* occurred in the border context, and the holding therefore should not be considered generally applicable to detentions outside the border area.

Thus, the Supreme Court has expressly rejected the imposition of rigid, arbitrary time limits upon the permissible duration of detention for *Terry* stops. Instead, the reasonableness of the detention is evaluated in light of the particular purpose of the stop in question and the time "reasonably needed" to take necessary and appropriate measures to achieve that purpose. The dispositive question is whether the detention is "*unnecessarily* prolonged." *Sharpe*, 470 U.S. at 685.[11]

Guided by these considerations, various federal courts have upheld *Terry* detentions ranging in length from 20 minutes to two hours. *E.g., Sharpe*, 470 U.S.

able under the circumstances. *Id.* at 709. The Supreme Court's subsequent opinion in *Sharpe*, however, expressly limited *Place*'s reach by stressing that in *Place* the police had possessed prior knowledge of the suspect's arrival time, could therefore have made advance arrangements for more expeditious processing, and thus had not acted diligently in pursuing their investigation. 470 U.S. at 684-85. *Sharpe* thus makes clear that the police's exercise of reasonable diligence, rather than any arbitrarily-drawn time limit, is the crucial factor in determining Fourth Amendment reasonableness in this context.

[11] *Sharpe*'s specific rejection of rigid, preconceived limitations on the duration of *Terry* stops is consistent with the Supreme Court's more recently-stated emphasis that Fourth Amendment requirements for prompt probable cause hearings following warrantless arrests do "not impose on the States a rigid procedural framework. Rather, individual States may choose to comply in different ways." *County of Riverside*, 500 U.S. at 53 (vacating as erroneous a Ninth Circuit panel's contrary holding that "no flexibility was permitted," *see id.* at 54).

41

at 687 (20-minute detention not unreasonable); *Bloomfield*, 40 F.3d at 917 (one-hour detention of motorist to await drug-sniffing dog held reasonable); *United States v. Adams*, 39 F.3d 1178 (4th Cir. 1994) (unpublished opinion) (45-minute detention upheld as reasonable); *United States v. Frost*, 999 F.2d 737, 741–42 (3d Cir.), *cert. denied*, 510 U.S. 1001 (1993) (detention of nearly one hour to await drug dog held reasonable); *Courson v. McMillian*, 939 F.2d 1479, 1491 (11th Cir. 1991) (30 minutes not unreasonable for an investigatory stop); *Jackson v. Wren*, 893 F.2d 1334 (6th Cir. 1990) (unpublished opinion) (detention for over two hours to await arrival of DEA agents upheld); *United States v. Hardy*, 855 F.2d 753, 761 (11th Cir. 1988), *cert. denied*, 489 U.S. 1019 (1989) (50-minute roadside detention to await drug dog held reasonable); *United States v. Davies*, 768 F.2d 893, 902 (7th Cir.), *cert. denied*, 474 U.S. 1008 (1985) (45-minute detention "for further questioning and advice from their superiors" held a valid investigative stop); *United States v. Willis*, 759 F.2d 1486, 1497 (11th Cir.), *cert. denied*, 474 U.S. 849 (1985); (25-minute detention upheld); *United States v. Borrero*, 770 F. Supp. 1178, 1189–91 (E.D. Mich. 1991) (70-minute detention by DEA agents at airport held reasonable).

It should be noted, however, that an opinion issued by a Ninth Circuit panel in 1994 suggests a more restrictive approach to the length-of-detention issue. In *United States v. $191,910.00 in U.S. Currency*, 16 F.3d 1051 (9th Cir. 1994) ("*Currency*"), Judge Reinhardt held that the 90-minute detention of a drug suspect's luggage, pending the arrival of a drug-sniffing dog, was in itself sufficient to invalidate the seizure under the Fourth Amendment. Relying heavily on the Supreme Court's baggage-detention ruling in *Place*—while seeking to minimize the Court's subsequent emphatic rejection of "rigid time limitations" in *Sharpe*[12]—the court adopted the view that the *Place* opinion established an "outer boundary of permissible seizures" that falls "somewhere short of 90 minutes." *Currency*, 16 F.3d at 1060.

We believe that this aspect of the *Currency* holding is irreconcilable with the Supreme Court's holdings in *Sharpe* and *Montoya de Hernandez*. As demonstrated in the quotes set forth above, the *Sharpe* opinion repeatedly and unmistakably emphasized that the constitutionality of *Terry* stops may not be mechanically measured against any pre-ordained time limitation. It held that the establishment of such a time limitation "is clearly and fundamentally at odds with our approach in this area." 470 U.S. at 686. Yet that is precisely what the panel purported to ordain in the *Currency* case ("the detention of Morgan's baggage violated the Fourth Amendment solely because of its length"). 16 F.3d at 1060.

---

[12] The *Currency* court's broad application of the *Place* ruling is incompatible with the Supreme Court's narrowing interpretation of that same ruling in the *Sharpe* opinion. *See supra* note 10. As the Court explained in *Sharpe*, "[I]n *Place*, we expressly rejected the suggestion that we adopt a hard-and-fast time limit for a permissible *Terry* stop." 470 U.S. at 686. This emphatic and unambiguous holding in *Sharpe* was studiously ignored by the panel opinion in the *Currency* case. *See* 16 F.3d at 1060 n.17.

*Assistance by State and Local Police in Apprehending Illegal Aliens*

Notwithstanding our view that *Currency's* adoption of a fixed time limit for *Terry* stops is erroneous — a limit that would fall "somewhere short of 90 minutes," but certainly no lower than 30 minutes [13] — that opinion has neither been overruled nor directly refuted by subsequent Ninth Circuit opinions. Accordingly, the approach reflected in the *Currency* opinion should be taken into account in formulating enforcement guidelines in this area. Moreover, it is significant to note that the *Currency* opinion imposed a 90-minute limitation on luggage detentions; it is reasonable to expect that that panel might be inclined to impose stricter limitations on detentions of persons.

However, considered in conjunction with the more authoritative Supreme Court holding in *Sharpe,* as well as more permissive Ninth Circuit opinions such as *Mondello,* we believe that the *Currency* opinion should be interpreted no more broadly than its holding specifically requires — i.e., that investigative detentions may not exceed 90 minutes in duration. To extrapolate a still more restrictive rule for the Ninth Circuit (e.g., a rule treating one-hour stops as per se unreasonable) would ascribe to the *Currency* opinion more weight than is warranted by its juridical authority relative to *Sharpe, Mondello,* and other less restrictive precedents. *Cf. County of Riverside,* 500 U.S. at 54–55 (where the Supreme Court rejected a comparably restrictive and "inflexible" Fourth Amendment interpretation by a Ninth Circuit panel).

We believe that the necessity of detaining immigration suspects until Border Patrol/INS agents arrive is analogous to the necessity of detaining drug suspects pending the arrival of DEA agents or drug-sniffing dogs for purposes of evaluating the duration of detention for reasonableness. In both situations, the purpose of the delay is to allow for the utilization of enhanced investigative or enforcement resources that are necessary to effectuate the legitimate purpose of the investigative detention. *See Winfrey,* 915 F.2d at 217 (45-minute detention of drug suspects by local officers to await arrival of federal DEA agents upheld, where "[t]he sheriff's deputies were not trained as drug agents and needed the DEA agents' expertise to confirm or dispel their suspicions"). Accordingly, the precedents upholding various periods of detention as reasonable to permit the arrival of DEA agents or drug-sniffing dogs provide valid guidelines for determining a reasonable period of detention in the immigrant suspect situations posed here as well. Based on those precedents, we believe that if Border Patrol agents exercising reasonable diligence require 45 minutes to one hour to reach the scene of detention, detentions of that length would be sustainable under *Sharpe* where there is reasonable suspicion that the detained aliens have violated the federal immigration laws. We caution, however, that when Border Patrol Agents do not promptly arrest the de-

---

[13] *See Mondello,* 927 F.2d at 1471, where another Ninth Circuit panel (Trott, J.) upheld the reasonableness of a 30-minute investigative stop to permit the arrival of drug-detecting dogs. There is no suggestion in *Currency* of disagreement with *Mondello*'s approval of a 30-minute *Terry* detention.

43

tainees, the additional period of detention required by them should be counted in calculating the permissible duration of detention.

*Police Force Policies.* We note that further complications may arise in this area from the language contained in written guidelines or policies used by state or local police forces. For example, if such guidelines specify that subjects may only be detained based on reasonable suspicion of criminal activity that is *unrelated to the immigration laws*, the legal basis for detentions pending the arrival of Border Patrol agents could be undercut. *Sharpe* requires that an extended *Terry* detention must be related to "the law enforcement purposes to be served by the stop," 470 U.S. at 685, and Border Patrol assistance is obviously not needed to deal with criminal activity unrelated to immigration status.

It is our understanding that the need for expanding the maximum alien-suspect *Terry* detention period from 20 minutes to as long as one-hour is premised upon the time required for Border Patrol agents to arrive on the scene to further investigate and process the INA violation. Under *Sharpe*, such extended detention must be related to the law enforcement purposes to be served by the stop or the further reasonable suspicions arising during the stop. However, if a Police Force policy states that detentions may only be made for *non-immigration* enforcement purposes, detentions imposed to await the Border Patrol would be vulnerable to challenge based on the limiting language of the policy. To minimize this complication, state and local police forces could be urged to modify their policies or guidelines to remove provisions indicating that *Terry* stops and detentions of undocumented aliens must be based on reasonable suspicion of criminal activity that is unrelated to immigration status or enforcement of federal immigration law.

In sum, we conclude that "reasonable suspicion" detention of undocumented aliens by local police for periods in the range of 45 to 60 minutes should comply with Fourth Amendment requirements when that much time is required to enable Border Patrol agents to arrive at the scene exercising reasonable diligence. This assessment presumes that the involved local police force does not disavow any purpose of assisting federal enforcement of the immigration laws in making such stops. Although the Supreme Court's *Sharpe* opinion expressly repudiates any rigid time limitation on reasonable stops under *Terry*, we caution that the Ninth Circuit panel opinion in the *Currency* case has held that stops of 90 minutes, and perhaps less, are per se unreasonable under the Fourth Amendment. Accordingly, we would not recommend adoption of a guideline establishing a period any greater than 45 to 60 minutes as a benchmark for maximum permissible detention periods. Moreover, any guidelines or benchmarks adopted in this area should stress that the maximum permissible period is premised upon the assumption that such a time period is *needed* to allow for the arrival and assistance of Border Patrol agents or other necessary support resources. Guidelines or rules should indicate that extended detention periods ranging roughly from fifteen minutes to an hour are only justified when that much time is genuinely needed to carry out

44

*Assistance by State and Local Police in Apprehending Illegal Aliens*

the permissible objectives of the stop. Allowing for the arrival of Border Patrol agents to properly handle the suspected violation of federal immigration law provides such justification.

### E. *Transportation of Aliens by State/Local Police*

Given the difficulties of Border Patrol agents promptly reaching the scene where state officers have stopped alien suspects, you have asked whether it would be lawful for the state police to transport the suspects to the federal officials instead. The constitutional issue is whether such involuntary transportation would necessarily transform a valid investigative detention into an arrest that would violate the Fourth Amendment in the absence of probable cause.

In *Hayes v. Florida*, 470 U.S. 811 (1985), the Supreme Court held that the line between investigative detention and full-fledged arrest is crossed when the police "forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes." *Id.* at 816. Similarly, in *United States v. Recalde*, 761 F.2d 1448 (10th Cir. 1985), the court upheld the Fourth Amendment claims of a drug suspect who "was taken from a public highway without his consent and transported five miles to a police station, where he was placed in a small room for further investigation and questioning." *Id.* at 1456. The Ninth Circuit invoked the Supreme Court's opinion in *Dunaway v. New York*, 442 U.S. 200 (1979), to the same effect in *Gonzales v. City of Peoria*, 722 F.2d at 477:

> If the seizure involves anything more than the brief and narrowly-defined intrusion authorized by *Terry*, it must be justified by probable cause. *Dunway*, 442 U.S. at 212; *Brignoni-Ponce*, 422 U.S. at 882. *Dunway* makes absolutely clear that where the defendant is transported to the police station and placed in a cell or interrogation room he has been arrested, even if the purpose of the seizure is investigatory, rather than accusatory. Because such a seizure constitutes an arrest, it must be supported by probable cause.

*Id.* at 477 (some citations omitted). *See also United States v. Obasa*, 15 F.3d 603, 608–10 (6th Cir. 1994) (holding that a detention following a highway taxi stop ripened into an arrest when the defendant was searched, given *Miranda* warnings, and transported back to the airport police station). These opinions reflect the view that the involuntary transportation of *Terry* detainees to a confined and coercive setting for further interrogation or investigation transforms the detention into an arrest, and can therefore be sustained only on the basis of probable cause.

Other opinions, however, have recognized that special circumstances may sometimes permit the limited transportation of *Terry* detainees without entailing an

45

unconstitutional arrest. The circumstances justifying such transport were summarized by the Ninth Circuit in *United States v. Baron*, 860 F.2d 911 (1988), *cert. denied*, 490 U.S. 1040 (1989), following a survey of the precedents:

> The principles that we distill from these cases are that the police may move a suspect without exceeding the bounds of the *Terry*-stop when it is necessary for safety or security reasons, *when it is the least intrusive method available to achieve the legitimate goals of the stop*, and when moving the suspect does not make the circumstances of the detention so coercive that the detention becomes indistinguishable from an arrest.

*Id.* at 915–16 (citations omitted; emphasis added).

Several recent California opinions have also recognized that transportation of a detained suspect may be authorized on less than probable cause where it is reasonably necessary to accomplish quickly the purposes of the detention. *In re Carlos M.*, 220 Cal. App.3d 372, 269 Cal. Rptr. 447 (1990); *In re Starvon*, 29 Cal. Rptr.2d 471 (Cal. App. 2 Dist. 1994). In *In re Carlos M.*, the court rejected arguments that the handcuffing and forced transportation of a juvenile sexual assault suspect to a hospital for identification by the victim were beyond the scope of a *Terry* stop and transformed the detention into a de facto arrest. In so holding, the court stressed that the officers were unable to obtain the suspect's consent to the transport because he spoke only Spanish and the detaining officer spoke no Spanish. The court also noted that alternative arrangements for bringing the victim to the scene of the detention would have required a two-hour delay. Taking all these facts into account, the court concluded that the transportation of the detained suspect was reasonable.

The leading decisions invalidating transportation of detainees have frequently stressed the coercive atmosphere of the place to which the suspects are transported—i.e., "the coerciveness created by isolating a suspect in a private space controlled by the police," *Baron*, 860 F.2d at 916—rather than the act of transporting per se. We also consider it significant that both *Baron* and *In re Carlos M.* stressed the point that transporting detainees may be justified where it is the least intrusive means to achieve the legitimate goals of the investigative detention.

Where alien suspects are validly detained on reasonable suspicion of an immigration crime, the detention may be reasonably extended in order to permit Border Patrol agents to make an expert assessment of probable cause and propriety of arrest. *Cf. Winfrey*, 915 F.2d at 217–18. In some situations, the Border Patrol's assistance may be more promptly and safely obtained by transporting the aliens to the agents rather than by awaiting the latters' arrival (e.g., where their duty requirements make it unworkable for them promptly to leave a particular location when called by the state police). In those particular circumstances, we believe

46

that transporting the suspects a reasonable distance to the agents could properly be viewed as "the least intrusive method available to achieve the legitimate goals" of the detention, *Baron*, 860 F.2d at 915, and would not violate the Fourth Amendment. This conclusion assumes that the ensuing interrogation or assessment by the Border Patrol agents would take place in an unconfined or "noncoercive" location rather than in an enclosed or coercive setting such as a police station. *Compare Gonzales*, 722 F.2d at 477 (stressing that transporting suspects to police station and placing them in a cell or interrogation room results in an arrest, even if the purpose is "investigatory rather than accusatory").

## F. *Deputation of State Officers to Enforce Federal Immigration Laws*

You have also inquired whether state and local law enforcement personnel may be formally deputized or cross-designated as federal officers by the Attorney General in order to enhance their authority to enforce the immigration laws. So deputized, such personnel would be empowered to make warrantless arrests of illegal immigration suspects and perform certain other INA enforcement tasks that they might not otherwise be authorized to do in their capacity as state officers.[14] We conclude that the state officials could be deputized for these purposes, but it would be in the capacity of Deputy U.S. Marshals exercising special authority to enforce the immigration laws conferred on the U.S. Marshals Service by the Attorney General.[15]

This office has previously opined that there is adequate statutory authority for special deputations of state and local law enforcement officials (including members of the State Militia) for purposes of assisting federal law enforcement in a mass immigration emergency. *See* Memorandum for David Nachtsheim, Emergency Planning Coordinator, Immigration and Naturalization Service, from Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, *Re: Operation Distant Shore Draft Plan* (Oct. 15, 1993). By special deputations, we referred to temporary designations as Deputy U.S. Marshals under the provisions of 28 U.S.C. §§561(f) and 566(c).

---

[14] Assuming state or local authorities agree to the federal deputation of their officers, and that such deputation is compatible with their status under California law, state law restrictions that would otherwise bar enforcement actions that Deputy U.S. Marshals are authorized to perform under federal law would be overriden by the Supremacy Clause in the case of state officers duly deputized under 28 U.S.C. §§566(c) or 561(f). *See* U.S. Const. art. VI, cl. 2.

[15] Individual state officers could also presumably be assigned on detail to the Department of Justice ("Department") or INS under the appropriate provisions of the Intergovernmental Personnel Act ("IPA"), 5 U.S.C. §§3372, 3374. It is our understanding that details under the IPA generally involve the temporary assignment of individual employees to full-time duty in a federal agency, rather than the conferring of special federal authority to be exercised within the context of the officer's ongoing state law enforcement duties. However, as further provided in the IPA, "The supervision of the duties of such an employee may be governed by agreement between the Federal agency and the State or local government concerned." 5 U.S.C. §3374(c). Accordingly, if the pertinent state and local officials were agreeable, we see no reason why the IPA could not be used as authority for detailing designated state officers to INA enforcement operations insofar as the Department, the INS, and the relevant state authorities considered it useful to do so.

47

Under such arrangements, we believe the Attorney General should first confer special authority to enforce the immigration laws upon the Director of the U.S. Marshals Service ("USMS") under the provisions of 8 U.S.C. § 1103.[16] The Director of the USMS ("DUSMS") could then, in turn, deputize state and local officials to assist him in his charge to enforce the immigration laws under the provisions of either 28 U.S.C. § 561(f)[17] or, more probably, 28 U.S.C. § 566(c). The Department of Justice regulations implementing those statutory provisions specifically provide that the DUSMS is authorized to deputize "[s]elected federal, state, or local law enforcement officers *whenever the law enforcement needs of the U.S. Marshals Service so require.*" 28 C.F.R. § 0.112(2) (1995) (emphasis added). Although the "law enforcement needs" of the USMS would not normally extend to alien interdiction, that jurisdictional gap would be filled by the Attorney General's special assignment of INA enforcement authority under 8 U.S.C. § 1103.

This very approach was followed in August 1994, when the Deputy Attorney General (exercising authority delegated to her by the Attorney General) issued an order empowering the DUSMS to deputize Florida law enforcement officials as Deputy U.S. Marshals so that they could exercise INS enforcement responsibilities in the event of an immigration emergency. Under the order (which was effective for a period of one year), INS enforcement authority was first delegated to U.S. Marshals and U.S. Deputy Marshals under 8 U.S.C. § 1103, including the power to detain and arrest, for deportation or exclusion, persons entering or present in the United States in violation of law. The order went on to authorize the DUSMS to deputize and designate Florida law enforcement officers to exercise those same INS enforcement powers—specifically including the authority to make warrantless arrests and detentions for purposes of deportation—"pursuant to the direction of officers of the [INS]." Provision was made for Florida law enforcement officers to be sworn in as Deputy U.S. Marshals "immediately upon the commencement of a mass immigration emergency." Whether or not such arrangements would be considered practicable or desirable in other areas of massive illegal immigration, we are not aware of any reason why they could not be lawfully undertaken pursuant to the same statutory authorities.

TERESA WYNN ROSEBOROUGH
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

[16]Under 8 U.S.C. § 1103, the Attorney General is authorized to confer on any employee of the United States, with the consent of the head of the Department or other independent establishment that employs such person, "any of the powers, privileges, or duties conferred or imposed . . . upon Officers . . . of the [Immigration and Naturalization] Service."

[17]A persuasive case can be made that deputations based upon 28 U.S.C. § 561(f) are only permitted when the person to be deputized is made an *employee* of the USMS—a complicating administrative process that would seem impracticable in the case of state and local police personnel. Special deputations of state and local police personnel would therefore be more realistically grounded upon the authority of 28 U.S.C. § 566(c).

48

23 of 23

**U.S. Department of Justice**

Office of Legal Counsel

Office of the Assistant Attorney General           *Washington, D.C. 20530*

April 3, 2002

**DISCLOSE**

## MEMORANDUM FOR THE ATTORNEY GENERAL

*Re: Non-preemption of the authority of state and local law
enforcement officials to arrest aliens for immigration violations*

**DISCLOSE**

to arrest for violation of federal law inheres in the States, subject only to preemption by federal law. In Part II, we reconsider advice rendered by this Office in 1996, shortly before the enactment of section 1252c. We concluded at that time that although the INA does not preclude [...] We explain in Part I below that the authority

state police from making arrests for violations of its criminal provisions, it does preclude them from arresting aliens on the basis of civil deportability. We now determine that our 1996 advice was mistaken and that it should not provide the background against which section 1252c is assessed. We conclude in Part III that section 1252c does not preempt state arrest authority in any respect.

██████████████████████████████████████████████████████

We assume for purposes of this memorandum that any arrests by state police comply with Fourth Amendment restrictions. We further assume that States have conferred on state police the necessary state-law authority to make arrests for violation of the federal immigration laws, but note that the existence and extent of such authority is a question of state law.

Except as otherwise noted, this memorandum does not address, and should not be read as limiting, the ability of state police to exercise federal arrest authority pursuant to federal authorization, including, for example, pursuant to the authority of the Attorney General to enter into agreements with States under which state officers or employees perform immigration officer functions subject to the direction and supervision of the Attorney General. *See* 8 U.S.C. § 1357(g) (2000).

## I.

We first address whether, in the absence of any affirmative authorization under federal law, States have inherent power (subject to federal preemption) to make arrests for violation of federal law. Otherwise stated, may state police, exercising state law authority only, lawfully make arrests for violation of federal law, or do they have power to make such arrests only insofar as they are exercising delegated federal executive power?

We believe that the answer to this question rests ultimately on the States' status as sovereign entities. The Declaration of Independence proclaims that the States are "FREE AND INDEPENDENT STATES . . . and that as FREE AND INDEPENDENT STATES, they have full Power to levy War, conclude Peace, contract Alliances, establish Commerce, *and to do all other Acts and Things which INDEPENDENT STATES may of right do*." (Emphasis added.) The United States Constitution conferred on Congress only the powers "herein granted," U.S. Const. art. I, § 1, and "reserved to the States respectively, or to the people," the "powers not delegated to the United States by the Constitution, nor prohibited by it to the States," *id.* amend. X. Thus, although the Constitution did impose some disabilities on the States, it did not purport to confer, or otherwise be the source of, their affirmative authority. *See U.S. Term Limits, Inc. v. Thornton,* 514 U.S. 779, 801 (1995) ("The 'plan of the convention' as illuminated by the historical materials, our opinions, and the text of the Tenth Amendment draws a basic distinction between the powers of the newly created Federal Government and the powers retained by the pre-existing sovereign States. As Chief Justice Marshall explained, 'it was neither necessary nor proper to define the powers retained by the States. These powers proceed, not from the people of America,

-2-

↑ DISCLOSE

but from the people of the several States; and remain, after the adoption of the constitution, what
they were before, except so far as they may be abridged by that instrument.'") (quoting *Sturges v.
Crowninshield*, 17 U.S. (4 Wheat.) 122, 193 (1819)); *The Federalist No. 32*, at 200 (Alexander
Hamilton) (Jacob E. Cooke ed., 1961) ("[T]he plan of the [Constitutional] Convention aims only
at a partial Union or consolidation, the State Governments would clearly retain all the rights of
sovereignty which they before had and which were not by that act *exclusively* delegated to the
United States"). The original States that ratified the Constitution instead obtained their authority
from state constitutions or charters that preceded the federal Constitution. And States that
entered the Union after 1789 did so on "equal footing" with the original States and thus enjoy the
same sovereign status as the original States. *See Coyle v. Smith*, 221 U.S. 559, 573 (1911)
("when a new State is admitted into the Union, it is so admitted with all of the powers of
sovereignty and jurisdiction which pertain to the original States").

We therefore do not believe that the authority of state police to make arrests for violation
of federal law is limited to those instances in which they are exercising delegated federal power.
We instead believe that such arrest authority inheres in the States' status as sovereign entities. In
the same way that police in Canada do not exercise delegated Article II power when they arrest
someone who has violated U.S. law and turn him over to U.S. authorities, state police, too, need
not be exercising such federal power when they make arrests for violation of federal law.
Instead, the power to make such arrests inheres in the ability of one sovereign to accommodate
the interests of another sovereign.

Case law reflects this same conclusion. No act of Congress has authorized state police to
arrest for federal offenses when they act without an arrest warrant. Nonetheless, in *United States
v. Di Re*, 332 U.S. 581 (1948), the Supreme Court, in the course of holding that "in absence of an
applicable federal statute the law of the state where an arrest without warrant takes place
determines its validity," *id.* at 589, implicitly adopted the position that States have inherent
authority to authorize their police to make warrantless arrests for federal criminal violations. *See
id.* at 589-90; *see also Miller v. United States*, 357 U.S. 301, 305 (1958) (citing *Di Re* for
proposition that "the lawfulness of the arrest without warrant is to be determined by reference to
state law"); *Johnson v. United States*, 333 U.S. 10, 15 n.5 (1948) ("State law determines the
validity of arrests without warrant") (citing *Di Re*). Similarly, in *Marsh v. United States*, 29 F.2d
172 (2d Cir. 1928), Judge Learned Hand's opinion for the Second Circuit construed a New York
statute to authorize state police to make warrantless arrests for violation of federal law. *Id.* at
174. In so doing, Judge Hand specifically rejected the argument that the existence of a federal
statute governing state arrests *pursuant to warrant* for federal offenses (the predecessor to current
section 3041 of title 18) should be understood to preempt state officers from making *warrantless*
arrests for federal offenses: "it would be unreasonable to suppose that [the United States']
purpose was to deny to itself any help that the states may allow." *Id.* Judge Hand's analysis is
plainly premised on the understanding that states have inherent authority to make arrests for
federal offenses, subject only to federal preemption.

-3-

More recent cases in the specific context of federal immigration law embody this same understanding. In *Gonzales v. City of Peoria*, 722 F.2d 468 (9th Cir. 1983), the Ninth Circuit, stating that the "general rule is that local police are not precluded from enforcing federal statutes," *id.* at 474, engaged in a preemption analysis to determine whether Congress had precluded state police enforcement of the criminal provisions of federal immigration law. *See id.* The Tenth Circuit has similarly opined that a "state trooper has general investigatory authority to inquire into possible immigration violations," *United States v. Salinas-Calderon*, 728 F.2d 1298, 1301 n.3 (10th Cir. 1984), and has applied preemption analysis to determine whether a federal statute "limit[s] or displace[s] the preexisting general authority of state or local police officers to investigate and make arrests for violations of federal law, including immigration laws," *United States v. Vasquez-Alvarez*, 176 F.3d 1294, 1295 (10th Cir. 1999).

Indeed, the only contrary suggestion of which we are aware is contained in a footnote in a 1989 opinion of this Office. In that footnote, after stating that "it is not clear under current law that local police may enforce non-criminal federal statutes" and that any exercise of authority granted under state law "would necessarily have to be consistent with federal authority," we opined that "unlike the *authorization* for state and local involvement in federal criminal law enforcement, we know of no similar *authorization* in the non-criminal context." Memorandum for Joseph R. Davis, Assistant Director, Federal Bureau of Investigation, from Douglas W. Kmiec, Assistant Attorney General, Office of Legal Counsel, *Re: Handling of INS Warrants of Deportation in relation to NCIC Wanted Person File* at 4 & n.11 (Apr. 11, 1989) ("1989 OLC Opinion") (emphasis added). We did not further examine or explain the suggestion arising from our use of the word "authorization." Indeed, the contrast that the 1989 OLC Opinion posits between the criminal and non-criminal contexts is belied by its own citations to the *Di Re* case and 18 U.S.C. § 3041 (1994), *see* 1989 OLC Opinion at 9 n.18: the Supreme Court in *Di Re* did not understand state authority to make arrests for federal offenses to be limited to the arrests pursuant to warrant that were authorized (or at least governed by) the predecessor to 18 U.S.C. § 3041. Moreover, the fact that the 1989 OLC Opinion elsewhere applies preemption analysis to the question of state police authority to arrest for federal offenses, *see* 1989 OLC Opinion at 4-5, indicates that the "authorization" language in this footnote should not be regarded as reflecting a considered view of this Office that state arrest authority is dependent on federal authorization.

Beyond lacking any legal support, the contrary conclusion – i.e., that States, through their police, may exercise only the arrest power that Congress has affirmatively authorized – would dramatically upset settled practices. Under such a conclusion, state police would not have any authority to make warrantless arrests for federal offenses. In Judge Hand's words, we would have to "say that there is no means of securing offenders caught in flagrante, a result which would so impair the execution of the laws that it seems to us incredible it should have been intended." *Marsh*, 29 F.2d at 174. Nor is it clear that Congress could delegate such unsupervised authority to the States. *See Printz v. United States*, 521 U.S. 898, 922-23 (1997) (federal executive power may not be delegated to individuals not subject to "meaningful Presidential control").

-4-

DISCLOSE

DISCLOSE

## II.

In 1996 this Office opined that state police lack the authority to arrest aliens on the basis of civil deportability. *See* Memorandum for Alan D. Bersin, United States Attorney, Southern District of California, from Teresa Wynn Roseborough, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Assistance by California Police in Apprehending Illegal Aliens* 6-7 (Feb. 5, 1996) ("1996 OLC Opinion"). Section 1252c was enacted two months after we rendered this advice. Because section 1252c of title 8 must be understood against the backdrop of existing law, we consider it appropriate to re-examine whether the understanding of the law expressed in the 1996 OLC Opinion was accurate. For the reasons explained below, we determine that our 1996 advice was mistaken and that we should instead have concluded that federal statutory law posed no obstacle to the authority of state police to arrest aliens on the basis of civil deportability.

### A.

The genesis of this Office's 1996 advice lies in the 1983 ruling in *Gonzales*, where the Ninth Circuit held that local police officers have the authority to arrest an alien for a violation of the criminal provisions of the INA if such an arrest is authorized under state law. In that case, a group of persons of Mexican descent challenged a policy of the City of Peoria, Arizona, that instructed local police to arrest and detain aliens suspected of illegally entering the United States in violation of the criminal prohibitions of section 1325 of title 8. *See* 722 F.2d at 472-73. Observing that local police generally are not precluded from enforcing federal statutes and that concurrent enforcement authority is authorized where local enforcement would not impair federal regulatory interests, *see id.* at 474 (citing, inter alia, *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132 (1963)), the court engaged in a preemption analysis to determine whether Congress had precluded local enforcement of federal immigration law. *See id.* In addressing whether the city possessed "the power to enforce the criminal provisions of federal immigration laws," *see id.*, the Ninth Circuit expressly "assume[d] that the civil provisions of the [INA] . . . constitute . . . a pervasive regulatory scheme" that evidenced a congressional intent to preempt local enforcement, *id.* at 474-75. By contrast, the Ninth Circuit found that the criminal provisions of the INA were "few in number and relatively simple in their terms," *id.* at 475, and were "not, and could not be, supported by a complex administrative structure," *id.* Therefore, the court concluded, the federal government had not preempted local enforcement of the criminal provisions of the INA. *See id.*

The Ninth Circuit then turned to whether state law granted the local police the affirmative authority to make arrests under the criminal provisions of the INA. After ascertaining that Arizona law permitted such arrests, the court "emphasize[d] . . . that this [state law] authorization is limited to criminal violations," and noted that local police had failed to distinguish between civil and criminal violations by using the term "illegal alien" to refer both to an alien who had illegally entered the country (a criminal violation) and an alien who was "illegally present" in the United States (a civil violation). *Id.* at 476.

-5-

▶ DISCLOSE

This Office first addressed *Gonzales* in the 1989 OLC Opinion, in which we advised the Federal Bureau of Investigation ("FBI") that the existence of an outstanding warrant of deportation for an alien provided an insufficient basis for entering the alien's name into its National Crime Information Center ("NCIC") Wanted Person File. *See* 1989 OLC Opinion at 1. FBI policy provided that only persons who could be arrested by any law enforcement officer with the power to arrest could be included in the NCIC Wanted Person File. Discussing *Gonzales* at length, we concluded that *Gonzales* "makes clear that local police may enforce criminal violations of the [INA]." 1989 OLC Opinion at 5. By contrast, we opined that "it is not clear under current law that local police may enforce non-criminal federal statutes." *Id.* at 4 & n.11. Citing *Gonzales*, we stated that "the pervasively federal nature of immigration control may preempt a state role in the enforcement of civil immigration matters." *Id.* at 4 n.11. Because the issuance of a warrant of deportation did not necessarily indicate that a criminal law had been violated, we concluded that the mere existence of a warrant of deportation for an alien did not, under FBI policy, justify inclusion of the alien's name in the NCIC Wanted Person File.

**B.**

The 1996 OLC Opinion directly addressed the circumstances in which state police could assist the INS in enforcing the federal immigration laws. In that opinion, we relied on *Gonzales* for the proposition that federal law does not preclude state police from enforcing the criminal provisions of the INA. *See id.* at 4. We concluded, by contrast, that state police "lack recognized legal authority to stop and detain an alien solely on suspicion of civil deportability." *Id.* at 7 (emphasis omitted). Our conclusion rested on five authorities. First, we stated that in *Gonzales* "the Ninth Circuit held that the authority of state officials to enforce the provisions of the INA 'is limited to criminal violations,'" *id.* at 6. Second, we cited a California appellate court case, *Gates v. Superior Court*, 193 Cal. App. 3d 205 (1987), that we understood to support the same proposition. Third, we relied on the 1989 OLC Opinion. Fourth, we stated that 8 U.S.C. § 1357(a)(2) "imposes substantial restrictions even upon the authority of *federal* officers to make warrantless arrests for purposes of civil deportation." 1996 OLC Opinion at 7. Fifth, we cited a Ninth Circuit case, *Mountain High Knitting, Inc. v. Reno*, 51 F.3d 216 (9th Cir. 1995), that applied 8 U.S.C. § 1357(a)(2). *See* 1996 OLC Opinion at 6-7.

We construe our statement in the 1996 OLC Opinion that state police "*lack recognized legal authority* to stop and detain an alien solely on suspicion of civil deportability" as an affirmative conclusion that state police lack the authority to arrest aliens on the basis of civil deportability. *Id.* at 7 (emphasis added and emphasis omitted). Any possibility that we may have crafted the peculiar phrase "lack recognized legal authority" in order to remain agnostic on the question whether state police possess that authority is foreclosed by our follow-on opinion a mere two weeks later, in which we read the 1996 OLC Opinion to establish "the disability of state police to enforce the *civil*, as opposed to criminal, provisions of the federal immigration laws." Memorandum for Alan D. Bersin, United States Attorney, Southern District of California, from

-6-

➤ **DISCLOSE**

Richard L. Shiffrin, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: State Assistance in Apprehending Illegal Aliens – Part II* at 1 (Feb. 21, 1996).

**C.**

On re-examination, we believe that the authorities we cited in the 1996 OLC Opinion provide no support for our conclusion that state police lack the authority to arrest aliens solely on the basis of civil deportability. First, our assertion that "the Ninth Circuit [in *Gonzales*] held that the authority of state officials to enforce the provisions of the INA 'is limited to criminal violations,'" *id.* at 6, confuses the court's *holding* on the state-law question of what authority the State of Arizona has conferred on its police officers with the court's mere *assumption in dictum* that the civil provisions of the INA preempt state enforcement. Second, the language that the 1996 OLC Opinion cites from the state appellate court ruling in *Gates* is that court's summary of the trial court's conclusion of law. The *Gates* court itself did not address a contested question, as "[n]either side disputes the exclusive authority of the federal government to enforce the civil provisions of the INA." *Gates*, 193 Cal. App. 3d at 214-15. Third, the 1989 OLC Opinion, notwithstanding its apparent confusion over the need for affirmative federal authorization for state arrests for federal offenses, goes no further than to conclude that "it is *not clear* under current law that local police may enforce non-criminal federal statutes." 1989 OLC Opinion at 4 (emphasis added) – a conclusion,that falls well short of the 1996 OLC Opinion's conclusion that it is *clear* that local police may *not* enforce non-criminal federal statutes. Finally, the restrictions imposed on INS employees by section 1357(a)(2) of title 8 (and recited by the Ninth Circuit in *Mountain High Knitting*) apply equally to warrantless arrests for criminal violations as to warrantless arrests for civil violations. We therefore fail to see how section 1357(a)(2) bears in any way on the question whether state police may arrest aliens for civil deportability.

We note further that the 1996 OLC Opinion failed to take account of the Tenth Circuit's contrary conclusion in its 1984 ruling in *Salinas-Calderon*. There, a defendant who had been arrested for the criminal violation of transporting aliens claimed, inter alia, that a state trooper did not have the authority to detain the transported passengers while he asked them about their immigration status. In rejecting this claim, the Tenth Circuit held that a "state trooper has general investigatory authority to inquire into possible immigration violations." 728 F.2d at 1301 n.3. The court did not differentiate between criminal and civil violations. Indeed, because there is no indication in the opinion that there was any reason to believe that the alien passengers had committed any criminal violations, the court's statement appears to apply fully to civil as well as criminal violations.

More fundamentally, we believe that the 1996 OLC Opinion failed to appreciate the extremely limited and unusual nature of the preemption question posed with respect to state arrests for violation of federal law. Unlike the typical preemption scenario, this question does *not* involve an attempt by States to enact *state* laws, or to promulgate regulations pursuant to state laws, that arguably conflict with federal law or intrude into a field that is reserved to Congress or that federal law has occupied. What this question instead presents is whether States

-7-

can *assist* the federal government by arresting aliens who have violated *federal* law and by turning them over to federal authorities. In this context, we believe that the question posed in dictum by the Ninth Circuit in *Gonzales* – whether the civil provisions of the INA constitute a pervasive regulatory scheme – was entirely misplaced. We instead believe that the principle governing our construction of federal law in this context should have been that voiced by Judge Learned Hand in *Marsh*: that "it would be unreasonable to suppose that [the United States'] purpose was to deny to itself any help that the states may allow." 29 F.2d at 174. Consistent with this principle, we believe that the 1996 OLC Opinion should have applied a strong presumption *against* preemption of state arrest authority. Had it done so, it should have concluded that federal law did not preempt state police from arresting aliens on the basis of civil deportability.

We therefore withdraw the 1996 OLC Opinion's advice that federal law precludes state police from arresting aliens on the basis of civil deportability.

### III.

We now address whether section 1252c preempts state arrest authority. We first present the legislative history of section 1252c and the Tenth Circuit's interpretation of section 1252c in *Vasquez-Alvarez*. We then explain why we agree with the Tenth Circuit that section 1252c does not in any respect preempt the inherent authority of the States to make arrests for violations of the immigration laws.

### A.

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat. 1214 (1996) ("AEDPA"). Section 439 of the AEDPA, entitled "Authorizing state and local law enforcement officials to arrest and detain certain illegal aliens," *id.* Title IV, § 439(a), 110 Stat. at 1276, is codified as section 1252c of title 8.

Section 1252c was proposed by Representative Doolittle as a floor amendment to H.R. 2703, 104th Cong. (1996), an earlier version of the AEDPA. *See* 142 Cong. Rec. 4619 (Mar. 13, 1996) (comments of Rep. Doolittle). The only legislative history of the provision is the floor debate that accompanied Representative Doolittle's introduction of the amendment. Representative Doolittle explained that his amendment was intended to address the problem of aliens who had been deported following criminal convictions but who return to the United States and commit more crimes:

In California alone, the INS deports thousands of illegal immigrants every year who have committed felonies in our State, and every year thousands of those same criminal aliens return back again. In fact, the California Department of Justice recently reported that 98 percent of all immigrants who are deported for

-8-

→ DISCLOSE

**DISCLOSE**

committing felonies in California will eventually return to the State, and of those, 40 percent will commit crimes again.

Unfortunately, this epidemic is not unique to urban areas, but has started to infest rural America as well. Just a few years ago, in the small rural community of Lincoln, [California,] which is located in my district, an illegal alien was found guilty of a driveby shooting, which was the first driveby shooting ever in that area. After spending a short time in prison, the criminal alien was deported out of the country by the INS. Now, despite his deportation, he returned to the area after only 1 week and, without hesitation, committed another crime.

With such a threat to our public safety posed by criminal aliens, one would think that we would give law enforcement all the tools it needs to remove these criminals from our streets, but unfortunately just the opposite is true. In fact, the Federal Government has tied the hands of our State and local law enforcement officials by actually prohibiting them from doing their job of protecting public safety. I was dismayed to learn that the current Federal law prohibits State and local law enforcement officials from arresting and detaining criminal aliens whom they encountered through their routine duties.

. . .

Mr. Chairman, you will be interested to know that shortly before my district was victimized for the second time by this criminal alien I spoke of earlier, an area police officer actually stopped him for a traffic violation. With my amendment the police officer would have been able to put him in jail for being back in the country illegally until the INS could take him into Federal custody. Without it, the officer had to release him, and our area became the victim of yet another crime.

. . .

[M]y amendment is very narrow and only covers situations in which the State or local officer encounters criminal aliens within his routine duties. In addition, the subject can only be held if the State or local police have obtained appropriate confirmation from the INS of the illegal status of the individual. Only confirmed criminal aliens are at risk of being taken into custody.

142 Cong. Rec. 4619. The Senate adopted the new provision without discussion. *See* 142 Cong. Rec. 7433-67 (Conference Report on S. 735, 104th Cong. (1996)).

-9-

→ **DISCLOSE**

## B.

The only case to address whether section 1252c preempts state arrest authority is the Tenth Circuit's 1999 decision in *Vasquez-Alvarez*.[1] In that case, Oklahoma police arrested the defendant because he was an "illegal alien." *Vasquez-Alvarez*, 176 F.3d at 1295. It was later discovered that the alien had illegally reentered the country after deportation, in violation of section 1326 of title 8, a criminal violation. When the government indicted the defendant, he moved to suppress his post-arrest statements, fingerprints, and identity, arguing that he was arrested in violation of section 1252c. The defendant contended that state and local police officers could arrest an illegal alien only in accordance with the restrictions set forth in section 1252c and that his arrest did not comport with that provision and was therefore unauthorized.

The Tenth Circuit concluded, however, that section 1252c "does not limit or displace the preexisting general authority of state or local police officers to investigate and make arrests for violations of federal law, including immigration laws. Instead, section 1252c merely creates an additional vehicle for the enforcement of federal immigration law." *Vasquez-Alvarez*, 176 F.3d at 1295. Citing its earlier decision in *Salinas-Calderon*, the court observed that it had "held that state law-enforcement officers have the general authority to investigate and make arrests for violations of federal immigration laws." *Vasquez-Alvarez*, 176 F.3d at 1296. The court noted that in addition to this general background authority, Oklahoma law permitted local law enforcement officers to make arrests for violations of federal law.

The Tenth Circuit found no congressional intent in the text of section 1252c to preempt existing state authority to enforce federal immigration laws. *See id.* at 1297-98. The court further opined that the legislative history of section 1252c supported its conclusion. Citing the comments of Representative Doolittle reproduced *supra*, the court stated that "the purpose of § 1252c was to displace a perceived federal limitation on the ability of state and local officers to arrest aliens in the United States in violation of Federal immigration laws." *Id.* at 1298-99. The court noted that Representative Doolittle, the defendant, the government, and the court had not "identif[ied] any pre-§ 1252c limitations on the powers of state and local officers to enforce federal law," *Id.* at 1299 n.4. The court concluded that the "legislative history does not contain the slightest indication that Congress intended to displace any preexisting enforcement powers already in the hands of state and local officers." *Id.* at 1299.

The court also relied on the fact that after enacting section 1252c, "Congress passed a series of provisions designed to encourage cooperation between the federal government and the states in the enforcement of federal immigration laws." *Id.* at 1300 (citing 8 U.S.C. §§ 1103(a)(9), (c), 1357(g) (2000)). The court noted that section 1357(g)(10)(B) states that no formal agreement is necessary for state and local officers "to cooperate with the Attorney General

---

[1] The only other published opinion that cites section 1252c is *United States v. Villa-Velazquez*, 282 F.3d 553, 555-56 (8th Cir. 2002), in which the Eighth Circuit ruled that a local officer had authority to arrest an alien for a criminal violation.

-10-

**DISCLOSE**

in the identification, apprehension, detention, or removal of aliens not lawfully present in the
United States." 8 U.S.C. § 1357(g)(10)(B). The court concluded that these provisions "evince[]
a clear invitation from Congress for state and local agencies to participate in the process of
enforcing federal immigration laws." *Vasquez-Alvarez*, 176 F.3d at 1300. The court
acknowledged that "it might be argued that [the court's] interpretation of § 1252c leaves the
provision with no practical effect," *id.*, but the court said that this reason alone was insufficient
grounds for the court to find that the provision preempted state law. *See id.*

C.

We agree with the Tenth Circuit that section 1252c has no preemptive effect. For the
reasons explained above, we begin with a strong presumption against construing a federal statute
"to deny to [the INS] any help that the states may allow." *Marsh*, 29 F.2d at 174. Nothing in the
text of section 1252c undercuts this presumption. On the contrary, section 1252c, by its terms,
does not purport to override any pre-existing state arrest authority. Rather, it accepts state arrest
authority as a given by providing federal "authoriz[ation]" only "to the extent permitted by
relevant State and local law." 8 U.S.C. § 1252c(a). And it purports only to override any federal
law ("Notwithstanding any other provision of law") that would deprive state police of the ability
"to arrest and detain an individual who—(1) is an alien illegally present in the United States; and
(2) has previously been convicted of a felony in the United States and deported or left the United
States after such conviction." *Id.* Thus, in context, the federal *authorization* that section 1252c
provides ("State and local law enforcement officials *are authorized* to arrest and detain") is
expressly redundant of, and dependent on, existing state authority. *Id.* (emphasis added). It is
true that section 1252c proceeds to specify two conditions that state police operating pursuant to
it must satisfy -- namely, obtaining prior confirmation from the INS of the individual's
immigration status and transferring such individual promptly into federal custody. But these two
conditions apply only to the federal authorization under section 1252c; they do not, by their
terms, apply to an exercise of state arrest authority.

It might be objected that our reading of section 1252c would appear to render it
meaningless. We think not, for at least two reasons. First, section 1252c provides a limited
safeguard against any other provision of federal law (current or future) being construed or applied
to preempt state arrest authority for immigration violations that involve illegal presence. If, for
example, a court were otherwise inclined (per the Ninth Circuit's assumption in dicta in
*Gonzales*) to misconstrue the provisions of the INA as preempting state authority to arrest for
civil deportability, section 1252c would operate to ensure that state police at least retained the
authority to make such arrests of aliens who had previously been convicted of a felony and had
been deported or had left the United States after such conviction. Second, there could well be
reasons why state police would choose to operate pursuant to section 1252c with respect to such
aliens (and might even operate as though section 1252c applied with respect to non-felon aliens),
rather than pursuant to their unrestricted state-law authority. For example, state police might
believe that doing so would foster a mutually beneficial relationship of trust and cooperation with
the INS and thereby deter the INS from exercising its regulatory authority to preempt state arrest

-11-

DISCLOSE

authority.[1]

We further note that if section 1252c were somehow to be read to preempt state arrest authority, it would appear that the preemptive effect would have to extend to all state arrests for violations involving illegal presence in the United States. In other words, for all such violations, state police would be able to arrest only those aliens who were felons and who had left the United States after being convicted. Because such aliens are not readily identifiable visually, this would mean "that there is no means of securing offenders caught in flagrante" – whether they were felons or not – "a result which would so impair the execution of the laws that it seems to us incredible it should have been intended." *Marsh*, 29 F.2d at 174. The fact that nothing in the legislative history of section 1252c remotely suggests such an intent confirms our rejection of such a reading.

DISCLOSE

[1] Insofar as state police choose to operate pursuant to section 1252c, we believe that section 1252c does not constitute an unconstitutional delegation of federal executive authority to state police. Under section 1252c, the role played by state police is limited to arrest and detention and is clearly under the direction of federal authorities: among other things, state and local officers may arrest an individual only after "obtain[ing] appropriate confirmation from the [INS] of the status of such individual and only for such period of time as may be required for the [INS] to take the individual into Federal custody." 8 U.S.C. § 1252c. We therefore believe that state police acting pursuant to section 1252c are subject to "meaningful Presidential control." *Printz v. United States*, 521 U.S. 898, 922-23 (1997).

-12-



### V.

We summarize our conclusions: (1) States have inherent power, subject to federal preemption, to make arrests for violation of federal law. (2) Because it is ordinarily unreasonable to assume that Congress intended to deprive the federal government of whatever assistance States may provide in identifying and detaining those who have violated federal law, federal statutes should be presumed not to preempt this arrest authority. This Office's 1996 advice that federal law precludes state police from arresting aliens on the basis of civil deportability was mistaken. (3) Section 1252c does not preempt state authority to arrest for federal violations.

**DISCLOSE**

Jay S. Bybee
by M. Edward Welsh III

Jay S. Bybee
Assistant Attorney General

**DISCLOSE**

-13-