Tony West
Assistant Attorney General
Dennis K. Burke
United States Attorney
Arthur R. Goldberg
Assistant Director, Federal Programs Branch
Varu Chilakamarri (NY Bar #4324299)
Joshua Wilkenfeld (NY Bar #4440681)
U.S. Department of Justice, Civil Division
20 Massachusetts Avenue, N.W.
Washington, DC 20530
Tel. (202) 305-7920/Fax (202) 616-8470
joshua.i.wilkenfeld@usdoj.gov
*Attorneys for the United States*

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| The United States of America,<br><br>Plaintiff,<br><br>v.<br><br>The State of Arizona; and Janice K. Brewer, Governor of the State of Arizona, in her Official Capacity,<br><br>Defendants. | No. 2:10-cv-1413-PHX-SRB<br><br>**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |

**INTRODUCTION**

On July 28, 2010, two days after Defendants filed their motion to dismiss, this Court granted the United States a preliminary injunction, instantly undercutting Defendants' motion. *See* Order of July 28, 2010 (Doc. 87) ("PI Order"). The PI Order specifically held that the United States was "likely to succeed on the merits in showing that [various] Sections of S.B. 1070 [as amended by H.R. 2162] are preempted by federal law," and therefore this Court enjoined the enforcement of Section 2(B), Section 3, Section 5 ( A.R.S. § 13-2928(C)), and Section 6 (the "Enjoined Provisions"). PI Order at 4, 36.[1] Thus, with respect to the Enjoined Provisions, this Court has already found that the United States has a likelihood of success – a showing that exceeds what is required to survive a motion to dismiss.

In addition, the United States has also stated a sufficient claim for relief with respect to Section 5 (A.R.S. § 13-2929) and A.R.S. § 13-2319 (against which the United States did not seek a preliminary injunction). Because this Court has already determined that the United States presented a viable constitutional challenge to the Enjoined Provisions, and because the Complaint has otherwise sufficiently stated a claim with respect to Sections 2 through 6 of S.B. 1070,[2] this Court should deny Defendants' motion to dismiss.

**LEGAL STANDARD**

In evaluating a motion to dismiss, this Court should "accept all allegations of material fact in the complaint as true and construe them in the light most favorable to the nonmoving party." *See Diaz v. Int'l Longshoremen's & Warehousemen's Union, Local 13*, 474 F.3d 1202, 1205 (9th Cir. 2007) (internal citations omitted). The Complaint need only "state[] a plausible claim for relief" to survive a motion to dismiss. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

---

[1] A detailed description of S.B. 1070 is presented in the United States' Motion for a Preliminary Injunction (Doc. 27) ("PI Motion").

[2] The motion to dismiss does not challenge the United States' claims with respect to Section 1 of S.B. 1070. Section 1, although largely a statement of intent, additionally affirms that the statute as a whole sets out a state-specific immigration policy, which raises sufficiently preemption concerns to survive a motion to dismiss. *See* PI Motion at 13-25.

1

# ARGUMENT

## I. The Motion to Dismiss Should Be Denied Because This Court Has Already Ruled That Plaintiff is Likely to Succeed on the Merits

It is well established that the showing required for obtaining a preliminary injunction is greater than the showing required to survive a motion to dismiss, or put otherwise, the issuance of a preliminary injunction necessarily means that plaintiff has stated a cognizable claim.[3] Accordingly, because this Court has already granted a partial preliminary injunction, this Court should deny Defendants' motion to dismiss.

Here, the United States' Complaint alleged that "[s]ections 1-6 of S.B. 1070, taken in whole and in part, . . . . violate the Supremacy Clause and are invalid." Complaint ¶¶ 62-63. The United States asserted, *inter alia*, that S.B. 1070 works as an integrated whole to create a separate immigration policy for the State of Arizona which conflicts with federal immigration law and interferes with the United States Government's conduct of foreign affairs and immigration policy. In preliminarily enjoining certain sections of S.B. 1070, this Court held as a matter of law that the United States was likely to prevail on many aspects of that claim. In doing so, this Court rejected many of the same arguments that are now

---

[3] *See, e.g.*, *De La Cruz v. Tormey*, 582 F.2d 45, 48 (9th Cir. 1978) (explaining that "[t]he issue [in evaluating a motion to dismiss] is not whether a plaintiff's success on the merits is likely but rather whether the claimant is entitled to proceed beyond the threshold in attempting to establish his claims"); *World Wide Rush, LLC v. City of Los Angeles*, 579 F. Supp. 2d 1311, 1316 (C.D. Cal. 2008), *rev'd on other grounds*, 606 F.3d 676 (9th Cir. 2010) (rejecting motion to dismiss because the "case involve[d] no disputed facts and Defendants have provided no persuasive reason why the Court should deviate from its decision granting Plaintiffs' motion for preliminary injunction"); *Radical Prods., Inc. v. Sundays Distrib.*, 821 F. Supp. 648, 651 (W.D. Wash. 1992) ("[T]his Court concludes that RPI has demonstrated likelihood of success on the merits . . . . THEREFORE, defendant's motion to dismiss for failure to state a claim is denied."); *see also Brosnahan v. JPMorgan Chase Bank*, 2010 U.S. Dist. LEXIS 51633, at *9-10 (D. Ariz. 2010) ("Because the Court has found that Plaintiff failed to state a cognizable claim in his Complaint, he necessarily cannot demonstrate a likelihood of success on the merits."); *Wills v. Tilton*, 2009 U.S. Dist. LEXIS 43405 (E.D. Cal. 2009) ("The Court's finding that Plaintiff failed to state a claim indicates that he is unable to show a likelihood of success on the merits.").

2

advanced in Defendants' motion to dismiss.[4] Accordingly, on that basis alone, the motion to dismiss must be denied.

## II. The United States Has Alleged Cognizable Challenges to S.B. 1070

Beyond the fact of the issuance of the PI Order, this Court should reject Defendants' motion to dismiss because, as discussed in the PI Motion, Sections 2 through 6 of S.B. 1070 represent unconstitutional efforts to set a unique, state-specific immigration policy and otherwise interfere with the federal immigration laws.

### A. The United States Is Likely to Succeed on Its Challenge to the Enjoined Provisions and Thus Has Stated a Claim With Respect to These Sections.

The PI Order definitively resolves the sufficiency of the United States' claims with respect to the Enjoined Provisions.

#### 1. The United States Has Presented a Cognizable Challenge to Section 2

Defendants first argue that the United States has failed to state a colorable challenge to the constitutionality of Section 2 of S.B. 1070. Def. Mot. at 7-8. However, as this Court correctly held in the PI Order, the United States is likely to prevail in this preemption challenge because Section 2(B) "is likely to burden legally-present aliens" and further "is likely to impermissibly burden federal resources and redirect federal agencies away from the priorities they have established." PI Order at 17; *see also id.* at 20-21.

First, Section 2 creates an unprecedented mandatory verification scheme which conflicts with federal law because it necessarily imposes substantial burdens on lawful immigrants in a way that frustrates Congress's "traditional policy of not treating aliens as a thing apart." *Hines v. Davidowitz*, 312 U.S. 52, 73-74 (1941); *see* PI Order at 16, 20.

---

[4] The vast majority of the arguments presented in the motion to dismiss were also presented in Defendants' opposition to the PI Motion. *See* Response to PI Motion (Doc. 63) ("PI Response"). Thus, the United States incorporates the arguments presented in its PI Motion herein.

3

Defendants do not deny that Section 2 will result in the harassment of lawfully present aliens and their motion to dismiss must therefore be rejected.[5]

Second, as this Court discussed, Section 2's mandatory immigration status verification scheme will necessarily result in a dramatic increase in the number of immigration status requests to be issued from Arizona police to the federal government. *Id.* at 16. This scheme will necessarily burden federal resources and "divert resources from the federal government's other responsibilities and priorities," PI Order at 17, 20-21, and is therefore preempted. *See, e.g., Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 349-51 (2001); *Garrett v. City of Escondido*, 465 F. Supp. 2d 1043, 1057 (S.D. Cal. 2006); *Kobar v. Novartis Corp.*, 378 F. Supp. 2d 1166, 1173-74 (D. Ariz. 2005).[6] Thus, the United States has successfully stated a claim by alleging that Section 2's mandatory verification scheme will create an unprecedented quantity of verification demands that will impermissibly shift the allocation of federal resources away from federal priorities.[7]

---

[5] Defendants suggest that Section 2 is immune from a preemption challenge because the mandatory verification scheme is premised on "reasonable suspicion" of unlawful presence. Def. Mot. at 7. However, as this Court noted, Section 2 also demands alien status verification in the case of every arrest – regardless of "reasonable suspicion" as to unlawful presence. *See* PI Order at 14-15. In addition, the risk of harassment is present even in cases where Section 2 is triggered by an officer's "reasonable suspicion" of unlawful presence because "the requirement of reasonable suspicion is not a requirement of absolute certainty," *N.J. v. T.L.O.*, 469 U.S. 325, 346 (1985), meaning that many lawfully present aliens will be subjected to Section 2. Many factors used to support a "reasonable suspicion" of unlawful presence could also apply to lawfully present aliens. *See* PI Motion at 27-28. Further, as this Court held, "[c]ertain categories of people . . . will not have readily available documentation of their authorization to remain in the United States, thus potentially subjecting them to arrest or detention," in violation of *Hines*. PI Order at 20. Accordingly, the United States has sufficiently alleged that Section 2 will result in the harassment of lawfully present aliens by a state government.

[6] Defendants contend, and the government has noted (PI Motion at 6-7), that the federal government has encouraged some forms of cooperation between state and federal authorities with respect to immigration enforcement. Def. Mot. at 7-8. However, Section 2 exceeds a state's traditional cooperative role by removing police discretion and "making immigration status determinations mandatory." PI Order at 20. The mandatory verification scheme of Section 2 dramatically increases the quantity of verification requests to the point of interference with federal functions that is no longer cooperative.

[7] To the extent that Section 2(H) renders state and local government agencies liable for failing to *mandate* immigration verification, it is preempted for the same reasons
(continued...)

**2. The United States Has Presented a Cognizable Challenge to Section 3**

As this Court held, the "current federal alien registration requirements create an integrated and comprehensive system of registration," which preempts S.B. 1070's attempt to enact parallel state registration regulations. PI Order at 22; *see also* 8 U.S.C. §§ 1301-1306. In *Hines*, the Supreme Court recognized that:

> [T]he federal government . . . has enacted a complete scheme of regulation . . . for the registration of aliens, [and] states cannot, inconsistently with the purpose of Congress, conflict or interfere with, curtail or complement, the federal law, or enforce additional or auxiliary regulations.

312 U.S. at 66-67.[8] The Court found that federal alien registration laws manifest Congress's intent to monitor aliens through a system that would be "uniform," "single," "integrated," and "all-embracing." *Id.* at 74. Section 3 conflicts with this federal goal of uniformity and singularity by creating state-specific crimes based on federal registration requirements.

Defendants contend that Section 3 simply "reinforces" Congress's objectives by "permitting Arizona to impose penalties that are no more than the penalties federal law imposes." Def. Mot. at 9. Defendants' argument ignores the underlying holding of *Hines*, which precluded states from supplementing the federal alien registration scheme, even if such regulations appear to "complement" that scheme. *See, e.g., Hines*, 312 U.S. at 66-67.[9] Section 3 enacts this type of prohibited "complement[ary]" regulation, by creating auxiliary penalties for violations of the federal alien registration laws. Indeed, as this Court explained,

---

[7] (...continued)
discussed in connection with Section 2(B). Similarly, although Section 2(A) would not be preempted if it merely prohibits localities from banning cooperation between local law enforcement and the federal government, the law would be preempted to the extent it mandates activities of the type required by Section 2(B).

[8] *Hines* considered the requirements imposed by the Alien Registration Act of 1940, 54 Stat. 670. Sections 1304 and 1306 were adopted in 1953 as part of the INA, which "incorporate[d] in substance the provisions of the Alien Registration Act, 1940." H.R. Rep. 82-1365, 2d Session, 1952, 1952 U.S.C.C.A.N. 1653, 1723.

[9] *See also Wisconsin Dep't of Indus., Labor and Human Relations v. Gould, Inc.*, 475 U.S. 282, 286 (1986) ("[C]onflict is imminent whenever two separate remedies are brought to bear on the same activity" (internal quotation marks omitted)); *Pennsylvania v. Nelson*, 350 U.S. 497, 507 (1956) ("Alien registration is not directly related to control of undesirable conduct; consequently there is no imperative problem of local law enforcement.").

"[w]hile Section 3 does not create additional registration requirements, the statute does aim to create state penalties and lead to state prosecutions for violations of the federal law" and "alters the penalties established by Congress under the federal registration scheme." PI Order at 22.[10]

Despite Defendants' claims, it is no defense that Section 3 supposedly "does not apply" aliens authorized to remain in the country, Def. Mot. at 9, because Section 3 still functions as an auxiliary penalty for federal alien registration violations, and therefore violates the rule of *Hines*.[11] As this Court found in granting a preliminary injunction, Section 3 "stands as an obstacle to the uniform, federal registration scheme and is therefore an impermissible attempt by Arizona to regulate alien registration." PI Order at 23. Thus, the United States has stated more than a sufficient claim against Section 3.

---

[10] Defendants' assertion that state law can always mandate compliance with federal law absent an express preemption clause fares no better. Def. Mot. at 9. *First*, *In re Jose C.*, 198 P.3d 1087 (Cal. 2009), cited by Defendants, presented very different circumstances. That case involved juvenile delinquency proceedings in which a state court adjudicated violations of federal immigration law, and held that such proceedings were not preempted because a federal statute – the Delinquency Prevention Act – established a presumption that juveniles alleged to have violated federal criminal law would have their proceedings in state juvenile court. *See* 198 P.3d at 1100. Congress has enacted no comparable presumption in favor of state proceedings for registration violations. *Second*, although Defendants contend that Congress has "amended the INA at least a dozen times since 1952 and never expressly preempted concurrent state regulation," Def. Mot. at 10 n.9, they have failed to point to Congress's "awareness" of any state alien registration laws since *Hines*, nor do they cite any such state regulation. Further, the fact that Congress has – in Defendants' words – "invited" states to reinforce alien classifications for specific statutory purposes, *see* Def. Mot. at 10, but Congress has not invited states to reinforce the penalties for violating federal registration provisions, only bolsters Plaintiff's argument concerning congressional intent.

[11] Further, Section 3's exception for aliens authorized to remain in the United States, *see* A.R.S § 13-1509(F), simply begs the question as to how and when the state will determine whether a suspected unlawfully present alien maintains such "authorization." As explained in the PI Motion, there are many categories of aliens who will not have the requisite registration documentation and who will therefore be susceptible to harassment by way of stops, arrests, and prosecutions under Section 3, but whom the United States would not remove or prosecute for registration violations. *See* PI Motion at 26-27, 38-39; PI Order at 18-19. Moreover, the fact that Section 3 targets unlawfully present aliens does not save it from scrutiny. Rather, it confirms that Section 3 is a thinly veiled attempt to criminalize unlawful presence, and therefore is at odds with the policy objectives of Congress, which has repeatedly rejected attempts to criminalize unlawful presence. *See infra*; PI Motion at 37-38.

### 3. The United States Has Presented a Cognizable Challenge to Ariz. Rev. Stat. 13-2928 (Section 5)

As they did in opposing the PI Motion, Defendants argue that the United States has failed to state a cognizable challenge to Ariz. Rev. Stat. 13-2928, which makes it a new state crime for any person who is "unauthorized" and "unlawfully present" in the United States to solicit, apply for, or perform work. S.B. 1070, Section 5(C)-(E); s*ee* Def. Mot. at 11-12; PI Response at 24-26. However, as this Court correctly held, this new employment crime is preempted because it interferes with "Congress['s] comprehensive[] regulat[ion] in the field of employment of unauthorized aliens," and Congress's "inten[tion] . . . not to penalize" the performance or solicitation of labor by unlawfully present aliens. *See* PI Order at 26-27.

The Immigration Reform and Control Act of 1986 ("IRCA") reflects Congress's deliberate choice *not* to criminally penalize unlawfully present aliens for performing work, much less for attempting to perform it.[12] As this Court recognized, IRCA's "comprehensive scheme" places primary emphasis on employer sanctions. *See* PI Order at 25; *see also Hoffman Plastic Compounds v. NLRB*, 535 U.S. 137, 147 (2002); *Lozano v. City of Hazleton*, 496 F. Supp. 2d 477, 524-25 (M.D. Pa. 2007). IRCA provides robust penalties for employers of unlawfully present aliens, and no criminal penalties for unlawfully present aliens who simply perform or solicit employment. *See* 8 U.S.C. § 1324a, *et seq.*[13] For this reason, the Ninth Circuit and this Court have both recognized that although Congress "discussed the merits of fining, detaining or adopting criminal sanctions against the *employee*, it ultimately

---

[12] *See Puerto Rico Dep't of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S. 495, 503 (1988) ("Where a comprehensive federal scheme intentionally leaves a portion of the regulated field without controls, then the pre-emptive inference can be drawn – not from federal inaction alone, but from inaction joined with action."); *Adkins v. Mireles*, 526 F.3d 531, 539 (9th Cir. 2008) ("State law may constitute an impermissible obstacle to the accomplishment of purposes of Congress by regulating conduct that federal law has chosen to leave unregulated." (internal quotation marks omitted)).

[13] In addition to its many provisions targeting employers, Congress enacted a very targeted set of sanctions against certain conduct of unauthorized aliens, such as the presentation of fraudulent documents to demonstrate work eligibility. *See* 8 U.S.C. § 1324c.

7

rejected all such proposals. . . . Instead, it deliberately adopted sanctions with respect to the *employer* only." *See* PI Order at 25-26 (quoting *Nat'l Ctr. for Immigrants' Rights v. INS*, 913 F.2d 1350, 1368 (9th Cir. 1990)). IRCA therefore embodied a "congressional policy choice [that was] clearly elaborated" in favor of sanctions only for the employer. *Nat'l Ctr. for Immigrants' Rights*, 913 F.2d at 1370.

By attempting to override Congress's conscious decision not to criminally punish unlawfully present aliens for soliciting or performing work, Arizona has created a clear conflict with federal law. *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 380 (2000); *Puerto Rico Dep't of Consumer Affairs*, 485 U.S. at 503. Accordingly, as this Court ruled, the United States is likely to succeed on the merits of its challenge to A.R.S. § 13-2928, and has certainly stated a claim sufficient to survive the instant motion to dismiss.

**4. The United States Has Presented a Cognizable Challenge to Section 6**

Section 6, which adds A.R.S. § 13-3883(A)(5), allows Arizona peace officers to make warrantless arrests of anyone whom they have probable cause to believe "has committed any public offense that makes the person removable from the United States." As this Court explained, Section 6 would require Arizona officers to make multiple judgments of unique legal complexity that would result in the erroneous arrests of many aliens who could not legitimately be subject to removal.[14] Among other considerations, Section 6 depends on a threshold determination of whether a "public offense makes [a] person removable" – a determination that requires expertise regarding a complex corpus of immigration law. *See Padilla v. Kentucky*, 130 S. Ct. 1473, 1488 (2010) (Alito, J., concurring); *see* PI Order at 31-33. Because Section 6 demands an instantaneous judgment on removability – a matter which is the subject of intense training for federal officers and which lies squarely outside

---

[14] Moreover, the liability provision in § 2(H) may encourage officers to make arrests under this provision even when they are uncertain as to whether an alien has committed a public offense that makes the alien removable.

8

of Arizona peace officers' general expertise[15] – Arizona police officers will undoubtedly erroneously arrest many aliens who could not legitimately be subject to removal, resulting in "distinct, unusual and extraordinary" burdens on lawfully present aliens in violation of *Hines*, 312 U.S. at 65-66.

Defendants baldly assert that nothing in S.B. 1070 would require Arizona officers to make determinations regarding a person's removability. Def. Mot. at 13. But, as this Court held, the plain language of Section 6 permits a warrantless arrest for an offense "that makes the person removable." Defendants' claim that Arizona law enforcement will communicate with federal authorities regarding an alien's immigration status simply ignores the plain terms of Section 6, which – unlike several other sections of S.B. 1070 – was not amended by H.B. 2162 to require verification of immigration status with the federal government.[16] "Considering the substantial complexity in determining whether a particular public offense makes an alien removable from the United States . . . , there is a substantial likelihood that officers will wrongfully arrest legal residents under [Section 6]," PI Order at 33, and the United States has therefore successfully stated a claim with respect to Section 6.

### B. The United States Has Stated a Claim in Its Challenges to Arizona's Smuggling and Transportation Provisions.

The United States has also stated cognizable claims with respect to those challenged provisions that this Court did not enjoin: A.R.S. § 13-2929 (Section 5's transportation, harboring, concealing provision) and A.R.S. § 13-2319 (the "Smuggling Prohibition").[17]

---

[15] The federal government has exclusive authority to make a final determination as to whether the commitment of a crime by a lawfully present alien – state or federal – would render the alien removable from the United States. *See* 8 U.S.C. §§ 1182(a)(2), 1227(a)(2).

[16] Similarly, Defendants contend that the United States has failed to state a claim because there are "circumstances in which A.R.S. § 13-3883(A)(5) can be applied consistent with federal law." Def. Mot. at 13. But this Court's holding in preliminarily enjoining Section 6 – that "[u]nder any interpretation of the revisions to A.R.S. § 13-3883, it requires an officer to determine whether an alien's public offense makes the alien removable from the United States," PI Order at 32 – raises sufficient preemption concerns to reject the motion to dismiss the United States' challenge to Section 6.

[17] At the PI Hearing, the United States explained that it was not seeking a *preliminary*
(continued...)

9

### 1. The Federal Scheme Regulating the Terms and Conditions of Entry Preempts State Regulations Such as A.R.S. § 13-2929 and § 13-2319

As federal courts have held, state statutes purporting to regulate third parties who transport or harbor aliens – such as A.R.S. §§ 13-2929 and 13-2319 – are preempted by Congress's comprehensive regulation of this issue. Congress has explicitly regulated the smuggling, transportation, harboring, and concealment of aliens. *See, e.g.*, 8 U.S.C. § 1324.[18] The federal courts that have squarely addressed the merits of the preemption issue have recognized that Congress's scheme comprehensively regulates the terms and conditions of entry, including sanctions on third parties who aid in entry. *See Villas at Parkside Partners v. City of Farmers Branch*, 2010 WL 1141398, at *17-18 (N.D. Tex. 2010) (holding that § 1324 preempts state restrictions on rental housing for unlawfully present aliens); *Garrett*, 465 F. Supp. 2d at 1056 (enjoining an ordinance because of "serious concerns" of field preemption based on § 1324's anti-harboring provisions).[19]

---

[17] (...continued)
*injunction* of A.R.S. § 13-2319; however, the United States maintains its claim that A.R.S. § 13-2319 is preempted and seeks to have this provision held invalid. Hr'g Tr. 5:12-15. Section 4 of S.B. 1070 recodified the amended A.R.S. § 13-2319 as one element of the statute's "attrition through enforcement" policy. The United States' challenge to Sections 1-6 of S.B. 1070 includes a specific challenge to A.R.S. § 13-2319, as recodified by Section 4.

[18] Part VIII of Chapter 12 of the INA sets forth various penalties relating to unlawful entry, including criminal penalties on an alien who unlawfully enters the United States, 8 U.S.C. § 1325, as well as several provisions targeting those who assist in an alien's unlawful entry. *See* 8 U.S.C. § 1323 (penalizing persons for unlawfully bringing aliens into the United States); 8 U.S.C. § 1324 (penalizing persons for bringing in or harboring certain aliens); 8 U.S.C. § 1327 (penalizing persons who assist certain inadmissible aliens to enter the country); 8 U.S.C. § 1328 (penalizing the importation of aliens for immoral purposes). Collectively, the structure of these provisions demonstrates that Congress has fully occupied the field of regulating the terms and conditions of an alien's entry, and that this field includes penalties on third parties who assist or aid in that entry.

[19] Although two intermediate state court cases have held that A.R.S. § 13-2319 is not preempted – *see State v. Barragan Sierra*, 196 P.3d 879, 889 (Ariz. App. Div. 1 2008) and *Arizona v. Flores*, 188 P.3d 706, 711 (Ariz. App. Div. 1 2008) – those decisions are not controlling on this Court's resolution of this issue of federal law. Defendants also rely on the district court's preemption discussion in *We Are Am./Somos Am. v. Maricopa County*, 594 F. Supp. 2d 1104 (D. Ariz. 2009). But that case did not address the merits of the preemption argument. Based on the *Younger* abstention doctrine, the district court in *We Are*
(continued...)

10

The preemptive force of this federal scheme, of which § 1324 is a part, is driven not only by the comprehensiveness of the INA but also by the federal government's undisputedly exclusive control over the process of alien entry. Through the INA, Congress has created a comprehensive scheme relating to the terms and conditions of entry and residence. *See, e.g.*, *Fiallo v. Bell*, 430 U.S. 787, 796 (1977); *Lem Moon Sing v. United States*, 158 U.S. 538, 547 (1895); *see also De Canas v. Bica*, 424 U.S. 351, 359 (1976) ("The central concern of the INA is with the terms and conditions of admission to the country . . . . [The] comprehensiveness of legislation governing entry and stay of aliens was to be expected in light of the nature and complexity of the subject."). As multiple courts have recognized, § 1324's restrictions against the bringing, harboring, and concealing of illegal entrants form an integral part of Congress's scheme for regulating alien entry. *See, e.g.*, *United States v. Ozcelik*, 527 F.3d 88, 98 (3d Cir. 2008); *United States v. Lopez*, 521 F.2d 437, 440 (2d Cir. 1975) (Section 1324 designed "to assist in preventing aliens from entering or remaining in the United States illegally"). Indeed, in the context of discussing the comprehensive nature of the federal legislation governing the terms of entry, the Supreme Court in *De Canas* specifically contrasted Section 1324's smuggling concerns (which *De Canas* considered related to the INA's core concern of alien entry) with Section 1324's concern with alien employment (which, prior to IRCA, represented a relatively minor concern of the immigration laws).[20]

---

[19] (...continued)
*America* declined to address the merits of whether federal smuggling law preempted A.R.S. § 13-2319. *See id.* at 1116. Moreover, in the appeal of that decision, the Ninth Circuit specifically left the preemption question open. *We Are Am.*, 2010 WL 2781879, at * 1 (9th Cir. 2010) (noting only that it is not "readily apparent" that federal law preempts A.R.S. § 13-2319). And, of course, no court has addressed this issue with respect to A.R.S. § 13-2929.

[20] *See also United States v. Sanchez-Vargas*, 878 F.2d 1163, 1169 (9th Cir. 1989) ("§ 1324(a)(1) . . . presents a single comprehensive 'definition' of the federal crime of alien smuggling – one which tracks smuggling and related activities from their earliest manifestations (inducing illegal entry and bringing in aliens) to continued operation and presence within the United States (transporting and harboring or concealing aliens)."); *Fiallo*, 430 U.S. at 796 ("The conditions of entry for every alien . . . the right to *terminate hospitality*
(continued...)

A.R.S. § 13-2319 and Section 5 of S.B. 1070 purport to regulate the transportation, harboring, and concealment of unlawfully present aliens and are therefore preempted because they improperly regulate in an area in which Congress has fully occupied the field.

### 2. The United States Has Presented a Cognizable Challenge to A.R.S. § 13-2319, as Amended by Section 4

In addition, the United States has stated a preemption claim against Arizona's Smuggling Prohibition, because that provision is crafted to impose sanctions upon unlawfully present aliens and others in Arizona in a manner that conflicts with Congress's objectives regarding the treatment of aliens.

On its face, A.R.S. § 13-2319 prohibits the commercial transportation of two groups of people: (1) persons whom the transporter has reason to know are not "United States citizens, permanent resident aliens, or persons otherwise lawfully in this state," or (2) persons whom the transporter has reason to know "have attempted to enter, entered, or remained in the United States in violation of law." A.R.S. § 13-2319(F)(3).[21] The Smuggling Prohibition conflicts with congressional objectives in several ways.

*First*, A.R.S. § 13-2319 serves as a penalty for unlawful presence that goes well beyond the specific set of sanctions established by Congress. *See* PI Motion at 39-41. Congress has carefully crafted the types of consequences it wishes to impose on unlawful presence, by sanctioning unlawful presence through civil removal and by enacting specific, targeted restrictions on third party interactions with unlawfully present aliens, such as the prohibition on smuggling and on hiring unlawfully present aliens. Notably, Congress has affirmatively rejected measures that would subject aliens to any *criminal* penalty for mere

---

[20] (...continued) *to aliens*, the grounds on which such determination shall be based, have been recognized as matters solely for the responsibility of the Congress." (emphasis added)).

[21] Critically, the statute's use of the disjunctive "or" allows for application of the Smuggling Prohibition if an alien (or U.S. Citizen) meets *either* description. By the statute's plain terms, the criminal penalties apply where transportation has been provided to someone who is not a U.S. Citizen, lawful permanent resident, or otherwise lawfully in Arizona (an ambiguous term undefined by federal immigration law) and *also* where transportation has been provided to someone who, at some point, has "entered or remained in the United States in violation of law."

unlawful status, and has never barred aliens from accessing commercial transportation based on their status.[22] Because the use of commercial transportation is a natural byproduct of presence in the country (unlawful or lawful), the criminalization of this service for unlawfully present aliens – without regard to whether the transportation would "further" an alien's unlawful presence (8 U.S.C. § 1324) – is akin to a sanction on unlawful presence itself and is fundamentally at odds with Congress's calibrated scheme of sanctions for unlawful presence. *See Crosby*, 530 U.S. at 380; *Wells Fargo Bank N.A. v. Boutris*, 419 F.3d 949, 966 (9th Cir. 2005). Further, when coupled with Arizona's conspiracy laws, A.R.S. § 13-2319 allows for criminal sanctions on the alien himself for using transportation services.[23]

A.R.S. § 13-2319, particularly when construed to allow for "self-smuggling" prosecutions, is not "focuse[d] directly upon" and "tailored to combat" what are "essentially local problems," *De Canas v. Bica*, 424 U.S. 351, 356-57 (1976), but rather it criminalizes unlawful presence in an effort to regulate immigration directly.[24]

---

[22] Congress has repeatedly considered and rejected attempts to criminalize unlawful presence. *See* S. 2454, 109th Cong. §§ 206, 275 (2006); H.R. 4437, 109th Cong. § 203 (2005); *see also* PI Mot. at 38 (quoting Steinberg Decl. ¶ 34 ("United States immigration law – and our uniform foreign policy regarding treatment of foreign nationals – has been that the mere unlawful presence of a foreign national, without more, ordinarily will not lead to that foreign national's criminal arrest or incarceration. . . . This is a policy that is understood internationally and one which is both important to and supported by foreign governments.")).

[23] Indeed, a state prosecution under this provision would not require that the state even prove, as an element of the crime, that the travel was "in furtherance" of an immigration violation. Instead, Arizona law criminalizes the provision of *any* commercial transportation services – including taxis and buses – to an unlawfully present alien so long as some objective basis should trigger the driver's suspicion that the passenger is unlawfully present. *See* A.R.S. § 13-2319(A); *see Flores*, 218 Ariz. at 412.

[24] Beyond acting as a sanction for unlawful presence, A.R.S. § 13-2319 functions in the same improper way as Section 3 of S.B. 1070, in that it provides the state with a mechanism for prosecuting violators of what the state claims is the equivalent of a federal offense. Under A.R.S. § 13-2319, Arizona can detain, arrest, and prosecute aliens for "smuggling" themselves. However, as the United States explained in the PI Motion, there are certain categories of aliens who may be unlawfully present, but whom the United States nonetheless assists or otherwise channels to civil removal proceedings. For example, an alien who pays to be transported into the United States because he is fleeing religious persecution may be eligible for asylum, or a victim of trafficking may be eligible for certain forms of relief, and the federal government may exercise its discretion to assist such aliens rather than put them in jail, notwithstanding their illegal entry. PI Motion at 21-22. Arizona's
(continued...)

*Second*, on its face, the state improperly restricts the commercial transportation of those who are, or are seeking to be, lawfully present. Although the statute excludes U.S. Citizens and lawful permanent residents, it makes no exception for the many other categories of aliens who are lawfully present or otherwise authorized to remain in the United States, such as aliens who have been granted asylum or temporary protected status.[25] The statute similarly applies to a person who has *ever* "attempted to enter, entered, or remained in the United States in violation of law." Thus, by its plain terms, the Smuggling Prohibition would apply to a person who at some point unlawfully entered or was unlawfully present, even if he has since gained lawful status. Further, even if A.R.S. § 13-2319 does not directly restrict the transportation of such aliens, the statute imposes burdens on lawfully present aliens of the type rejected in *Hines*. 312 U.S. at 73-74. *See* PI Motion at 41-42.

### 3. The United States Has Presented a Cognizable Challenge to Ariz. Rev. Stat. 13-2929 (Section 5 of S.B. 1070)

The Complaint successfully states a claim as to Section 5 because that provision both impermissibly regulates immigration and violates the Commerce Clause.[26]

---

[24] (...continued) "smuggling" law interferes with this discretion by allowing Arizona to independently and indiscriminately prosecute aliens who happen to be in Arizona. Moreover, a conviction under A.R.S. § 13-2319 (for "self smuggling" or otherwise) would constitute a felony, which can have severe immigration related consequences for the alien by, for example, absolutely disqualifying an alien who may otherwise have been eligible for temporary protected status despite his initial unlawful entry or presence in this country. *See* 8 U.S.C. § 1254a(c)(2)(B).

[25] The statute carves out from liability people who are "lawfully present in [Arizona]." But that term does not have meaning under the immigration laws because immigration status is not a creature of state law. Accordingly, this provision does not limit the problematic reach of the Smuggling Prohibition. The provision's application to lawfully present aliens and aliens otherwise authorized to remain in the United States is reinforced by the absence of a provision similar to S.B. 1070 § 3(F), which limited that criminal prohibition from applying "to a person who maintains authorization from the federal government to remain in the United States." The absence of any comparable limitation in the Smuggling Prohibition demonstrates that Arizona intends the provision to cover even aliens whose presence has been accepted by the federal government.

[26] Although this Court declined to preliminarily enjoin A.R.S. § 13-2929, it is well settled that the denial of a preliminary injunction motion with respect to a certain claim does not necessitate dismissal of that claim. *See, e.g.*, *Harper v. Poway Unified Sch. Dist.*, 345 F. Supp. 2d 1096, 1119 (S.D. Cal. 2004).

*First*, the Complaint successfully states a preemption claim regarding Section 5 because Section 5 directly regulates immigration by allowing for the prosecution of aliens based on their unlawful presence. Just as with A.R.S. § 13-2319, Arizona courts can be expected to construe this provision in combination with Arizona's general conspiracy offense as allowing for prosecution of an unlawfully present alien for "conspiracy" to be transported or concealed (*see Barragan Sierra*, 196 P.3d a 888) – a framework that essentially criminalizes unlawful presence. As discussed in greater detail in the PI Motion, whatever powers a state may have to enact laws that incidentally or indirectly touch on aliens, a state may not criminalize unlawful presence.[27] *See De Canas*, 424 U.S. at 356-57; *see also* PI Motion at 38-41.

*Second*, Section 5 violates the Dormant Commerce Clause, which forbids state attempts to discourage or otherwise restrict the movement of people between states. The Supreme Court has adopted a two-tiered approach to analyzing whether state regulations run afoul of the Commerce Clause:

> [1] When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, we have generally struck down the statute without further inquiry. . . . [2] When, however, a statute has only indirect effects on interstate commerce and regulates evenhandedly, we have examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits.

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986). As discussed in the PI Motion (at 45-46), Arizona's prohibition on "encourag[ing] an alien to come to or reside in" Arizona violates the first tier of the Dormant Commerce Clause

---

[27] In the PI Order, this Court declined to construe Section 5 as a regulation of immigration, because the law does not explicitly govern admission, removal, or conditions of residence. PI Order at 28. However, when combined with Arizona's conspiracy statute, Section 5 *does* become a prohibited regulation of immigration, by criminalizing mere unlawful presence for any alien who "conspires" to be transported within the state. And this Court should construe Section 5 according to its expected interpretation by the Arizona state courts. *See Clements v. Pasadena Finance Co.*, 376 F.2d 1005, 1006 (9th Cir. 1967).

inquiry[28] by "restraining the transportation of persons . . . across its borders." *See Edwards v. California*, 314 U.S. 160, 172-73 (1941).

This Court advanced two reasons for denying the United States' preliminary injunction motion with respect to Section 5: first, because Section 5 does not explicitly "restrict or limit which aliens can enter Arizona," and second, because Section 5 merely "prohibits the transportation of people who are unlawfully present in the United States." PI Order at 29 & n. 19. The United States respectfully disagrees that these factors insulate Section 5 from a constitutional challenge. Although Section 5 targets those who encourage aliens to enter Arizona rather than directly targeting an alien seeking to enter Arizona, this aspect of Section 5 is virtually identical to the state law struck down by the Supreme Court in *Edwards,* which made it a criminal offense to "bring[ ]or assist[ ] in bringing into the State any indigent person who is not a resident of the State." 314 U.S. at 171. Just as with Section 5, which targets those who "[e]ncourage or induce" an alien "to come to" Arizona," the statute in *Edwards* did not target the indigent person, but instead criminalized the conduct of those who assisted with the interstate movement. Thus, the fact that Section 5 is not a restriction upon the alien does not make it any less impermissible.

---

[28] As set forth in *Brown-Forman Distillers Corp.*, a state regulation is *per se* invalid where it "directly regulates *or* discriminates against interstate commerce." *Id.* (emphasis added). Arizona primarily argues that Section 5 is not invalid because it does not discriminate against interstate commerce, and thereby ignores the other aspect of the *Brown-Forman* test for *per se* unconstitutionality. Def. Mot. at 16-17. However, as the Ninth Circuit has explained, "discrimination and economic protectionism are not the sole tests" under the Dormant Commerce Clause, and a "court should also . . . consider[] whether the statute directly regulates interstate commerce." *NCAA v. Miller*, 10 F.3d 633, 638 (9th Cir. 1993). A statute directly regulates interstate commerce where, as here, "the Statute is directed at interstate commerce and only interstate commerce." *Id.* Such a direct regulation of interstate commerce "is invalid *per se*, regardless of whether the state intended to inhibit interstate commerce." *Valley Bank of Nevada v. Plus System, Inc.*, 914 F.2d 1186, 1190 (9th Cir. 1990). Section 5 functions as such a direct regulation of interstate commerce because it explicitly targets the encouragement of interstate movement. Such a regulation is unconstitutional – even absent a discriminatory or protectionist motive. *See also Bowman v. Chi. & N. Ry.*, 125 U.S. 465, 493 (1888) (holding that a state law that barred the importation of alcohol was an invalid regulation of interstate commerce, even though alcohol itself was illegal within the state, and therefore the law could not be said to have discriminated or treated out-of-state interests less favorably than in state interests).

Similarly, the state regulation is not immunized from constitutional scrutiny because it targets the movement of aliens who are "unlawfully present." The Supreme Court has repeatedly made clear that the Commerce Clause is implicated by restrictions on the movement of aliens. *Henderson v. Mayor of N.Y.*, 92 U.S. 259, 270 (1876). The exclusive federal control over the interstate movement of aliens is not diminished because of an alien's unlawful presence. As the Supreme Court has held, "[a]ll objects of interstate trade merit Commerce Clause protection" and that "none is excluded by definition at the outset." *See City of Philadelphia v. New Jersey*, 437 U.S. 617, 622 (1978). Indeed, a state may not bar the importation of a product *even if* that product would be illegal to possess or sell once inside the state. *See Bowman*, 125 U.S. at 493 (invalidating state's bar on the importation of alcohol, which was itself illegal within the state, as a violation of the Commerce Clause).[29] Because the lawful status of an article of commerce has no bearing on a state's inability to control the importation of the product, an alien's unlawful presence does not permit Arizona to regulate that alien's interstate movement.[30] Accordingly, the United States has stated a sufficient claim against Section 5.

## **CONCLUSION**

For the foregoing reasons, the Court should deny Defendants' motion to dismiss.

DATED: August 26, 2010

>Respectfully Submitted,
>
>Tony West
>Assistant Attorney General

---

[29] The Supreme Court has repeatedly reaffirmed this restriction on state regulatory power. *See New Jersey*, 437 U.S. at 629; *Leisy v. Hardin*, 135 U.S. 100, 108-109 (1890).

[30] This Court also suggested that Section 5 did not raise Commerce Clause concerns because the statute "criminalizes specific conduct already prohibited by federal law." PI Order at 29 n.19. The United States respectfully disagrees with this equivalency. Federal law prohibits the "encourage[ment] or induce[ment of] an alien" to come to the United States. 8 U.S.C. § 1324(a)(1)(iv). This sanction is keyed to movement across an international border. Arizona, by contrast, criminalizes the encouragement of movement across *state* borders – a category of conduct that is not regulated by the purportedly analogous federal statute and that directly impedes interstate commerce.

Dennis K. Burke
United States Attorney

Arthur R. Goldberg
Assistant Director, Federal Programs Branch

*/s/ Joshua Wilkenfeld*
Varu Chilakamarri (NY Bar #4324299)
Joshua Wilkenfeld (NY Bar #4440681)
U.S. Department of Justice, Civil Division
20 Massachusetts Avenue, N.W.
Washington, DC  20530
Tel. (202) 305-7920/Fax (202) 616-8470
joshua.i.wilkenfeld@usdoj.gov
*Attorneys for the United States*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 26, 2010, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of Notice of Electronic Filing to the CM/ECF registrants on record in this matter.

/s/ *Joshua Wilkenfeld*
Joshua Wilkenfeld