1

2

3

4

5               IN THE UNITED STATES DISTRICT COURT

6                   FOR THE DISTRICT OF ARIZONA

7

8   United States of America,            )   No. CV 10-1413-PHX-SRB
                                          )
9                Plaintiff,               )   **ORDER**
                                          )
10  vs.                                   )
                                          )
11                                        )
    State of Arizona; and Janice K. Brewer,)
12  Governor of the State of Arizona, in her)
    official capacity,                    )
13                                        )
                 Defendants.              )
14  _____  )
                                          )
15  State of Arizona; and Janice K. Brewer,)
    Governor of the State of Arizona, in her)
16  official capacity,                    )
                                          )
17              Counterclaimants,         )
                                          )
18  vs.                                   )
                                          )
19  United States of America; United States)
    Department of Homeland Security; Janet)
20  Napolitano, Secretary of the United States)
    Department of Homeland Security, in her)
21  official  capacity;  the  United  States)
    Department of Justice; and Eric H. Holder)
22  Jr., Attorney General for the United States)
    Department  of  Justice,  in  his  official)
23  capacity,                             )
                                          )
24              Counterdefendants.        )
    _____  )
25
          The Court now considers the Counterdefendants' Motion to Dismiss Counterclaims
26
    ("MTD") (Doc. 154).
27

28

## I.   BACKGROUND

In April 2010, the Arizona Legislature enacted Senate Bill 1070, later modified by House Bill 2162 (collectively, "S.B. 1070"), a set of statutes and statutory amendments intended to "discourage and deter the unlawful entry and presence of aliens and economic activity by persons unlawfully present in the United States." S.B. 1070 § 1. On July 6, 2010, the United States filed a Complaint challenging the constitutionality of S.B. 1070. (Doc. 1, Compl.) The United States requested that the Court enjoin Arizona from enforcing S.B. 1070, arguing principally that the power to regulate immigration is vested exclusively in the federal government and that provisions of S.B. 1070 are preempted by federal law. (*See* Doc. 27, Pl.'s Mot. for Prelim. Inj.) The Court entered an Order preliminarily enjoining certain provisions of S.B. 1070 on July 28, 2010. (Doc. 87, July 28, 2010, Order at 4.) On February 10, 2011, Arizona and Governor Brewer (collectively, "Arizona") answered the United States' Complaint and also asserted Counterclaims against the United States, the Department of Homeland Security ("DHS"), the Secretary of the DHS ("Secretary"), the Department of Justice ("DOJ"), and the Attorney General. (Doc. 138, Ariz. and Governor Janice K. Brewer's Answer & Countercls.) Arizona asserts the following five counterclaims: failure and refusal to achieve and maintain "operational control" of the Arizona-Mexico border (Count One); failure and refusal to protect Arizona from invasion and domestic violence (Count Two); abdication of statutory responsibilities (enforcement of the federal immigration laws) (Count Three); declaratory relief regarding State Criminal Alien Assistance Program ("SCAAP") reimbursement obligations (Count Four); and declaratory relief under the Tenth Amendment (Count Five). (*Id.* at 16-55 ("Countercls.") ¶¶ 147-218.)

## II.   LEGAL STANDARDS AND ANALYSIS

The Counterdefendants now move to dismiss Arizona's Counterclaims pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (MTD at 1.) The Federal Rules of Civil Procedure require "only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555

1    (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)); *see also* Fed. R. Civ. P. 8(a)(2).

2    Thus, dismissal for insufficiency of a complaint is proper if the complaint fails to state a

3    claim on its face. *Lucas v. Bechtel Corp.*, 633 F.2d 757, 759 (9th Cir. 1980).

4              **A.       Standing**

5              The Counterdefendants argue that Arizona does not have standing to pursue Counts

6    One, Two, Three, and Five of the Counterclaims. (MTD at 14-15, 18 n.9; *see also* Doc. 169,

7    Counterdefs.' Reply in Supp. of MTD ("Reply") at 8.) The plaintiff has the burden of

8    establishing standing and must "'allege[] such a personal stake in the outcome of the

9    controversy' as to warrant [the] invocation of federal-court jurisdiction and . . . justify

10   exercise of the court's remedial powers."*Warth v. Seldin*, 422 U.S. 490, 498-99 (1975)

11   (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). In order to have standing, a plaintiff must

12   show (1) an "injury in fact" that is concrete and particularized and actual or imminent (not

13   conjectural or hypothetical); (2) that the injury is fairly traceable to the challenged action of

14   the defendant; and (3) that it is likely, as opposed to merely speculative, that the injury will

15   be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61

16   (1992); *see also Summers v. Earth Island Inst.*, 129 S. Ct. 1142, 1149 (2009).

17             The Counterdefendants do not dispute that Arizona has alleged an injury in fact

18   arising from illegal immigration. Indeed, Arizona alleges that it faces increased costs as a

19   direct result of illegal immigration into the state. (Countercls. ¶¶ 2, 6, 43, 110-22.) The

20   Counterdefendants do, however, dispute whether Arizona meets the two remaining

21   requirements for standing, arguing that the injury raised by Arizona is not fairly traceable to

22   the Counterdefendants' challenged actions and that the injury complained of in Count One

23   of the Counterclaims cannot be redressed because there is no remedy available. (MTD at 14;

24   Hr'g Tr. 7:1-7, July 28, 2011 ("Hr'g Tr.").)

25             In order to give rise to standing, an "injury has to be 'fairly . . . trace[able] to the

26   challenged action of the defendant, and not . . . th[e] result [of] the independent action of

27   some third party not before the court.'" *Lujan*, 504 U.S. at 560-61 (alteration in original)

28   (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976)). Where a plaintiff

alleges an injury arising from the government's failure to regulate third parties, the plaintiff must allege "facts showing that [the choices of the regulated third parties] have been or will be made in such manner as to produce causation and permit redressability of injury." *Id.* at 562.

Here, Arizona alleges injuries resulting from the costs incurred by the state as a result of the Counterdefendants' failure to adequately enforce the federal immigration laws and comply with their statutory duties. (Countercls. ¶¶ 2, 6, 43, 110-22.) According to Arizona, over forty percent of all illegal border crossings occur in Arizona and Arizona faces substantial costs as a result of the high number of unlawfully present aliens in the state. (*Id.* ¶¶ 2, 6.) Arizona alleges facts indicating that the conduct and choices of undocumented aliens illegally crossing into Arizona are directly influenced by federal immigration enforcement; as a result, the Court concludes that these alleged injuries are fairly traceable to the Counterdefendants' enforcement and immigration policies. (*See id.* ¶¶ 88-91, 111-12); *see Lujan*, 504 U.S. at 562; *cf. Massachusetts v. E.P.A.*, 549 U.S. 497, 524-25 (2007) (finding that where an actual injury was caused by third parties as a result of a failure of a governmental agency to regulate an identified activity, the injury was sufficiently traceable to the challenged governmental failure to regulate). In addition, although "the level of illegal immigration is dependent on many factors outside the control of the [United States]," Arizona's alleged injuries can be redressed because "an order against the named defendants would offer some relief to [Arizona]." *See Chiles v. United States*, 69 F.3d 1094, 1096 (11th Cir. 1995); *cf. Massachusetts*, 549 U.S. at 525-26 (finding that while the requested regulation would not eliminate the problem, it would reduce it sufficiently to meet the redressability requirement).[1] The Court presumes that Arizona has standing to raise the Counterclaims and

---

[1] While *Massachusetts* involved standing under a statute explicitly permitting individuals to sue to enforce the statute, the analysis of Article III's independent standing requirements in *Massachusetts* evaluated causation and redressability for an injury resulting from a government agency's failure to regulate the injurious activity and provides a useful approach to causation and redressability under these circumstances. *See Massachusetts*, 549 U.S. at 520-21, 523-27.

1    considers the merits of each claim in turn.

2          **B.     Issue Preclusion (Counts Two, Three, and Five)**

3          The Counterdefendants assert that the Court should dismiss Counts Two, Three, and

4    Five of Arizona's Counterclaims because the claims are barred by the doctrine of collateral

5    estoppel. (MTD at 5-8.) The doctrine of collateral estoppel, also known as issue preclusion,

6    bars the relitigation "'of an issue of fact or law actually litigated and resolved in a valid court

7    determination essential to the prior judgment,' even if the issue recurs in the context of a

8    different claim." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (quoting *New Hampshire v.*

9    *Maine*, 532 U.S. 742, 748-49 (2001)). Issue preclusion serves to "'relieve parties of the cost

10   and vexation of multiple lawsuits, conserve judicial resources, and, by preventing

11   inconsistent decisions, encourage reliance on adjudication.'" *United States v. Mendoza*, 464

12   U.S. 154, 158 (1984) (quoting *Allen v. McCurry*, 449 U.S. 90, 94 (1980)). The party asserting

13   issue preclusion must establish that (1) the issue previously decided is identical to the issue

14   sought to be relitigated; (2) the prior proceeding concluded with a final judgment on the

15   merits; and (3) the party against whom collateral estoppel is asserted was a party in the first

16   proceeding. *Hydranautics v. FilmTec Corp.*, 204 F.3d 880, 885 (9th Cir. 2000). Issue

17   preclusion may not apply to bar relitigation where "controlling facts or legal principles have

18   changed significantly since the prior judgment," or where "'other special circumstances

19   warrant an exception to the normal rules of preclusion.'" *Richey v. I.R.S.*, 9 F.3d 1407, 1410

20   (9th Cir. 1993) (quoting *Montana v. United States*, 440 U.S. 147, 155 (1979)).

21         In *Arizona v. United States*, CV 94-866-PHX-SMM (D. Ariz. 1995) ("*Arizona I*"),

22   Arizona asserted that the United States violated the Guarantee and Invasion Clauses of

23   Article IV, Section 4 of the United States Constitution by failing to protect Arizona from an

24   invasion of undocumented aliens. (*Arizona I*, Doc. 13, Am. Compl. ("*Arizona I* Am.

25   Compl.") ¶¶ 23-35.) Arizona also asserted in *Arizona I* that the United States violated the

26   Tenth Amendment by failing to effectively enforce immigration laws, forcing Arizona to

27   spend funds to incarcerate and provide services to undocumented aliens in Arizona. (*Id.* ¶¶

28   62-70.) Finally, Arizona also claimed that the United States "failed to properly enforce

immigration policies" and that this failure in enforcement was actionable. (*Arizona I*, Doc. 28, April 17, 1995, Order ("*Arizona I* Order") at 2 (characterizing Arizona's claims against the United States in *Arizona I*); *see also Arizona I* Am. Compl. ¶¶ 3, 6, 31-32.) The district court in *Arizona I* dismissed Arizona's claims on the merits. (*Arizona I* Order at 4-13.) The Ninth Circuit Court of Appeals affirmed the dismissal. *Arizona v. United States*, 104 F.3d 1095, 1096 (9th Cir. 1997) (affirming for the reasons set forth in *California v. United States*, 104 F.3d 1086 (9th Cir. 1997)); *California*, 104 F.3d at 1090-94.

Arizona does not dispute that the issues in Counts Two, Three, and Five were litigated in *Arizona I*, that the litigation concluded with a final judgment on the merits, or that Arizona was a party to the prior litigation. (*See* Doc. 162, Counterclaimants' Resp. to MTD ("Resp.") at 8-11.) Rather, Arizona argues that changed facts and circumstances prevent collateral estoppel from barring the instant litigation and that the constitutional issues raised by Arizona in the instant case should be addressed on their merits. (*Id.* at 9-10.) While "changes in facts *essential* to a judgment will render [issue preclusion] inapplicable in a subsequent action raising the same issues," a change in facts or circumstances that does not alter the factual predicate of the earlier action does not impact the preclusive effect of the earlier decision. *Montana*, 440 U.S. at 159 (emphasis added); *see also Starker v. United States*, 602 F.2d 1341, 1347-48 (9th Cir. 1979) (finding that where the legal and factual basis of the prior decision remain the same, preclusion will apply even if some facts differ). Here, Arizona asserts that changes in the controlling facts and applicable legal rules, including the fact that "[i]llegal immigration has exponentially increased since the mid-1990s" and "Congress has passed significant legislation intended to secure the Southwestern border," render issue preclusion inapplicable. (Resp. at 9-10.) The *Arizona I* decision did not depend in any way on an assessment of the scope of unlawful immigration or the federal immigration laws in place. *See Arizona I* Order at 4-12; *California*, 104 F.3d at 1090-95. The alleged factual and legal changes do not alter the factual or legal predicate of *Arizona I* and do not impact the preclusive effect of that decision. *See Montana*, 440 U.S. at 159.

Arizona asserts that the Counterclaims should be addressed on the merits because

"'other special circumstances warrant an exception to the normal rules of preclusion.'" (Resp. at 10 (quoting *Montana*, 440 U.S. at 155).) Arizona does not identify any special circumstances that would warrant an exception to the normal rules of preclusion or provide any substantive support for its assertion that an exception to preclusion is warranted. (*See id.*)[2] Arizona also argues that issue preclusion is inappropriate in this case because, "'where . . . a court . . . has enunciated a rule of law, the parties in a subsequent action upon a different demand are not estopped from insisting that the law is otherwise, merely because the parties are the same in both cases.'" (*Id.* (quoting *United States v. Moser*, 266 U.S. 236, 242 (1924)).) Preclusion may not be appropriate when "'unmixed questions of law' [arise] in successive actions involving substantially unrelated claims." *Montana*, 440 U.S. at 162 (quoting *Moser*, 266 U.S. at 242). However, a "question or right distinctly adjudged in the original action cannot be disputed in a subsequent action, even [if] the determination was reached upon an erroneous view or by an erroneous application of the law." *Moser*, 266 U.S. at 242. Here, the subject matter of the Counterclaims is closely related to the subject matter of *Arizona I*, the issues raised by Arizona were distinctly adjudged in *Arizona I*, and preclusion prohibits the relitigation of the legal issues that have already been resolved for the parties. *See Montana*, 440 U.S. at 162-63 (finding that preclusion was appropriate where legal issues, which were "closely aligned in time and subject matter," arose in successive actions); *Moser*, 266 U.S. at 242.

In *Arizona I*, Arizona litigated claims for violation of the Tenth Amendment and the Invasion Clause of Article IV, Section 4 of the United States Constitution. (*Arizona I* Order

---

[2] Arizona also asserts that the Counterclaims should not be precluded because "the Government initiated this litigation, which allow[s] Arizona to seek the redress set forth in its Counterclaims." (Resp. at 9.) Arizona fails to cite any law in support of this argument and the argument is ultimately unavailing. The Counterclaims are independent actions against the Counterdefendants and are not immune from the rules of preclusion. *See Seung Woo Lee v. Imaging3, Inc.*, 283 F. App'x 490, 493 (2008) (finding that claims raised as counterclaims were subject to the preclusion doctrines). The United States' initiation of the instant litigation, asking the Court to determine different legal issues, does not permit Arizona to relitigate issues already determined in prior litigation.

at 4-9.) Issue preclusion bars Arizona from attempting to relitigate these issues. Therefore, Count Five and the portion of Count Two asserting a violation of the Invasion Clause are barred. Arizona did not litigate a claim under the Domestic Violence Clause, nor did Arizona raise an independent claim for abdication of statutory responsibilities. As a result, these issues are not precluded. *See Eureka Fed. Sav. & Loan Ass'n v. Am. Cas. Co. of Reading, Penn.*, 873 F.2d 229, 233 (9th Cir. 1989) ("Collateral estoppel is inappropriate if there is any doubt as to whether an issue was actually litigated in a prior proceeding.").[3]

### C.    Failure to State a Cognizable Claim

#### 1.    Arizona's Constitutional Counterclaims (Counts Two and Five)

Even if Counts Two and Five were not barred by the doctrine of issue preclusion, binding precedent requires the dismissal of these claims in their entirety.

##### i.    Count Two

Arizona asserts that the Counterdefendants have violated Article IV, Section 4 of the United States Constitution by "fail[ing] and refus[ing] to protect Arizona from invasion and domestic violence" resulting from illegal immigration. (Countercls. ¶¶ 163, 165-68.) A political question is a "controvers[y] which revolve[s] around policy choices and value determinations constitutionally committed to the Congress or the Executive Branch, and [is] not subject to judicial review." *United States v. Mandel*, 914 F.2d 1215, 1222 (9th Cir. 1990). The United States Supreme Court has established the following six factors for determining

---

[3] The Counterdefendants assert in a footnote that the related doctrine of claim preclusion also prevents Arizona from raising any claims that could have been raised in *Arizona I.* (MTD at 6 n.2.) As the party asserting the defense of claim preclusion, the Counterdefendants bear the burden of demonstrating that the requirements of claim preclusion are met. *See Sturgell*, 553 U.S. at 907. The Counterdefendants do not attempt to demonstrate the identity of the claims or that the claims arise out of the same transactional nucleus of facts. (*See* MTD at 6 n.2); *see also ProShipLine Inc. v. Aspen Infrastructures Ltd.*, 609 F.3d 960, 968 (9th Cir. 2010) (laying out the test for determining the identity of claims for purposes of claim preclusion). In addition, courts have found that continuing conduct may give rise to a new claim not barred by claim preclusion. *See Harkins Amusement Enters., Inc. v. Harry Nace Co.*, 890 F.2d 181, 183 (9th Cir. 1989) (citing *Lawlor v. Nat'l Screen Serv. Co.*, 349 U.S. 322, 329 (1955)).

whether an issue presents a political question:

> "[1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question."

*Vieth v. Jubelirer*, 541 U.S. 267, 277-78 (2004) (quoting *Carr*, 369 U.S. at 217). If an issue implicates any one of these factors, it is a nonjusticiable political question. *Mandel*, 914 F.2d at 1222.

Arizona's claim for violation of the Invasion and Domestic Violence Clauses of Article IV, Section 4 presents a nonjusticiable political question. In *California*, the Ninth Circuit Court of Appeals found that claims that the United States violates the Invasion Clause by failing to prevent illegal immigration present nonjusticiable political questions. *California*, 104 F.3d at 1090-91. "[P]rotection of the States from invasion implicates foreign policy concerns which have been constitutionally committed to the political branches," and "there are no manageable standards to ascertain whether or when an influx of illegal immigrants should be said to constitute an invasion." *Id.* at 1091; *see also Chiles*, 69 F.3d at 1097 (concluding that "whether the level of illegal immigration is an 'invasion' of Florida . . . present[s] [a] nonjusticiable political question[]"). In addition, the Invasion Clause protects against "armed hostility from another political entity" and does not permit Arizona to sue the federal government for its alleged failure to protect the state from unlawful immigration. *See California*, 104 F.3d at 1091 (quotation and citation omitted); *see also New Jersey v. United States*, 91 F.3d 463, 468 (3d Cir. 1996).[4] This Court is bound by Ninth

---

[4] Arizona argues that the definition of "invasion" has changed since the drafting of the Constitution. (Counterrcls. ¶ 167.) However, in 1997, the *California* court conclusively determined that an almost identical Invasion Clause claim presented a nonjusticiable political question and that Article IV, Section 4's reference to "invasion" does not apply to a state's claim based on illegal immigration. *See California*, 104 F.3d at 1091.

1   Circuit precedent. Arizona's Invasion Clause claim is a nonjusticiable political question and

2   is therefore dismissed.

3        Similarly, Arizona's claim for violation of the Domestic Violence Clause also fails.

4   As an initial matter, the Domestic Violence Clause is meant to apply to "insurrection[s], riots,

5   and other forms of civil disorder." *United States v. Smith*, 171 F.3d 617, 626 (8th Cir. 1999);

6   *see also United States v. Cruikshank*, 92 U.S. 542, 556 (1875) (finding that the Domestic

7   Violence Clause does not apply to ordinary crimes). Arizona's factual allegations focus on

8   crime and violence of a general, apolitical nature and do not implicate the type of disorder

9   addressed by the Domestic Violence Clause. (*See* Countercls. ¶¶ 169-70.) Furthermore,

10  Arizona's claim under the Domestic Violence Clause presents a nonjusticiable political

11  question. It is well settled that the federal response to insurrection and rebellion in the states

12  is appropriately determined by the political branches. *See Georgia v. Stanton*, 73 U.S. 50, 60-

13  62 (1867); *Luther v. Borden*, 48 U.S. 1, 75-77 (1849). Arizona's claim implicates a federal

14  response that is appropriately reserved for the political branches. There are also no

15  manageable standards for ascertaining whether or when the presence of unlawfully present

16  aliens results in "domestic violence" within the meaning of Article IV, Section 4. *See*

17  *Stanton*, 73 U.S. at 60-62; *cf. California*, 104 F.3d at 1091 (discussing the political question

18  doctrine and determining that a claim by a state under the Invasion Clause presented a

19  political question); *see also Carr*, 369 U.S. at 223-24 (noting that, generally, Article IV,

20  Section 4 "is not a repository of judicially manageable standards" and that "challenges to

21  congressional action on the ground of inconsistency with that clause present no justiciable

22  question").

23        Arizona argues that "[b]y . . . filing suit to enjoin S.B. 1070, the Government has

24  waived any claim that the issue is nonjusticiable" and is estopped from asserting the political

25  question doctrine as a defense. (Resp. at 17-18.) However, "[t]he nonjusticiability of a

26  political question is primarily a function of the separation of powers." *Carr*, 369 U.S. at 210.

27  Further, "[w]hen . . . Article III limitations are at issue, notions of consent and waiver cannot

28  be dispositive because the limitations serve institutional interests that the parties cannot be

- 10 -

1   expected to protect." *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 851

2   (1986); *see also United States v. Finn*, 239 F.2d 679, 682-83 (9th Cir. 1956) (holding that

3   jurisdictional defects in counterclaims against the United States were not waived by the

4   United States' affirmative suit). Count Two presents a nonjusticiable political question.

5   Accordingly, Count Two of Arizona's Counterclaims is dismissed.

6                                    **ii.   Count Five**

7        Arizona asserts that, as a result of the federal government's failure to enforce

8   immigration laws and the preliminary injunction obtained in this case, which Arizona asserts

9   "effectively prohibits Arizona from exercising its police and other traditional state powers"

10  to address immigration, Arizona has been forced to expend state resources to "provide

11  education, medical care, and other benefits" to unlawfully present aliens and to protect state

12  trust lands, in violation of the Tenth Amendment. (Countercls. ¶¶ 199, 202; *see also id.* ¶¶

13  199-204; Resp. at 30.)

14       The Tenth Amendment prohibits Congress from "simply 'commandee[ring] the

15  legislative processes of the [s]tates by directly compelling them to enact and enforce a federal

16  regulatory program.'" *New York v. United States*, 505 U.S. 144, 161 (1992) (quoting *Hodel

17  v. Va. Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 288 (1981)). In addition,

18  courts have recognized the possibility that "extraordinary defects in the national political

19  process might render congressional regulation of state activities invalid under the Tenth

20  Amendment," where a state is "singled out in a way that le[aves] it politically isolated and

21  powerless" or where a state is "deprived of any right to participate in the national political

22  process." *South Carolina v. Baker*, 485 U.S. 505, 512-13 (1988); *see also Nuclear Energy

23  Inst., Inc. v. E.P.A.*, 373 F.3d 1251, 1305 (D.C. Cir. 2004). The Tenth Amendment is not

24  implicated where alleged state expenditures arise from state policies and activities and

25  independent constitutional obligations, rather than a federal mandate. *California*, 104 F.3d

26  at 1092-93; *see also Padavan v. United States*, 82 F.3d 23, 28-29 (2d Cir. 1996) (dismissing

27  Tenth Amendment claims based on state expenditures for social, educational, health, and

28  correctional services for persons unlawfully present in the United States); *Chiles*, 69 F.3d at

1097 (finding that "Florida's provision of benefits to [undocumented] aliens [was] not the product of federal coercion of the kind which violates the Tenth Amendment"). In *Arizona* and *California*, the Ninth Circuit Court of Appeals rejected Tenth Amendment claims based on the costs associated with incarcerating and providing services to unlawfully present aliens. *Arizona*, 104 F.3d at 1096; *California*, 104 F.3d 1092-93.

Arizona does not point to any federal immigration policy that mandates or compels Arizona to take any action. The complained of expenditures arise entirely from Arizona's own policy choices and independent constitutional obligations and are not incurred as a result of any federal mandate. These state costs do not give rise to a claim under the Tenth Amendment. *See California*, 104 F.3d at 1093.[5] In addition, Arizona asserts that "extraordinary defects in the national political process," deprive Arizona of the opportunity to participate in the national political process and that Arizona is singled out in a way that leaves it politically isolated and powerless. (*See* Countercls. ¶¶ 213-14). However, only the "congressional regulation of state activities" may be invalid under the Tenth Amendment as a result of "extraordinary defects in the national political process." *See Baker*, 485 U.S. at 512; *Nuclear Energy Inst.*, 373 F.3d at 1305 (finding that "the possibility that some extraordinary defects in the national political process might render congressional regulation . . . invalid under the Tenth Amendment [is] an issue only with respect to congressional regulation of state activity" (quotation and citation omitted)). Arizona does not identify any congressional regulation of state activity that may be invalid as a result of an extraordinary defect in the political process. *See Nuclear Energy Inst.*, 373 F.3d at 1305. Arizona fails to state a claim for violation of the Tenth Amendment. *See Arizona*, 104 F.3d at 1096; *California*, 104 F.3d at 1092-93. Accordingly, Count Five of Arizona's Counterclaims is

---

[5] Arizona argues that its Tenth Amendment claim is distinguishable from the claim rejected in *California* based on the "action" taken by the federal government in obtaining a preliminary injunction of portions of S.B. 1070. (Resp. at 32.) However, as in *California*, there is no federal mandate requiring Arizona to expend any funds. Arizona's financial burden still arises entirely from the state's own policies and independent constitutional obligations. *See California*, 104 F.3d at 1093.

1   dismissed.

2           **2.      Arizona's Statutory Counterclaims (Counts One, Three, and Four)**

3           Arizona also alleges that the Counterdefendants have failed to comply with and

4   enforce federal immigration law. (Countercls. ¶¶ 147-56, 177-83, 185-191.) Arizona requests

5   injunctive, declaratory, and mandamus relief to force the Counterdefendants to comply with

6   the immigration statutes, take certain actions to gain control of the border, and regulate

7   immigration. (*Id.* ¶¶ 157, 184, 192-93.) The parties agree that Arizona's statutory claims arise

8   under the Administrative Procedures Act ("APA"). (MTD at 15; Resp. at 11.)

9           The APA authorizes suit by a plaintiff "suffering legal wrong because of agency

10  action, or adversely affected or aggrieved by agency action within the meaning of a relevant

11  statute." 5 U.S.C. § 702. The APA permits judicial review of a "final agency action for which

12  there is no other adequate remedy in a court." *Id.* § 704. Under the APA, a reviewing court

13  must "hold unlawful and set aside agency action, findings, and conclusions found to be . . .

14  arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* §

15  706(2)(A); *see also Alvarado Cmty. Hosp. v. Shalala*, 155 F.3d 1115, 1121-22 (9th Cir.

16  1998). Review under the arbitrary and capricious standard is "highly deferential [and]

17  presum[es] the agency action to be valid." *Irvine Med. Ctr. v. Thompson*, 275 F.3d 823, 830-

18  31 (9th Cir. 2002). The APA also permits review of agency inaction "where a plaintiff asserts

19  that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v.

20  S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004). The APA permits a reviewing court to

21  "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). In

22  order to obtain an order compelling agency action, a plaintiff must show that the agency had

23  a non-discretionary duty to act and unreasonably delayed in acting on that duty. *Norton*, 542

24  U.S. at 63-65. The APA does not apply to permit judicial review or intervention where

25  "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Agency

26  action is committed to agency discretion where there are "no judicially manageable standards

27  . . . available for judging how and when an agency should exercise its discretion." *Heckler

28  v. Chaney*, 470 U.S. 821, 830 (1985).

1      ####     i.      Count One

2              In Count One of the Counterclaims, Arizona asserts a claim against the United States,

3      the DHS, and the Secretary for their alleged failure and refusal to achieve and maintain

4      "operational control" of the Arizona-Mexico border. (Countercls. ¶¶ 148-52.) Arizona asserts

5      that the Secure Fence Act, Pub. L. No. 109-367, 120 Stat. 2638 (2006) ("Secure Fence Act"),

6      and the Consolidated Appropriations Act of 2008, Pub. L. No. 110-161, 121 Stat. 1844

7      (2007) ("2008 Appropriations Act"), require the DHS and the Secretary to achieve and

8      maintain "operational control" of the border, report to Congress on the progress made to

9      obtain operational control, build at least 700 miles of fencing along the United States-Mexico

10     border, and install additional physical barriers and other infrastructure along the border. (*Id.*

11     ¶ 149.) Arizona argues that the identified actions are "required agency action unlawfully

12     withheld or unreasonably delayed[,] which [are] reviewable under 5 U.S.C. § 706(1)." (Resp.

13     at 11 (internal quotation omitted).) Arizona seeks injunctive, declaratory, and mandamus

14     relief requiring that the United States, the DHS, and the Secretary achieve and maintain

15     operational control of the Arizona-Mexico border, complete 700 miles of fencing, and take

16     temporary measures to protect Arizona. (Countercls. ¶¶ 157-58.)

17             In order to obtain a judicial order compelling agency action under the APA, a plaintiff

18     must show that there is a mandatory statutory obligation that the agency take the discrete

19     action requested by the plaintiff. *See* 5 U.S.C. § 706(1); *Norton*, 542 U.S. at 63-64. The

20     requirement of a discrete agency action "precludes . . .[a] broad programmatic attack" on

21     agency decisions. *Norton*, 542 U.S. at 64 (also noting that a plaintiff "'cannot seek wholesale

22     improvement of [a] program by court decree, rather than in . . . the halls of Congress, where

23     programmatic improvements are normally made. Under the terms of the APA, respondent

24     must direct its attack against some particular agency action [or inaction] that causes it harm'"

25     (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990))). In *Norton*, the United States

26     Supreme Court reviewed a statutory mandate that the Bureau of Land Management "continue

27     to manage [wilderness areas] . . . in a manner so as not to impair the suitability of such areas

28     for preservation as wilderness." *Id.* at 65. The *Norton* Court held that while the statute was

1  "mandatory as to the object to be achieved[,] . . . it le[ft] [the agency] a great deal of

2  discretion in deciding how to achieve it . . . [and] assuredly [did] not mandate, with the

3  clarity necessary to support judicial action," any discrete agency action. *Id.* at 66.

4        Arizona asserts that the Secure Fence Act requires the DHS to achieve and maintain

5  "operational control" of the United States-Mexico border and that the 2008 Appropriations

6  Act and the DHS Appropriations Act of 2010 ("DHS Appropriations Act") require the

7  Secretary to construct at least 700 miles of fencing and additional physical barriers, roads,

8  lighting, and other detection technology along the southwest border in order to obtain

9  operational control over the United States' borders. (Resp. at 13-14.) The Secure Fence Act

10  directs the Secretary to "take all actions the Secretary determines necessary and appropriate

11  to achieve and maintain operational control" over the United States border within eighteen

12  months. Secure Fence Act, Pub. L. No. 109-367, § 2, 120 Stat. 2638 (2006) (codified at 8

13  U.S.C. § 1701 note). The Secure Fence Act's "operational control" requirement does not

14  mandate a discrete action that the Court could compel under the APA. *See Norton*, 542 U.S.

15  at 64-66. The requirement that the Secretary achieve "operational control" does not mandate

16  any discrete agency action "with the clarity necessary to support judicial action." *See id.* at

17  66. Rather, the Act creates an objective and leaves the DHS and the Secretary with "a great

18  deal of discretion in deciding how to achieve it." *See id.* The APA does not empower the

19  Court to enter a general order compelling compliance with the broad statutory objective of

20  "operational control." *See id.* at 66-67.

21        The Illegal Immigration Reform and Immigrant Responsibility Act of 1996

22  ("IIRIRA"), as amended by the 2008 Appropriations Act, provides for the construction of

23  700 miles of fencing and additional infrastructure along the border "where [it] would be most

24  practical and effective." 2008 Appropriations Act, Pub. L. No. 110-161, Div. E, § 564, 110

25  Stat. 1844, 2091 (amending IIRIRA § 102(b)(1)(A)). Arizona argues that the Court can

26  compel the DHS and the Secretary to act to achieve operational control and complete 700

27  miles of fencing without specifying the manner of completion because "'[w]hen an agency

28  is compelled by law to act within a certain time period, but the manner of its action is left to

1    the agency's discretion, a court can compel the agency to act, but has no power to specify

2    what the action must be.'" (Resp. at 15 (quoting *Norton*, 542 U.S. at 65).)

3          Here, no deadline mandates completion of the fencing and infrastructure

4    developments or any required discrete action by a specific time. *See* IIRIRA, Pub. L. No.

5    104-208, Div. C, § 102, 110 Stat. 3009-546, 3009-555; 2008 Appropriations Act, Pub. L. No.

6    110-161, Div. E, § 564, 110 Stat. 1844, 2090-91 (amending IIRIRA § 102(b)(1)). In addition,

7    the IIRIRA and the Appropriations Acts provide the DHS and the Secretary with substantial

8    discretion in determining where to build fencing, where to use alternative infrastructure

9    improvements rather than fencing, and how best to develop a comprehensive program to

10   prevent illegal immigration. *See* 2008 Appropriations Act, Pub. L. No. 110-161, Div. E, §

11   564, 121 Stat. 1844, 2091 (stating "nothing in this paragraph . . . require[s] the Secretary .

12   . . to install fencing, physical barriers, roads, lighting, cameras, and sensors in a particular

13   location . . . if the Secretary determines that the use or placement of such resources is not the

14   most appropriate means to achieve and maintain operational control over the international

15   border"). While the construction of the fencing and infrastructure improvements may be

16   phrased in mandatory language, the IIRIRA and the Appropriations Acts leave the Secretary

17   and the DHS with a great deal of discretion in deciding how, when, and where to complete

18   the construction. *See id.* Moreover, the Acts do not mandate any discrete agency action with

19   the clarity to support a judicial order compelling agency action. *See Norton*, 542 U.S. at 66.

20         Arizona also alleges that the DHS has taken actions that are reviewable under §

21   706(2)(A) and that the government has changed its practices and policies. (Resp. at 16-17.)

22   While Arizona alleges that the DHS and the Secretary have acted arbitrarily and capriciously

23   and in excess of statutory limitations, Arizona does not identify any specific improper actions

24   in its allegations in the Counterclaims. (*See* Countercls. ¶ 155.) In addition, Arizona requests

25   only that the Court require the United States, the DHS, and the Secretary to comply with the

26   Secure Fence Act and the 2008 Appropriations Act by achieving and maintaining

27   "operational control" of the border and completing at least 700 miles of fencing along the

28   border. (Countercls. ¶ 157.) The APA permits review only of final agency actions; it does not

permit review of ongoing agency action where a plaintiff asserts that an agency has failed to act, but actually challenges the sufficiency of the agency's ongoing, non-final action. *See Ecology Ctr., Inc. v. U.S. Forest Serv.*, 192 F.3d 922, 926 (9th Cir. 1999). The allegations in the Counterclaims and the briefing do not indicate that the federal government has completely failed or refused to act under the Secure Fence Act or the 2008 Appropriations Act. Rather, Arizona appears to challenge the manner in which the government has acted to complete the infrastructure and fencing goals and achieve "operational control." It is not disputed that the federal government has taken substantial action to complete fencing along the border and increase additional infrastructure designed to stem illegal immigration. (*See* Countercls. ¶¶ 88, 152 (noting that the DHS established a target of 661 miles of fencing).) Arizona cannot challenge the sufficiency of the government's ongoing, non-final actions by attempting to frame its claims as a challenge to agency action wrongfully withheld or unreasonably delayed. *See Ecology Ctr.*, 192 F.3d at 926. In addition, no judicially manageable standards permit the Court to determine how or when the DHS or the Secretary should complete the fencing and infrastructure construction contemplated by the IIRIRA, the Secure Fence Act, and the Appropriations Acts. Arizona has failed to state a claim in Count One of its Counterclaims. Accordingly, Count One is dismissed.

### ii.   Count Three

In Count Three of the Counterclaims, Arizona alleges that the Counterdefendants have failed to adequately enforce the federal immigration laws and have adopted policies amounting to an abdication of their enforcement responsibilities. (Countercls. ¶¶ 180-82.) Arizona asserts that the Counterdefendants adopted policies and practices providing better protection to other states, filed suit to enjoin S.B. 1070, publicly stated that Immigration and Customs Enforcement may not respond to inquiries from Arizona regarding an individual's immigration status, failed to take action against jurisdictions with "sanctuary policies," prioritized their enforcement efforts, and considered changes in the interpretation and enforcement of immigration laws that would "result in meaningful immigration reform absent legislative action." (*Id.* ¶ 181.) Arizona also asserts that the Counterdefendants have "adopted

1   policies . . . that are so extreme that they amount to an abdication of the DHS's and the
2   DOJ's statutory responsibilities." (*Id.* ¶ 180.)

3          As noted above, the APA does not apply to permit judicial review or permit a
4   reviewing court to compel agency action where "agency action is committed to agency
5   discretion by law." 5 U.S.C. § 701(a)(2). "[A]gency refusals to institute investigative or
6   enforcement proceedings" are not reviewable because they fall under the "exception to
7   reviewability provided by § 701(a)(2) for action 'committed to agency discretion.'" *Heckler*,
8   470 U.S. at 838; *see also California*, 104 F.3d at 1094-95. The *Heckler* Court found that
9   agency enforcement decisions often involve the balancing of several factors uniquely within
10  the expertise of the agency, including determinations about whether a violation occurred and
11  the best use of agency resources. 470 U.S. at 831. Discretionary decisions not to enforce a
12  law may, however, be reviewable "'where it could justifiably be found that the agency has
13  consciously and expressly adopted a general policy that is so extreme as to amount to an
14  abdication of its statutory responsibilities.'" *Mont. Air Chapter No. 29, Ass'n of Civilian*
15  *Technicians v. Fed. Labor Relations Auth.*, 898 F.2d 753, 756 (9th Cir. 1990) (quoting
16  *Heckler*, 470 U.S. at 833 n.4).

17         The Court cannot properly review the enforcement decisions challenged by Arizona
18  in Count Three. The challenged "decision[s] not to prosecute or enforce, whether through
19  civil or criminal process, [are] decision[s] generally committed to an agency's absolute
20  discretion." *See Heckler*, 470 U.S. at 831; *see also California*, 104 F.3d at 1094. As actions
21  committed to agency discretion, these enforcement decisions are not subject to judicial
22  intervention pursuant to § 701(a)(2) of the APA. *See Heckler*, 470 U.S. at 838; *see also*
23  *California*, 104 F.3d at 1094-95. In *California*, the Ninth Circuit Court of Appeals found that
24  a state's claim that the United States failed to enforce immigration laws challenged
25  unreviewable discretionary agency actions. 104 F.3d at 1094-95. Here, Arizona attempts to
26  challenge the same types of enforcement decisions that the Ninth Circuit Court of Appeals
27  determined were discretionary and unreviewable in *California*. *See id.* In addition, the
28  enforcement decisions challenged by Arizona involve the balancing of factors uniquely

1   within the expertise of the DHS and the DOJ, including determinations about enforcement

2   priorities and the best use of agency resources. *See Heckler*, 470 U.S. at 831-32. The

3   challenged enforcement decisions are committed to agency discretion and are not subject to

4   judicial intervention. *See id.* at 838; *see also California*, 104 F.3d at 1094. Arizona's

5   allegations also do not indicate that the Counterdefendants have abdicated their statutory

6   responsibilities to enforce the immigration laws. *See California*, 104 F.3d at 1094. According

7   to Arizona's own allegations, the Counterdefendants continue to enforce federal immigration

8   laws in accordance with priorities established by the federal government. (*See* Countercls.

9   ¶¶ 181-82.) While Arizona may disagree with the established enforcement priorities,

10  Arizona's allegations do not give rise to a claim that the Counterdefendants have abdicated

11  their statutory responsibilities.[6] Arizona has failed to state a claim in Count Three of its

12  Counterclaims. Therefore, Count Three is dismissed.

### iii.   Count Four

14  In Count Four of the Counterclaims, Arizona alleges that the Counterdefendants have

15  failed to adequately reimburse Arizona for the cost of incarcerating undocumented criminal

16  aliens. (Countercls. ¶¶ 187-91.) Arizona seeks a declaration that the DOJ or the Attorney

17  General's method of calculating reimbursements under SCAAP violates federal law because

18  it does not equal the actual costs of incarceration. (*Id.* ¶ 192(c).) Arizona also requests a

19  declaration that the Attorney General has failed to prioritize the federal incarceration of

20  undocumented criminal aliens. (*Id.* ¶ 192(d).) In addition, Arizona seeks a declaratory

21  judgment interpreting 8 U.S.C. § 1231(i), determining the DOJ and Attorney General's

---

[6] Arizona also argues that review is available because the federal government has modified long-standing agency policy. (Resp. at 23-24.) While it is true that courts may review a change in agency policy, regulations, or rules, *see Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 41-42 (1983), that does nothing to change the fact that the decisions challenged by Arizona in the Counterclaims are enforcement decisions. These enforcement decisions, including the decisions to prioritize agency resources and act on agency determined priorities, are committed to the discretion of the Counterdefendants. *See California*, 104 F.3d at 1094; *Heckler*, 470 U.S. at 831.

1    reimbursement obligations and statutory responsibilities, determining whether Arizona has

2    a right to reject future SCAAP allocations, and determining whether the cost of federal

3    incarceration is subject to the appropriations section found in 8 U.S.C. § 1231. (*Id.* ¶ 192(a),

4    (b), (e), (f).)

5        SCAAP allows the federal government to reimburse states for the costs of

6    incarcerating undocumented criminal aliens. 8 U.S.C. § 1231(i)(1)(A). Compensation under

7    SCAAP is based on "the average cost of incarceration of a prisoner in the relevant [s]tate as

8    determined by the Attorney General." *Id.* § 1231(i)(2). Limited congressional appropriations

9    prevent states from receiving SCAAP reimbursements that equal their total incarceration

10   costs. (*See* Countercls. ¶¶ 68-69, 106.)

11       Arizona is not entitled to a declaratory judgment that the DOJ or the Attorney

12   General's calculation method violates federal law. Under SCAAP, the calculation of the

13   average cost of incarceration is explicitly committed to the discretion of the Attorney

14   General. 8 U.S.C. § 1231(i)(2) ("Compensation . . . shall be the average cost of incarceration

15   of a prisoner in the relevant State *as determined by the Attorney General*." (emphasis

16   added)). The statute does not provide any manageable standards for the Court to review the

17   Attorney General's method for calculating the average cost of incarceration. *See id.* As a

18   result, the APA does not permit judicial review of the Attorney General's calculation

19   methods. *See Heckler*, 470 U.S. at 830.[7] Arizona is not entitled to a declaratory judgment that

20   the DOJ or the Attorney General's calculation method violates federal law.

21

22       [7] To the extent Arizona is attempting to challenge other decisions resulting in less than

23   full reimbursement, courts have determined that the Attorney General has the discretion to
     reimburse states on a pro rata basis and that both the federal reimbursement and incarceration

24   options are limited by the funds actually appropriated by Congress. *See California v. Dep't*

25   *of Justice*, 114 F.3d 1222, 1225-26 (D.C. Cir. 1997) (reviewing the government's obligations
     under 8 U.S.C. § 1252(j), the previous codification of the reimbursement obligation). Arizona

26   does not allege that the Attorney General has failed to reimburse the states to the extent
     possible with the appropriated funds or that the Attorney General has failed to reimburse

27   Arizona on a pro rata basis for the average costs of incarceration as determined by the

28   Attorney General.

1    In addition, the Court declines to provide the additional declaratory interpretation of

2   the statutory law requested by Arizona. The Declaratory Judgment Act provides, "In a case

3   of actual controversy within its jurisdiction . . . any court of the United States, upon the filing

4   of an appropriate pleading, may declare the rights and other legal relations of any interested

5   party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C.

6   § 2201(a). The Declaratory Judgment Act's permissive language "confers . . . discretion on

7   the courts rather than an absolute right upon the litigant." *Pub. Serv. Comm'n of Utah v.*

8   *Wycoff Co.*, 344 U.S. 237, 241 (1952); *see also Leadsinger, Inc. v. BMG Music Publ'g*, 512

9   F.3d 522, 533 (9th Cir. 2008) ("Federal courts do not have a duty to grant declaratory

10   judgment; therefore, it is within a district court's discretion to dismiss an action for

11   declaratory judgment."). "In the declaratory judgment context, the normal principle that

12   federal courts should adjudicate claims within their jurisdiction yields to considerations of

13   practicality and wise judicial administration." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 288

14   (1995).

15    Arizona asks the Court to interpret the statutory framework for SCAAP

16   reimbursements without asserting that the federal government has violated any right or

17   explaining how a declaration by this Court would settle any dispute between the parties. (*See*

18   Countercls. ¶ 192.)[8] Here, Arizona does not present the Court with a concrete controversy,[9]

19   and the declaration requested by Arizona would not provide Arizona with any real relief.

20   Therefore, the Court declines to enter the requested declaratory judgment. *See Rio Grande*

22    [8] In fact, 28 U.S.C. § 1231(h) explicitly provides, "Nothing in this section shall be
23   construed to create any substantive or procedural right or benefit that is legally enforceable
     by any party against the United States or its agencies or officers or any other person." As a
24   result, it is not clear that Arizona has any rights under 8 U.S.C. § 1231 that it can seek to
     vindicate.

26    [9] While Arizona requests a declaratory judgment interpreting the government's
     obligations under SCAAP, Arizona's allegations do not establish an actual controversy.
27   "There being no controversy . . . the declaratory judgment is not only worthless to [Arizona],
     it is seemingly worthless to all the world." *Steel Co. v. Citizens for a Better Env't*, 523 U.S.
28   83, 106 (1998).

1   *Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1109-10 (10th Cir. 2010) (finding

2   that "what makes a declaratory judgment action a proper judicial resolution of a case or

3   controversy rather than an advisory opinion is the settling of some dispute which affects the

4   behavior of the defendant toward the plaintiff" (quotation and citation omitted)); *DeNovellis*

5   *v. Shalala*, 124 F.3d 298, 313-14 (1st Cir. 1997) (finding that a district court acted within its

6   discretionary power in deciding to refrain from a trial where the court could not award any

7   relief).

8   **III.   CONCLUSION**

9          For the foregoing reasons the Court grants the Counterdefendants' Motion to Dismiss

10  and dismisses Arizona's Counterclaims in their entirety.

11         **IT IS THEREFORE ORDERED** granting the Counterdefendants' Motion to

12  Dismiss Counterclaims (Doc. 154) and dismissing Arizona's Counterclaims.

13

14         DATED this 21st day of October, 2011.

15

16

17  _____

18                  Susan R. Bolton
                    United States District Judge

19

20

21

22

23

24

25

26

27

28